THOMAS MELONE (*pro hac vice*)
MICHAEL MELONE (*pro hac vice*)
Allco Renewable Energy Limited
14 Wall St., 20th Floor
New York, NY 10005
Telephone: (212) 681-1120
Facsimile: (801) 858-8818
Thomas.Melone@AllcoUS.com
MJMelone@AllcoUS.com

*Attorneys for Plaintiff*

FUTTERMAN DUPREE DODD CROLEY MAIER LLP
JAMIE L. DUPREE (158105)
JAIME G. TOUCHSTONE (233187)
180 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3906
Facsimile: (415) 399-3838
jdupree@fddcm.com
jtouchstone@fddcm.com

*Local Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| WINDING CREEK SOLAR LLC, | Case No. C 13-04934 RS |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL POWER ACT, THE PUBLIC UTILITY REGULATORY POLICIES ACT OF 1978 AND FEDERAL ENERGY REGULATORY COMMISSION REGULATIONS** |
| v. | |
| MICHAEL PEEVEY, MICHAEL FLORIO, CATHERINE SANDOVAL, CARLA PETERMAN AND MICHAEL PICKER, in their official capacity as Commissioners of the California Public Utilities Commission, | |
| Defendants. | **Action Filed: October 24, 2013** |

## NATURE OF THE ACTION

1.      Promoting resources that generate renewable energy is unquestionably a societal imperative.  In January 2014, scientists from the University of New South Wales and from the Universite´ Pierre et Marie Curie in Paris published a report concluding that temperatures are on

course to rise at least 4 degrees Celsius by the end of the century.[1]  While the debate will continue as to how high the Earth's temperatures will rise by the end of this century, there is little doubt that the effect of rising temperatures will be devastating.  With political gridlock at the national level, legal steps to arrest climate change must come from existing tools as well as at the state and local level.

2.     State governments have various tools to promote the development of renewable energy generating facilities.  Using their traditional power to regulate the type and mix of facilities used for the generation of electric energy, state governments can require utilities, subject to their jurisdiction, to obtain a certain percentage of their energy from renewable resources, including requiring a certain percentage be obtained under long-term power purchase agreements ("PPAs").  State governments can also enact net metering laws designed to increase the use of renewable energy.

3.     State governments can establish competitive procedures that regulated utilities must follow when the utility seeks to acquire energy and capacity.  States may also promote renewable energy by providing tax incentives, easing environmental regulations, fast-tracking permits and zoning approval, and providing a myriad of other similar incentives.

4.     States can promote renewable energy generating resources that are located within a utility's load serving area on the basis of reliability and a requirement that all resources, whether located in-state or out-of-state, deliver their energy to the relevant load area.  Such a policy is also economically beneficial to local economies because it creates jobs and increases the tax base.

5.     Although States have various tools to promote renewable energy, it is well-established that States may not promote renewable resources by regulating wholesale electricity sales, because any such regulation is preempted by federal law. When Congress passed the Federal Power Act[2] (the "FPA") in 1935, Congress "occupied the field" of wholesale electricity

---

[1] Peter Hannam, *Climate change:  Planet to warm by 4 degrees by 2100,* The Sydney Morning Herald (January 1, 2014, 5:13 AM), http://www.smh.com.au/environment/climate-change/climate-change-planet-to-warm-by-4-degrees-by-2100-20131231-304nw.html#ixzz2pAHhwEDc.

[2] 16 U.S.C., Ch.12.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

FIRST AMENDED COMPLAINT
Case No. C 13-04934 RS

1    sales and gave the Federal Energy Regulatory Commission ("FERC") exclusive jurisdiction over

2    all wholesale electricity rates, charges, and terms. In so doing, the FPA preempted any State

3    regulation within the field of wholesale electricity sales.

4         6.    The only exception to the blanket rule prohibiting States from engaging in any

5    type of regulation or setting the wholesale price for energy is if the State government is acting

6    under its authority under the Public Utility Regulatory Policies Act of 1978 ("PURPA"), *see* 16

7    U.S.C. § 824a-3.

8         7.    PURPA is designed to encourage the development of alternative energy sources.

9    *See* 16 U.S.C. § 824a-3(a).

10        8.    The FERC is charged with establishing regulations to implement PURPA, and

11   specifically the requirement that electric utilities must purchase power from qualifying power

12   production facilities ("Qualifying Facilities" or "QFs"). 16 U.S.C. § 824a-3(a)(1).

13        9.    State regulatory authorities such as the California Public Utilities Commission

14   ("CPUC"), in turn, are charged with implementing FERC's regulations. 16 U.S.C. § 824a-3(f).

15        10.   With no real national renewable energy policy on the horizon, the "must buy"

16   obligation imposed upon utilities under PURPA is the single best chance for the rapid

17   deployment of renewable energy in the United States.  In order to be successful, however, the

18   FERC's rule that QFs must receive a rate *equal to* a utility's full long-term avoided costs must be

19   enforced.

20        11.   The Plaintiff's solar projects need to enter into long-term PPAs in order to obtain

21   financing to allow the projects to be built.  Without a long-term PPA, the Plaintiff's projects will

22   not be built.

23        12.   The need for a PPA is one of the reasons for the establishment of California's

24   Renewable Market Adjusting Tariff (or "Re-MAT"), which the Defendants assert was

25   established pursuant to the CPUC's authority under PURPA. The Re-MAT establishes a program

26   that provides certain projects a PPA at a fixed rate for a term of 20 years.

27        13.   The rate established by the Defendants for the Re-MAT program, however, does

28   not properly reflect the long-run rate to which a QF is entitled under 18 C.F.R.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

FIRST AMENDED COMPLAINT
Case No. C 13-04934 RS

§292.304(d)(2)(ii).  In addition, the Defendants established conditions to a QF's entitlement for a PPA under the Re-MAT program that are not permissible under PURPA.

14. In addition, outside of the Re-MAT, the Defendants have eliminated a QFs ability to obtain a PPA using the long-run rate provided for in 18 C.F.R. §292.304(d)(2)(ii).

15. Winding Creek Solar LLC ("Winding Creek" or "Plaintiff") brings this civil action to enforce federal statutes, the FPA, the PURPA, and the FERC's regulations implementing PURPA, *see* 18 C.F.R. pt. 292.  Plaintiff brings this civil action for (i) violations of the Supremacy Clause of the United States Constitution related to the FPA and PURPA as the result of the Defendants' fixing of a wholesale rate for electricity and capacity in violation of the FPA and PURPA, and (ii) enforcement of the requirements of PURPA.

16. As demonstrated below, Defendants, who are the Commissioners of the CPUC, have (i) established a policy of not allowing a qualifying power production facility as defined in 16 U.S.C. §796(17) to elect the long-run rate established by 18 C.F.R. §292.304(d)(2)(ii), and (ii) has issued a series of orders establishing a program called the Re-MAT which establishes a fixed rate for wholesale power in violation of the FPA and PURPA.

17. This action seeks a declaration that the Defendants violated the Supremacy Clause when they fixed the wholesale price of energy outside of their limited authority under PURPA. This action also seeks appropriate injunctive relief (i) to remedy the constitutional violation and invalidate the contracts that have been executed under California's Re-MAT, or alternatively, adjust the rate paid under those contracts upwards to properly reflect long-term avoided costs, (ii) to cause the Defendants to order the execution of PPAs with applicants, one of which is the Plaintiff, under the Re-MAT at a rate that properly reflects long-term avoided costs, (iii) to enforce the requirements of PURPA that QFs are entitled to a rate equal to a utility's long-term avoided costs, (iv) to invalidate the conditions imposed under the Re-MAT to a PPA that are not permitted by PURPA, and (v) to require the Defendants to bring the CPUC's practices into compliance with PURPA and FERC's PURPA regulations. In so doing, this action seeks to alleviate the past harm suffered by Plaintiff and other solar project owners, operators and developers and to prevent the future harm that Plaintiff and other solar project owners, operators

1   and developers will suffer if the Defendants are permitted to continue to take actions contrary to

2   federal law.

3                               **JURISDICTION AND VENUE**

4          18.     Section 210(h)(2)(B) of PURPA, 16 U.S.C. § 824a-3(h)(2)(B), permits any

5   qualifying small power producer, among others, to petition FERC to bring an enforcement action

6   under section 210(h)(2)(A), 16 U.S.C. § 824a-3(h)(2)(A).

7          19.     Where FERC refuses to bring an enforcement action within 60 days of the filing

8   of such a petition, the petitioner may, under section 210(h)(2)(B) of PURPA, 16 U.S.C. § 824a-

9   3(h)(2)(B), bring its own enforcement action directly against a State regulatory authority in the

10  appropriate United States district court.

