JENNER & BLOCK LLP
MATTHEW PRICE (*pro hac vice*)
1099 New York Avenue NW Suite 900
Washington, DC 20001
Telephone: (202) 639-6873
Facsimile: (202) 661-4802
mprice@jenner.com

THOMAS MELONE (*pro hac vice*)
MICHAEL MELONE (*pro hac vice*)
ALLCO RENEWABLE ENERGY LIMITED
14 Wall St., 20th Floor
New York, NY 10005
Telephone: (212) 681-1120
Facsimile: (801) 858-8818
Thomas.Melone@AllcoUS.com
MJMelone@AllcoUS.com

*Attorneys for Plaintiff*

FUTTERMAN DUPREE DODD CROLEY MAIER LLP
JAMIE L. DUPREE (158105)
JAIME G. TOUCHSTONE (233187)
180 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3906
Facsimile: (415) 399-3838
jdupree@fddcm.com
jtouchstone@fddcm.com

*Local Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WINDING CREEK SOLAR LLC, | Case No. C 13-04934 JD |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| MICHAEL PEEVEY, MICHAEL FLORIO, CATHERINE SANDOVAL, CARLA PETERMAN, and MICHAEL PICKER, in their official capacity as Commissioners of the California Public Utilities Commission, | **Honorable James Donato** |
| Defendants. | **Leave to File Granted June 11, 2014** |

**NATURE OF THE ACTION**

1.    This case concerns the legality of a series of orders issued by the California Public Utilities Commission ("CPUC").  Those orders purport to implement federal regulations promulgated by the Federal Energy Regulatory Commission ("FERC") pursuant to the Public Utility Regulatory Policies Act ("PURPA"), Pub. L. 95-617 (Nov. 9, 1978).[1]  Congress enacted PURPA to encourage the development of renewable energy generation and to reduce reliance on fossil fuels.  It did so by imposing an obligation on electric utilities, like Pacific Gas & Electric, to purchase electricity at wholesale from certain renewable energy generators, called "qualifying facilities."

2.    Congress called upon state regulatory commissions, like CPUC, to implement FERC's regulations for the electric utilities under their jurisdiction.  Under FERC's regulations, an electric utility must purchase *any* electricity made available to it by a qualifying facility.  An electric utility also must pay a particular price for those purchases: the utility's "avoided costs," that is, the amount the utility otherwise would have spent to buy or produce the electricity that it is required to purchase from the qualifying facility.  Although the utility's avoided costs may be greater than the qualified facility's costs of production, Congress and FERC determined that allowing qualified facilities to receive the benefit of that difference would further the statutory purpose, by providing economic incentives to increase renewable energy production and improve efficiency.  Consumers, meanwhile, would be left no worse off.  Because their utility would pay no more than its avoided costs – that is, no more than the utility would otherwise pay to obtain that electricity – consumers' bills would not increase.

3.    Federal regulations further provide that the utilities' avoided costs are to be calculated using two different methodologies.  The first methodology determines the utility's avoided costs at the moment electricity is actually delivered to the utility – often calculated on a month-to-month basis, based on fluctuating market prices for natural gas or coal.  The second

---

[1] Pursuant to the Court's May 21, 2014 Order, attached as an appendix to this Complaint is a table of acronyms used in this pleading, as well as key federal regulations and FERC decisions cited in this Complaint.

methodology determines the utility's projected avoided costs over the length of the entire contract with the qualified facility, calculated at the time the contract is entered. That second method provides a qualified facility with greater certainty concerning its revenues over the length of its contract with the utility. Federal regulations require that the qualifying facility be able to choose the pricing methodology it prefers.

4. As noted above, PURPA directs state regulatory commissions, like CPUC, to implement the federal regulations for each utility within its jurisdiction. While states have some flexibility in devising programs to implement the federal statute and regulations, they still must act within the boundaries of federal law. Thus, states may not exempt their utilities from the obligation to purchase renewable power under PURPA. Nor may states require their utilities to pay a price different than each utility's avoided costs, or refuse to offer renewable generators the ability to choose between the two pricing methodologies set forth in the federal regulations.

5. States have no authority to regulate the pricing of wholesale electricity contracts other than the authority provided to them by PURPA. With the exception of the specific authority afforded to states by PURPA, Congress has occupied the field of wholesale sales of electricity, and it has assigned to FERC exclusive authority to regulate that field. Accordingly, if a state regulatory commission were to require its utilities to pay a price different than the utility's avoided costs, such a requirement would be doubly preempted: it would not only conflict with PURPA, but would also fall within the field of wholesale electricity rate-setting, which, except for PURPA, Congress has reserved exclusively for FERC.

6. This case challenges a series of CPUC Orders – D.12-05-035 (the "May 2012 Order," attached as Exhibit A), D.13-01-041 (the "January 2013 Order," attached as Exhibit B), and D.13-05-034 (the "May 2013 Order," attached as Exhibit C) (collectively, the "Orders") – that purport to implement PURPA and the related federal regulations. These Orders require investor-owned electric utilities in the state, such as Pacific Gas & Electric, to enter into long-term (ten, fifteen, or twenty-year), fixed-price contracts with qualifying facilities. Rather than implementing PURPA and FERC's regulations, however, these Orders conflict with federal law in two main respects.

7. *First*, the Orders significantly limit the utilities' obligation to purchase electricity from qualifying facilities. They place an overall cap on the amount of electricity each utility is required to buy from qualifying facilities. For example, under the Orders, Pacific Gas & Electric is required to purchase only another 31 megawatts in total from qualifying facilities that generate electricity using solar technology. Moreover, during each two-month period, the Orders require each utility to enter into new contracts for only up to 5 megawatts of solar-generated electricity. Other qualifying facilities must wait in a queue. As a result, CPUC's program is oversubscribed. Today, Pacific Gas & Electric's queue contains 54 megawatts of solar-generated electricity – more than Pacific Gas & Electric will ever be required to purchase under CPUC's Orders. Federal law, which was enacted specifically to encourage the development of renewable energy generation, does not permit a state commission to limit utilities' purchase obligations in this manner.

