AROCLES AGUILAR (CSB 94753)
HARVEY Y. MORRIS (CSB 87902)
TRACI L. BONE (CSB 172580)
CHRISTINE J. HAMMOND (CSB 206768)
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA  94102
Telephone:  (415) 703-2048
Facsimile:  (415) 703-4592
tbo@cpuc.ca.gov

Attorneys for Defendants Clifford Rechtschaffen,
Martha Guzman Aceves, Carla Peterman, Michael Picker,
and Liane Randolph, in their official capacities as Commissioners
of the California Public Utilities Commission

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| WINDING CREEK SOLAR LLC,<br><br>               Plaintiff,<br>  vs.<br><br>MICHAEL FLORIO, CATHERINE SANDOVAL, CARLA PETERMAN, MICHAEL PICKER, and LIANE RANDOLPH, in their official capacity as Commissioners of the California Public Utilities Commission,<br><br>               Defendants. | Case No. 13-04934 JD<br><br>**PRE-TRIAL BRIEF OF DEFENDANTS COMMISSIONERS OF THE CALIFORNIA PUBLIC UTILITIES COMMISSION**<br><br>Trial Date: April 4, 2017<br>Time: 9:00 a.m.<br>Courtroom 11, 19th Floor |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES ..................................................................................... ii-iii

TABLE OF ACRONYMS AND TERMS................................................................... iv-vi

I.   INTRODUCTION..............................................................................................1

II.  STANDARD OF REVIEW.................................................................................2

III. ARGUMENT ......................................................................................................3

    A.  The QF SOC Complies With § 292.304(d)(2)......................................3

        1.  FERC And The Ninth Circuit Endorse The Use of Market Mechanisms To Set Avoided Costs ................................................4

        2.  CPUC SRAC Formulas Have Been Found PURPA-Compliant In Many Forums; FERC Determinations Of PURPA Compliance Are Entitled To Deference ...............................................................6

        3.  Formula Rates With Inputs Fixed At Contract Execution Comply With § 292.304(d)(2) Even If The Payment Cannot Be Calculated At That Time..................................................................................7

        4.  The CPUC's PURPA Implementation Is Entitled To Deference ................8

    B.  It Is Undisputed The Re-MATRe-MAT Complies With § 292.304(d)(2)(ii) ...................................................................................9

IV. CONCLUSION ................................................................................................10

# TABLE OF AUTHORITIES[1]

Page

**FEDERAL CASES**

*Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774 (9th Cir. 2012) ..............9

*Chevron, U.S.A., Inc. v. Natural Res. Defense Council,*
467 U.S. 837 (1984) ........................................................................................7

*FERC v. Mississippi,* 456 U.S. 742 (1982) ........................................................2

*Indep. Energy Producers v. Cal. P.U.C.,* 36 F.3d 848 (9th Cir. 1994) ......................*passim*

*Perfectly Fresh Farms, Inc. v. U.S. Dep't of Agric.,* 692 F.3d 960 (9th Cir. 2012) ...........7

*P.U.C. of Cal. v. FERC,* 254 F.3d 250 (D.C. Cir. 2001) ...............................................7, 8

*Renee v. Duncan*, 686 F.3d 1002, 1012 (9th Cir. 2012) ........................................9

**Solutions for Util's, Inc. et al. v. CPUC*, CV 11-04975, Order Granting Defendants'
Motion for Summary Judgment (Dec. 28, 2016), *appeal pending*
(CPUC RJN, ECF 129, Ex. 6) ..............................................................................7

*United States v. Morgan*, 313 U.S. 409 (1941) ..................................................2

**FERC ISSUANCES**

***Administrative Determination of Full Avoided Costs, Sales of Power to Qualifying
Facilities, and Interconnection Facilities,* Federal Energy Reg. Comm'n Rep.
(CCH) ¶ 32,457, 32,174 (March 16, 1988) (CPUC RJN, ECF 129, Ex. 4) ..............*passim*

**Cal. P.U.C.*, 133 FERC ¶ 61,059 (2010),
*reh'g denied,* 134 FERC ¶ 61,044 (2011) .................................................................1, 3

**Cal. P.U.C.*, 134 FERC ¶ 61,044 (2011) ........................................................7

---

[1] FERC and CPUC decisions designated with an "*" were provided in the CPUC Appendix of Authorities, ECF 91. In addition, FERC's *Administrative Determination* and the decision in *Solutions for Util's, Inc. et al. v. CPUC,* both designated with an "**" were provided in the CPUC's Request for Judicial Notice filed March 21, 2017 as Exs. 4 & 6. With these exceptions, the remaining decisions will be provided in the CPUC Appendix of Authorities filed concurrent with this Pre-Trial Brief.

