JENNER & BLOCK LLP
MATTHEW PRICE (*pro hac vice*)
ISHAN BHABHA (*pro hac vice*)
1099 New York Avenue NW Suite 900
Washington, DC 20001
Telephone: (202) 639-6873
Facsimile:   (202) 661-4802
mprice@jenner.com

THOMAS MELONE (*pro hac vice*)
MICHAEL MELONE (*pro hac vice*)
ALLCO RENEWABLE ENERGY LIMITED
14 Wall St., 20th Floor
New York, NY 10005
Telephone: (212) 681-1120
Facsimile:   (801) 858-8818
Thomas.Melone@AllcoUS.com
MJMelone@AllcoUS.com

*Attorneys for Plaintiff*

FUTTERMAN DUPREE DODD CROLEY MAIER LLP
JAMIE L. DUPREE (158105)
JAIME G. TOUCHSTONE (233187)
180 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3906
Facsimile:  (415) 399-3838
jdupree@fddcm.com
jtouchstone@fddcm.com

*Local Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| WINDING CREEK SOLAR LLC, | Case No. 3:13-cv-04934-JD |
| Plaintiff, | **PRETRIAL BRIEF OF PLAINTIFF WINDING CREEK SOLAR LLC** |
| v. | Trial Date:     April 4, 2017 |
| MICHAEL PEEVEY, MICHAEL FLORIO, CATHERINE SANDOVAL, CARLA PETERMAN, and MICHAEL PICKER, in their official capacity as Commissioners of the California Public Utilities Commission, | Time:            9:00 a.m.<br>Courtroom:    11, 19th Floor<br>Judge:           Hon. James Donato |
| Defendants. | |

# I. Introduction

In its January 26, 2017 order, this Court identified a single question for trial: "[W]hether the CPUC's standard contract complies with 18 C.F.R. § 292.304(d)(2)?" ECF No. 117. The answer to that question is no. As discussed in greater detail below, 18 C.F.R. § 292.304(d)(2) contains the applicable legal standard for assessing this question. That section provides that a Qualifying Facility ("QF"), such as Winding Creek Solar LLC ("Winding Creek"), must be given the option to sell its energy "pursuant to a legally enforceable obligation," *i.e.*, a contract, "over a specified term." *Id.* § 292.304(d)(2). When it elects this option, the QF must also be given the choice of whether the rate at which it will sell its energy is "calculated at the time of delivery" of the energy, *or* instead is "calculated at the time the [contractual] obligation is incurred." *Id.* § 292.304(d)(2)(i)-(ii).

The California Public Utility Commission's ("CPUC") Standard Contract does not comply with these requirements because it does not provide a QF with the option of selling its energy at a rate "calculated at the time the obligation is incurred." Indeed, even CPUC's own expert Michael Colvin acknowledges that under the Standard Contract, a QF cannot know, at the time the contract with the utility is signed, the rate that the QF will be paid for its energy. Instead, that rate will change each month, and the QF will only learn what the rate is for a given month during the preceding month. For this simple reason the Standard Contract does not comply with § 292.304(d)(2), and Winding Creek should prevail.

# II. Statutory and Regulatory Background

In enacting the Public Utility Regulatory Policies Act of 1978 ("PURPA"), Congress established a framework designed to make it easier for certain small renewable generators— QFs—to sell their electricity to utilities, and to provide economic incentives for parties to develop such generation facilities. *See generally Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 404-05 (1983).

In order to achieve this goal, Congress provided that electric utilities *must* purchase *any* electricity produced by QFs. *See* 16 U.S.C. § 824a-3(a); 18 C.F.R. § 292.303(a)(1). However, Congress also specified that the price to be paid by a utility to a QF should not "exceed[] the

incremental cost to the electric utility of alternative electric energy."  16 U.S.C. § 824a-3(b).

Pursuant to this directive, FERC adopted a regulation—18 C.F.R. § 292.304(b)(2)—requiring

that utilities pay QFs at a rate "equal[ to] the avoided costs" of the utility, *i.e.*, the rate the utility

would have paid to another generator had it not purchased the electricity from a QF.  *See* Small

Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the

Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214, 12,216 (Feb. 25, 1980)

("PURPA Rulemaking").