11         20.     On June 13, 2013, Plaintiff petitioned FERC to bring an enforcement action under

12  section 210(h)(2)(A), 16 U.S.C. § 824a-3(h)(2)(A), against the CPUC.   The petition was

13  docketed as FERC Docket No. EL13-71.  On August 12, 2013, FERC gave notice that FERC

14  declined to initiate an enforcement action pursuant to section 210(h)(2)(A) of PURPA. *See,*

15  *Winding Creek Solar LLC*, 144 FERC ¶ 61,122 (2013).

16         21.     This Court has jurisdiction over this action pursuant to PURPA section

17  210(h)(2)(B), 16 U.S.C. § 824a-3(h)(2)(B), which authorizes Plaintiff to bring an enforcement

18  action in a United States district court against a State regulatory authority to enjoin violations of

19  and ensure compliance with PURPA and FERC's PURPA regulations now that the FERC has

20  given notice that it would not.

21         22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

22  § 1331 because the action brings claims under the United States Constitution and federal law.

23         23.     The Court is empowered to grant declaratory relief by 28 U.S.C. §§ 2201 and

24  2202 and Rule 57 of the Federal Rules of Civil Procedure and *Ex Parte Young*, 209 U.S. 123

25  (1908).

26         24.     This Court is empowered to grant preliminary and permanent injunctive relief by,

27  *inter alia*, 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

28  / / /

25.     16 U.S.C. §825p provides that District Courts of the United States shall have exclusive jurisdiction of violations of the FPA or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty.

26.     Venue in this Court is proper because the Defendants in their capacity as Commissioners of the CPUC are located in this district and are in control of the State regulatory authority responsible for implementing PURPA in this district. The Defendants' acts and practices that form the basis for the violations alleged in this complaint occurred in this district.

27.     INTRADISTRICT ASSIGNMENT:  Assignment to the San Francisco division of this Court is proper because the Defendants are located in San Francisco and the Defendants' acts and practices that form the basis for the violations alleged in this complaint occurred in San Francisco.

### THE PARTIES

28.     Winding Creek Solar LLC is the owner and developer of a 1.0 megawatt ("MW") solar project located at 17016 North Jack Tone Road in Lodi, California, and is also the owner and developer of a 3.0MW project in Templeton, California.  Allco Finance Limited is the sole member of Plaintiff.  Winding Creek Solar LLC is also the operator of an existing and fully constructed 1.5MW solar generating facility at 17016 North Jack Tone Road in Lodi, California. The 1.5MW project is in commercial operation and delivering and selling electricity and capacity to Pacific Gas and Electric Company ("PG&E") under a 20-year power purchase agreement.  The 1.5MW solar electric generating facility constitutes a "small power production facility" within the meaning of Section 210(l) of PURPA.  *See,* Section 3(17) of the FPA, 16 U.S.C. 796(17). The 1.5MW facility of which Plaintiff is the operator has been self-certified as a QF in FERC Docket No.  QF13-364-000.  The Plaintiff is therefore a "qualifying small power producer" within the meaning of Section 210(h)(2)(B) of PURPA.

29.     The Defendants are the Commissioners of the CPUC, which is the State regulatory authority with ratemaking jurisdiction with respect to the sale of retail electric energy in California and the responsibility to carry out certain PURPA-related functions, including, under PURPA section 210(f), 16 U.S.C. § 824a-3(f), the responsibility to implement FERC's

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

PURPA regulations.

## STATUTORY AND REGULATORY FRAMEWORK
## APPLICABLE TO ALL COUNTS

30.     Under the Supremacy Clause of the United States Constitution, a state law, rule or tariff is preempted when Congress intends federal law to occupy the field or when state regulation stands as an obstacle to the accomplishment of Congress's goals. Under Part II of the FPA, 16 U.S.C. § 824(b), Congress has granted FERC the exclusive authority to regulate in the wholesale electricity field. Only FERC may set wholesale rates and regulate wholesale markets.

31.     Attempts by States to fix wholesale power rates, even for the most laudable goals or under the guise of state jurisdiction over generation facilities and a utility's mix of generation sources, have been consistently rejected.  In the most widely known case during the past few years, which was brought by the CPUC, *California Public Utilities Commission*, 132 F.E.R.C. P61,047 (2010) at ¶64, the FERC re-iterated that, except with respect to QFs under PURPA, there is no room for a State to take any action regulating the wholesale price of energy for a generation facility, such as what the Defendants did here:

> The Commission's authority under the FPA includes the exclusive jurisdiction to regulate the rates, terms and conditions of sales for resale of electric energy in interstate commerce by public utilities. [*citing* 16 U.S.C. §§ 824, 824d, 824e; *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988)]. While Congress has authorized a role for States in setting wholesale rates under PURPA, *Congress has not authorized other opportunities for States to set rates for wholesale sales in interstate commerce by public utilities, or indicated that the Commission's actions or inactions can give States this authority*. . . . . Because the CPUC's AB 1613 Decisions are setting rates for wholesale sales in interstate commerce by public utilities, we find that they are preempted by the FPA. (Emphasis added.)

32.     The only role for the States in regulating wholesale energy prices in a contract is if a State is acting pursuant to its authority under PURPA.  It is only under PURPA that a State can require a utility to purchase energy at a specified price, and in such a case, the State must make a determination that the specified price equals the utility's avoided costs.

33.     Congress enacted PURPA in 1978 as part of a package of legislation designed to address a nationwide energy crisis. *See, FERC v. Mississippi*, 456 U.S. 742, 745, 750 (1982).

7

1   "Congress believed that increased use of these sources of energy would reduce the demand for

2   traditional fossil fuels," but it recognized that "traditional electricity utilities were reluctant to

3   purchase power from, and to sell power to, the nontraditional facilities," and this reluctance

4   impeded the development of such facilities. *FERC v. Mississippi*, 456 U.S. at 750.

5        34.     In section 210(a) of PURPA, 16 U.S.C. § 824a-3(a), Congress required FERC to

6   promulgate "such rules as it determines necessary to encourage cogeneration and small power

7   production"[3] development. *See generally* 18 C.F.R. pt. 292.  Accordingly, Congress specifically

8   directed FERC to issue rules requiring electric utilities to purchase electric energy from such

9   facilities. 16 U.S.C. § 824a-3(a)(1). In its duly promulgated regulations, FERC interpreted

10   section 210(a) of PURPA, 16 U.S.C. § 824a-3(a), as imposing on electric utilities an obligation

11   to purchase all electric energy and capacity made available from qualifying cogeneration and

12   small power production facilities. *See* 18 C.F.R. § 292.303.

13        35.     Pursuant to 18 C.F.R. §292.304(a)(4) the rate for purchases from a new small

14   power production facility must be at the utility's *full* avoided costs "i.e., the cost the utility would

15   have incurred had it generated the electricity itself or purchased the electricity from another

16   source."[4]

17        36.     The FERC's regulations provide Qualifying Facilities with an option to sell

18   energy only or capacity and energy to electric utilities pursuant to a "legally enforceable

19   obligation." *See,* 18 C.F.R. § 292.304(d).

20        37.     18 C.F.R. §292.304(d) provides that the QF (not the utility) shall have the option

21   to sell at either a rate based upon the utility's avoided costs calculated at the time of delivery

22   (commonly referred to a short-run avoided cost rate), or a long-run rate based upon the projected

23   avoided costs calculated at the time the obligation is incurred over a specified longer term.[5]  The

---

[3] A cogeneration facility produces both electric energy and steam or some other form of useful energy, such as heat. 16 U.S.C. § 796(18)(A). A small power production facility uses biomass, waste, or renewable resources (such as wind, water, or solar energy) to produce no more than 80 megawatts of electric power. 16 U.S.C. § 796(17)(A).

[4] *See, Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 404 (1983).

[5] *See, JD Wind 1 LLC*, 130 FERC ¶61,127 (2010) at P23 (stating "[t]he FERC has . . . consistently affirmed the right of QFs to long-term avoided cost contracts or other legally enforceable obligations with rates determined at the time the obligation is incurred, even if the avoided costs at the time of delivery ultimately differ from those calculated at the time the

FIRST AMENDED COMPLAINT
Case No. C 13-04934 RS

FERC has made it clear that the option of what pricing arrangement to use is that of the QF.[6]

38.     In promulgating 18 C.F.R. § 292.304(d)(2), the FERC explained that it used the term "legally enforceable obligation" in order to prevent an electric utility from circumventing the mandatory purchase obligation by refusing to negotiate or enter into a contract.[7]

39.     The FERC also has issued regulations establishing criteria, including capacity size and fuel use, and procedures for small power production facilities and other facilities to be certified as Qualifying Facilities. *See* 18 C.F.R. §§ 292.203(a), 292.204.