8. *Second*, the Orders provide for a purchase price that is different than the utilities' avoided costs. CPUC's method for deciding which of the projects in the queue should receive a contract from the utility is to hold what is effectively a reverse auction, so that, over time, the price offered will be the lowest price at which qualifying facilities are willing to sell their electricity. That is inconsistent with federal law, which provides that the price of a contract entered into under PURPA must be based upon the *utility's* avoided costs, not the *qualifying facility's* production costs. Indeed, CPUC's pricing method frustrates the very purpose of PURPA, which was to promote renewable energy generation by mandating its purchase, so long as it was more cost-effective than the traditional, fossil-fuel based generation that it would displace. Yet CPUC's Orders, by forcing qualifying facilities to compete against one another to offer the lowest price, has the result of denying contracts to qualifying facilities that, even if more expensive than certain other qualifying facilities, are still more cost-effective than the highest-priced fossil-fuel based generation.

9. CPUC's sole authority to regulate wholesale electricity sales derives from PURPA. Therefore, any orders it issues must be consistent with PURPA and FERC's regulations implementing PURPA. Because CPUC's Orders are, in these two main respects, in

JENNER & BLOCK LLP

conflict with governing federal regulations concerning PURPA, the Orders are preempted and must be declared invalid. Additionally, CPUC should be enjoined from applying its Orders in the future, and should be ordered to issue new regulations that faithfully implement federal law.

## PARTIES

10.     Plaintiff Winding Creek Solar LLC ("Plaintiff") is the owner and developer of a 1.0 megawatt solar project located at 17016 North Jack Tone Road in Lodi, California ("the Lodi facility"). Allco Finance Limited is the sole member of Plaintiff.

11.     Defendant Michael Peevey is President of the California Public Utilities Commission, and is sued in his official capacity.

12.     Defendant Michael Florio is Commissioner of the California Public Utilities Commission, and is sued in his official capacity.

13.     Defendant Catherine Sandoval is Commissioner of the California Public Utilities Commission, and is sued in her official capacity.

14.     Defendant Carla Peterman is Commissioner of the California Public Utilities Commission, and is sued in her official capacity.

15.     Defendant Michael Picker is Commissioner of the California Public Utilities Commission, and is sued in his official capacity.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action brings claims arising under federal law.

17.     This Court also has subject matter jurisdiction over this action because, under 16 U.S.C. § 824a-3(h)(2)(B), a "qualifying small power producer," after first petitioning FERC, may bring an enforcement action in a United States district court against a State regulatory authority to enjoin violations of, and ensure compliance with, PURPA and FERC's regulations promulgated pursuant to PURPA.

18.     A "qualifying small power producer" is statutorily defined as "the owner or operator of a qualifying small power production facility." 16 U.S.C. § 796(17)(D).

JENNER &
BLOCK LLP

19.    Plaintiff is a "qualifying small power producer" because it is the "owner" of the Lodi facility, which is a "qualifying small power production facility."

20.    PURPA defines a "qualifying small power production facility" as "a small power production facility that the Commission [*i.e.*, FERC] determines, by rule, meets such requirements . . . as the Commission may, by rule, prescribe." 16 U.S.C. § 796(17)(C). PURPA defines the type of facility that is a "small power production facility": it "(i) produces electric energy solely by the use … of … renewable resources" and "(ii) has a power production capacity … not greater than 80 megawatts." 16 U.S.C. § 796(17)(A).

21.    FERC has adopted regulations setting forth a definition of "qualifying small power production facility." These regulations provide that "a small power production facility is a qualifying facility if it: (1) Meets the maximum size criteria …; (2) Meets the fuel use criteria …; and (3) … has filed with the Commission a notice of self-certification, pursuant to § 292.207(a); or has filed with the Commission an application for Commission certification, pursuant to § 292.207(b)(1), that has been granted." 18 C.F.R. § 292.203(a).

22.    The self-certification process referred to in Section 292.203(a) is set forth in 18 C.F.R. § 292.207(a). FERC has provided that "[t]he qualifying facility status of an existing or a proposed facility that meets the requirements of § 292.203 may be self-certified by the owner or operator of the facility" by submitting a particular form. 18 C.F.R. § 292.207(a).

23.    The Lodi facility is a "qualifying small power production facility" pursuant to 18 C.F.R. § 292.203(a) because (1) it meets the maximum size criteria (it is a 1 megawatt facility, less than the 80 megawatt maximum); (2) it meets the fuel use criteria (it is designed to generate electric energy solely by the use of solar photovoltaic cells, which is a form of renewable energy); and (3) its owner, Plaintiff, on May 1, 2013, filed with FERC a notice of self-certification, pursuant to § 292.207(a), stating that the Lodi facility meets the requirements of § 292.203. *See* FERC Docket No. QF13-403-000.

24.    Plaintiff, as the owner of the Lodi facility, has also satisfied the administrative exhaustion requirements of 16 U.S.C. § 824a-3(h)(2)(B). On June 13, 2013, Plaintiff petitioned FERC to bring an enforcement action against CPUC pursuant to Section 824a-3(h)(2)(A). On

August 12, 2013, FERC gave notice that it would not initiate an enforcement action under that section. *See Winding Creek Solar LLC*, 144 FERC ¶ 61,122 (2013).

25. The Court is empowered to grant declaratory relief by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

26. This Court is empowered to grant preliminary and permanent injunctive relief by, *inter alia*, 28 U.S.C § 2202; Rule 65 of the Federal Rules of Civil Procedure; and *Ex Parte Young*, 209 U.S. 123 (1908).

27. This Court has personal jurisdiction over Defendants because each Defendant conducts a substantial portion of his or her duties as an officer of CPUC in the Northern District of California. CPUC is located at 505 Van Ness Avenue, San Francisco, CA 94102.

28. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in the Northern District of California.