*City of Ketchikan*, 94 FERC ¶ 61,293 (Mar. 15, 2001) ........................................................8

*Energy Producers and Users Coalition,* 149 FERC ¶ 61,251 (2014) ..........................5, 6

*Order Terminating Proceeding,* 84 FERC ¶ 61,265 (Sept. 21, 1998)................................5

*Revised Regulations Governing Small Power Production and Cogeneration Facilities,* 114 FERC ¶ 61,102 (2006)..................................................................................................5

*Signal Shasta Energy Co*., 41 FERC ¶ 61,120 (1987) ............................................ *passim*

*So. Cal. Edison Co.,* 143 FERC ¶ 61,222 (2013) ..............................................................6

*Winding Creek Solar LLC,* 144 FERC ¶ 61,122 (2013) ....................................................6

*Winding Creek Solar LLC,* 151 FERC ¶ 61,103 (2015) ....................................................6

**FEDERAL STATUTES AND REGULATIONS**

16 U.S.C. § 824a-3 ........................................................................................................1, 8

18 C.F.R. § 292.304 (1980) ......................................................................................*passim*

**CALIFORNIA DECISIONS**

*So. Cal. Edison Co. v. Cal. P.U.C.,* 101 Cal. App. 4th 982 (2002) ....................................7

*So. Cal. Edison Co. v. Cal. P.U.C.,* 128 Cal. App. 4th 1 (2005) ....................................3, 7

**CPUC DECISIONS**

D.04-01-050, 2004 WL 188191 (Jan. 22, 2004)................................................................4

*D.10-12-035, 2010 WL 5650671 (Dec. 16, 2010) ............................................................1

**CALIFORNIA STATUTES AND REGULATIONS**

Pub. Util. Code § 399.11 ....................................................................................................2

# TABLE OF ACRONYMS AND TERMS

**399.20 FiT:** Original feed-in tariff implementing California Public Utilities Code § 399.20, enacted in 2006.

**AB 1613 CHP:** A certain type of cogeneration facility (combined heat and power system), as defined in California Public Utilities Code § 2840.2.

*Administrative Determination*: *Administrative Determination of Full Avoided Costs, Sales of Power to Qualifying Facilities, and Interconnection Facilities*, Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457 (March 16, 1988).

**Avoided Cost:** The incremental cost to the utility of the electricity that, but for the purchase from the QF, the utility would need to generate or purchase from "another source," as defined by 16 U.S.C. § 824a-3(b), (d); and 18 C.F.R. §§ 292.101(b)(6), 292.304(a)(2).

**Capacity**: Capacity is the ability to generate power - to actually be built and ready to generate when needed. We typically measure capacity in MWs of *potential* production. A capacity payment is a type of "stand by" payment and is made before the generator actually produces the electricity.

**CSI:** California Solar Initiative.

**Energy**: Energy is the actual electricity that is generated and transferred to the grid. An Energy payment is made when the utility needs the energy and the QF actually generates electricity to meet this need. We typically measure energy in MW-hours (MWh).

**FERC:** Federal Energy Regulatory Commission.

**FiT:** A feed-in tariff.

**IOU:** Investor-Owned Utility regulated by the CPUC.

**kW:** A kilowatt is 1,000 watts of power. A watt hour is the basic unit of measure of electric energy consumption.

**kWh**: A kilowatt hour is the amount of power necessary to produce 1,000 watts for one hour. For example, ten 100-wattlight bulbs burning for one hour uses 1,000 Wh of electric energy, or 1 kWh.

**MPR:** The Market Price Referent reflects the construction, operation and maintenance costs of a proxy generator: a new, highly efficient 500 MW capacity combined cycle natural gas turbine.

**MW:** A megawatt is a million watts of power. For example, a MW is the amount of power needed to light 10,000 100 watt bulbs.