      Critically for this case, FERC also adopted a rule providing that when a utility purchases

from a QF pursuant to a legally enforceable obligation—typically a contract, like the Standard

Contract at issue in this trial—the QF may choose between two different ways of calculating a

utility's avoided costs.  *See* 18 C.F.R. § 292.304(d)(2).  Specifically, FERC provided:

> [T]he rates for such purchases shall, *at the option of the qualifying facility* exercised prior to the beginning of the specified term, be based on *either*: (i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred.

18 C.F.R. § 292.304(d)(2) (emphasis added).

      In other words, a QF can elect to have the utility's avoided costs (and thus its rate)

calculated on an ongoing basis, as energy is physically delivered to the utility; *or* the QF can

instead elect to have the utility's avoided costs (and thus its rate) calculated when the contract is

entered, so that the utility can "establish a fixed contract price for its energy and capacity at the

outset of its obligation."  PURPA Rulemaking, 45 Fed. Reg. at 12,224.

      FERC has explained that affording QFs the option of choosing a rate under Section

292.304(d)(2)(ii)—a price "calculated at the time the [utility's] obligation is incurred," *id.*—is

central to achieving the statutory objective.  "FERC has stated that the purposes behind PURPA

are furthered by allowing a QF to establish a fixed contract price for its energy and capacity at

the outset of its obligation.  A fixed contract price provides a potential investor in a QF with

reasonable certainty about the expected return on a potential investment."  *Allco Renewable*

*Energy Ltd. v. Mass. Elec. Co.*, No. CV 15-13515-PBS, --- F. Supp. 3d ---, 2016 WL 5346937, at

*8 (D. Mass. Sept. 23, 2016).  FERC understood that "in order to be able to evaluate the

financial feasibility of a [QF], an investor needs to be able to estimate, with reasonable certainty, the expected return on a potential investment before construction of a facility." PURPA Rulemaking, 45 Fed. Reg. at 12,218.

FERC also understood that the utility's avoided costs calculated at the time the obligation is incurred, which are based upon forecasts of future costs, may turn out to be quite different than the utility's avoided costs at the time the energy is actually delivered. PURPA Rulemaking, 45 Fed. Reg. at 12,224. But FERC believed that "in the long run, 'overestimations' and 'underestimations' of avoided costs will balance out," and it emphasized "the need for certainty with regard to return on investment in new technologies." *Id.*; *see also JD Wind*, 130 FERC ¶ 61,127, at para. 23 (2010) ("[FERC] has … consistently affirmed the right of QFs to … rates determined at the time the obligation is incurred, even if the avoided costs at the time of delivery ultimately differ from those calculated at the time the obligation is originally incurred.").

Thus, 18 C.F.R. § 292.304(d)(2) makes it the "*option of the qualifying facility*" to decide whether its rate will be "based on *either*: (i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2) (emphasis added).

PURPA directed state regulatory agencies, such as the CPUC, to adopt rules that comply with and implement FERC's regulations. *See* 16 U.S.C. § 824a-3(f)(1); *see also* PURPA Rulemaking, 45 Fed. Reg. at 12,216 ("each State regulatory authority … must implement these rules."). And because States' only authority to regulate wholesale electricity sales is derived from PURPA, *see* 16 U.S.C. § 824(b) (generally giving FERC exclusive jurisdiction over wholesale sales of electricity in interstate commerce); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986), a state rule or program that conflicts with PURPA is necessarily preempted, as this Court has previously recognized. *See* ECF No. 39 at 2.

### III.    Plaintiff's Witnesses

Plaintiff will present testimony in its case-in-chief from the following three individuals:

- Michael Colvin (by deposition designation): Mr. Colvin is a Senior Regulatory Analyst in the Policy and Planning Division at CPUC.

- Jonathan Lesser (by pre-submitted direct testimony): Dr. Lesser is the President of Continental Economics, an economic consulting firm specializing in regulated industries. His testimony explains why the Standard Contract does not give QFs the option of choosing a rate for energy calculated at the time the contractual obligation is incurred. In reaching that conclusion, he analyzes the elements of the formula that determines the rate paid for energy under the Standard Contract.