40.     Pursuant to 18 C.F.R. §292.304(a)(4) the rate for purchases from a new QF must be at the utility's *full* avoided costs "i.e., the cost the utility would have incurred had it generated the electricity itself or purchased the electricity from another source."[8]

41.     PURPA's legislative history and the FERC's regulations make it clear that the full avoided costs are determined at the margin, *i.e.*, the highest marginal cost that is being avoided.[9]

42.     The FERC has observed that "[w]hile such rates do not result in direct benefits to ratepayers, they nevertheless are fully consistent with PURPA section 210(b)'s requirement that the rates be just and reasonable to ratepayers and in the public interest."[10]   The FERC has also observed that paying QFs "full avoided cost rates would nevertheless benefit ratepayers by decreasing reliance on scarce fossil fuels and resulting in the more efficient use of energy."

---

obligation is originally incurred.")
[6] *See, JD Wind 1 LLC, supra,* at P23 (stating "[t]he FERC's regulations, from the beginning, have given QFs the option of choosing to have rates calculated at the time the obligation is incurred. The intention of the FERC was to enable a QF 'to establish a fixed contract price for its energy and capacity at the outset of its obligation.' The FERC recognized that: [I]n order to be able to evaluate the financial feasibility of a cogeneration or small power production facility, an investor needs to be able to estimate, with reasonable certainty, the expected return on a potential investment before construction of a facility.")
[7] *Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978*, Order No. 69, FERC Stats. & Regs. ¶ 30,128, at 30,880, *order on reh'g*, Order No. 69-A, FERC Stats. & Regs. ¶ 30,160 (1980), *aff'd in part and vacated in part, Am. Elec. Power Serv. Corp. v. FERC*, 675 F.2d 1226 (D.C. Cir. 1982), *rev'd in part, Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402 (1983).
[8] *See, Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 404 (1983).
[9] *See*, Order No. 69: Final Rule Regarding the Implementation of Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214, 12,216 (Feb. 19, 1980) (codified at 18 C.F.R. pt. 292) ("Order No. 69").
[10] *See, Southern California Edison*, 70 F.E.R.C. P61,215, 61,675 (1995). *See also*, *Am. Paper*, 461 U.S. at 413 (stating "[t]he FERC plainly has the authority to adopt a full-avoided-cost rule, for PURPA sets full avoided cost as the maximum rate that the FERC may prescribe.")

43.     Section 210(f) of PURPA, 16 U.S.C. § 824a-3(f), requires State regulatory authorities and non-regulated electric utilities to implement FERC's PURPA regulations.

44.     Section 210(h)(2)(A) of PURPA, 16 U.S.C. § 824a-3(h)(2)(A), permits FERC to enforce the requirement of PURPA section 210(f) – requiring implementation of FERC's PURPA regulations – against any State regulatory authority or non-regulated electric utility.

45.     As provided in PURPA section 210(h)(2)(A), 16 U.S.C. § 824a-3(h)(2)(A), FERC's PURPA regulations are treated as rules enforceable under section 314 of the Federal Power Act, 16 U.S.C. § 825m.

**FACTS APPLICABLE TO ALL COUNTS**

46.     On December 21, 2010, the CPUC issued Decision (D.) 10-12-035 adopting a settlement involving Southern California Edison Company ("SCE"), PG&E, and San Diego Electric and Gas Company ("SDG&E") and other parties with respect to certain issues involving QFs.   As a result of that settlement, the CPUC has adopted a policy eliminating a QFs entitlement to the long-run rate specified by 18 C.F.R. §292.304(d)(2)(ii), except for facilities that qualified for either the feed-in-tariff ("FIT") for renewable energy generators established by CPUC D. 07-07-027 or the FIT established under Cal. Pub. Utils. Code Section 399.20.

47.     Cal. Pub. Utils. Code Section 399.20, as originally enacted, mandated that each investor-owned utility ("IOU" or the "California Utilities") in California enter into PPAs up to a specific allocation for each utility from renewable energy facilities whose size did not exceed 1.5MW.  The parallel FIT adopted in D. 07-07-027 as originally adopted applied only to SCE and PG&E.

48.     The PPA rate for both FITs was based upon the market price referent ("MPR") which was determined based upon the cost of fossil fuel generation that would be avoided by the IOUs as a result of entering into the PPAs with the renewable energy facilities.  The MPR is a long-run avoided cost rate, not a short-run avoided cost rate.  *See*, D.11-04-033, 2011 Cal. PUC LEXIS 250, *42 (2011)(stating "the MPR is intended to represent the long term market price of electricity for fixed price contracts".)

/ / /

49.     In 2008, and again in 2011, the California legislature amended Cal. Pub. Utils. Code Section 399.20. The amendments (1) increased the size of the facilities that qualified for the program to 3.0MW, (2) eliminated the requirement that the owner be a water or wastewater agency (thus making that FIT full program capacity available to all sellers), and (3) asked the CPUC to implement, if permitted by Federal law, a methodology that would replace the MPR and that such rate should ensure ratepayer indifference, i.e., a market avoided cost long-run rate.

50.     CPUC Decisions D.12-05-035 (as amended by D.13-01-041)(the "Conformed Decision"), D.13-01-041 and D.13-05-034 (collectively, the "Re-MAT Decisions"), adopt the Re-MAT program and create an adjusting auction rate mechanism that is the CPUC's attempt to comply with the market rate and ratepayer indifference provisions of Cal. Pub. Utils. Code Section 399.20.

51.     In the Re-MAT Decisions, the CPUC fixed the wholesale price of energy but did not make any attempt to determine the avoided costs that would be realized by the IOUs from the interconnection of the renewable energy QF as required by PURPA.  Rather the Re-MAT Decisions make the theoretical leap that the PPA rate based upon the adjusting auction rate mechanism equals *as a matter of Federal law* the utility's long-term avoided costs under PURPA that would be realized by interconnecting that QF.  The CPUC stated:

> As discussed above, FERC's recent interpretations in response to a petition for declaratory order also support consideration of additional pricing options, as long as the facilities are QFs and the pricing options are an avoided cost. Therefore, it is reasonable for us to shift the price away from the MPR to the renewable power market. *We further find that a FiT price that reflects the renewable market ultimately more fully reflects avoided costs under federal law*.[11]

That legal conclusion as to how PURPA can be implemented forms the foundation of the Re-MAT program.

52.     Under the FPA, it is only the FERC that has the right to regulate wholesale power prices.  The only area in which a State has the authority to regulate wholesale prices is if the State is acting under the authority granted to it under PURPA.[12]

---

[11] *See, Conformed Decision*, at p.40 (emphasis added.)

[12] *See, California Pub. Utils. Comm'n*, 132 FERC ¶61,047 (2010) ("*CPUC I*"), *California Pub. Utils. Comm'n*, 133 FERC ¶61,059 (2010)("*CPUC II*"), and *California Pub. Utils. Comm'n*, 134

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

53.     The Re-MAT sets a fixed price for wholesale power and can only be valid, and not preempted, if the Re-MAT qualifies as a valid exercise of a State's authority under PURPA.

### INJURIES SOUGHT TO BE REDRESSED

54.     The Plaintiff's 1.0MW and 3.0MW solar projects need to enter into long-term PPAs in order to obtain financing to allow the projects to be built.  Without a long-term PPA or a legally enforceable obligation for a PPA, Plaintiff's 1.0MW and 3.0MW projects will not be built.

55.     The need for a PPA is one of the reasons for the enactment of Cal. Pub. Utils. Code §399.20, under which the Re-MAT has been adopted.

56.     Plaintiff is entitled under PURPA to a legally enforceable obligation to sell energy and capacity at the long-run rate.

57.     Starting on June 7, 2013, and ending on July 22, 2013, the Plaintiff and other affiliates of Plaintiff requested that PG&E, which is a utility subject to the jurisdiction of the Defendants, execute long-term PPAs for various solar energy facilities including Plaintiff's 1.0MW facility located in Lodi, California, and at the same time offered to sell all energy and capacity from those facilities to PG&E under the must-buy obligation of PURPA as well as under Cal. Pub. Utils. Code §399.20.

58.     The long-term 20-year avoided cost PPA rate in effect in California at the time was a fixed per megawatt-hour rate based upon the year the facility actually begins commercial operation.  That rate was $97.53/MWh for facilities beginning commercial operation in 2014, $101.32/MWh for 2015, and $105.09/MWh for 2016.

59.     PG&E refused to enter into a PPA for those projects at those rates under PURPA on the basis that the Defendants had eliminated the availability of a long-run rate under PURPA, and that PG&E's only obligations under PURPA were to pay a short-run avoided cost rate.

60.     The difference between a short-run avoided cost ("SRAC") rate and a long-run avoided cost ("LRAC") rate is significant, both in terms of the price paid and the fact that a fixed long-term rate is necessary for a project to be financed and built.  A SRAC rate is the as-available

FERC ¶61,044 (2011).

rate specified by 18 C.F.R. §292.304(d)(2)(i).  The LRAC rate is the long-run rate specified by 18 C.F.R. §292.304(d)(2)(ii).  The SRAC rate is determined from time to time at the actual market rate for energy and capacity at the time of delivery.  The SRAC rate varies as the energy markets vary.  The LRAC rate differs from the SRAC rate in a few significant respects.  First, a LRAC rate requires a forecast of future energy prices.  Second, the LRAC requires a forecast for future avoided costs for capacity, and other costs that would be avoided by the utility because the QF facility is committing for a term of 20 years.