29. INTRADISTRICT ASSIGNMENT: Assignment to the San Francisco division of this Court is proper because the Defendants are located in San Francisco and Defendants' acts and practices that form the basis for the violations alleged in this complaint occurred in San Francisco.

## STATUTORY AND REGULATORY FRAMEWORK

30. Through the Federal Power Act, Congress occupied the field of wholesale electricity sales, and assigned to the Federal Power Commission – now FERC – exclusive authority to regulate that field. *See* 16 U.S.C. § 824(b)(1); *PPL EnergyPlus LLC v. Nazarian*, --- F.3d ----, 2014 WL 2445800, at *4-5 (4th Cir. June 2, 2014) (collecting "[a] wealth of case law confirm[ing] FERC's exclusive power to regulate wholesale sales of energy in interstate commerce").

31. In 1978, Congress enacted PURPA, which amended the Federal Power Act. Congress's purpose in enacting PURPA was to facilitate the development of renewable energy generation and to reduce the country's reliance on fossil fuels.

32. Prior to the enactment of PURPA, small renewable energy generators had difficulty finding buyers for their output, because electric utilities were reluctant to purchase power from non-traditional generation facilities. PURPA addressed that problem by directing FERC to adopt rules *requiring* electric utilities to purchase power generated by, among others, "qualifying small power production facilities." 16 U.S.C. § 824a-3(a). As noted above, this type of facility is small in size (less than 80 megawatts) and is designed to produce electricity solely through the use of a renewable fuel source. *See supra* at ¶¶ 20-21.

33. Pursuant to PURPA's directive, FERC provided in its regulations that "[e]ach electric utility shall purchase … any energy and capacity which is made available from a qualifying facility … [d]irectly to the electric utility." 18 C.F.R. § 292.303(a). A utility's obligation to purchase all the output of a qualifying facility that is interconnected with its distribution network is known as a "legally enforceable obligation." Once the utility's legally enforceable obligation is triggered, the utility becomes bound to purchase any electricity the qualifying facility produces. In California and elsewhere, state regulatory commissions have implemented PURPA by requiring the utility, in light of its legally enforceable obligation, to enter into a power purchase agreement with the qualifying facility, in which the utility commits to purchase the qualifying facility's electricity for a defined contract term.

34. PURPA also directed FERC to promulgate rules ensuring that "in requiring any electric utility to offer to purchase electric energy from any … qualifying small power production facility, the rates for such purchase" shall not "exceed[] the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a-3(b).

35. Pursuant to that statutory directive, FERC promulgated a regulation providing that "a rate for purchases satisfies the requirements" of PURPA "if the rate equals the avoided costs" of the utility. 18 C.F.R. § 292.304(b)(2). The avoided costs of a utility, in turn, are to be determined after considering various factors set forth in Section 292.304(e), including specific data the utility must collect concerning its operational and cost characteristics. *Id.* § 292.302(b). The regulation further emphasizes that, while rates for purchases from existing facilities may be set lower than the utility's avoided cost in certain circumstances, *id.* §292.304(b)(3), "[r]ates for

purchases from new capacity" – that is, from facilities constructed after PURPA's enactment, *id.* § 292.304(b)(1) – "shall be in accordance with paragraph (b)(2) of this section," that is, equal to, and not less than, the utility's avoided costs. *Id.* § 292.304(b)(4); *see also Am. Paper Inst. v. Am. Electric Power Serv. Corp.*, 461 U.S. 402, 417 (1983) (upholding FERC's decision to require a rate equal to the full amount of the utility's avoided costs, and not less than that amount).

36.     FERC's regulations also detail the methodologies that must be used in determining a utility's avoided costs, and provide that the qualifying facility has the option to choose which of two methodologies shall be used in calculating the utility's avoided costs. *Id.* § 292.304(d).   When a qualifying facility provides "energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, … the rates for such purchases shall, *at the option of the qualifying facility* exercised prior to the beginning of the specified term, be based on either: (i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred." *Id.* § 292.304(d)(2) (emphasis added).

37.     The first methodology – "[t]he avoided costs calculated at the time of delivery," *id.* § 292.304(d)(2)(i) – is known in the industry as a "short run avoided cost" ("SRAC") rate, because it can be determined only at the moment that electricity is delivered.   Typically, the "short run avoided cost" is calculated on a month-to-month basis, and depends in part upon the fluctuating market price of natural gas or coal.   The second methodology – "[t]he avoided costs calculated at the time the obligation is incurred," *id.* § 292.304(d)(2)(ii) – is known in the industry as a "long run avoided cost" ("LRAC") rate, because it is determined at the time the utility incurs the purchase obligation, and is determined for the entire duration of the contract term.   A utility's long-run avoided costs are typically calculated through the use of a mathematical model that projects the utility's anticipated avoided costs in the future, accounting for the many variables that might affect those avoided costs.

38.     PURPA provides that each state's regulatory authority "implement [FERC]'s rule … for each electric utility for which it has ratemaking authority."   16 U.S.C. § 824a-3(f)(1). That provision constitutes a limited exception to FERC's exclusive regulatory authority over

wholesale electricity sales. Aside from "implement[ing]" FERC's rules under PURPA, *id.*, however, state regulatory commissions enjoy no authority to regulate wholesale electricity sales.

39.     Section 824a-3(f)(1) affords state regulatory commissions some latitude in implementing FERC's rules under PURPA. For example, with respect to qualifying facilities still in development, state regulatory commissions have some flexibility to establish rules concerning the point at which projects are deemed sufficiently viable to trigger a utility's legally enforceable obligation. *See, e.g.*, *Power Resource Group, Inc. v. Pub. Utility Comm'n of Texas*, 422 F.3d 231 (5th Cir. 2005) (upholding Texas law limiting a utility's legally enforceable obligation to those qualifying facilities able to deliver electricity within 90 days). In its Orders purporting to implement PURPA, CPUC has decided that a utility's legally enforceable obligation is triggered so long as a qualifying facility in development can satisfy six "project viability criteria," which include a contractual commitment to be online and delivering electricity within 24 months of the contract date, with one 6-month extension for regulatory delays. May 2012 Order at 69-70. A qualifying facility that failed to meet that deadline would then be liable to the utility for breach of contract; contractual remedies under CPUC's program include the forfeiture of development security.