**MWh**: A megawatt hour is the amount of electric power delivered multiplied by the time over which the energy is consumed (measured in hours). A MWh is the amount of power needed to light 10,000 100 watt bulbs for one hour.

**NEM:** The Net Energy Metering program is one of several CPUC programs in the CSI that is designed to promote small scale solar installations located at the site of the utility customer. Customers in the NEM program can choose to sell to their interconnected utility any solar energy generated in excess of their on-site consumption at the Net Surplus Compensation rate, a PURPA avoided cost.

**PG&E**: Pacific Gas and Electric Company.

**PURPA:** Public Utility Regulatory Policies Act of 1978, codified generally at 16 U.S.C. § 796 and § 824a-3.

**QF:** A qualifying facility is an eligible cogeneration or small power production facility that is a qualifying facility under the requirements specified in Subpart B of FERC's regulations (18 C.F.R. § 292.101(b)(1), § 292.203).

**QF SOC:** The power purchase agreement approved by the CPUC in Decision 10-12-035, and contained at Attachment A, Ex. 6 of that decision, that California's regulated utilities must offer QFs of 20 MW or less to the extent that the QFs' prices do not exceed the utilities' avoided costs as determined by the CPUC.

**QF Settlement:** The comprehensive settlement among QFs, utilities, and ratepayer representatives approved and adopted by the CPUC in December 2010 in CPUC decision D.10-12-035, 2010 WL 5650671 (Dec. 16, 2010).

**RAM:** The Renewable Auction Mechanism was established by the CPUC in D.10-12-048 as the primary contracting tool for utility procurement from smaller renewable energy projects (up to 20MW in size) that are eligible for the California Renewables Portfolio Standard Program.

**Re-MAT:** Renewable Market Adjustment Tariff, the revised feed-in tariff program implementing amendments to California Public Utilities § 399.20.

**Re-MAT Product Category:** A category of energy product in the Re-MAT program based upon when the energy can be made available. The three Re-MAT Product Categories are: as-available peaking, as-available non-peaking, and baseload.

**Re-MAT Program Period:** An interval that occurs every two months in which the utility offers Re-MAT contracts up to 5 MW of capacity in order of the queue.

**RPS**: The Renewable Portfolio Standard is a utility procurement requirement mandated by California law (Article 16 of the Public Utilities Code, commencing with § 399.11). The RPS

requires increasing utility procurement by CPUC-regulated utilities from eligible renewable energy resources.

**SCE:** Southern California Edison Company.

**SRAC:** Short-Run Avoided Costs are the short-run marginal costs for the production of one additional unit of electricity: fuel costs, and certain operation and maintenance costs. The SRAC payment is for the delivery of energy.

## I. INTRODUCTION

Defendants Commissioners of the California Public Utilities Commission (CPUC) submit this Brief pursuant to the Court's order setting a one-day bench trial to resolve "whether the CPUC's standard contract complies with 18 C.F.R. § 292.304(d)(2)." ECF 117. That section of FERC's PURPA regulations provides that a QF has the option "to provide energy *or* capacity pursuant to a legally enforceable obligation … over a specified term" at avoided cost rates calculated "at the time of delivery" *or* when "the obligation is incurred." 18 C.F.R. § 292.304(d)(2) (emphasis added).

Winding Creek Solar, LLC (WCS) claims that the "disputed issue is whether a formula that has variables for which the value is not known can be said to be a rate calculable at the time the contract is entered under 292.304(d)(2)(ii)." ECF No. 120, Tr., p. 4, lines 22-25 (Mr. Price). More specifically, given that WCS does not object to Time of Delivery (TOD) variable inputs (Lesser Dep., ECF 93, pp. 173:20-174:15), the *actual* dispute is whether a formula rate containing a *variable market-based input* can comply with § 292.304(d)(2).

In sum, WCS argues that 292.304(d)(2)(ii) entitles it to a fixed and immutable dollar amount for every unit of energy delivered for all periods under a long-term contract. WCS misunderstands FERC's regulations, and FERC's interpretation of its own regulations is entitled to judicial deference. FERC has repeatedly determined that avoided cost rates under long-term contracts that are based on formulas with variable inputs, including market-adjusting inputs, are PURPA-compliant. One such formula FERC has expressly approved several times is the CPUC's SRAC energy payment formula.