- Christopher Whitman (by pre-submitted direct testimony): Mr. Whitman is Chief Executive Officer of Solomon Energy Inc., a company that invests in, and arranges financing for, renewable energy projects and companies throughout the United States. He is also President of US Solar Finance LLC, a company that advises banks and other financial institutions with respect to financing renewable energy electric generating facilities. Mr. Whitman also will testify that the Standard Contract does not comply with § 292.304(d)(2) because it fails to give QFs the option to sell energy at a rate based on avoided costs calculated at the time the utility incurs the contractual obligation. He explains why, as a business matter, QFs need such a pre-determined rate in order to be able to secure financing.

## IV. The Standard Contract

In an attempt to meet its PURPA obligations, the CPUC has made the Standard Contract available to QFs of less than 20 megawatts, like Winding Creek. A QF can enter the Standard Contract to sell its energy to a utility for up to 12 years. This Court has framed the question for trial as whether the Standard Contract complies with § 292.304(d)(2).

As trial testimony and exhibits will show, the Standard Contract does not comply with Section 292.304(d)(2). The Standard Contract does not give QFs the option to select between two different methods of calculating avoiding costs, as Section 292.304(d)(2) requires. Instead, it imposes a single method for calculating the rate at which QFs may sell energy: a rate based on avoided costs calculated at or near the time of delivery. Thus, under the Standard Contract, a QF has *no* ability to opt to sell its energy at a rate based on "avoided costs calculated at the time the obligation is incurred," contrary to 18 C.F.R. § 292.304(d)(2)(ii).

Winding Creek will submit the Standard Contract and energy pricing formula as exhibits at trial, and will also submit testimony in its case-in-chief from three witnesses explaining the rate paid for energy under the Standard Contract. All three witnesses, including Mr. Colvin, the CPUC's own expert, will testify that the Standard Contract's rate for energy is calculated at or near the time the energy is delivered, not at the time the utility incurs the contractual obligation.

As Dr. Lesser explains in his pre-submitted direct testimony: "The Standard Contract uses a formula, known as the 'SRAC' or 'short run avoided cost,' intended to capture the cost that the utility would incur, but for its purchase from the QF, in purchasing power from a natural gas-fired power plant, *as calculated at the time the QF delivers that power*." Lesser Direct 7:14-17 (emphasis added). The SRAC formula is set forth in Section 10 of the Settlement Agreement Term Sheet, attached to Dr. Lesser's testimony as Exhibit JAL-3.

Dr. Lesser notes that he "largely agree[s] with Mr. Colvin's explanation of the various components of [the] formula," and he goes on to identify the six basic components: Burner Tip Gas Price; Market Heat Rate; Variable Operations and Maintenance; Greenhouse Gas Compliance Costs; Time of Use Factor; and Location Adjustment Factor. Lesser Direct 7:1-20; *see also* Colvin Decl. 8:26-9:26. Dr. Lesser and Mr. Colvin each explain each of these components. But for purposes of addressing the Court's question, the key fact—on which Dr. Lesser and Mr. Colvin both agree—is that two components of the formula fluctuate and change month-to-month over the life of the utility's contractual obligation to the QF. Specifically, both Mr. Colvin and Mr. Lesser agree that the Burner Tip Gas Price—which is simply the monthly market-based price for natural gas—changes monthly. *See* Lesser Direct 8:6-23; Colvin Dep. 54:3-56:156. They likewise agree that the Market Heat Rate, which is a measure of efficiency of gas-fired generating units that are displaced by purchases from QFs, varies over time and thus cannot be known at the time a utility and a QF enter into a contract. *See* Lesser Direct 7:4-5; Colvin Dep. 76:1-11.

As a result, the rate received by the QF under the Standard Contract *cannot* be calculated at the time the obligation is incurred; instead, it is calculated anew each month and applied to energy delivered during that month. On this point too, both Dr. Lesser and Mr. Colvin agree. As Dr. Lesser's testimony states:

> [T]he rate to be paid to QFs for energy under the Standard Contract is a formula based on variables that change over time such as natural gas prices and the wholesale market price of electricity. The value of these variables will change each month that the QF's electricity is delivered under the contract. As a result, the rate under the Standard Contract can only be calculated at or near the time that electricity is *delivered* to the utility in the future. The rate *cannot* be calculated at the time the utility's obligation to purchase the electricity is incurred—i.e., when

1    a QF signs a contract with the purchasing utility.