61.     Attached as Exhibit C is a presentation prepared by the CPUC's energy division in 2012 which addresses some issues related to avoided costs and some of the history of avoided costs in California.  Page 12 of the presentation provides a good example of the difference between short and long term avoided capacity costs.  At the time of the presentation, the short term avoided costs would be low because there was a large capacity surplus, but in the long-run the avoided costs would be much higher.  It is those types of differences that must be accounted for in a properly calculated LRAC rate under 18 C.F.R. §292.304(d)(2)(ii).  Similar differences would result in the energy price.

62.     Even if Plaintiff receives a legally enforceable obligation or a PPA under the Re-MAT program, Plaintiff is injured because the PPA rate that it would receive would be lower than the relevant utility's full long-term avoided costs, and lower than the rate that Plaintiff would have been entitled to receive in June 2013 but for Defendants' rule prohibiting the LRAC rate under 18 C.F.R. §292.304(d)(2)(ii).

63.     Plaintiff has suffered an injury in fact because the Plaintiff as a qualifying small power producer and participant in energy markets has a legally protected interest to be free from unlawful actions of State officials related to those markets.  Plaintiff as a qualifying small power producer has specific protected interests under the FPA and PURPA with respect to selling energy to utilities, such as PG&E.  Those specific interests include the right of the Plaintiff to sell energy and capacity, and to obtain a legally enforceable obligation to sell energy and capacity, to PG&E at PG&E's long-term avoided costs as such costs were in effect at the time that Plaintiff offered to commit to sell the energy and capacity to PG&E.  Plaintiff's rights include the right to

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

1    prevent State officials from circumventing those rights by promulgating rules or engaging in

2    practices in violation of the Constitution, the FPA or PURPA.

3        64.   The Plaintiff has suffered an injury in fact because many costs incurred in

4    developing its solar projects are now lost because of Defendants' unlawful actions.

5        65.   The Plaintiff has suffered an injury in fact because, by the Defendants'

6    promulgating rules or engaging in practices that eliminate a QFs ability to obtain a legally

7    enforceable obligation at a LRAC, PG&E was unwilling to enter into the PPAs proffered by

8    Plaintiff.  As a result, Plaintiff's facilities will not be able to obtain financing and will not be able

9    to be built and Plaintiff has lost revenue that it otherwise would have received.

10       66.   It is likely that the Plaintiff's injuries will be redressed by a favorable decision.  If

11   the Plaintiff receives a favorable decision in this case, Plaintiff would then be able to obtain a

12   PPA at a proper LRAC rate, which will allow its projects to be financed and built.

13       67.   A favorable decision for Plaintiff in this case would redress the injuries to

14   Plaintiff, and the future injuries that would result from unlawful State action interfering with

15   Plaintiff's participation in the energy markets and Plaintiff's rights under the FPA and PURPA.

16       68.   Moreover, unless a favorable decision is issued to Plaintiff in this case, the

17   Defendants will more than likely continue to take action in violation of the FPA, PURPA and the

18   Supremacy Clause which will likely adversely affect Plaintiff's participation in energy markets

19   and its ability to develop its current projects and additional projects that would be QFs.

20       69.   An injunction is necessary and appropriate because Defendants in their official

21   capacity are acting in, and will continue to act in, violation of the Constitution and federal law.

22   Without an injunction from this Court, the Defendants will continue to act in violation of the

23   FPA, PURPA and the Supremacy Clause. This complaint seeks to prevent those future unlawful

24   acts.   For that reason, the Plaintiff seeks an injunction requesting that the Defendants be

25   restrained from acting in contravention of controlling federal law in the future.

26       **THE RE-MAT DECISIONS AND THE CONDITIONS IMPOSED**

27       70.   The initial Re-MAT price is fixed at $89.23/MWh.  The Defendants fixing that

28   price constitutes the setting of the wholesale price for energy.  As such it is only valid if it results

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

1     from a proper implementation of PURPA.

2          71.     That initial Re-MAT fixed price was determined by reference to recent pricing

3     received by the IOUs under the Renewable Auction Mechanism or "RAM" program, which is a

4     request for proposals ("RFP") type solicitation for projects between 3MW and 20MW.  RAM

5     projects can be (and generally are) 20MW in size and would unlikely provide the transmission

6     and distribution savings that the smaller Re-MAT projects would provide.  Re-MAT projects on

7     the other hand must not be greater the 3.0MW.

8          72.     The initial Re-MAT fixed price is the same for all three separate categories of

9     renewable QFs—baseload, peaking as available, and non-peaking as available (the "FIT

10    Buckets").  Solar PV is included in the peaking as available category.

11         73.     The Defendants have stated that the RAM results on which the initial Re-MAT

12    price is based "contained insufficient market information for the three products types" to

13    determine a valid starting price for each of the three separate categories.[13]  The Defendants'

14    admission that the basis on which it determined the initial Re-MAT starting price *prima facie*

15    establishes that no proper decision of avoided costs was made.

16         74.     Nevertheless, in the absence of sufficient data, or any analysis as to the relation of

17    RAM projects to the avoided costs realized by the interconnection utility from those RAM

18    projects, the Defendants decided that any number that relates to some renewable energy

19    procurement would suffice as a measure of avoided costs under PURPA.

20         75.     The Re-MAT Decisions provide for an ongoing adjusting mechanism to the Re-

21    MAT price. For example, the allotted volume for solar PV facilities for the first bi-monthly

22    period for PG&E would be up to 5MW.

23         76.     That allotment was fully subscribed at a base pre-time-of-day ("TOD") rate of

24    $89.23/MWh during the first Re-MAT bi-monthly period.  The price for the second bi-monthly

25    period declined to $85.23/MWh, a decrease of $4/MWh, and was also fully subscribed. For the

26    third bi-monthly period the price declined to a base pre-TOD rate of $77.23/MWh.

27    / / /

---

28    [13] *See, Conformed Decision*, at p. 43.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

FIRST AMENDED COMPLAINT
Case No. C 13-04934 RS

77.     If that allotment is subscribed then other QFs must wait two months before the next allocation becomes available at an even lower price, and the declines will likely continue.[14]

78.     While two parties to the CPUC proceedings—Clean Coalition and California Solar Energy Industries Association—describe the limited contract capacity in each bi-monthly period as the "race to unviability"[15] for solar PV facilities, it could more accurately be described as a death spiral.

### THE FOUNDATION OF THE RE-MAT PROGRAM IS BASED UPON AN ERRONEOUS INTERPRETATION OF PURPA.

79.     The entire legal basis for the Defendants' design of the Re-MAT is its conclusion that the "renewable market ultimately more fully reflects avoided costs under" PURPA.   The Defendants' conclusion is unsupported by any legal or factual analysis.  PURPA requires that full avoided costs be determined by reference to the highest marginal costs of generation being displaced.[16] The notion that Congress would have intended for a renewable project to displace another renewable project in the context of legislation intended to displace fossil fuels is nonsensical.

80.     Dressing up a price in terms of a "market" price does not change the fact that the price is not determined by reference to, and is not supported by any findings of fact related to, the costs that would be avoided by the interconnecting IOU.

---

[14] *See*, *Conformed Decision*, at §6.4.2, at pp. 49-50.  A similar, but very different, mechanism in terms of results is used for price increases. *See, Conformed Decision*, §6.4.1, at pp. 48-49.  For example, the as-available non-peaking and baseload categories have not been fully subscribed in any bi-monthly period under the Re-MAT, yet there is no price increase that has taken effect. The Re-MAT "market" mechanism, therefore, is not a mechanism that is designed to set a price based upon supply and demand.  Rather in practical terms, it is designed to provide for decreases only.

[15] *See*, Docket 11-05-005, Clean Coalition and California Solar Energy Industries Association Petition for Modification of D.12-05-035, November 13, 2012, at p.6; (available at http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M031/K724/31724058.PDF); *see also, id.* at p. 7 (stating "Clean Coalition has observed over the last few years many developers accepting PPAs in various programs at prices that can't be financed. As a consequence, many PPAs are accepted and ultimately lead to project failure. This will surely happen, with even higher frequency, under the current Re-MAT because of the shortage of PPAs for a growing population of developers in California.")  These comments were filed when the bi-monthly allocation was 3MW.

[16] *See*, Order No. 69, 45 Fed Reg. at 12216. *See, also*, *Joint Explanatory Statement of the Committee of Conference*, at 7832-7833.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

FIRST AMENDED COMPLAINT
Case No. C 13-04934 RS

81.     Whether a price is administratively set at a PPA rate needed to build a renewable energy project, or whether that PPA price is set by a "market" mechanism designed to set a price needed to build a renewable energy project, the final result is still a price representative of the cost to build the specific type of renewable energy facility, and not the highest marginal costs avoided by the interconnecting utility.