40.     Section 824a-3(f)(1) also gives state regulatory commissions some latitude in calculating avoided costs and in setting the actual contract rate accordingly. However, state regulatory commissions are not permitted to adopt a rate for purchases based on some measure *other* than the utility's avoided costs. *See Independent Energy Producers Ass'n, Inc. v. Cal. Pub. Utilities Commission*, 36 F.3d 848, 857-58 (9th Cir. 1994). Nor, under the federal regulations, are state regulatory commissions permitted to offer qualifying facilities pricing under only one of the two methodologies prescribed by 18 C.F.R. § 292.304(d)(2) – *e.g.*, only a short-run avoided cost rate, and not a long-run avoided cost rate. The federal regulations are clear that the utility gets to choose whichever of those two pricing methodologies it wishes.

## FACTUAL ALLEGATIONS

41.     Prior to the issuance of the Orders under challenge here, qualifying facilities in California seeking to enter into contracts with utilities under PURPA had been able to choose

JENNER &
BLOCK LLP

between two pricing methodologies reflecting two different ways of calculating a utility's avoided costs – just as federal regulations require. *See* 18 C.F.R. § 292.304(d)(2). The first, a short-run avoided cost price, was calculated month to month over the contract term, depending upon, among other things, the price of natural gas and the price of intrastate transportation of gas. These inputs could fluctuate over time. The second, a long-run avoided cost rate, was calculated "to reflect the long-term ownership, operating, and fixed-price fuel costs" for a new, 500 megawatt natural gas-fired power plant. May 2012 Order at 7. This rate was intended "to represent the long term market price of electricity for fixed price contracts." *See* CPUC Order D.11-04-033 at 23 (attached as Exhibit D). CPUC based its long-run avoided cost rate on the costs of a natural gas-fired plant because it assumed that, but for the obligation to buy electricity from qualifying facilities, the utilities most likely would have purchased electricity from, or generated electricity through the use of, a natural gas-fired generation facility. Accordingly, the costs that would be associated with a long-term, fixed-price contract with a natural gas-fired facility represented the long-run costs that the utility would avoid by contracting with qualifying facilities instead. *Id.* at 21-22.

42. On May 24, 2012, CPUC issued the May 2012 Order, in order to implement statutory amendments to Cal. Pub. Util. Code § 399.20 (known as the "Feed-In Tariff" program), purportedly pursuant to PURPA. *See* May 2012 Order at 10-13. These Orders replaced the long-run avoided cost rate that California had previously offered to qualifying facilities.

43. On their face, the statutory amendments to Cal. Pub. Util. Code § 399.20 appear consistent with PURPA's requirement that long-run pricing reflect a utility's avoided costs as calculated at the time the contractual obligation is incurred. For example, the amendments direct CPUC to adopt a long-run pricing methodology that reflects the "long-term market price of electricity for fixed price contracts, determined pursuant to an electrical corporation's general procurement activities as authorized by the commission." Cal. Pub. Util. Code § 399.20(d)(2)(A). Likewise, the amendments direct CPUC to adopt a long-run pricing methodology that reflects the "long-term ownership, operating, and fixed-price fuel costs associated with fixed-price electricity from new generating facilities." *Id.* § 399.20(d)(2)(B).

JENNER &
BLOCK LLP

44.     Nonetheless, as detailed below, CPUC's May 2012 Order adopted a long-run pricing methodology that does not reflect utilities' avoided costs, and therefore – even if authorized by state law – violates PURPA and applicable federal regulations.

45.     Under the May 2012 Order – and as reaffirmed in the January 2013 Order and the May 2013 Order – qualifying facilities that seek a long-run avoided cost rate under PURPA must participate in a program called the "Renewable Market-Adjusting Tariff," also known as "Re-MAT" for short.

46.     In order to implement the Re-MAT program, CPUC approved a tariff for each participating investor-owned utility – Pacific Gas & Electric, Southern California Edison, and San Diego Gas & Electric.  The Re-MAT tariff for Pacific Gas & Electric became effective on July 24, 2013, and Pacific Gas & Electric began awarding contracts under the program on November 1, 2013.  The contracts are fixed-price contracts with a duration of ten, fifteen, or twenty years.

### A.     Eligibility to Participate in the Re-MAT Program.

47.     In order to be eligible to participate in the Re-MAT program and be able to receive a contract from a utility, a facility must be a qualifying facility pursuant to PURPA.  May 2012 Order at 11; May 2013 Order at 49 ([T]he program … is only available to sellers that are [qualifying facilities]… It is the responsibility of the sellers to complete all necessary documents with FERC.  If FERC does not require any action be taken to be a [qualifying facility,] we will not require any.").  In addition, the qualifying facility must satisfy six "project viability criteria" established by CPUC: (1) payment of a bid fee; (2) performance of a study concerning the impact that the facility's interconnection with the grid would have on the electrical system; (3) control of the site on which the qualifying facility will be built, or an option to lease or purchase that could be exercised once a contract with the utility is executed; (4) prior development experience; (5) an online date within 24 months of the contract date with one 6-month extension; and (6) a lack of market power.  May 2012 Order at 69-70.

48.     A project meeting these criteria is eligible to enter a "queue" to receive a contract from a utility.  (Upon executing the contract, the qualifying facility will also need to post a

development security bond, which would compensate the utility in the event that the qualifying facility fails to meet its contractual online date.) A project's place in a queue is on a first-come, first-served basis.