As described below, this SRAC formula is informed by decades of FERC and CPUC experience regarding the setting of avoided costs, hard lessons learned, and the profound changes that have occurred in energy markets during that time. Given this history, it would be inconsistent with FERC and Ninth Circuit precedent for this court to find that an SRAC formula containing market-based inputs cannot be used to comply with § 292.304(d)(2)(ii). It is also unnecessary, given the CPUC's aggressive implementation of California's RPS

1  requirements,[2] which far exceed federal PURPA requirements, and WCS's ability to obtain a
2  fixed price contract right now through the Re-MAT program.

## II. STANDARD OF REVIEW

PURPA is a program of "cooperative federalism" that allows states the flexibility to develop programs to meet their particular needs. *FERC v. Mississippi*, 456 U.S. 742, 767 (1982). Courts review a state's implementation of both PURPA, and the relevant FERC regulations, with deference because a state has "broad authority" and plays "the primary role in calculating avoided costs and in overseeing the contractual relationship between QFs and utilities operating under the regulations promulgated by the Commission." *Indep. Energy Producers Ass'n v. Cal. P.U.C.,* 36 F. 3d 848, 856 (9th Cir. 1994) (*IEP*). Such deference is appropriate with respect to ratemaking because ratemaking is a legislative, not judicial, function, "a task of striking a balance and reaching a judgment on factors beset with doubts and difficulties, uncertainty and speculation." *U.S. v. Morgan*, 313 U.S. 409, 417 (1941).

FERC precedent similarly provides that "states are allowed a *wide degree of latitude* in establishing an implementation plan for section 210 of PURPA … 'Such latitude is necessary in order for implementation to accommodate *local conditions and concerns*, so long as the final plan is consistent with statutory requirements.'" *Signal Shasta Energy Co.,* 41 FERC ¶ 61,120, P 61,295, 1987 WL 118362 (Oct. 30, 1987), *2 (*Signal Shasta*) (finding an SRAC formula compliant with §292.304(d)(2)) (emphases added). FERC later added: "determinations that a state commission makes to implement … PURPA are by their nature fact-specific and include consideration of many factors, and *we are reluctant to second guess*

---

[2] California's RPS is one of the most ambitious in the country, requiring IOUs to procure 33% of their energy from eligible renewable resources by 2020 and 50% by 2030. Cal. Pub. Util. Code § 399.11, *et seq*. The IOUs exceeded the 23.3% goal set for the 2014-2016 period with 31% of retail sales served by renewable resources. ECF 129, CPUC RJN, Ex. 7, CPUC RPS Report, 4th Quarter 2016, p. 2. Since 2002, the CPUC has approved more than 435 RPS contracts for over 23,705 MW of renewable capacity. *Id.*

*the state commission's determinations…*" *CPUC*, 133 FERC ¶ 61,059, ¶ 24, 2010 WL 4144227 (Oct. 21, 2010), *7 (citations omitted; emphases added).

**III.    ARGUMENT**

WCS has proposed a 1 MW solar QF to be located in PG&E's service territory. Melone Decl., ECF 89-2, ¶¶ 5-6.  It is undisputed that WCS is eligible to sell energy under at least two CPUC-administered QF programs: Re-MAT and the QF Settlement.  Both programs provide long-term fixed price standard offer contracts, are currently open, and comply with PURPA.  WCS's expert objects to the QF SOC's SRAC energy payment formula because it contains three market-based inputs (related to the gas price, market heat rate, and QF's location) that prevent WCS from knowing the precise energy payment it will receive at the time of contract execution.  Lesser Decl., ECF 89-1, *¶¶* 12-13 & 63-64.  These objections do not equate to PURPA violations.

WCS's true objection is to the *prices* offered under the QF Settlement and Re-MAT programs.  WCS seeks a higher payment, and higher profits, than they offer.  However, PURPA provides that it is the *IOU's* avoided costs, not the *generator's*, that matter.  *See, e.g., Southern Cal. Edison, Co. v. Cal. P.U.C.,* 128 Cal. App. 4th 1, 10-11 (2005).  The Re-MAT and QF SOC payments properly reflect the *IOU's* avoided costs – not WCS's – and the design of both programs is consistent with the CPUC's "wide degree of latitude", *CPUC*, 133 FERC ¶ 61,059, ¶ 24, 2010 WL 4144227, *7, to implement PURPA consistent with "local conditions and concerns."  *Signal Shasta,* 41 FERC ¶ 61,120, P 61,295, 1987 WL 118362, *2.