2   Lesser Direct 2:17-24.

3        Mr. Colvin likewise testified at his deposition: "I think it is correct to say that the

4   commission has determined that the short run avoided costs, the costs that the qualifying facility

5   would be paid, should be best represented by what the individual generator unit would have been

6   paid that a utility would have procured but for the QF *at the time that the energy is delivered*."

7   Colvin Dep. 62:24-63:5 (emphasis added).  Mr. Whitman agrees as well.  Whitman Direct 2:15-

8   3:3.

9        Thus, if Plaintiff entered the Standard Contract today, it would know the rate it will

10  receive for the energy it sells this month, but would not know what rate it will receive for its

11  energy next month, let alone next year or five years from now.  The rate is re-calculated

12  monthly.  Whitman Direct 3:14-4:7.  PG&E's rate sheets for energy under the Standard Contract

13  are revealing in this regard.  The rate sheets for December, 2016 through March, 2017 will be

14  submitted as exhibits at trial, and are attached to Mr. Whitman's testimony as Exhibit CW-2.  As

15  is evident from the plain face of these exhibits, the energy rate changes monthly, and there is

16  currently no energy rate for any period after March 2017, because the natural gas price for April

17  2017 and beyond has not yet been determined, and thus the rate cannot yet be calculated. The

18  PG&E rate summary shown in Exhibit CW-3, attached to Mr. Whitman's testimony, likewise

19  shows the rate paid for energy under the Standard Contract for each month in the past.  But there

20  is no rate sheet showing the rate for energy under the Standard Contract next month, because that

21  cannot yet be calculated.  As Mr. Colvin admitted at his deposition:

22       Q   So if I want to enter into the contract today as a QF, there's no way for me to
         calculate the rate I'm going to receive for the energy I sell under the contract
23       today; I have to wait until the end of March 2017 to find out the rate for March
         2017 and the end of February 2018 to find out the rate for February 2018.  Is that
24       right?

25       A   For the energy portion of its payment.

26       Q   You agree with me with respect to the energy portion of this payment?

27       A   I agree with you that the short run avoided cost formula is tied to the monthly
         price of natural gas, and you need to know what that monthly price of natural gas
28       is in order to be able to calculate the actual physical check that is written to the
         qualifying facility. The formula is known at the time of contract execution.

*Q   But the rate isn't yet calculated, right?*

*A    Correct.*

Colvin Dep. 72:23-73:18 (emphasis added).

Moreover, as Mr. Lesser will testify, due to month-to-month fluctuations in natural gas prices, the energy price paid under the Standard Contract is quite volatile: "For example, over the 14-month period from January 2016 through February 2017, the Burner Tip Natural Gas Price varied from a low of $2.37 per Dekatherm (in March 2016) to a high of $5.39 per Dekatherm (in January 2017), a difference of 127%. As a result of this volatility in gas prices, the SRAC prices have also varied substantially, from 2.27 cents/kWh ($22.70 per megawatt-hour (MWh)) in March 2016 to 3.76 cents/kWh ($37.60 per MWh) in January 2017, a difference of 65%." Lesser Direct 9:11-16.

## V.    The Standard Contract Does Not Comply With 18 C.F.R. § 292.304(d)(2)

As discussed above, Section 292.304(d)(2) requires that QFs selling energy have the *option* to choose *either* (i) a rate "calculated at the time of delivery" *or* (ii) a rate "calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2). Because the Standard Contract *only* offers the first type of rate, it does not comply with PURPA, under the plain language of the regulations.

A federal District Court recently invalidated a Massachusetts standard contract under PURPA due to the same flaw Plaintiff identifies here. In *Allco*, 2016 WL 5346937, at *2-*3, Allco sought to enter a contract with National Grid, a Massachusetts electric utility, to energy generated by solar QFs based in Massachusetts. National Grid offered to purchase electricity from the QFs pursuant to Massachusetts's standard power purchase contract. That standard contract provided that energy would be compensated at a "Short-run Rate" based on the "hourly market clearing price for energy," *i.e.*, the market price for energy each hour. *See id.* at *2 (quoting 220 Mass. Code Regs. § 8.02). Allco challenged the Massachusetts Department of Public Utilities ("MDPU") rule containing this rate on the same basis that Winding Creek brings the instant challenge: a rate based on the hourly market price for energy—just like a rate based on the monthly market price for gas in California—is variable and cannot be calculated until the

time that energy is delivered.  Thus, the QF does not have the option of choosing a rate "calculated at the time the obligation is incurred," as Section 292.304(d)(2) requires.  *Id.* at *3.  As in this case, FERC declined to initiate an enforcement action.  *Id.*