82.     In *CPUC II*, the FERC stated that "the concept of a multi-tiered avoided cost rate structure can be consistent with the avoided cost rate requirements set forth in PURPA and our regulations," but specifically did not approve, any particular price or methodology.  The concept of a multi-tiered avoided cost rate structure is that there are in fact tiers in which the state commission calculates or explains the components of the avoided cost rate and how that calculation is consistent with PURPA.

83.     As the FERC confirmed in *CPUC II*, PURPA defines "avoided costs in terms of cost that the electric utility avoids by virtue of purchasing from the QF."[17]

84.     In order to answer the question of "what costs the electric utility is avoiding," the focus must be on the transaction from the utility side, not from the supplier side.

85.     The CPUC's Re-MAT price focuses only on the supplier side, which ignores where the specific unit of generation fits in with the IOU's current generating and future generating portfolio and its current and projected costs of operation.

86.     Under PURPA, whose goal is to displace fossil fuels (not other renewables), a multi-tier structure must start with a traditional base, or fossil fuel avoided cost, tier that reflects the highest marginal cost of the fossil fuel generation or market purchases being avoided, both over the short and long term.

87.     The second component would be the avoided capacity.  In the case of peaking as-available, such as solar, such avoided capacity should include the value of avoided fossil fuel peaking plants.[18]

---

[17] *See, CPUC  II* at P26.
[18] *Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978*, Order No. 69, FERC Stats. & Regs. P 30,128, at 30,884-85 (1980) (stating that "the value of service from the qualifying facility to the electric utility may be affected by the degree to which the qualifying facility ensures by contract

88.     The next tier should reflect the value to the utility from distributed generation, i.e., the lower line losses, and avoided transmission and distribution costs from having the generator closer to load.[19]

89.     These fossil fuel tiers when calculated properly would likely result in an avoided rate higher than the initial FIT price.[20]

90.     Lastly, the state policy avoided costs should be considered, which include the other environmental and state policy value of service provided by the QF, which on information and belief, the CPUC takes into account in determining avoided costs related to other programs administered by the CPUC.  Those would include (i) compliance with state renewable energy requirements, which could in a bundled energy and renewable energy certificate ("REC") transaction reflect a value for RECs as those reflect a state policy avoided cost, (ii) compliance with state greenhouse gas emission requirements, if any, and (iii) other avoided costs.

/ / /

---

or other legally enforceable obligation that it will continue to provide power" and that "[i]f purchases from qualifying facilities enable a utility to defer or avoid these new planned capacity additions, the rate for such purchases should reflect the avoided costs of these additions"), *order on reh'g*, Order No. 69-A, FERC Stats. & Regs. P 30,160 (1980), *aff'd in part and vacated in part, Am. Elec. Power Serv. Corp. v. FERC*, 675 F.2d 1226, 219 U.S. App. D.C. 1 (D.C. Cir. 1982), *rev'd in part, American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 103 S. Ct. 1921, 76 L. Ed. 2d 22 (1983).

[19]  Other avoided costs, or value to the interconnecting utility, if not already reflected should include, without limitation, (i) the long-term locational marginal price suppression impact from having a zero cost fuel resource, and (ii) the price hedge value from having a zero cost fuel resource. *See, also, CPUC II* at P23   (stating "[t]he factors to be considered in determining avoided costs include: (1) the utility's system cost data; (2) the terms of any contract including the duration of the obligation; (3) the availability of capacity  or energy from a QF during the system daily and seasonal peak periods; (4) the relationship of the availability of energy or capacity from the QF to the ability of the electric utility to avoid costs; and (5) the costs or savings resulting from variations in line losses from those that would have existed in the absence of purchases from the QF.  Avoided cost rates may also 'differentiate among qualifying facilities using various technologies on the basis of the supply characteristics of the different technologies.'")

[20]  One recent example of the voluntary use of the avoided costs mechanism by a utility can be found in Georgia, which has no state renewable energy mandates.  Georgia Power undertook an honest assessment of the avoided costs that it would realize from distributed generation solar PV facilities throughout its territory.  Based upon that assessment it instituted a feed-in tariff program at avoided costs (including the benefits on the transmission and distribution system from local generation), which it determined at a levelized PPA rate equal to $130MWh over 20 years. Given the low cost resources, lower cost land, less dense population and lesser environmental regulation in Georgia as compared to California, it is difficult to see how the Defendant's starting price of $89.23/MWh (even with the time of day adjustments) represents a true assessment of long-term avoided costs.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

FIRST AMENDED COMPLAINT
Case No. C 13-04934 RS

91.     The Re-MAT Decisions did not conduct any tier analysis, but rather assumed that the PPA price that a developer would accept to build a renewable QF (regardless of the type of QF) equaled the highest marginal avoided cost of the utility from the interconnection of the QF. There is no basis in PURPA or the FERC's regulations on which to make such a conclusion, and the implementation of such a policy is an improper implementation of PURPA.

92.     The Re-MAT Decisions are also inconsistent with the Defendants' calculation of long-term avoided costs in other areas subject to regulation by the CPUC and, upon information and belief, the long-term forecasts for the costs of energy and capacity of the California Utilities on which the California Utilities' integrated resource plans are designed.

### THE RE-MAT STARTING PRICE WAS NOT DETERMINED BY AVOIDED COSTS.

### The RAM is not a valid starting point for avoided costs.

93.     The CPUC established the starting Re-MAT price after taking into account the TOD factors based upon contracts approved for large renewable energy projects submitted under the RAM program.  The presumed intention was to set the price based upon a rough measure of the cost of developing a Re-MAT project.[21] RAM projects can be (and generally are) 20MW in size and generally would not provide the transmission and distribution savings that the smaller Re-MAT projects would provide.  The RAM price itself, however, is not a measure of avoided costs.

94.     The RAM is a RFP.  It is not a mechanism that can or should displace statutorily mandated avoided costs, or form the basis for a mechanism that does.  The RAM, like RFPs, are designed to control the *volume* as well as the *price* of energy purchased from QFs. Allowing the implementation of a state rule under PURPA that would base an avoided cost determination on a mechanism that is intentionally designed to limit the energy purchased from renewable QFs cuts at the very essence of the policy behind PURPA which "seeks to encourage the development of cogeneration and small power production facilities [in order to reduce] the demand for traditional fossil fuels."[22] The process of the RAM, as with RFPs, and the Re-MAT result in a regulation of

---

[21] *See*, D.13-01-041, at p. 5.
[22] *FERC v. Mississippi*, 456 U.S. 742, 750 (1982).

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

1    *price*, based upon a limited volume.  Here, the IOUs select a cut-off point for RAM projects.

2    Presumably there were other RAM projects that proposed prices higher than the $89.53 initial

3    Re-MAT starting price.  In any case, the PPA price of RAM projects does not equate to the costs

4    avoided by the relevant IOU from the interconnection of the RAM project.  As a result, the price

5    for such a project cannot properly form the basis for the costs avoided by an IOU from the

6    interconnection of a Re-MAT project.

7        95.    Moreover, the $89.23/MWh was set based upon post-TOD factors for an energy

8    only facility (i.e., without capacity)[23].  Under the Re-MAT, that $89.23/MWh is again further

9    adjusted by another set of TOD factors.  As shown on the attached Exhibit D, for a typical

10   1.0MW fixed-tilt solar facility, the TOD factors imposed by the Re-MAT result in a further

11   decline in the price of 10.1%.  As a result, even assuming *arguendo* that the $89.23/MWh rate

12   was a valid determination of avoided costs, the further adjustment downward would not be.

13   Thus the rate actually paid under the Re-MAT is, by definition, approximately 10% less than

14   what the Defendants' purportedly concluded was an avoided cost rate.

15/16    **The Defendants made no attempt to determine the avoided costs that would be realized by a California Utility.**

17       96.    In the case of a mandatory program, such as the Re-MAT, in order to constitute a

18   valid exercise of the Defendant's authority under PURPA, the feed-in tariff rates would need to

19   be based upon a price that is equal to the Defendant's determination of the utility's full long-term

20   avoided costs. The Re-MAT rates are not supported by any such findings of the Defendant.

21       97.    The Re-MAT Decisions fail to make a determination of what costs the utility is

22   avoiding by interconnection of the specific QF.  The Re-MAT starting price only looks to the

23   alleged market cost of a large solar facility.

24       98.    The Re-MAT mechanism defeats the express purpose of PURPA which was to

25   displace and reduce the conventional use of fossil fuels with either renewable energy or

26   cogeneration facilities.  It is inconsistent with Congress's express intent, and the FERC's long-

27

28   ---

[23] The base Re-MAT rate was determined based upon results of the 2011 Renewable Auction Mechanism, which did not require projects to have full deliverability.