49. Each utility maintains three separate "queues," one for each of three types of generation facilities. One queue is for "baseload" facilities – that is, facilities that can dependably generate electricity under all circumstances (for example, geothermal facilities, which generate electricity using heat from beneath the earth's crust). A second queue is for "non-peaking, as available" facilities, which are typically wind-powered facilities. The ability of such facilities to generate electricity may depend upon conditions, such as whether the wind is blowing – and thus they sell their electricity "as available." Further, such facilities do not necessarily generate electricity at times of peak demand – for example, a wind-powered facility may generate electricity during cool and breezy nights, when demand for electricity is low – and thus they are called "non-peaking" facilities. The third queue is for "peaking, as available" facilities, which are typically solar generation facilities. The ability of such facilities to generate electricity also depends upon conditions, such as whether the sun is shining, and therefore they sell their electricity "as available." But these facilities tend to generate electricity at times when demand is at its peak – for example, a hot, sunny summer afternoon – and therefore are called "peaking" facilities. As further explained below, the Re-MAT program is designed to provide a different price to each of these three types of generation facilities.

**B.     The Re-MAT Program Places Limits on the Amount of Electricity That Utilities Are Required to Purchase.**

50. Under the statutory amendments to Cal. Pub. Util. Code § 399.20, the total size of the Re-MAT program is capped at 750 megawatts. In the May 2012 Order, CPUC directed that each of the three investor-owned utilities participating in the Re-MAT program were responsible for procuring a portion of the 750-megawatt total that accords with their share of statewide electricity demand. Under this metric, Pacific Gas & Electric is required to procure only 218.8 megawatts under the Re-MAT program. *See* May 2012 Order at 78.

JENNER &
BLOCK LLP

51.     The May 2012 Order further divides each investor-owned utility's share among the three subcategories of renewable generation technology.  May 2012 Order at 42-44, 49.  Thus, Pacific Gas & Electric is required to purchase one-third of its total cap – about 42.9 megawatts – from "baseload" generation facilities, one-third from "peaking, as-available," and one-third from "non-peaking, as available".  *See* PG&E, ReMAT Feed-In Tariff, http://www.pge.com/b2b/energysupply/wholesaleelectricsuppliersolicitation/ReMAT/   (attached as Exhibit E).

52.     Pacific Gas & Electric has already entered into a number of power purchase agreements.  As a result, Pacific Gas & Electric's remaining obligation for "peaking, as available" facilities is currently only approximately 31.1 megawatts.  *See* Exhibit E.

53.     As a result of CPUC's decision to limit each utility's obligation to purchase electricity from qualified facilities, the Re-MAT program is oversubscribed.  Pacific Gas & Electric's queue for "peaking, as available" facilities currently contains projects amounting to 54.1 megawatts – about 23 megawatts more than the CPUC Orders obligate Pacific Gas & Electric to buy.  *See* Pacific Gas & Electric Company, ReMAT Queue Information, http://www.pge.com/includes/docs/pdfs/b2b/energysupply/wholesaleelectricsuppliersolicitation/ ReMat/Program_Period_4_Queue_Information.pdf   (attached as Exhibit F).  As a practical matter this means that Pacific Gas & Electric will not purchase available solar-based energy from qualifying facilities, despite the fact that federal regulations require that utilities purchase "any energy and capacity which is made available from a qualifying facility … [d]irectly to the electric utility."  18 C.F.R. § 292.303(a).

54.     To make matters worse, under the May 2013 Order, in each bi-monthly period, Pacific Gas & Electric may not enter into contracts for more than 5 megawatts for each of the three types generation facilities.  May 2013 Order at 10-15, 20-21.  Thus, for example, in any given two-month period, Pacific Gas & Electric may not enter contracts for more than 5 megawatts of electricity from "peaking, as available" facilities – despite the fact that the queue for such projects contains 54.1 megawatts, and, again, despite the federal requirement that utilities purchase all energy made available by qualifying utilities.

JENNER &
BLOCK LLP

**C. The Price Offered By the Re-MAT Program Is Not an Avoided Cost Price.**

55. The 5 megawatt-cap described above is central to the Re-MAT program's mechanism for setting the price at which those contracts are awarded.

56. Every two months, each participating utility offers to enter a contract, at a particular price, with the qualifying facilities in a queue. (As noted above, each utility has three queues, one for each type of generation facility, and this process is carried out for each of the utility's queues.) The price offered by a utility under the Re-MAT program is fixed for the length of the contract term, which is either 10 years, 15 years, or 20 years.

57. An offer is made to each project in the queue, in order of the project's position in the queue, until the utility has reached the 5-megawatt cap for that two-month period. If a qualifying facility accepts the price offered, it enters into the contract with the utility. If a qualifying facility declines the price, it maintains its position in the queue until the next two-month period. If there are at least five projects in the queue, and none is willing to accept the price offered by the utility, then no contracts will be awarded, but the offer price will increase in the next two-month period based on a CPUC-determined formula. If the utility is able to enter contracts for the full 5 megawatts, then the offer price will decrease in the next two-month period based on a CPUC-determined formula. If the utility is able to contract for at least 1 megawatt, but does not reach its 5 megawatt cap, then the price will stay the same in the next two-month period. *See* May 2012 Order at 44-48; May 2013 Order at 13-14. Finally, if there are fewer than five separate projects from five unrelated developers in a queue, as has been the case in the "baseload" and "as-available, non-peaking" queues, then the price for that queue will stay the same in the next two-month period.

58. For example, in the initial two-month period (beginning November 1, 2013), Pacific Gas & Electric offered to purchase electricity from qualifying facilities in its "peaking, as-available" queue for a base price of $89.23/megawatt-hour. CPUC established this as the initial price based on the amount that the utilities paid for renewable energy at an auction

JENNER &
BLOCK LLP

SECOND AMENDED COMPLAINT
CASE NO. C-13-04934 JD

sponsored by CPUC in November 2011. *See* May 2012 Order at 42-44.[2] Pacific Gas & Electric entered into contracts with qualified facilities in its queue at that initial price for the full 5 megawatts available in that initial two-month period.