**A. The QF SOC Complies With § 292.304(d)(2)**

WCS's expert argues that a formula rate with variable inputs "whose values cannot be determined in advance and which are subject to constant change" *cannot* comply with § 292.304(d).  Lesser Decl., ECF 89-1, ¶¶ 64.  This is in contrast to his conclusion that the Re-MAT rate complies with § 292.304(d)(2), notwithstanding the TOD factors in that formula that prevent QFs from knowing the rate they will be paid until after delivery. Lesser Dep., ECF 93, pp. 173:20-174:15. It is undisputed that WCS cannot calculate the bulk of the *actual payment* that it will receive for a specific month under the SRAC formula until the first business day of

CPUC Pre-Trial Brief
Case No. 13-04934 JD

3

the month when the gas price is known. Colvin Test., ¶ 43. However, this fact does not constitute a violation of § 292.304(d)(2) or any other PURPA violation for several reasons.

### 1. FERC And The Ninth Circuit Endorse The Use of Market Mechanisms To Set Avoided Costs

FERC has clearly expressed, over many decades, a *strong preference* and *commitment* to market-based avoided costs over administratively determined ones. This preference is based on the fact – proven through the CPUC's own experiences with PURPA – that avoided costs that incorporate market-based factors more efficiently and accurately identify avoided costs, and because of the dangers inherent in forecasts.

California demonstrated its alternative energy leadership in the early 1980's with the CPUC's aggressive and successful implementation of PURPA. *See, e.g,* CPUC D.04-01-050, Finding of Fact 68, p. 191, 2004 WL 188191 (Jan. 22, 2004). However, the CPUC's PURPA successes came with costly mistakes borne by millions of utility customers. Among the most lasting was the CPUC's decision to require IOUs to execute long-term standard offer QF contracts with fixed price payments based on forecasted fossil fuel prices. As the Ninth Circuit recounts in *IEP*, these contracts resulted in QF payments higher than the IOUs' avoided costs because the CPUC (and other states) assumed that fossil fuel prices would continue to rise into the 1980s. Instead, the prices declined. *IEP,* 36 F. 3d at 852. While *IEP* recognized that PURPA's avoided cost requirement was intended to protect consumers, it found that certain CPUC efforts to mitigate the impacts of the *executed* contracts were preempted. *Id.* at 859. The Ninth Circuit advised that "the proper remedy for such a situation is to ensure that *future* standard offer contracts contain *more flexible pricing mechanisms*." *Id.* (emphases added). The Ninth Circuit proffered this advice understanding the obligation to provide a contract consistent with § 292.304(d)(2). *See id.,* p. 852.

In reaching its determinations in *IEP*, the Ninth Circuit relied heavily on FERC's *Administrative Determination of Full Avoided Costs, Sales of Power to Qualifying Facilities, and Interconnection Facilities,* Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457, 32,174 (March 16, 1988) (*Admin. Det'n*), CPUC RJN, ECF 129, Ex. 4. *See, e.g., IEP,* 36 F. 3d at 859

CPUC Pre-Trial Brief
Case No. 13-04934 JD
4

& 852, n.8 summarizing the *Admin. Det'n* ("Recognizing that these contracts may obligate utilities to purchase QF energy at rates that are too high, the Commission suggested that states develop contracts that provide increased price flexibility but still provide a secure revenue stream to the QFs."). Acknowledging that avoided cost payments based on fixed price fossil fuel forecasts extended to several states, FERC's *Administrative Determination* unequivocally stressed "the danger of including forecasted fuel costs in the fixed rate structure of long-term contracts..." *Admin. Det'n* at 32,174, CPUC RJN, ECF 129, Ex. 4. FERC explained:

> ...[A]dministratively calculating avoided cost is unlikely to successfully result in an equilibrium price. The Commission believes that bidding is an alternative that promises efficiency in both determining avoided cost rates and assigning avoided cost payments among QFs.