Allco moved for summary judgment, arguing that the MDPU rule was invalid "because it conflicts with FERC's regulations implementing PURPA."  *Id.* at *6.  The District Court agreed.  It found, first, that "the only standard contract rate available to such QFs is the spot market price for wholesale energy."  *Id.* at *7.  Next, the court observed:

> Allco contends that because the spot market rate fluctuates hourly with market conditions and cannot be determined in advance of the actual delivery of electricity, the rate is necessarily "calculated at the time of delivery."  18 C.F.R. § 292.304(d)(2)(i).  But under FERC's regulations, if a QF chooses to provide electric energy pursuant to a "legally enforceable obligation," the QF must have the option to receive the avoided costs "calculated at the time of delivery" or "calculated at the time the obligation is incurred."  *Id*. § 292.304(d)(2).  *The MDPU rule, by providing only the spot market rate, eliminates the QF's ability to choose the latter pricing option.  As such, the MDPU rule fails to properly implement FERC's regulations, as mandated by PURPA section 210(f)(1).* 16 U.S.C. § 824a-3(f)(1).

*Id*. (emphasis added).

*Allco* is on all-fours with this case.  As in *Allco*, the Standard Contract made available by CPUC offers *only* a rate for energy that fluctuates with market conditions and cannot be determined in advance—in this case the monthly market for natural gas.  And, as in *Allco*, because the market in natural gas varies monthly, the price QFs will be paid under the Standard Contract by utilities likewise will vary monthly and thus cannot be known at the time the QF and the utility sign their contract.  Thus, just as in *Allco*, CPUC's Standard Contract fails to comply with FERC's regulations.

The Standard Contract not only violates the plain terms of Section 292.304(d)(2), but also frustrates the FERC policy reflected in that regulation.  As discussed above, FERC gave QFs the option of choosing a rate that could be calculated at the time the utility entered the contract with the QF, because it understood that "in order to be able to evaluate the financial feasibility of a [QF], an investor needs to be able to estimate, with reasonable certainty, the expected return on a potential investment before construction of a facility."  PURPA Rulemaking, 45 Fed. Reg. at 12,218.  While the avoided costs at the time of delivery may be different than the avoided costs

calculated at the time the contractual obligation is incurred, "the utility making a purchase under a long-term forecasted rate bears the risk that prices will drop in the future and the QF bears the corresponding risk that prices will rise." *Allco*, 2016 WL 5346937, at *8; *see also* PURPA Rulemaking, 45 Fed. Reg. at 12,224. In sum, "[a] fixed contract price provides a potential investor in a QF with reasonable certainty about the expected return on a potential investment," *Allco*, 2016 WL 5346937, at *8, and FERC wanted a QF to be able to choose that certainty if it wished.

As Mr. Whitman will testify, "In order to obtain financing to construct an electric generating facility, the bank or other financing party needs sufficient certainty that the revenue generated by the electric generating facility will cover the periodic financing payments, taking into account a typical debt service coverage ratio." Whitman Direct 5:16-19. And "[i]n the case of an independent power producer like Winding Creek or other developers of QFs, the revenue certainty comes from being able to select a rate that is calculated when the contractual obligation is incurred, and thus is known at the start of the contract for the duration of the contract term." *Id.* at 5:23-26. Because the Standard Contract fails to offer that revenue certainty, however, it is unsurprising that "there are no solar facilities in PG&E territory delivering power based upon the QF Standard Contract that have been built since the QF Standard Contract was implemented (as opposed to having been grandfathered into that contract)." *Id.* at 6:10-12.

## CONCLUSION

For the foregoing reasons, the Court should determine that the Standard Contract does not comply with 18 C.F.R. § 292.304(d)(2).

Dated: March 22, 2017                                Respectfully submitted,

                                                     JENNER & BLOCK LLP

                                                     By: /s/  Matthew E. Price
                                                     Matthew E. Price (*pro hac vice*)
                                                     *Attorney for Plaintiff*
                                                     Email:  mprice@jenner.com