FIRST AMENDED COMPLAINT
Case No. C 13-04934 RS

1  standing rule embodied in Order No. 69 that the incremental avoided costs are determined by

2  reference to the highest marginal cost unit or future expansion that would be avoided.[24]

3  **The FIT Buckets confirm the lack of an avoided cost determination.**

4  99.    The division into the three FIT Buckets, each with the same starting price,

5  reinforces the fact that the price does not reflect avoided costs.

6  100.    There is no state mandate that requires a certain portion of an IOU's generation

7  from each of the three categories—baseload, peaking as available and non-peaking as available.

8  101.    Rather the state mandate under Section 399.20 is for a certain amount of

9  renewable energy to be acquired by the IOUs.

10  102.    Section 399.20 allows the CPUC to vary the FIT price based upon the three FIT

11  Buckets but it does not impose a mandate that a certain portion of the Section 399.20 program

12  come from each of those three FIT Buckets.

13  103.    As a result, the same price is only justified from an avoided costs standpoint if the

14  Defendant determined that an IOU's avoided costs were the same regardless of the category of

15  generator.

16  104.    While the adjustment mechanism may be designed to reach some sort of market

17  equilibrium with respect to each FIT Bucket, there is no basis to conclude that the avoided costs

18  for each Bucket is the same in month 1 (where there is no differentiation among the type of

19  generator), and then in month X there could be a wide differential.

20  105.    The avoided costs realized by the interconnecting IOU is either the same for all

21  types or it is not.   It is irrational to conclude (particularly in light of the small impact these

22  generators have on the IOUs overall requirements) that the avoided costs for all three types of

23  energy are the same today but in two months' time, they could be widely different.

24  **THE RE-MAT ADJUSTMENT MECHANISM IS NOT BASED**
**UPON A CALCULATION OF AVOIDED COSTS.**

25

26  106.    The mechanics of the adjusting mechanism show that the adjustment mechanism,

27  and hence the adjusted price, is not based upon any change in the benefit that an IOU receives

28  _____

[24] *See*, Order No. 69 at 12216.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

from the interconnection of a renewable QF.  Rather, it is based upon the same flawed premise on which the initial price is based, i.e., that the PPA price that a QF is prepared to accept is the avoided cost of the IOU.

107.    The adjustment mechanism, however, highlights how the initial price and the adjusted price bears no relation to avoided costs, and thus cannot adequately determine on a periodic basis what a utility's avoided costs are.

108.    The feature of the Re-MAT mechanism that allows the price to drop below the utility's fossil fuel avoided cost violates PURPA.  As of now, the current fossil fuel avoided cost in California is represented by the MPR,[25] which is higher than the starting FIT price.

109.    In order to have the type of adjusting mechanism that the CPUC wants for its Re-MAT program, it must first determine the full long-term base tier avoided costs and then provide pricing that does not drop below that level.

110.    In addition, the adjusting mechanism is likely to lead to irrational price differences.  In California, the most widely available in-state renewable energy is solar.

111.    There are not many 3.0MW or less wind projects, *i.e.*, the non-peaking, as available Bucket.  After the first bi-monthly period, the price for non-peaking, as available, will likely exceed the adjusted price for peaking-as available, which not only is an irrational result but shows that the Re-MAT price would not be based upon an IOU's avoided costs because non-peaking, as available, is by definition worth substantially less to an IOU than peaking, as available.

**THE VOLUME OF TRANSACTIONS IS AN INSUFFICIENT BASIS
ON WHICH TO DETERMINE AVOIDED COSTS.**

112.    The nominal volume of transactions during each bi-monthly period cannot be considered to be a valid representation of a change in the avoided costs realized by the interconnecting IOU. To put it into perspective, PG&E's electricity sales exceed 105,000 GWHs per year.[26]  5MW of solar may produce around 12,000MWHs per year.   The bi-monthly

---

[25] The MPR may not account for all long-term costs avoided by an IOU, but it provides a baseline number for the displacement of fossil fuel generation.
[26] *See, e.g.,* http://www.energy.ca.gov/2012_energypolicy/documents/2012-02-

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

allocation is less than 0.012% of PG&E's sales.  Yet the Re-MAT mechanism would lead us to believe that infinitesimal amount has moved the needle of avoided costs by $4/MWh (or 4.7%) in the second bi-monthly period, and $8/MWh (or 9.8%) in the next bi-monthly period.

113.    The price adjustment mechanism occurs if the program's bi-monthly allocation is either subscribed or not subscribed.  As currently designed, the bi-monthly allocation may be one to two projects per category.  Such a nominal volume of transactions cannot be considered to be a valid representation of a change in the respective IOU's avoided costs.

### THE BI-MONTHLY CAP ALLOCATION VIOLATES PURPA.

114.    The bi-monthly allocation methodology violates PURPA.  PURPA does not permit any "allocation" of its requirements.  The only justifiable limitation under PURPA is one that is based upon "avoided costs."  Shutting down or suspending PURPA between bi-monthly allocations is not provided for in either the statute or the FERC's regulations.  Here, assuming *arguendo* that a proper determination of avoided costs was made, then as of the start of the Re-MAT program, the CPUC has determined that the avoided costs for all types of renewable energy is the initial price.  That price must be available to whatever QFs apply, and to all that apply.

115.    In addition, section 292.303 of the FERC's regulations provides that "[e]ach electric utility shall purchase, in accordance with § 292.304, ... any energy and capacity which is made available from a qualifying facility....". Section 292.304, in turn, requires that the rates for such purchases shall not discriminate against qualifying cogeneration and small power production facilities. The attempt to limit the availability of an avoided cost rate and exclude QFs violates the clear requirements of the FERC's regulations and also is unlawful discrimination under Section 292.304.

### THE AVOIDED COSTS RATES INCLUDE RECS, THUS RESULTING IN A QF RECEIVING LESS THAN TRUE AVOIDED COSTS.

116.    The Re-MAT program requires the QF to transfer all the renewable energy credits ("RECs") to the IOU.[27]

---

23_workshop/presentations/07_Kavalec_PGE_Forecast.pdf.
[27] *See*, Exhibit D, §4.1 of the Joint Standard Contract.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

1    117.    Assuming *arguendo* that the initial Re-MAT starting price was a true calculation

2    of avoided costs, that would mean that the value of the RECs would be transferred to the

3    interconnecting utility at zero cost, i.e., without providing any additional compensation to the

4    QF.

5    118.    Such a result constitutes the unconstitutional taking of property without

6    compensation.

7    119.    It is clear that RECs have independent value, and the Re-MAT Decisions make no

8    finding as to what that value may be.

9    120.    Although the FERC has generally left the determination of ownership of RECs to

10   states, the FERC has asserted jurisdiction over bundled sales of energy and RECs.[28]   Here

11   because RECs have independent value, the net result would be that the IOU would pay less than

12   avoided costs for energy and/or capacity in what is a bundled sale, which would be a violation of

13   PURPA.

14
    **DISQUALIFYING QFS WITH AN INTERCONNECTION COST IN EXCESS OF
    $300,000 IS UNDULY DISCRIMINATORY, UNJUST AND UNREASONABLE.**
15

16   121.    The Re-MAT Decisions disqualify otherwise eligible QFs if the "transmission

17   system network upgrades" to interconnect the QF exceed $300,000.[29]   That exclusion of such

18   QFs further highlights the lack of a determination of full avoided costs.   As the Conformed

19   Decision states, the only reason to exclude such a project is because such a project is not

20   strategically located, which is the equivalent of such a project not providing extra benefits to the

21   interconnecting utility.   Those benefits, however, are not reflected in the avoided cost price

22   (despite the mandate of Cal. Pub. Utils. Code Section 399.20 to do so).   Rather the avoided cost

23   price has been determined by reference to prices of 20MW solar projects which provide no such

24   benefit and would undoubtedly require more than $300,000 of network upgrades.

25   ───────────────

[28] *See, WSPP Inc*, 139 FERC ¶ 61,061 at P24 (2012)(stating "where a wholesale energy sale and
26   a REC sale take place as part of the same transaction, RECs are charges in connection with a
     jurisdictional service that affect the rates for wholesale energy. Thus, the FERC has jurisdiction
27   over the wholesale energy portion of the transaction as well as the RECs portion of a bundled
     REC transaction under FPA sections 205 and 206 (regardless of whether the contract price is
28   allocated separately between the energy and RECs.")
[29] *See*, *Conformed Decision*, §6.9, at p.60.

122.    In an FIT regime that must comply with PURPA, there is no justification for excluding such QFs.  The IOUs do not pay any additional amounts in the PPA rate.  Whether the QF's proper share of interconnection upgrades is $300,000 or $350,000, is irrelevant to the determination of the utility's avoided costs. Excluding those QFs is unduly discriminatory, unjust and unreasonable.