59. In the next two-month period (beginning January 1, 2014), Pacific Gas & Electric offered a base price of $85.23/megawatt-hour, a reduction in price dictated by the CPUC-determined formula. Pacific Gas & Electric again entered into contracts with qualified facilities in its queue for the full 5 megawatts available in that two-month period.

60. In the next two-month period (beginning March 1, 2014), Pacific Gas & Electric offered a further-reduced base price, this time to $77.23/megawatt-hour, again pursuant to the CPUC-determined formula. And, again Pacific Gas & Electric entered into contracts with qualifying facilities in its queue for the full 5 megawatts available in that two-month period.

61. In the current two-month period (which began on May 1, 2014), Pacific Gas & Electric offered a base price of $65.23/megawatt-hour. If Pacific Gas & Electric is able to enter contracts for 5 megawatts at that price, the base price for the next two-month period (beginning July 1, 2014) will drop even further, to $53.23/megawatt-hour. If Pacific Gas & Electric is not able to enter any contracts at $65.23/megawatt-hour, then the base price for the next two-month period will increase to $69.23/megawatt-hour. If Pacific Gas & Electric is able to contract for at least 1.0 megawatt but not 5 megawatts during this period, then the base price will stay the same for the next two-month period.

62. As a result of these decreasing prices, a project that entered into a contract in the initial two-month period of the Re-MAT program received a substantially higher price for its electricity than a project that entered into a contract in a subsequent period.

63. The prices offered by Pacific Gas & Electric, as mandated by the CPUC Orders, have no relationship at all to Pacific Gas & Electric's avoided costs – that is, they have no

---

[2] The auction involved renewable energy projects that were significantly larger than those eligible for the Re-MAT program – typically projects about 20 megawatts in size. Because larger projects typically must be located further away from populated areas than smaller projects, transmitting that electricity to consumers is typically more costly to utilities than transmitting electricity from smaller projects located closer to populated areas.

JENNER &
BLOCK LLP

relationship whatsoever to the costs that Pacific Gas & Electric would otherwise incur if, instead of contracting with the qualifying facility, it had generated that electricity itself or procured it from another source.

64. Rather, the Re-MAT program's pricing mechanism is intended, over time, to identify the lowest price at which a qualifying facility is willing to sell electricity. In other words, the Re-MAT program's pricing is intended to reflect the qualifying facility's production costs – not the utility's avoided costs. This approach inverts the policy adopted by PURPA and implemented by FERC's regulations.

65. In its Orders, CPUC has made clear that the Re-MAT program is designed so that prices paid to qualifying facilities under the Re-MAT program reflect those facilities' production costs. The May 2012 Order, for example, explains that CPUC "seek[s] to pay generators [*i.e.*, qualifying facilities] the price needed to build and operate a renewable generation facility." May 2012 Order at 42;[3] *id.* at 33 (rejecting certain proposed adjustments to the price on the ground that "these adders could increase the contract price above the resource's actual costs and lead to overpayment"). The January 2013 Order confirms that "the rationale for a market-based price is that all of the generator's costs are included in the price because a generator would not bid something lower than its costs. In a market-based process, the seller determines the price it wishes to seek based on its understanding of the underlying project costs, and changes in those costs." January 2013 Order at 6.

## INJURIES TO BE REDRESSED

66. The Lodi facility, owned by Plaintiff, is registered with FERC as a qualifying facility and satisfies the six project viability criteria set forth in the May 2012 Order. Thus, under the rules established by CPUC, the Lodi facility is eligible to receive a contract from a utility.

---

[3] CPUC's January 2013 Order subsequently deleted this statement lest it be misconstrued to suggest that the qualifying facilities participating in the Re-MAT program enjoyed some guarantee of cost recovery. *See* January 2013 Order at 6-7. Nevertheless, the pricing theory implied by this observation remains pertinent.

67. The Lodi facility is currently in Pacific Gas & Electric's "queue" for "peaking, as available" facilities. Indeed, the Lodi facility currently occupies the first position in that queue.

68. In the two-month period beginning March 1, 2014, Pacific Gas & Electric offered the Lodi facility a long-term contract at the CPUC-mandated base price of $77.23/megawatt-hour. Plaintiff, as the owner of the Lodi facility, declined to enter into a contract at that price.

69. In the two-month period beginning May 1, 2014, Pacific Gas & Electric offered the Lodi facility a long-term contract at the CPUC-mandated base price of $65.23/megawatt-hour. Again, Plaintiff, as the owner of the Lodi facility, declined to enter into a contract at that price.

70. In the two month period beginning July 1, 2014, Pacific Gas & Electric will again offer the Lodi facility a long-term contract at the CPUC-mandated base price for that period, as described in paragraph 61 above.

71. Plaintiff seeks to enter into a contract with Pacific Gas & Electric, pursuant to PURPA, on terms consistent with federal law concerning the pricing of such contracts.

72. On information and belief, Pacific Gas & Electric's long-run avoided costs are higher than the current Re-MAT price offered by Pacific Gas & Electric, pursuant to CPUC's Orders, for "peaking, as available" qualifying facilities.

73. Plaintiff, as owner of the Lodi facility, has suffered an injury-in-fact because the Re-MAT pricing mechanism adopted by CPUC is not based on Pacific Gas & Electric's avoided costs, and, on information and belief, has resulted in an offer price that is lower than Pacific Gas & Electric's long-run avoided costs. As a result, Plaintiff has been denied the opportunity to enter into a contract with Pacific Gas & Electric on terms required by federal law.

74. A favorable ruling in Plaintiff's favor, declaring the Re-MAT scheme to be preempted and requiring CPUC to implement PURPA in a manner consistent with federal regulations concerning pricing, would redress that injury-in-fact, by providing Plaintiff the opportunity to enter into a contract with Pacific Gas & Electric on terms required by federal law.