*Id.* at 32,167. To address this "danger," the *Administrative Determination* endorsed the use of avoided cost rates that included *both* long-term capacity payments *and* energy payments. *Admin. Det'n,* CPUC RJN, ECF 129, Ex. 4, P32,173. Ten years later, FERC terminated its avoided cost rulemaking due to changing electric markets, noting with approval that "[w]hile few states allowed competitive bidding at the time of the [*Administrative Determination*], well over half the states now use competitive bidding to one degree or another in setting avoided cost rates. *See Order Terminating Proceeding,* 84 FERC ¶ 61,265, *62,301, 1998 WL 770222 (Sept. 21, 1998), **2. FERC noted: "Indeed, in a number of cases, the Commission itself has considered rates resulting from competitive bidding and negotiation in which QFs were active participants." *Id., citing over seven such decisions* at n.18.

With further evolution of the energy markets since these FERC findings, FERC's commitment to the use of market mechanisms in lieu of administratively set avoided costs persists. *See, e.g., Energy Producers and Users Coalition,* 149 FERC ¶ 61,251, ¶ 19, n.47 (*EPUC*), 2014 WL 7205371 (Dec. 18, 2014), **5 ("As-Available PPAs are … part of the implementation of the transition from a pure PURPA regime to a more market-oriented regime"); *and Revised Regulations Governing Small Power Production & Cogeneration Facilities*, 114 FERC ¶ 61102, 2006 WL 250518, at *24 (2006) (stating that "many sales made pursuant to bilateral contracts between QFs and electric utilities (including contracts at

market-based rates) are made pursuant to a state regulatory authority's implementation of PURPA").

### 2. CPUC SRAC Formulas Have Been Found PURPA-Compliant In Many Forums; FERC Determinations Of PURPA Compliance Are Entitled To Deference

The payment provisions of the QF SOC for 20 MWs or less embody the FERC and *IEP* advice to adopt "more flexible pricing mechanisms" that avoid the use of unreliable forecasts and strike the necessary balance between QFs and ratepayers (*see* Section III.A.4 below). The QF SOC is a long-term fixed price contract with two payment streams: (1) a long-term fixed capacity payment that cannot decrease during the contract term, which is not impacted by the amount of actual generation; and (2) an SRAC per kilowatt hour energy payment with market-based pass-throughs for variable factors. Colvin Test., ¶¶ 39-45.

FERC is familiar with SRAC formulas and has twice determined, in response to WCS's challenges to Re-MAT's PURPA compliance, that the QF SOC, complies with PURPA as the CPUC's "primary PURPA program." *Winding Creek Solar, LLC* 151 FERC ¶ 61,103, ¶ 6, 2015 WL 2151303 (May 8, 2015), **2; *Winding Creek Solar, LLC*, 153 FERC ¶ 61,027, ¶ 7, 2015 WL 6083932 (Oct. 15, 2015), *2 ("We found that the Re-MAT program is consistent with PURPA, because it is an alternative to a *primary PURPA program, the Standard Contract for QFs 20 MW or Under, which is consistent with PURPA*.") (emphases added). FERC has also found in two other instances that other QF Settlement contracts with SRAC formula rates complies with PURPA. *See EPUC,* 149 FERC ¶ 61,251, PP 2, 16-19, n.47, 2014 WL 7205371, ** 1, 4, 5 (as-available QF Settlement contracts comply with PURPA); and *So. Cal. Edison, Co.*, 143 FERC ¶ 61,222, PP 6-8, 17-18, 2013 WL 2477179 (June 7, 2013), **1, 2, 4.

Further, in response to PG&E claims that an early CPUC standard offer contract violated § 292.302(d)(2), FERC determined that the contract, which contained a form of SRAC payment, complied with § 292.304(d)(2). *See Signal Shasta,* 41 FERC ¶ 61,120, PP 61,294-61,295, 1987 WL 118362, *2 ("this option establishes that the rate for sales by the QF to PG&E for the first ten years shall be the state forecasted energy prices as set forth in the PPA. Thereafter, rates for sales are to equal PG&E's full short-run avoided operating costs."). FERC

observed that the parties "agreed to the prices set forth in the contract and neither retained the right to renegotiate such prices for any reason." *Id.,* P 61,295, *2. In finding the contract PURPA-compliant, FERC relied upon the "wide degree of latitude" states have to implement PURPA, as articulated in a 1983 policy decision. *Id.*