### THE RE-MAT BASE STARTING PRICE IS NOT BASED UPON A SRAC RATE.

123.    The Defendants' claim that the Re-MAT base starting price is based upon short-run avoided cost, an approach it alleges it has used for 25 years, is simply unfounded.  First, the Re-MAT base starting price is explicitly based upon the RAM results, which is a process that awards long-term, 20-year contracts.  Second, prior to changing to the Re-MAT base starting price, the CPUC used a rate based upon the MPR to determine the rate used for the Cal. Pub. Utils. Code Section 399.20 tariff, which is a long-term rate, not a SRAC rate.  *See*, D.11-04-033, 2011 Cal. PUC LEXIS 250, *42 (2011) (stating "the MPR is intended to represent the long term market price of electricity for fixed price contracts").

### COUNT I

### VIOLATION OF PURPA AND FERC'S REGULATIONS; THE RULE ELIMINATING THE LONG-RUN RATE REQUIRED BY 18 C.F.R. §292.304(d)(2)(ii) VIOLATES PURPA.

124.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 123 as though fully set forth herein.

125.    Section 210(a) of PURPA, 16 U.S.C. § 824a-3(a), requires FERC to promulgate such rules as are necessary to encourage QFs to produce power and to require electric utilities to purchase power from such QFs.

126.    FERC's duly promulgated regulations give QFs the right to sell electric energy to an electric utility pursuant to a legally enforceable obligation. 18 C.F.R. § 292.304(d)(2); *see also*, *e.g*., *Grouse Creek Wind Park, LLC,* 142 FERC ¶61,187 (2013)*("Grouse Creek")* P 40.

127.    As described in FERC's rulemaking adopting 18 C.F.R. § 292.304(d)(2), the term "legally enforceable obligation" is intended to prevent utilities from circumventing the PURPA mandatory purchase requirement by refusing to enter into a contract, or delaying the execution of

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

a contract. *Cedar Creek Wind, LLC,* 137 FERC ¶ 61,066 (2011)("*Cedar Creek*") P 32 (citing Order No. 69, FERC Stats. & Regs. ¶ 30,128 at 30,880); *see also Grouse Creek* P 36; *Murphy Flat Power, LLC,* 141 FERC ¶61,145 (2012)("*Murphy Flat*") P 24.

128.    A legally enforceable obligation "can pre-date the signing" of a contract. *Grouse Creek* P 40; *see also Murphy Flat* P 24.

129.    FERC regulations do not require that a QF file a meritorious complaint or otherwise seek state regulatory assistance to obtain a legally enforceable obligation. *Grouse Creek* P 40.

130.    A QF may seek state regulatory assistance to enforce a legally enforceable obligation, but seeking such assistance and, in particular, filing a meritorious complaint is not a necessary condition precedent to obtaining a legally enforceable obligation. *Id.* P 40.

131.    To the contrary, FERC has interpreted its regulations as providing a QF, upon committing itself to sell to an electric utility, with the right to a legally enforceable obligation.[30] *Grouse Creek* P 40; *Murphy Flat* P 24.

132.    18 C.F.R. §292.304(d) provides that the QF (not the utility) shall have the option to sell at either a rate based upon the utility's avoided costs calculated at the time of delivery, or a long-run rate under 18 C.F.R. §292.304(D)(2)(ii) which equals the projects avoided costs calculated at the time the obligation is incurred over a specified longer term.[31]  The FERC has made it clear that the option of what pricing arrangement to use is that of the QF.[32]

---

[30] *See*, *e.g.*, *JD Wind 1, LLC*, 129 FERC ¶ 61,148, at P 25 (2009) ("Under our regulations, [the QF] has the right to choose to sell pursuant to a legally enforceable obligation . . . ."); *see also Murphy Flat* P 24 ("a QF, by committing itself to sell to an electric utility, also commits the electric utility to buy from the QF; these commitments result either in contracts or in non-contractual, but binding, legally enforceable obligations") (quoting *Cedar Creek* P 32); *see also Grouse Creek* P 36 (same).

[31] *See*, *JD Wind 1 LLC*, 130 FERC ¶61,127 (2010) at P23 (stating "[t]he FERC has . . . consistently affirmed the right of QFs to long-term avoided cost contracts or other legally enforceable obligations with rates determined at the time the obligation is incurred, even if the avoided costs at the time of delivery ultimately differ from those calculated at the time the obligation is originally incurred.")

[32] *See, JD Wind 1 LLC, supra,* at P23 (stating "[t]he FERC's regulations, from the beginning, have given QFs the option of choosing to have rates calculated at the time the obligation is incurred. The intention of the FERC was to enable a QF 'to establish a fixed contract price for its energy and capacity at the outset of its obligation.'  The FERC recognized that: [I]n order to be able to evaluate the financial feasibility of a cogeneration or small power production facility, an investor needs to be able to estimate, with reasonable certainty, the expected return on a potential

133.    The CPUC's D. 10-12-035 adopting a settlement relating to QFs, has resulted in the  CPUC adopting a policy eliminating a QFs entitlement to the long-run rate specified by 18 C.F.R. §292.304(d)(2)(ii).

134.    The CPUC and PG&E have separately confirmed to Plaintiff that a long-run rate is prohibited in California.

135.    The attached two separate emails from the CPUC (attached hereto as Exhibit A) confirm that position when they state:

> There is no long term avoided cost rate cost for QF/CHP. However, there are longer contract durations for New QF/CHP facilities per the QF/CHP Settlement. In short an "Existing QF" can sign a PPA for a maximum of 7 years and a "New QF" can sign a PPA for a maximum of 12 years. This information is public, and can be found at the link below:
>
> http://docs.cpuc.ca.gov/PUBLISHED/GRAPHICS/124875.PDF
>
> ******
>
> Hi, Tom,
>
> There are no long term QF contracts under the QF/CHP Settlement which is the new mandate for all QF's in California regardless of their size (if a facility wants to have a PPA per the settlement, then they can get a 7 year contract if they are existing and 12 years if they are a new QF). However, as Adam has mentioned earlier, a Solar QF can participate in the RPS competitive solicitations.
>
> The SRAC calculations and historic values are listed on each utilities website. You may search ("SRAC PG&E" etc…) online (for example here is PG&E's website: http://www.pge.com/b2b/energysupply/qualifyingfacilities/prices/) to get the SRAC prices for each utility.

136.    Those emails from the CPUC confirm what is posted by the CPUC and the California Utilities on their websites as to the lack of the long-run rate required by 18 C.F.R. §292.304(d)(2)(ii).

137.    In addition, PG&E confirmed the lack of a long-run rate to Plaintiff in an email (attached hereto as Exhibit B) dated June 17, 2013, in response to Plaintiff's request for a long-run rate PPA under 18 C.F.R. §292.304(d)(2)(ii).  PG&E stated:

investment before construction of a facility.")

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

FIRST AMENDED COMPLAINT
Case No. C 13-04934 RS

"[t]o clarify your statement regarding the election of payments - these contracts are all paid the Short Run Avoided Cost (SRAC) which is calculated on an monthly basis (based on natural gas prices) and paid in monthly intervals and is not associated with the Market Price Referent."

138.   As confirmed directly to Plaintiff by both the CPUC and PG&E, Plaintiff does not have the ability to obtain the long-run rate mandated by 18 C.F.R. §292.304(d)(2)(ii).

139.   While Plaintiff has the option to obtain a PPA under the standard all-source QF rules, those rules provide for only a short-run rate determined from time-to-time, and for a methodology that, if attempted to be used to calculate a long-run rate, would not accurately reflect the full long-term avoided costs realized by the interconnecting utility.

140.   The CPUC's policy implemented by Defendants, which constitutes a rule with respect to rates under PURPA Section 210(f)(1),[33] eliminating the long-run rate required by 18 C.F.R. §292.304(d)(2)(ii) is a violation of, and an improper implementation of, PURPA.

141.   The Plaintiff has already suffered harm as stated herein because if the Defendants had not improperly eliminated the long-run rate required by 18 C.F.R. §292.304(d)(2)(ii), Plaintiff's projects would have entered into a PPA at the LRAC rate in effect at the time of Plaintiff's offer to PG&E.

## COUNT II

**VIOLATION OF THE SUPREMACY CLAUSE, THE FEDERAL POWER ACT, PURPA AND FERC'S REGULATIONS;
THE RE-MAT IS PREEMPTED BY THE FEDERAL POWER ACT
AND IS AN IMPROPER IMPLEMENTATION OF PURPA**.

142.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 141 as though fully set forth herein.

143.   Under the Supremacy Clause of the United States Constitution, action by a state is preempted when Congress intends Federal law to occupy the field, as well as in cases where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The Supremacy Clause of the United States Constitution renders federal

---

[33] *See,* 16 U.S.C. 2602(10). The term "rate" includes "(B) any rule, regulation, or practice respecting any such rate, charge, or classification."

law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause of the United States Constitution, action by a state is preempted when Congress intends federal law to occupy the field or when state regulation stands as an obstacle to the accomplishment of Congress's goals.