75. Plaintiff, as owner of the Lodi facility, has also suffered an injury-in-fact because the price currently offered under CPUC's Re-MAT pricing mechanism, $65.23/megawatt-hour,

which Plaintiff alleges is in conflict with federal law, is too low to enable Plaintiff to obtain the financing needed to construct the Lodi facility.

76. The low pricing under the Re-MAT program is the only remaining barrier to Plaintiff's ability to obtain the financing needed to construct the Lodi facility.

77. A favorable ruling in Plaintiff's favor, declaring the Re-MAT scheme to be preempted and requiring CPUC to implement PURPA in a manner consistent with federal regulations concerning pricing, is, on information and belief, substantially likely to result in a price high enough to allow Plaintiff to obtain the financing needed to construct the Lodi facility.

**CLAIM FOR RELIEF**

**COUNT I: PREEMPTION**
**(Violation of the Supremacy Clause of the U.S. Constitution and 42 U.S.C. § 1983)**

78. Plaintiffs restate and incorporate by reference each and every allegation in Paragraphs 1 through 77 as if fully set forth herein.

79. Under the Supremacy Clause of the United States Constitution, a state law is preempted when Congress intends federal law to occupy the field, as well as in cases where the state law conflicts with federal statutes or regulations, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

80. In passing the Federal Power Act, Congress intended FERC to have exclusive jurisdiction over the field of wholesale electricity sales. Section 201(b) of the Federal Power Act, codified at 16 U.S.C. § 824(b), sets out the scope of federal regulatory power and draws a bright line between mutually exclusive spheres of state and federal regulatory authority. The Federal Power Act left no power in states to regulate wholesale electricity pricing or sales.

81. In 1978, Congress enacted PURPA, codified at 16 U.S.C. § 824a-3, which amended the Federal Power Act and created a limited role for states in setting rates for certain wholesale transactions.

82. Other than the authority granted to the states in PURPA, states have no other authority to set wholesale electricity rates or regulate wholesale electricity transactions.

83.     PURPA directed FERC to adopt rules requiring electric utilities to purchase power generated by, among others, "qualifying small power production facilities." 16 U.S.C. § 824a-3(a).  PURPA then directed state regulatory commissions, like CPUC, to implement FERC's regulations.

84.     Under FERC's regulations, "[e]ach electric utility shall purchase … any energy and capacity which is made available from a qualifying facility … [d]irectly to the electric utility." 18 C.F.R. § 292.303(a).

85.     CPUC's Re-MAT program, as set forth in the Orders, conflicts with FERC's regulations under PURPA, because it limits the utilities' total obligation to purchase electricity. For example, in the case of Pacific Gas & Electric, CPUC limits the utility's total purchase obligation to 218.8 megawatts.  CPUC further limits the utilities' total obligation to purchase electricity from different kinds of generation facilities.  For example, in the case of Pacific Gas & Electric, CPUC limits the utility's obligation to purchase electricity generated by qualifying solar facilities to 42.9 megawatts.  CPUC still further limits the utilities' obligation to enter contracts with qualifying facilities, allowing the utilities to enter into contracts with qualifying solar facilities for only 5 megawatts in each bimonthly period.  These limitations on the utilities' purchase obligations conflict with FERC's regulation requiring that "[e]ach electric utility *shall purchase … any* energy and capacity which is made available from a qualifying facility."  18 C.F.R. § 292.303(a) (emphasis added).  Accordingly, the Re-MAT program's limitation on the utilities' purchase obligations is preempted.

86.     Under FERC's regulations, the rate for purchases shall be equal to the utility's avoided costs, 18 C.F.R. § 292.304, and the qualifying facility has the option of choosing from two different ways of calculating avoided costs:  "(i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred."  *Id.* § 292.304(d)(2).

87.     CPUC's Re-MAT program purports to implement the second method, the avoided costs calculated at the time the obligation is incurred, but its pricing mechanism is not based on

the *utilities' avoided* costs. Instead, it is intended to reflect the *qualifying facilities' production* costs.

88.     Because the Re-MAT program's pricing mechanism results in prices for electricity that do not reflect the utilities' avoided costs, it conflicts with federal regulations. *See Indep. Energy Producers*, 36 F.3d at 857 ("[FERC]'s regulations are clear that the rate to be paid by utilities for electric energy be determined according to the avoided costs to the *utility* of generating that energy or purchasing it elsewhere, and not according to the [qualifying facility's] efficiency."). Therefore, the Re-MAT pricing mechanism is preempted.

89.     Moreover, because the Re-MAT pricing mechanism is not authorized by PURPA, it falls outside the narrow exception that Congress has given to states to set rates for wholesale electricity sales. Except for the authority granted by PURPA, states are without power to set rates for wholesale electricity sales; the field of wholesale rate-setting is, with the exception of PURPA, reserved exclusively for FERC. For that reason, too, the Re-MAT pricing mechanism is preempted.

90.     CPUC has justified its pricing mechanism on the ground that it "prevents overpayment" to qualifying facilities. May 2012 Order at 18; *id.* at 49-50 (explaining that the Re-MAT program is intended to "minimize ratepayer exposure to a large number of non-competitively priced contracts"); *id.* at 35 (explaining that the purpose of the Re-MAT pricing mechanism is to use "the ability for competition to control contract cost").

91.     CPUC's policy reflected in the Orders is in conflict with FERC's policy and stands as an obstacle to the accomplishment and execution of the full purposes of Congress. FERC understood that a utility's avoided costs may well be larger than the cost to a qualifying facility of producing electricity, yet it expressly chose *not* to tie price to qualifying facilities' costs. Rather, FERC adopted a policy under which any difference between a utility's avoided costs and the qualifying facilities' production costs would be paid to the owners and operators of qualifying facilities, rather than allocated among the utilities' customers.