Final FERC determinations regarding compliance with its own regulations are entitled to deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, pp. 845, 863 (1984) (courts defer to an agency's reasonable policy choices in "technical and complex arena[s]" unless contrary to the history and purpose of the statute); and *CPUC*, 134 FERC ¶ 61,044, *61162, ¶ 28 n. 50, 2011 WL 182464, ** 12 (Jan. 20, 2011) (FERC's declaratory orders are generally entitled to precedential effect). *See also, Solutions for Util's, Inc. et al. v. CPUC*, CV 11-04975, Order Granting Defendants' Motion for Summary Judgment (Dec. 28, 2016) (*Central Dist. Order*), *appeal pending*, CPUC RJN, ECF 129, Ex. 6, 2016 WL 7613906, *10, Bates No. CPUC0112 (citing *Perfectly Fresh Farms, Inc. v. U.S. Dep't of Agric.*, 692 F.3d 960, 966-67 (9th Cir. 2012) to conclude that FERC's *Winding Creek* decisions finding the QF SOC PURPA-compliant were entitled to deference).

The California Courts of Appeal have also upheld similar CPUC SRAC formulas as PURPA-compliant because complainants failed to demonstrate that they were below the IOU's avoided costs. *See So. Cal. Edison, Co. v. Cal. P.U.C.,* 128 Cal. App. 4th 1, 10-11 (2005)*; So. Cal. Edison, Co.,* 101 Cal. App. 4th 982, 991-93 (2002). More recently, the Central District issued an order granting summary judgment to the CPUC, finding that Plaintiffs failed to show that *any* of the CPUC's QF programs, including both Re-MAT and the QF Settlement, violated PURPA. *Central Dist. Order,* CPUC RJN Ex. 6.

### 3. Formula Rates With Inputs Fixed At Contract Execution Comply With § 292.304(d)(2) Even If The Payment Cannot Be Calculated At That Time

WCS fundamentally misunderstands the legal concept of a formula rate and its intersection with § 292.304(d)(2)(ii). A formula rate with all inputs identified at the time of contract execution, even if those inputs contain market-variables, complies with § 292.304(d)(2)(ii). Such rates have been accepted as valid since the 1970's. *See P.U.C. of Cal.*

*v. FERC,* 254 F.3d 250, 254 (D.C. Cir. 2001). FERC's "acceptance of formula rates is premised on the rate design's 'fixed, predictable nature,' which both allows a utility to recover costs that may fluctuate over time and prevents a utility from utilizing excessive discretion in determining the ultimate amounts charged to customers. *Id.* (internal citations omitted).

Thus, the SRAC *formula,* not the particular inputs, *is the energy rate*, and adjustments to the amount paid to the QF, based on variable formula inputs, do not constitute changes in the rate itself. The fact that the actual inputs applied under the SRAC formula (*e.g.*, fuel price indices, TOD factors, heat rate, and location adjustments) will not be known until a time after contract execution does not mean that the rate – the formula – was not fixed at the time the obligation was incurred.

### 4. The CPUC's PURPA Implementation Is Entitled To Deference

In implementing PURPA, the CPUC has a federal law obligation to strike the appropriate balance between encouraging QF investment and protecting ratepayers. *See, e.g.* 16 U.S.C. §§ 824a-3(b)-(d); and *Admin. Det'n* at 32,158, CPUC RJN, ECF 129, Ex. 4 ("Under section 210 of PURPA, an electric utility's ratepayers are intended to be at least indifferent, in terms of the rates they pay, as to the source of power. In other words, the ratepayer is not to pay any more for power because the utility has purchased power from a QF rather than generating the power itself or purchasing power from another wholesale source. This is the purpose underlying the incremental cost ceiling …"). Thus, the obligation to buy QF power is not absolute. As FERC has recognized, "there is no obligation under PURPA for a utility to enter contracts to make purchases which would result in rates which are not 'just and reasonable to electric consumers of the electric utility and in the public interest' or which exceed 'the incremental cost to the electric utility of alternative electric energy.'" *City of Ketchikan*, 94 FERC ¶ 61,293, 2001 WL 275023 (Mar. 15, 2001), *5.

As described in § III.A.1 above, California's experience with fossil fuel forecasts embedded in long-term QF contracts resulted in payments significantly higher than the IOUs' avoided costs. The CPUC addressed this issue by using gas market indices in its long-term

contracts rather than fixed price forecasts. The indices act as a gas price pass-through which leaves the QF and the IOU (and therefore IOU ratepayers) neutral as to the price of gas. The use of such "flexible pricing mechanisms" is consistent with the wide degree of latitude states have when implementing PURPA, and is supported by the Ninth Circuit's *IEP* decision.