144.   Under the FPA, the FERC has jurisdiction over "the transmission of electric energy in interstate commerce and ... the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 24(b)(1). In contrast, States have jurisdiction over, *inter alia*, "facilities used for the generation of electric energy." *Id.*

145.   In passing the FPA, Congress intended FERC to have exclusive jurisdiction over the field of wholesale electricity regulation. Section 201(b) of the FPA, codified at 16 U.S.C. § 824(b), sets out the scope of federal regulatory power and draws a bright line between mutually exclusive spheres of state and federal authority. The FPA left no power to the States to regulate wholesale electricity transactions, including wholesale sales of capacity, in interstate commerce except if the States are acting in compliance with PURPA.

146.   Pursuant to the FPA, the FERC has adopted an elaborate regulatory framework to regulate wholesale electric energy rates.

147.   By enacting the FPA, Congress intended to give the FERC exclusive jurisdiction over setting wholesale electric energy and capacity rates or prices and thus intended this field to be occupied exclusively by federal regulation. Thus, state action that regulates within this field is void under the doctrine of field preemption.

148.   In addition, under the federal regulatory framework, wholesale electric energy prices must be freely negotiated between electric generation facilities and distributors. Neither the Defendants nor the CPUC can directly dictate the price of a wholesale electricity contract. Any attempt by a State to compel utilities to purchase energy from generation facilities at a particular price is void under the doctrine of conflict preemption.

149.   The only exception for pre-emption in this case is if it can be shown that the Defendants' actions comply with PURPA and are within the scope of a State's authority under PURPA.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

150.   By directing the California Utilities to enter into PPAs at a particular price under the Re-MAT, the Defendants intruded on the FERC's exclusive jurisdiction to regulate wholesale electric energy prices. Accordingly, the PPAs are the product of state action that is illegal under the doctrine of field preemption.

151.   By requiring the California Utilities to purchase power at a fixed price from certain generators, pursuant to criteria developed by the State that does not comply with PURPA, the California Utilities are prevented from freely negotiating for a different contractual price, thus violating federal law and policy which requires wholesale electric energy prices to be set pursuant to freely-negotiated market transactions. Accordingly, the Re-MAT PPAs are the product of state action that is illegal under the doctrine of conflict preemption.

152.   The Defendants' Decisions implementing the Re-MAT are preempted because they intrude on the FERC's exclusive jurisdiction to regulate wholesale transactions for capacity and energy. The Re-MAT Decisions set the price at which the California Utilities would purchase energy from certain generators.  The fixing of that price constitutes the setting of the wholesale price for energy. As such it is only valid if it results from a proper implementation of PURPA.

153.   No determination was made, and no evidence has shown, that the fixed price equals the California Utilities' avoided costs.  As a result, the Re-MAT Decisions are not a valid exercise of the Defendants' authority under PURPA.

154.   The Re-MAT Decisions invade the FERC's exclusive jurisdiction to set wholesale rates and therefore is preempted and void, and as a result the PPAs executed pursuant thereto are preempted and void *ab initio*.[34]

/ / /

/ / /

---

[34] *See*, *Connecticut Light and Power Company,* 70 FERC P61,012, 61,030 (1995) (stating "[h]enceforth, however, if parties are required by state law or policy to sign contracts that reflect rates for QF sales at wholesale that are in excess of avoided cost, those contracts will be considered to be void ab initio.") *See also, PPL EnergyPlus LLC v. Nazarian*, 2013 U.S. Dist. LEXIS 140210, * 110 (D. Md. 2013)(holding that no matter how disguised a fixed contract price set by the State to be paid to the generator is void); *PPL EnergyPlus, LLC v. Hanna*, 2013 U.S. Dist. LEXIS 147273 (D. N.J. 2013) (holding to the same effect but holding that incentives for local generation because of reliability concerns is reasonable).

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

FIRST AMENDED COMPLAINT
Case No. C 13-04934 RS

155.     Plaintiff has no adequate remedy at law and no opportunity for compensation for the Defendants' violations of the Supremacy Clause and Defendants improper implementation of PURPA.

156.     Plaintiff will suffer irreparable harm by the violation of the Supremacy Clause and the improper implementation of PURPA, and the balance of harms favors Plaintiff, because Plaintiff will suffer substantial economic losses due to the inability to build its projects, sell the energy and capacity from those projects, and recover the costs it has incurred in developing those projects, but the Defendants are immune from suit for retrospective relief.

157.     Plaintiff will suffer irreparable future harm if the Defendants are permitted to continue to take actions prohibited by, or that are not in accordance with, federal law.  The harm to Plaintiff will include, without limitation, the harm specified in ¶¶54-69 of this Complaint.

158.     The Plaintiff has already suffered harm as stated herein because if the Re-MAT Decisions had not improperly set the price of wholesale power and subjected PPA availability to improper conditions, Plaintiff's projects would have entered into a PPA at either a proper LRAC rate in effect at the time, or, if it is shown that the $89.23/MWh was a proper rate, Plaintiff's projects would have entered into a PPA at that rate.

159.     The Defendants' actions also interfere with the FERC's achievement of its regulatory goals in the wholesale electricity markets, and Congress's goals, of encouraging and providing special rules that favor small power production.

160.     The public interest will be harmed by the violation of the Supremacy Clause because the Re-MAT Decisions frustrates Congress's desire to place wholesale energy markets under the exclusive purview of FERC and, by interfering with the workings of PURPA, will undermine Congress's choice to encourage small power production facilities.

161.     Plaintiff is entitled to judgment under 28 U.S.C. §§ 2201(a) and 2202, declaring that the Re-MAT Decisions violate the Supremacy Clause (Article VI, Clause 2) of the United States Constitution, and that the PPAs executed pursuant thereto are void *ab initio*.

162.     Granting the requested declaratory and injunctive relief will harm the Defendants less (if at all) than denying the relief would harm Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

(1)     That the Court find and declare as follows:

      a.   The rule that eliminates or restricts a 3MW or smaller QF's ability to seek an avoided cost long-run rate pursuant to 18 C.F.R. §292.304(d)(2)(ii) is inconsistent with PURPA and the FERC's regulations implementing PURPA;

      b.   The Re-MAT program instituted in the Re-MAT Decisions is preempted by the FPA and therefore void under the FPA and the Supremacy Clause of the United States Constitution and without legal force and effect and that any PPAs executed under the Re-MAT program are void (or alternatively, adjust the rate paid under those contracts upwards to properly reflect long-term avoided costs);

      c.   The Re-MAT Decisions' legal conclusion that a price that sets an avoided cost price based upon the adjusting mechanism designed by Defendants is inconsistent with PURPA and the FERC's regulations implementing PURPA;

      d.   The initial price set under the Re-MAT program violates the FPA and is inconsistent with PURPA and the FERC's regulations implementing PURPA;

      e.   The Re-MAT price adjusting mechanism is inconsistent with PURPA and the FERC's regulations implementing PURPA;

      f.   A determination of avoided costs, whether through a market mechanism or by an administrative determination, must reflect the highest marginal costs avoided by the interconnection utility;

      g.   The Re-MAT Decisions' failure to exclude RECs from the assets transferred to the IOU results in the QF receiving less than avoided costs for energy and/or capacity, which is inconsistent with PURPA and the FERC's regulations implementing PURPA;

      h.   Limiting the availability of the avoided cost price to certain renewable QFs, (whether as the result of the QFs network upgrades, the FIT Buckets, or the bi-

monthly limitation) as opposed to making it available to all renewable QFs that apply is inconsistent with PURPA and the FERC's regulations implementing PURPA; and

    i.  If the Re-MAT is not wholly preempted, to cause the Defendants to order the execution of PPAs with Re-MAT applicants, one of which is the Plaintiff, under the Re-MAT at a rate that properly reflects long-term avoided costs, and is not limited by the bi-monthly caps or other improper limitations.

(2)    That the Court further:

    a.  Enjoin the Defendants from issuing further orders and decisions that are inconsistent with the FPA and PURPA;

    b.  Order the Defendants to implement a rule providing a QF the right to choose an avoided cost long-run rate pursuant to 18 C.F.R. §292.304(d)(2)(ii); and

    c.  Order the Defendants to issue such orders as are necessary and appropriate to give effect to this Court's findings.

(3)    That Plaintiff be granted such other further relief as the Court may deem just and proper.

Dated: March 11, 2014          /s/ Thomas Melone
                           Thomas Melone (*pro hac vice*)
                           Email:  Thomas.Melone@AllcoUS.com
                           *Attorneys for Plaintiff*


FUTTERMAN DUPREE DODD
CROLEY MAIER LLP


By: /s/ Jaime G. Touchstone
            Jaime G. Touchstone
            Email:  jtouchstone@fddcm.com
            *Local Attorneys for Plaintiff*

    I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this efiled document.

                        /s/Jaime G. Touchstone
                        Jaime G. Touchstone