92.     In FERC's view, a pricing scheme that would allow qualifying facilities to increase their profit as a result of lowering their costs would encouraging qualifying facilities to

increase their efficiency and promote further reliance on renewable generation technology. In its Order explaining this rationale, FERC noted: "In most instances … purchases of energy or capacity from qualifying facilities will only occur when the cost to the qualifying [facility] … of producing the energy or capacity is lower than the utility's avoided costs. Only if this is the case will payment by the utility of its avoided costs provide economic benefit for the … [qualifying facility]." FERC, Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214, 12,222 (1980). FERC continued: "The Commission notes that, in most instances, if part of the savings from [qualifying facility production] … were allocated among the utilities' ratepayers, any rate reductions will be insignificant for any individual customers. On the other hand, if these savings are allocated to the relatively small class of qualifying [facilities], they may provide a significant incentive for a higher growth rate of these technologies." *Id.* Accordingly, FERC determined that "the basis for the determination of rates for purchases should be the utility's avoided costs and should not vary on the basis of the costs of the particular qualifying facility." *Id.*

93.     The Supreme Court considered and affirmed FERC's decision "to set the rate at full avoided cost rather than at a level that would result in direct rate savings for utility customers by permitting a utility to obtain energy at a cost less than the cost to the utility of producing the energy itself or purchasing it from an alternative source." *Am. Paper Inst,*, 461 U.S. at 406. The Court reasoned that, in setting the required rate at the utility's full avoided costs, and not less than that amount, "the Commission considered the relevant factors and deemed it most important at this time to provide the maximum incentive for the development of cogeneration and small power production, in light of the Commission's judgment that the entire country will ultimately benefit from the increased development of these technologies and the resulting decrease in the nation's dependence on fossil fuels." *Id.* at 417.

94.     The Ninth Circuit has likewise emphasized FERC's decision to "provide that [qualifying facilities] are entitled to sell electric energy to utilities at a rate that is the utility's *full* avoided costs." *Indep. Energy Producers*, 36 F.3d at 858. The Ninth Circuit explained that "[i]n

implementing its regulations, [FERC] clearly weighed Congress's desire" to promote electricity production by qualifying facilities "while not burdening ratepayers, and concluded that requiring utilities to pay *full* avoided costs properly balanced these interests." *Id.* As the Ninth Circuit explained, "If purchase rates are set at the utility's avoided cost, consumers are not forced to subsidize [qualifying facilities] because they are paying the same amount they would have paid if the utility had generated energy itself or purchased energy elsewhere." *Id.*

95. CPUC, in the Orders, has adopted a policy that conflicts with FERC's and stands as an obstacle to the accomplishment and execution of the full purposes of Congress. CPUC has concluded, in direct conflict with FERC, that consumers would be "overpay[ing]," May 2012 Order at 18, if qualifying facilities received contracts at a price equal to the utilities' avoided costs. Accordingly, it has adopted a pricing mechanism designed to minimize the cost of PURPA contracts, without regard to the utilities' avoided costs. Indeed, CPUC specifically designed the Re-MAT program to "minimize[] costs to ratepayers [and] prevent[] overpayment…" and to "maximize contract value to the ratepayer and the utility by using the market to determine the price…" May 2012 Order at 18; *see also* paragraph 65, *supra*. CPUC's adoption of such a pricing mechanism conflicts with FERC's policy, which mandates that qualifying facilities be paid a price equal to the utilities' avoided costs, regardless of the qualifying facilities' own cost of production. CPUC's orders thus stand as an obstacle to the full achievement of Congress's purpose in enacting PURPA, which is to facilitate renewable energy generation by providing economic incentives for qualifying facilities to enter the market, without making consumers any worse off than they would otherwise be.

96. Because CPUC's Orders conflict with federal regulations under PURPA and are an obstacle to the achievement of Congress' policy in enacting PURPA, and because CPUC has no authority to set wholesale electricity rates other than that given by PURPA, CPUC's Orders are preempted by federal law and violate the Supremacy Clause of the U.S Constitution.

97. Plaintiff will suffer irreparable harm by virtue of CPUC's violation of the Supremacy Clause, because it will continue to be unable to enter into a contract at the long-run

JENNER &
BLOCK LLP

avoided cost price guaranteed by federal law, and is without any adequate remedy at law and no opportunity for compensation for CPUC's violation of the Supremacy Clause.

98. The public interest is also harmed by CPUC's violation of federal law. Congress and FERC have determined that the public interest lies in encouraging the development of renewable energy generation, so long as consumers do not pay more for renewable energy generation than they would for the electricity that would otherwise need to be produced.

99. Plaintiff is entitled to judgment under 28 U.S.C. §§ 2201(a) and 2202, declaring that the CPUC Orders violate the Supremacy Clause (Article VI, Clause 2) of the United States Constitution.

100. Plaintiff is entitled to injunctive relief preventing Defendants from continuing to carry out its unlawful Re-MAT program, and requiring Defendants to promulgate regulations consistent with federal regulations and policy.

101. Such injunctive relief would harm Defendants less (if at all) than denying relief would harm Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that this Court enter an Order:

a. Declaring that the Orders violate the Supremacy Clause of the U.S. Constitution insofar as they place numerical limits on utilities' obligations to enter into contracts purchasing electricity from qualifying facilities;

b. Declaring that the Orders violate the Supremacy Clause of the U.S. Constitution insofar as they establish a price different than the utility's avoided costs calculated for the length of the contract term at the time the contractual obligation is incurred;

c. Enjoining Defendants from continuing to apply the Re-MAT program as set forth in the Orders;

d. Enjoining Defendants to issue new Orders implementing PURPA in a manner consistent with federal law;

e. Awarding Plaintiff its reasonable attorney fees pursuant to 42 U.S.C. § 1983 and

1    42 U.S.C. § 1988;

2    f.    Awarding Plaintiff such further relief as the Court may deem just and equitable.

3

4    Dated: June 25, 2014                    Respectfully submitted,

5                                             JENNER & BLOCK LLP

6                                             By: /s/  Matthew E. Price
                                              Matthew E. Price (*pro hac vice*)
7                                             *Attorney for Plaintiff*
                                              Email:  mprice@jenner.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28