**B. It Is Undisputed The Re-MAT Complies With § 292.304(d)(2)(ii)**

Notwithstanding the fact that the QF does not know what price it will be paid until the time of delivery due to the TOD Factor, WCS's expert *agrees* that the Re-MAT contract has a fixed price at the time of execution, consistent with § 292.304(d)(2). Lesser Dep., ECF 93, pp. 173:20-174:15. WCS's expert nevertheless observes that Re-MAT's statewide program cap and 5 MW per auction cap are inappropriate. *See, e.g.,* Lesser Decl., ECF 89-1, ¶¶ 37-41.

WCS's objection to the statewide cap is not ripe, as the soonest the statewide cap will be met for PG&E, given the 5 MW per auction cap, will be July 2018, or later, given that the program must remain open for two years after full subscription. Lee Decl., ECF 130, ¶ 3. *See, e.g., Renee v. Duncan*, 686 F.3d 1002, 1012 (9th Cir. 2012); and *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012).

WCS's objection to the 5 MW per auction cap is also misplaced because – consistent with lessons learned from earlier QF programs – that cap ensures that consumers benefit from falling technology costs by preventing oversubscription to the Re-MAT program in any single auction. Lee Decl., ECF 130, Ex. 1, ¶¶ 18 & 29. This mechanism is consistent with guidance provided in FERC's *Administrative Determination*:

> …[I]n the event that it becomes clear that a rate is eliciting more QF power than the purchasing utility needs, the state regulatory authorities … could suspend the rate. This would not affect contracts that have already been entered into, but would provide an opportunity to review and recalculate the rate if appropriate.

*Admin. Det'n* at 32,167, CPUC RJN, ECF 129, Ex. 4. In other words, PURPA does not require a solicitation to be held open indefinitely. The Re-MAT auction cap properly acts as an automatic suspension and readjustment where market signals suggest the price should be raised or lowered. Lee Decl., ECF 130, Ex. 1, ¶¶ 40-43. The Re-MAT price established

CPUC Pre-Trial Brief
Case No. 13-04934 JD
9

through the auction represents the IOUs' avoided cost of purchasing electricity from specially-located solar facilities of 3 MW or less and is also consistent with PURPA.

Significantly, WCS admits that the "price of renewable generation has fallen" and therefore "fossil generation can be the incremental generation avoided by a QF purchase." While WCS relies on these facts to argue that avoided cost *must therefore* be set based on the cost of renewable generation, PURPA does not require this. WCS SJM Reply, ECF 95, p. 13, n.10. Nonetheless the CPUC provides this option to facilitate state RPS goals: WCS has the choice to pursue either the QF SOC, with avoided cost based on an avoided fossil fuel facility, or the Re-MAT SOC, based on the avoided cost of renewables similar to WCS, and it may choose whichever one is more profitable to it.

Re-MAT is open and accepting offers for new generation, and WCS is first in the queue for peaking, as-available facilities. Melone Decl., ¶ 11, ECF 89-2. Thus, there is nothing preventing WCS from obtaining a Re-MAT contract other than its objection to participating in an auction that will establish the price it will be paid. *Id.,* ¶ 9. This fact does not constitute a PURPA violation.

### IV. CONCLUSION

For the foregoing reasons, the Court should find in favor of the CPUC and dismiss WCS's complaint with prejudice.

Respectfully submitted,

By: /s/ *Traci Bone*

TRACI BONE

March 22, 2017

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I hereby certify that I electronically filed the foregoing **PRE-TRIAL BRIEF OF** |
| 3 | **DEFENDANT COMMISSIONERS OF THE CALIFORNIA PUBLIC UTILITIES** |
| 4 | **COMMISSION** with the Clerk of the Court for the United States District Court for the |
| 5 | Northern District of California by using the appellate CM/ECF system on March 22, 2017. |
| 6 | I certify that all participants in the case are registered CM/ECF users and that service |
| 7 | will be accomplished by the appellate CM/ECF system. |

/s/  ROSCELLA V. GONZALEZ

Roscella V. Gonzalez