UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO

WINDING CREEK SOLAR, LLC,           )
                                    )
            Plaintiff,              )
                                    )
  vs.                               ) No. C 13-4934 JD
                                    )
MICHAEL PEEVEY, MICHAEL FLORIO,     )
CATHERINE SANDOVAL, CARLA PETERMAN  )
and MICHAEL PICKER, in their        )
official capacity as Commissioners  )
of the California Public Utilities  )
Commission,                         )
                                    )  San Francisco, California
            Defendants.             )  Tuesday
                                    )  April 4, 2017
_____)  9:00 a.m.

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**           JENNER & BLOCK
                              1099 New York Avenue, NW
                              Suite 900
                              Washington, DC 20001
                    **BY:  MATTHEW EVEN PRICE, ESQ**
                          **ISHAN K. BHABHA, ESQ.**


**For Defendants:**           CALIFORNIA PUBLIC UTILITIES COMMISSION
                              505 Van Ness Avenue
                              San
                              Room 5133
                              San Francisco, California 94102
                    **BY:  CHRISTINE JUN HAMMOND, ESQ.**
                          **TRACI LYNN BONE, ESQ.**
                          **HARVEY YALE MORRIS, ESQ.**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

<u>**P R O C E E D I N G S**</u>

**APRIL 4, 2017**                                         **9:08 A.M.**

---o0o---

   **THE CLERK:**  Calling Civil 13-4934, Winding Creek
Solar, LLC versus Florio, et al.

  Counsel, will you please state your appearances for the
record.

   **MR. BHABHA:**  On behalf of plaintiff, Winding Creek
Solar --

   **THE COURT:**  Come on up.

   **MR. PRICE:**  On behalf of plaintiff Winding Creek
Solar my name is Matthew Price of Jenner and Block, and I'm
joined by Ishan Bhabha.

  Good morning, your Honor.

   **THE COURT:**  Okay.

   **THE CLERK:**  Defense?

   **MS. HAMMOND:**  Good morning, your Honor.  My name is
Christine Hammond.  I'm representing the defendant, CPUC
Commissioners, and with me is Traci Bone and Harvey Morris.

   **THE COURT:**  All right.

  Okay.  Let's get our witnesses going.

  Now, here is what we're doing today.  We are helping the
judge understand an area where the law is poorly developed and
the facts are, in my view, more obscure than they should be.

  So we are on a mission of clarity today.  I have a lot of

1  questions for the witnesses, but why don't you just line them

2  up and get them going and I'll jump in when I can.

3          **MR. PRICE:**  Thank you, your Honor.

4      I had a brief opening statement, if that would be helpful

5  to the Court.

6          **THE COURT:**  Opening statement?

7          **MR. PRICE:**  Yes.

8          **THE COURT:**  I'm not contemplating that, but that

9  sounds find.  It's a bench trial.

10          **MR. PRICE:**  Well, a preview of what's coming up.

11          **THE COURT:**  Go ahead.

12      You can just -- you can sit down if you'd like.

13          **MR. HAMMOND:**  Okay.

14          **THE COURT:**  If you want to, that's fine.  You don't

15  have to.

16          **MR. HAMMOND:**  Thank you.

17      And, your Honor, I, too, would like to make an opening

18  statement.

19          **THE COURT:**  Okay.

20      (Brief pause.)

21          **THE COURT:**  All right.  Mr. price.

22          **MR. PRICE:**  Thank you, your Honor.

23          **THE COURT:**  Go ahead.

24          **MR. PRICE:**  By the way, we've left a binder of the

25  slides on your desk up there, if you want to follow along.

1         **THE COURT:**  Am I going to see them on the screen as

2  well?

3         **MR. PRICE:**  Yes.

4         **THE COURT:**  All right.

5                     **OPENING STATEMENT**

6         **MR. PRICE:**  Your Honor set the following question for

7  today's trial, whether the CPUC's Standard Contract complies

8  with 18 C.F.R. 292.304(d)(2).  And our goal is to remain laser

9  focused on that issue and help provide clarity to the Court on

10  that issue.

11        And I think the place to start is by looking at the

12  regulation itself.  And there are a couple things about the

13  regulation I would just like to point out to the Court to begin

14  with.

15        The first is that it provides an option for a qualifying

16  facility.  "Each qualifying shall have the option either to

17  provide energy and capacity," and then it describes two ways of

18  calculating the avoided costs.  And, again, the qualifying

19  facility gets -- has the option of choosing either of those two

20  methods of calculating avoided costs.

21        Now, avoided costs, as your Honor well knows by this

22  point, are the costs that a utility avoids by purchasing from a

23  QF, a qualifying facility, instead of a different source.  And

24  PURPA, as you know, say is that QFs must be --

25         **THE COURT:**  We've got plenty of time.  Slow down.

1          **MR. PRICE:**  Okay.

2          **THE COURT:**  We have a court reporter that is racing

3     along desperately to catch up.  Slow down.  Take your time.

4          **MR. PRICE:**  Okay.

5     And PURPA says that QFs must be paid at a rate equal to

6     the utility's avoided cost.  So --

7          **THE COURT:**  It's equal or less than, right?

8          **MR. PRICE:**  Well, that's what the statute says, your

9     Honor, but FERC is a promulgated regulation saying equal to.

10    And Section 292.304(d)(2) says, as I said, the QFs have

11    the option of choosing an avoided cost rate based on either the

12    avoided costs calculated at the time of delivery -- and I'll

13    refer to that as an as-delivered rate -- or the avoided costs

14    calculated at the time the obligation is incurred.  I'll refer

15    to that, for shorthand, as an as-incurred rate.

16    Now, let me just say a few words about the difference

17    between those two, as you'll see -- as the evidence will show.

18    An as-delivered rate, when is this?  When a qualifying

19    facility delivers the electricity, you ask:  What are the

20    utility's costs at that moment?  And so to calculate an

21    as-delivered rate, you look to the actual avoided cost at the

22    moment the electricity is delivered to the utility or you use

23    very short-term forecasts.  For example, the cost this month

24    that the utility will avoid by receiving --

25         **THE COURT:**  Why not just have a formula?  What's

1 wrong with just having a formula?

2          **MR. PRICE:**  Well, there is nothing wrong with having

3 a formula, your Honor, and --

4          **THE COURT:**  In other words, you may not know what the

5 cost is, but there is a formula that will tell you.

6          **MR. PRICE:**  That's right.

7          **THE COURT:**  Isn't that enough?

8          **MR. PRICE:**  Well, for an as-delivered rate, yes, that

9 is enough.

10     But, as I say, 292.304(d)(2) also requires that the

11 qualifying facility have a choice of choosing an as-incurred

12 rate.  An "as-incurred rate" means that at the outside of the

13 contract we ask:  What are the utility's avoided costs going to

14 be over the life of this contract?  And you calculate that.

15 And that requires the use of longer-term forecasts.

16     So, for example, in a 10-year contract you would say,

17 okay, we're going to calculate the avoided cost of the utility

18 for 10 years.  What are they in year one?  Year two?  Year

19 three?  Year four?  And you can use a formula to reach those

20 results, but the key thing is you have to be able to calculate

21 it.  You have to know what the number is at the outset of the

22 contract.

23     Now, an --

24          **THE COURT:**  You agree, though, that having a formula

25 is enough to satisfy both of those pricing conditions, right?

1     MR. PRICE:  Well, I think it depends what's in the

2   formula, your Honor.  And I think what the evidence will

3   show -- and I'll discuss this more in a moment -- is the

4   formula that's used under the Standard Contract has variables

5   that fluctuate over time.  They depend on things, for example,

6   like the price of natural gas in any given month, and that's

7   not something that can be known at the time the contract is

8   entered.

9     THE COURT:  What's wrong with that?  If you have a

10  formula with variables that may be undefined at any specific

11  moment in time, why is that -- why is that inadequate for the

12  second prong of (d)(2)?  Why is it not enough?

13   Do you know with certainty what the formula is?  You may

14  not know with certainty what the output of the formula is, but

15  no matter, you have a very good guide on what the price is

16  likely to be.

17     MR. PRICE:  Well, it's --

18     THE COURT:  It's not an unconstrained, you know,

19  arbitrary discretion.  It's a formula.

20     MR. PRICE:  It's true it's a formula, but it is

21  unconstrained and you don't really have a good sense of --

22     THE COURT:  Why is it unconstrained?  It's a formula.

23  It has places where you plug in variables.  That doesn't mean

24  it's unconstrained.  It just means it's undefined.

25     MR. PRICE:  Let me skip ahead and I hope perhaps this

1  will help answer your Honor's question.

2          THE COURT:  What are we on, slide number seven?

3          MR. PRICE:  I think it's slide number nine.

4          THE COURT:  All right.  "Simple mathematics teaches,"

5  okay.

6          MR. PRICE:  Here, I think --

7          THE COURT:  I was a history major.

8          MR. PRICE:  I think we'll go to -- let me see.  This

9  is going to be slide number -- I think it will be slide number

10 14, which I think will help explain --

11         THE COURT:  Can we start with nine?  Why don't you

12 ease me in with nine?

13         MR. PRICE:  Okay.  That sounds fine.

14    So slide number nine.  Let's see.  I actually think we

15 should then go back to number -- number five, which discusses

16 the formula.  Let's do that.  And I'll walk you through that

17 and then, hopefully, we will get to the point --

18         THE COURT:  This is what you're calling the

19 as-incurred formula, right?

20         MR. PRICE:  So this is the formula, slide number

21 five.

22         THE COURT:  Okay.

23         MR. PRICE:  So the formula for the energy price in

24 the Standard Contract consists of these variables.  This is the

25 formula.  And three of these variables, the Market Heat rate,

1    the Burner Tip gas price and the Location Adjustment Factor,

2    are, as the evidence will show, variables where you don't know

3    when you enter the contract what that value will be.

4         And the witnesses all agree about this.  So the

5    witnesses --

6              **THE COURT:**  Let me just jump in.

7         My point is -- that's fine, okay.  There are some things,

8    factors, that will be defined over time.

9         The point is when (d)(2) says you need to know the cost as

10   incurred, this formula tells you how that cost is going to be

11   calculated.  It doesn't tell you the exact number, but it says

12   here is how we're going to come up with it.

13        Why is that inadequate?  What is wrong with that?  I know

14   it doesn't spit out -- it will spit out on any given day an

15   exact number.

16        Now, when the day is in the future, you can't stalk these

17   three little red areas that you have as variables, but you know

18   what the number is going to be calculated.  You also know what

19   the number is going to look like because the formula says,

20   here's our numbers.  Why is that not adequate?

21             **MR. PRICE:**  Because it doesn't allow you to actually

22   calculate the rate.

23        I mean, the regulation is very clear.  The avoided cost

24   needs to be calculated at the time the obligation is incurred.

25   The reason for that is that FERC understood that it's difficult

1    for qualifying facilities to actually get financing to build if

2    you don't have a known revenue stream.

3        And so FERC said, we recognize that the utility's avoided

4    costs at the time of delivery maybe turn out to be different

5    than the avoided costs that were projected when the contract

6    was entered.  There may be a gap there.  But that's okay.

7    We're going to allow the qualifying facility a known rate that

8    is actually calculated at the time the obligation is incurred

9    so that the utility is able to have the revenue certainty it

10   needs to in order to be able to build.

11        And, you know, the dictionary definition of "to

12   calculate" -- this is on Slide 12 -- is to ascertain by

13   computation.  You need to be able to actually compute what the

14   number is, and the Standard Contract doesn't allow you to do

15   that.

16        And so let me skip ahead to slide --

17        **THE COURT:**  I want to get to the witnesses, so I

18   don't mean to make this as back and forth right now as it

19   really is.  But I'm just -- I am not sold on your theory that

20   under (d)(2) the phrase "calculated at the time the obligation

21   is incurred" necessarily means an exact number.

22        I think having the formula adequately -- that's how you

23   calculate, with the formula.  It doesn't say you've got to have

24   an exact, you know, dollar megawatt hour, whatever the unit is.

25   It just says calculate.  This formula calculates the

1    as-incurred price.

2            **MR. PRICE:**  Well, your Honor --

3            **THE COURT:**  What is -- I mean, you know, life is full

4    of variables.  Doesn't it seem reasonable there can be a little

5    bit of flexibility as long as the calculation is known?  Why

6    should this be a straight jacket in the day you sign a contract

7    for the next 20 years?  I don't see that in the statute.  And I

8    don't see that in Congress' intent in PURPA.

9            **MR. PRICE:**  Well, respectfully, your Honor, I

10    disagree with that.  So if you look on page --

11            **THE COURT:**  Listen.  Disagreement is encouraged, but

12    you have to give me reasons.

13            **MR. PRICE:**  I will.  If you look on Page 18.

14            **THE COURT:**  Page 18 of what?  Your slide 18?

15            **MR. PRICE:**  Yes, slide 18.

16            **THE COURT:**  All right.

17            **MR. PRICE:**  This is an excerpt from FERC's decision

18    setting up the PURPA rule making.  And what FERC says is that:

19            "In order to be able to evaluate the financial

20            feasibility of a QF, an investor needs to be able to

21            estimate with reasonable certainty the expected return

22            on a potential investment before construction of a

23            facility."

24            And the Commission also says that it recognizes the

25    possibility that there may be a gap between the actual avoided

1    costs at the time of delivery and the one -- the ones that are

2    estimated when the contract is incurred, and -- but many

3    commentators have stressed the need for certainty with regard

4    to return on investment in new technologies and the Commission

5    agrees with these arguments and believes in the long run

6    over-estimations and under-estimations of avoided costs will

7    balance out.

8         So FERC has made the policy decision that these qualifying

9    facilities need the option of choosing revenue certainty.  And

10   the idea --

11        **THE COURT:**  No, no.  That's not right.  They need the

12   option of being able to estimate with reasonable certainty.

13   That's all FERC is saying.

14        **MR. PRICE:**  That's right, your Honor --

15        **THE COURT:**  Whether I'm bound by that or not is a

16   separate issue.

17        Nevertheless, let's just for a moment go with the FERC

18   folks.  This is very much like damages.  Okay?  You are not

19   entitled to a scientific determination of damages at trial.

20   You just need an estimate that is reasonably certain.

21        Seems to me FERC has been quite clear in saying the PUCs,

22   the various states, and the conditions in each state are going

23   to be different.  These are climatically driven; wind, solar,

24   biomass, all driven by variables.  It's all perfectly fine to

25   say:  We'll give you have a formula, parts of which are

1   variables that need to be stocked over time, but that formula

2   gives you an estimate with reasonable certainty.  Everybody in

3   your side of the table may use that formula and model.

4       This is going to be, you know we have data on all these

5   variables over the last, 10, 15, 20 years.  Here is the low

6   model.  Here is the medium model.  Here is the high model.

7       So knowing that, they have ample information.  Nobody is

8   being left in the dark on the wind power side about what they

9   are going to get.  They have the formula.  They have the

10  state's commitment to the formula.  They have three variables

11  that they can model to their heart's content and they can set a

12  high and a low and a medium and then they can say:  Well, we

13  can live with this or we can't live with it.

14      That's really all that FERC is suggesting.  And I just --

15  I'm very resistant because I don't think it's grounded in law

16  or fact to the idea that when you sign a contract under -- if

17  you elect to do (d)(2)(ii), you are guaranteed a precise dollar

18  figure for the life of that contract.  I don't think -- it

19  doesn't say that.  It just says you're entitled to reasonable

20  certainty about what your return will be.  Formula seems ample

21  for that.

22      Anyway, that's where I'm starting from.  So can we -- I'll

23  let you close it out and then I want to dive into our first

24  witnesses, okay?

25          **MR. PRICE:**  If I understand what your Honor views as

1   really the factual issue then, it's whether this formula

2   actually provides that reasonable certainty.  And I just point

3   out on slide 14 you can see the prices that you're paid under

4   the SRAC in the same months over time vary very substantially.

5       So January 2010, at the top, you were paid a rate of six

6   cents per kilowatt hour.  In January 2016, half that.

7       In March 2012, you were paid 2.9 cents per kilowatt hour.

8   In March 2014, almost double that.

9       In November 2013, 4.5 cents.  November 2015, you know,

10  about 60 percent of that.

11      **THE COURT:**  All right.  So to put a point on that.

12  The question then will be:  Is the formula sufficient to give

13  you a reasonably certain estimate?  It may not be.

14      **MR. PRICE:**  Okay.  Thank you, your Honor.

15      **THE COURT:**  I think that's the point you're getting

16  to.

17      **MR. PRICE:**  That's right.

18      **THE COURT:**  Okay.  Well, let's -- did you have

19  anything from the PUC?

20      **MR. HAMMOND:**  Thank you, your Honor.

21                    **OPENING STATEMENT**

22      **MS. HAMMOND:**  I wanted to bring up a --

23      **THE COURT:**  Get a little closer to the mic.  Move

24  that forward.

25      **THE CLERK:**  Move the microphone.  Just pull it down.

1        **THE COURT:**  There you go.  Thank you.

2        **MR. HAMMOND:**  Your Honor, the CPUC filed a statement

3   showing good cause to reopen summary judgment proceedings --

4        **THE COURT:**  I'm not going to get into that now.

5   We'll deal with that later.  Today I need to get what I need to

6   get so we can get this thing done.  It's been -- my reasons and

7   your reasons and other reasons, it's been pending too long.

8        **MR. HAMMOND:**  Thank you, your Honor.

9        **THE COURT:**  All right.

10       **MS. HAMMOND:**  We do want to tell the Court that

11  Cheryl Lee is available as a witness to testify and we do want

12  to make this proffer of evidence; that is, Cheryl Lee's

13  testimony, her expert report.  And we -- we respectfully

14  request that her testimony is necessary to give the Court a

15  complete presentation of the plaintiff's claims.

16       No contract should be reviewed in a vacuum, just as we are

17  concerned that this single section of the regulation is

18  reviewed in isolation.  So it's the totality --

19       **THE COURT:**  Nothing is being reviewed in isolation.

20  I had a specific question that I want the answer to.  Because,

21  as I said earlier, we're going to do everything that I need to

22  do on whatever the issue is to get this thing done.  Okay?

23  Nothing is being reviewed in isolation.

24       All right.  Can we --

25       **MR. PRICE:**  Your Honor, can I just register for the

1  record an objection to Cheryl Lee's testimony?

2     **THE COURT:**  You have it filed.  I'm not going to rule

3  on any of those things right now.  If I want to hear from her,

4  I'll call her up.

5     **MR. PRICE:**  Okay.

6     **THE COURT:**  First witness, Mr. Price.

7     **MR. BHABHA:**  Good morning, your Honor.  I'm Ishan

8  Bhabha.  We would first like to call Dr. Jonathan Lesser to the

9  stand, please.

10     **THE COURT:**  Yes.

11         **JONATHAN LESSER**,

12  called as a witness for the Plaintiff herein, having been duly

13  sworn, testified as follows:

14     **THE WITNESS:**  I do.

15     **THE CLERK:**  Please be seated.

16   Please state your full name for the Court and spell your

17  last name.

18     **THE WITNESS:**  My name is Jonathan Lesser,

19  L-E-S-S-E-R.

20     **THE CLERK:**  Thank you.

21         **DIRECT EXAMINATION**

22  **BY MR. BHABHA**

23  **Q.**  Good morning, Mr. Lesser.

24  **A.**  Good morning.

25  **Q.**  Mr. Lesser, did you file direct written testimony in this

1  case?

2  **A.**   I did.

3           **MR. BHABHA:**  Your Honor, may I approach the witness?

4           **THE COURT:**  Yes.

5       (Whereupon document was tendered to the witness.)

6  **BY MR. PRICE**

7  **Q.**   Mr. Lesser, is the document that I've just handed you, ECF

8  138, you're prefiled written direct testimony in this case?

9  **A.**   Yes, it is.

10 **Q.**   Is everything you said in that testimony true and correct?

11 **A.**   Yes, it is.

12          **MR. BHABHA:**  Your Honor, we move to qualify

13 Dr. Jonathan Lesser as an expert on the factual issue that this

14 Court identified, whether the Standard Offer Contract complies

15 with 18 C.F.R. 292.304(d)(2).

16          **THE COURT:**  All right.  Any objection?

17          **MS. BONE:**  No, your Honor.

18          **THE COURT:**  Okay.  He's qualified.  Go ahead.

19          **MR. BHABHA:**  Your Honor, we move to introduce

20 Dr. Lesser's prefiled direct testimony.

21          **THE CLERK:**  That is exhibit what?

22          **MR. BHABHA:**  It's ECF 138.  We haven't submitted it

23 as we didn't believe it was properly submitted as an exhibit

24 for the Court because it was prefiled direct.  We can label

25 that trial exhibit.

1        THE CLERK:  Okay.  And you're going to label it

2   exhibit what?

3        MR. BHABHA:  We will label that Trial Exhibit 23.

4        THE CLERK:  Thank you.

5      (Trial Exhibit 23 marked for identification.)

6        MR. BHABHA:  Your Honor, we also would like to move

7   into evidence a number of exhibits through Mr. Lesser.  We

8   would like to move into evidence Trial Exhibit No. 1 --

9        THE COURT:  What are these, things attached to his

10  declaration?

11       MR. BHABHA:  They were attached to his direct

12  testimony, but they would be -- they would be submitted with

13  exhibit numbers to the Court and to opposing counsel as well.

14       THE COURT:  All right.  I'll take them -- we don't

15  have to go through this.  It's a bench trial.  Okay?

16       MR. BHABHA:  Okay.

17       THE COURT:  I'll take them in.  If I decide later

18  they are inadmissible for some reason, I'll let you know, but

19  consider them provisionally admitted.

20       MR. BHABHA:  Okay.  Well, we have no further

21  questions for Mr. Lesser on direct then.

22       THE COURT:  Well, you are not going to run through

23  the direct with him?

24       MR. BHABHA:  We can.  We assumed you would rather

25  just hear from cross, but I can certainly go through his direct

1    with him if you'd like.

2            THE COURT:  Well, I want to hear from you Mr.

3    Lesser -- is it Dr. Lesser?

4            THE WITNESS:  Either one.

5            THE COURT:  All right.  First of all, tell me about

6    the Standard Contract.  What is it?  When was it founded?  What

7    does it do, and who has ever signed it?

8        Start with when did it come into being, do you know?

9            THE WITNESS:  Well, this -- the current Standard

10   Contract came into being, I believe, in the late 2000s; 2011 or

11   so.  And the contract is for qualifying facilities less than 20

12   megawatts in capacity.  That's a change from the original PURPA

13   legislation which had qualifying facilities.  It could be

14   anything up to 80-megawatts capacity.

15       The difference being that FERC determined that for

16   facilities larger than 20 megawatts, there are sufficiently

17   competitive wholesale markets where they can sell power

18   directly.  And so now the California Standard Contract is

19   limited to facilities 20 megawatts or less.

20           THE COURT:  Okay.  So who has taken up the state on

21   that contract?

22           THE WITNESS:  I'm sorry, your Honor?

23           THE COURT:  Who has signed up for that contract?

24           THE WITNESS:  Well, it's limited to qualifying

25   facilities.

1      THE COURT:  I understand that.  Can you identify a

2  single facility that's signed up for this contract?

3      THE WITNESS:  I cannot, your Honor, no.

4      THE COURT:  Why is that?  Because you don't know?

5      THE WITNESS:  I don't know.

6      THE COURT:  You don't know one way or the other?

7      THE WITNESS:  I don't know the specific companies

8  that have signed up for, as qualifying facilities under the

9  contract.

10      THE COURT:  All right.  So what are the -- what's

11  your -- have you looked at the contract?

12      THE WITNESS:  Yes, I have.

13      THE COURT:  What are the general terms of the

14  contract?

15      THE WITNESS:  The general terms include a known

16  capacity payment, which can be thought of as a payment for

17  basically an iron in the ground.  And then a variable --

18      THE COURT:  I don't understand.  What does that mean,

19  "an iron in the ground"?

20      THE WITNESS:  Well, there is -- essentially electric

21  generation provides capacity and energy.

22      Capacity -- the difference can be thought of this way.  If

23  you think of the difference between a garden hose and a fire

24  hose.  The fire hose can -- you want to put out a fire with a

25  fire hose because it can deliver much more water every second

1    to the fire.  It has a larger capacity.

2         The energy is actually the amount of water in this case

3    that would be delivered over time.

4         So the capacity payment is essentially a payment for how

5    much can a facility actually deliver at any given time.  And

6    sometimes that's referred to as "an iron in the ground"

7    facility.  Because that has value in the electric system.  You

8    want -- you need to make sure that they are generating

9    resources that can meet demand at any time.

10        **THE COURT:**  Okay.

11        **THE WITNESS:**  When you flip the lights on in this

12   courtroom, there is a slight change in electricity demand.

13   There has to be enough capacity available in the electric

14   system to ensure that that -- that increased demand is met

15   instantly.  That's capacity.

16        The energy payment is the actual energy that's delivered

17   at any time.  That is the subject of this case, is my

18   understanding.

19        **THE COURT:**  That is the subject of (d)(2), C.F.R.,

20   right?

21        **THE WITNESS:**  Yes, yes.

22        **THE COURT:**  Okay.

23        **THE WITNESS:**  And so the SRAC energy rate formula is

24   the formula that has the various inputs, such as the Heat rate

25   and/or Burner Tip Efficiency rate, the Natural Gas price and

1    the Location Adjustment.

2            THE COURT:  All right.  Now, what is your

3    understanding of how pricing works for the Standard Contract?

4            THE WITNESS:  My understanding is that, again, there

5    is a capacity payment.  There is the energy payment.  And then

6    there is known Time of Delivery factors.  And what those are

7    are factors that recognize that at different times of the

8    day --

9            THE COURT:  Let me step back.  Maybe my question was

10   inartful.

11       What's your understanding of how the prices are determined

12   under the Standard Contract?

13           THE WITNESS:  The capacity prices are fixed.  They

14   are set in the tariff.  So they are known.  Each year there is

15   a specific price that's known.  You can look that up.

16       The energy price is a formula rate with inputs that are

17   not known -- well, some inputs are known.  Three of the inputs,

18   key inputs, in my view, are not known at the time.  And so

19   those after -- this is -- we're in the month of April, 2017.

20   Payments for QFs in April 2017 won't be known until the first

21   of May when the input prices, when the Burner Tip Fuel

22   Efficiency value is calculated, when the natural gas delivered

23   price for the month of April is calculated --

24           THE COURT:  Let me just jump in.

25       How in your view does the Standard Contract satisfy

1    (d)(2)(i) 18 C.F.R. 292.304.

2            THE WITNESS:  May I have just a copy of that --

3            THE COURT:  Can you put that on the screen?

4            THE WITNESS:  Thank you.

5        (Document displayed)

6            THE COURT:  Okay.  So how or -- let me ask you this.

7    Is it your in opinion that the Standard Contract provides

8    pricing under (d)(2)(i)?

9            THE WITNESS:  Yes, it is, your Honor.  Because at the

10   time of delivery once you actually sell the power, you will

11   know what you're going to obtain for that, at least at the end

12   of that following month.

13           THE COURT:  Okay.  And you're happy with that?

14           THE WITNESS:  That's fine with me, yes.

15           THE COURT:  Okay.  Now, what's the problem with

16   (d)(2)(ii)?  Why does -- is it your view that the Standard

17   Contract does not provide that pricing?

18           THE WITNESS:  That's my view, sir.

19           THE COURT:  All right.  Tell me why.

20           THE WITNESS:  Because the inputs -- the way I think

21   of this -- and it's from an economic and statistical

22   standpoint, not a legal one obviously -- is that the obligation

23   at the time that's incurred essentially means I know what I'm

24   going to be paid when I sign on the dotted line.  That cannot

25   be determined --

1          THE COURT:  Let me just jump in.

2      By that you mean a precise dollar value forevermore for

3  the life of the contract?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Why do you think that is -- what's the

6  basis for that understanding?

7          THE WITNESS:  Because that's how -- I know of no

8  other way to say how you would calculate what I'm going to be

9  paid at the time an obligation is incurred.

10         THE COURT:  Well, you mentioned economics.  I mean,

11  you are aware of variable contracts that have output and input

12  differences with price fluctuations that are not only binding,

13  but commonly used in business.  What's wrong with that?

14      I mean, they don't know the day they sign a five-year

15  supply price contract exactly what the price is going to be on

16  any given day, but that's not an impediment to doing business.

17      So what is the economic reason why you would expect a

18  precise dollar figure at the day that you sign, as you said, on

19  the dotted line?

20         THE WITNESS:  The reason -- well, first off, a QF can

21  choose option Roman ii.  So they don't have to choose the

22  second option.

23      If they choose the second option, that makes it far easier

24  to finance a project when you have -- you have a known revenue

25  stream.

1          Given the uncertainty in the calculated avoided cost under

2     the Standard Offer formula, trying to forecast over the long

3     term, and I'll use your term, reasonable certainty --

4          **THE COURT:**  It's FERC's term, not my term.

5          **THE WITNESS:**  My apologies.

6     From my standpoint as an economist and mathematician,

7     there is either certainty or there is uncertainty.  So I don't

8     know what reasonable certainty, how that term can actually be

9     applied.

10         **THE COURT:**  It's a concept that we live with in the

11    law every day.

12    So let me ask you this.  Do you have an analysis of the

13    variability or the uncertainty of the formula used for (d)(ii)?

14         **THE WITNESS:**  I have, and I've discussed that in my

15    testimony.

16         **THE COURT:**  Why don't you run me through your

17    conclusions on that?

18         **THE WITNESS:**  Well, looking at the PG&E rates in

19    terms of the Burner Tip Efficiency and the natural gas prices

20    and the resulting SRAC prices, the Standard Offer prices -- if

21    I can turn to my -- that's on Page 8 of my direct testimony.

22         **THE COURT:**  Is there an exhibit for this?

23         **MR. BHABHA:**  Yes, your Honor.  If you look at Exhibit

24    No. 3.

25         **THE COURT:**  Yes.  Okay.  Trial Exhibit No. 3?

1        **MR. BHABHA:**  Trial Exhibit No. 3, yes, your Honor.

2        **THE COURT:**  All right.  Okay.  Yes.

3        **THE WITNESS:**  Is that -- excuse me.  Is that

4   something I have --

5        **MR. BHABHA:**  We're going to --

6        **THE WITNESS:**  -- in this somewhere?

7        **THE COURT:**  We're going to put it on the -- it

8   doesn't show up.

9        **THE WITNESS:**  All it says now is "No Signal".

10       **THE COURT:**  We're going to fix it.

11       **MR. BHABHA:**  Your Honor, may I approach the witness?

12       **THE COURT:**  Yes.

13   You're not able to get it on?

14   (Whereupon document was tendered to the witness.)

15       **THE COURT:**  Not going to work?  That's fine.  If it's

16   too hard --

17       **MR. BHABHA:**  It won't work, your Honor.

18       **THE COURT:**  All right.  Go ahead.

19   Do you have a copy of this for my clerk, the trial

20   exhibits?

21       **MR. BHABHA:**  Sure.

22   (Whereupon document was tendered to the law clerk.)

23       **THE COURT:**  Okay.

24       **THE WITNESS:**  Your Honor, if I may direct you to the

25   last page of this exhibit.

1    **THE COURT:**  Yes.

2    **THE WITNESS:**  And if we just look at --

3    **THE COURT:**  The very last page?

4    **THE WITNESS:**  Yes, yes.  WC000513.

5    **THE COURT:**  513.

6    **MR. BHABHA:**  I believe that's the penultimate page.

7    **THE COURT:**  Yes.

8    **THE WITNESS:**  If you look at the column that says --

9  at the top it says "IER BTU per kilowatt hour," that's the heat

10  rate.  That's otherwise known as the Burner Tip Efficiency in

11  the equation.

12      You can see that it goes -- it starts in January of --

13  actually, 2011, 8325 BTUs kilowatt hour.  It then goes down.

14  It stayed at 8125 in 2013, 2014.

15      Then in 2015 it jumped up as high as -- in May of 2015,

16  8769.  Then it's dropped down to 8357.  Then it goes back up in

17  December to 8545.

18      In 2016 it went up to 8250 in June of 2016.  Dropping down

19  to 6415 in November.  Back up to 6448 in December.

20      And in the most recent month, March 2017, it's back down

21  to 6019.

22      So the pattern there it's clearly a volatile number.

23      Now, let's look at what's even more volatile, the next --

24  the column to the right of that.  The average UEG, that's the

25  delivered price of natural gas.

1     And as my testimony explains, again, the price of natural

2   gas just in the last couple years, if you look at a 14-month

3   period, January 2016 through February of this year, the price

4   ranged from a low of $2.57 since per Dekatherm in March 2016 to

5   a high of $5.39 in January this year.  That's a difference of

6   125 -- 127 percent.

7     Now, one thing you could always ask is, well, does the

8   same seasonal pattern always apply?  The answer is no, it does

9   not.  So, for example, in March 2016 that was the lowest price

10  for that year, but if you go to March, 2014 on the exhibit and

11  look at the natural gas prices, you'll see that the March

12  price, $6.39, was the highest price for the year.

13    So when I look at that, and I started my career as a

14  forecaster --

15          THE COURT:  Let me just jump in.

16          THE WITNESS:  Sure.

17          THE COURT:  Where is the third variable?

18          THE WITNESS:  The locational difference?

19          THE COURT:  Yes.

20          THE WITNESS:  That is not --

21          THE COURT:  Not in this table?

22          THE WITNESS:  -- on here because that is specific to

23  each QF resource, depending on where it's located.

24          THE COURT:  That can't change, right?  I mean, that's

25  sort of a geographic --

 1        **THE WITNESS:**  No, that can change all the time.

 2        **THE COURT:**  How so?

 3        **THE WITNESS:**  Well, it's based on something called

 4   locational marginal prices.  And what that means is in the

 5   electric system there are prices posted at each location, each

 6   generator's location.  And basically it reflects that

 7   generator's marginal cost and the demand for power at that

 8   point.

 9        **THE COURT:**  Okay.

10        **THE WITNESS:**  And so the difference is based on that

11   and the nearest trading hub.

12        **THE COURT:**  All right.  And is there some reason why

13   it's not on here?

14        **THE WITNESS:**  Because there is -- I'm assuming

15   because it's unit specific.  So it's -- it's not just -- there

16   is not one locational difference adjustment for all QFs.

17        **THE COURT:**  But there is no column for where Winding

18   Creek is located.  That wasn't factored in.

19        **THE WITNESS:**  That would not be on this, no.

20        **THE COURT:**  Okay.

21        **THE WITNESS:**  Because Winding Creek, obviously,

22   doesn't exist yet and so there is no -- there is no locational

23   marginal price at Winding Creek.

24        **THE COURT:**  Okay.  It's going to be in Lodi.  We know

25   that.  You all --

1    **THE WITNESS:**  But once you --

2    **THE COURT:**  You didn't do that.

3    **THE WITNESS:**  If you put the facility there, then the

4    locational marginal price can actually change.

5    **THE COURT:**  That's right.  Like the natural gas price

6    changes.

7    All right.  It's fine.  It's not here.  I just wanted to

8    make sure I understood the table.

9    Now, these are a lot of data points.  I understand that.

10   But what I was looking for, and you tell me if you did this or

11   not, how -- if you plug in these variables over time, how much

12   does the output in the formula vary?

13   For example, did you do any kind of analysis to show that

14   if you ran these numbers over the time frame in Exhibit 3, you

15   know, there is a plus or minus difference of 30, 10, 5,

16   200 percent in the output.

17   **THE WITNESS:**  I did that for some of the values, your

18   Honor.  I show that there is a 65 percent difference.

19   **THE COURT:**  Where is that?  Is that in one of these

20   exhibits?

21   **THE WITNESS:**  If you look at the March 2016 price and

22   you go to the -- it's the right-most column on that same page

23   we were on.

24   **THE COURT:**  Okay.

25   **THE WITNESS:**  So you'll see a price in March 2016 of

1    $2.27 -- I'm sorry, 2.27 cents per kilowatt hour.

2         THE COURT:  All right.

3         THE WITNESS:  And then if you look at the price in

4    January 2017, just go down there, and the price is three point,

5    approximately, seven five five cents; 3.76 cents.  That's a

6    difference of 65 percent.

7         THE COURT:  Okay.  But did you run a model over time

8    showing how -- yes, there may be periodic, you know,

9    overestimates and underestimates --

10        THE WITNESS:  I did not calculate --

11        THE COURT:  Let me finish so we have a clear record.

12        THE WITNESS:  I'm sorry.

13        THE COURT:  Did you run a model over time that showed

14   that -- whether these differences do or do not iron out over

15   time?

16        In other words, do they converge more or less on a

17   reasonably certain number or are they, you know, scattered like

18   random dots on a graph?

19        THE WITNESS:  I did not do that analysis, your Honor.

20   When I look at the data here, to me it's quite obvious that

21   there is a high degree of volatility.

22        Clearly, you can calculate an average over time.  And by

23   definition the average -- the data essentially, you know,

24   converge over time to that average.  But it's the volatility

25   that matters or what statisticians sometimes call the variance.

1          **THE COURT:**  Did you calculate the volatility or

2     variance?

3          **THE WITNESS:**  I did not do that sir, no.

4          **THE COURT:**  All right.  Okay.

5     Go ahead, Mr. Bhabha.

6          **THE WITNESS:**  I certainly can.  It's a very

7     straightforward calculation.

8          **MR. BHABHA:**  Okay.

9          **THE COURT:**  All right.  Next?

10          **MR. BHABHA:**  Yes.  We have no further questions, your

11     Honor.

12          **THE COURT:**  That's it?  You know, you don't just hand

13     me the testimony.  The witnesses are here so you can do some

14     exam.

15          **MR. BHABHA:**  Okay.  Well, I can --

16          **THE COURT:**  I mean, if you don't want to do that,

17     that's fine.

18          **MR. BHABHA:**  No, no.  That's fine.

19          **THE COURT:**  Otherwise, I would have done this in my

20     room.

21          **MR. BHABHA:**  No, no.  That's fine, your Honor.  Happy

22     to walk Mr. Lesser through --

23          **THE COURT:**  You understand the word "trial"?

24          **MR. BHABHA:**  I do understand that, yes.  I do

25     understand that your Honor, loud and clear.

1        **THE COURT:**  Put some questions out.

2        **MR. BHABHA:**  Okay.

3    **BY MR. BHABHA**

4    **Q.**   Dr. Lesser, could you please explain to the Court what an

5    avoided cost is?  Avoided from what?

6    **A.**   An avoided cost is defined as a cost that the utility

7    would otherwise incur if it had to buy power from a non-QF

8    source or it's -- in more general terms it's, you know, but for

9    taking this specific resource or this investment, what cost

10   would you otherwise incur?

11   **Q.**   Now, the Standard Offer Contract, does that contain the

12   only way of calculating the avoided cost that gets paid -- the

13   avoided cost that gets paid to a qualifying facility for its

14   production of energy?

15   **A.**   I'm not sure I understand the question.  If you're talking

16   about is -- do QFs have an alternative to a Standard Offer,

17   they can bid into the -- what's called a Re-MAT.

18   **Q.**   But as regards to the Standard Offer Contract itself, you

19   talked about the SRAC rate, is that correct?

20   **A.**   That's correct.  That's the short term average cost.

21   **Q.**   And can you explain for the Court in some detail what is

22   the Short-Run Avoided Cost rate?

23   **A.**   The Short-Run Avoided Cost rate is essentially -- you can

24   think of it as a market-based rate that's designed to

25   essentially reflect current market conditions.  And it's -- it

1    does that through that specific formula where you look at

2    the -- the avoided cost is essentially what would it cost if we

3    used a gas fire generator instead of the QF?  And that's based

4    on the efficiency of the generator, which is reflected in its

5    heat rate.  That's the BTU per kilowatt hour value.  The cost

6    of natural gas.  The -- the variable operating and maintenance

7    cost such a generator would incur every month, plus the various

8    adjustments; Location Adjustment, Time of Delivery, et cetera.

9    **Q.**   So the Short-Run Avoided Cost, or the SRAC rate, is the

10   formula in the Standard Offer Contract for calculating the

11   price of energy for a QF, is that correct?

12   **A.**   That's correct.

13   **Q.**   And is that the only way in the Standard Offer Contract

14   that the price of energy gets calculated for a QF?

15   **A.**   That is correct.

16   **Q.**   So as you said, the SRAC rate has various components

17   within it, correct?

18   **A.**   Yes.

19   **Q.**   As you discussed with the judge, some of those components

20   are variable and some of those components are fixed, correct?

21   **A.**   That's correct.

22   **Q.**   Okay.

23        **MR. BHABHA:**  And just briefly, could we pull up the

24   SRAC?

25        (Brief pause.)

1      (Document displayed)

2         **MR. BHABHA:** Thank you.

3  **BY MR. BHABHA**

4  **Q.** Dr. Lesser, if you could just for the Court identify the

5  three variables within the SRAC formula that are variable as

6  opposed to fixed?

7  **A.** The variables are shown on the screen. These are the ones

8  in red, the Market Heat rate, which is a measure of the

9  efficiency of the assumed avoided gas fired generator.

10     The Burner Tip gas price, which is a measure of the

11  delivered price of natural gas to that avoided generator.

12     And then the locational adjustment factor, which is the

13  difference between the price at the nearest market trading hub

14  and where a facility is actually located.

15  **Q.** Thank you.

16     And you spent some time discussing with the Court, the

17  variability -- in your opinion, the significant variability of

18  the Burner Tip gas price, which is essentially the price for

19  natural gas, is that correct?

20  **A.** That's correct.

21         **THE COURT:** Let me jump in. Have you looked at the

22  Re-MAT pricing?

23         **THE WITNESS:** Yes.

24         **THE COURT:** Tell me what your understanding is of

25  that.

1      THE WITNESS:  Would you like to know how the Re-MAT

2  pricing works?

3      THE COURT:  Yes, in your view.

4      THE WITNESS:  Okay.  It's based on a type of auction.

5  The price was initially set to, I think, a value of $89.23 per

6  megawatt-hour.  And that was based on the final clearing price

7  of the previous California program called RAM.

8      There is nothing like acronyms in this industry.

9      THE COURT:  So I have seen.

10      THE WITNESS:  And then the auction is for PG&E, in

11  this case --

12      THE COURT:  That was in, what, 2013?

13      THE WITNESS:  It started in -- I think it started in

14  2013, subject to check.

15      THE COURT:  That's fine.  Go ahead.

16      THE WITNESS:  The auction then takes place -- each

17  auction occurs every two months.  It's -- the auction is for up

18  to five megawatts of -- you know, it could be solar.  It could

19  be wind.

20      And depending on what the -- what is offered by QFs in

21  that auction, the price can adjust.  It can adjust up, or it

22  can adjust down, or it can actually stay the same.

23      And it depends on the -- I believe they have to have at

24  least five different -- five separate bids submitted and if

25  those are all accepted, then I believe the price would go down

1    by -- under the formula it would adjust by $4 a megawatt-hour.

2        And then they hold another auction two months later.  And

3    they will do this until they reach the prescribed amount of

4    Solar PV that's been prescribed by the CPUC.

5        **THE COURT:**  You mean, the cap?

6        **THE WITNESS:**  Yes.  I believe, subject to check,

7    that's 750 megawatts total.

8        **THE COURT:**  Let's fine-tune.  For PG&E that cap is

9    about 36?

10        **MR. BHABHA:**  For solar facilities, yeah.

11        **THE COURT:**  All right.  So let's just kick this up at

12    a higher level.

13        **THE WITNESS:**  Sure.

14        **THE COURT:**  So your understanding -- tell me if I'm

15    wrong.  Your understanding is the state defined a starting

16    point of $89.23.

17        That price was then adjusted, depending on bidding

18    practices, in subsequent two month intervals, is that right?

19        **THE WITNESS:**  Yes.

20        **THE COURT:**  Okay.  And when you say there is a

21    formula, what formula are you referring to?

22        **THE WITNESS:**  The formula is simply -- when I refer

23    to a formula in this case, it's just how that -- that auction

24    price is adjusted.

25        **THE COURT:**  Okay.  Now, I have two follow-up

1    questions.

2         First, what is your view, if you have one -- if you don't

3    just say so.  But if you have a view, because you've considered

4    it and done some research on it, what is your view on whether

5    that Re-MAT pricing mechanism is or is not compliant with

6    (d)(ii)?

7         **THE WITNESS:**  In my view, the Re-MAT pricing is not

8    compliant because it is not an avoided cost rate.

9         The way I look at an avoided cost rate is but for QF

10   power, what would the utility pay.  Under Re-MAT QFs are

11   bidding against one another.  Therefore, it's not an avoided

12   cost rate.

13        **THE COURT:**  And is your understanding Re-MAT is a

14   voluntarily program; that a qualifying facility, like Winding

15   Creek, can elect to participate, but is not required to?

16        **THE WITNESS:**  That's my understanding, yes.

17        **THE COURT:**  Do you agree that a qualifying facility,

18   like Winding Creek, can elect to take a Standard Contract?

19        **THE WITNESS:**  That's my understanding, yes.

20        **THE COURT:**  Anything else, Mr. Bhabha?

21        **MR. BHABHA:**  Just two questions in light of your

22   Honor's questions.

23        **THE COURT:**  Sure.

24   **BY MR. BHABHA**

25   **Q.**  Mr. Lesser, is it your understanding under PURPA,

1   regardless of whether a qualifying facility elects to go under

2   the Standard Contract or under Re-MAT, it must be paid an

3   avoided cost rate?

4   **A.**   That's my understanding, yes.

5   **Q.**   And, your Honor, the judge was asking you about Re-MAT.

6   Do the Re-MAT prices today have anything to do with the price

7   the utility would pay if it were not purchasing from a

8   qualifying facility?

9   **A.**   Not in my opinion, it does not.

10  **Q.**   So in your expert opinion, are the Re-MAT prices avoided

11  cost prices?

12  **A.**   No, they are not.

13          **MR. BHABHA:**   Your Honor, we have no further

14  questions.

15          **THE COURT:**   Okay.  Before I pass you over to the PUC,

16  did you look, Dr. Lesser, at how much the total contract

17  payments to a qualifying facility would be under the Standard

18  Contract?

19          Say, it's a 20-year contract.  Did you look at what the

20  total payments would be to that QF over the life of that

21  contract using the SRAC formula?

22          **THE WITNESS:**   No, because there are no forecasts of

23  those values for 20 years -- or the contracts actually are 10

24  years in length.  And that's the point.  You can't forecast

25  those with any accuracy.

1    **THE COURT:**  How much data is there for, you know,

2    past performance on those variables?  Isn't there a mountain of

3    data on natural gas prices?  You can go back to natural gas

4    prices back to 1920, I would imagine.

5    **THE WITNESS:**  Oh, absolutely.  The problem is, you

6    can go back 40 years when we were running out of natural gas.

7    Prices were high.  And suddenly the market changed.  Congress

8    deregulated natural gas prices and, lo and behold, you get

9    natural gas reserves going up.

10    Back 10 years ago, again, we were talking about natural

11    gas shortages after Hurricane Katrina.  Prices spiked up to

12    over $14 at the Henry hub, trading hub in Louisiana.  And,

13    again, the talk was we're running out of natural gas, prices

14    will always be very high.

15    Suddenly you have hydraulic fracturing coming along

16    providing huge increases in gas supplies.  Prices plummet.

17    Now some people talk about we'll always have gas supply, a

18    gas supply glut.  Prices are going to say low forever.

19    My experience as a forecaster is if I do a long-term

20    forecast for you, I can guarantee one thing with perfect

21    certainty.  My forecast will be wrong.  And that's why there is

22    an old joke about the forecaster's creed, which is:  Give them

23    a number or give them a date, don't give them both.

24    **THE COURT:**  It's uncertainty principle.

25    **THE WITNESS:**  Exactly.

1    **THE COURT:**  So let me ask you this.  What is the

2    average term of a Standard Contract?  Is it 20 years?

3    **THE WITNESS:**  I believe the contract -- for this

4    Standard Contract is 10 years.  Some of them have extended --

5    QF contracts that I'm aware of have extended up to 30 years.

6    **THE COURT:**  It's your opinion that the data is not

7    sufficient to project or forecast over a 10-year contract time

8    with respect reasonable certainty what the pricing would be?

9    **THE WITNESS:**  Not at all.  I -- I wouldn't try to do

10   it.

11   And I think more importantly, as my co-witness will talk

12   about, banks are unwilling to finance because of that

13   uncertainty.  And that's what really matters.  If a bank says:

14   We're not going to give you money because we can't predict your

15   revenue stream with any degree of certainty, whether it's

16   reasonable certainty, unreasonable certainty, or however you

17   want to define it, if they won't finance it, then you can't get

18   the development.

19   **THE COURT:**  All right.

20   PUC?

21   **MR. MORRIS:**  Thank you, your Honor.

22   **CROSS EXAMINATION**

23   BY MS. BONE

24   **Q.**  Good morning, Dr. Lesser.  Good morning, your Honor.  Good

25   to see you again.

1      Judge Donato asked a little bit about the QF Standard

2  Offer Contract's capacity payment.  And I was wondering if you

3  could talk a little bit about it.  Is it a fixed price payment?

4  **A.**   I believe it's a known payment.  I don't have the schedule

5  in front of me, counselor, so I can't tell you the exact

6  payments.

7  **Q.**   Okay.  Do you know if it is known with certainty at the

8  time of contract execution?

9  **A.**   The capacity payment, yes, it is.

10  **Q.**   Okay.  So in other words, if -- if the QF were only

11  receiving that one payment, that capacity payment, would it

12  comply with Section 304 (d)(2), in your opinion?

13  **A.**   If it only received a capacity payment, but for

14  intermittent resources like solar, it's the energy component

15  that counts for probably 80 percent of the revenues.

16      So, yes, the capacity component is fixed and known at the

17  time a contract obligation is incurred, but no solar facility

18  I'm aware of -- and the other witness can speak to this in more

19  detail -- could ever be financed based solely on capacity

20  payment revenues.

21  **Q.**   And I take it that you don't know how much Winding Creek

22  would receive from that payment if it were to sign the Standard

23  Offer Contract, is that true?

24  **A.**   From the capacity payment?  Just the capacity payment?

25  **Q.**   Correct.

1    A.    I haven't done that calculation, no.

2    Q.    You've testified, I think at length now, that there is

3    lots of variability in the SRAC payment, correct?

4    A.    That's correct.

5    Q.    And you've even used the word "volatility," correct?

6    A.    Correct.

7    Q.    What do you think is the biggest changing variable in the

8    SRAC payment?

9    A.    In my opinion, the most volatile component is the Burner

10   Tip gas price.

11   Q.    Okay.  And when you ran your calculations showing the

12   variability factor of roughly 65 percent, did you look at the

13   all in price of the payment under the Standard Offer Contract,

14   that is both the capacity and the SRAC payment, or were you

15   just looking at the Burner Tip price of gas or the SRAC payment

16   in general?

17   A.    I was looking at actually neither of those.  I was looking

18   at the SRAC energy payment, which is the majority payment for

19   an intermittent resource like a solar facility.

20        So the 65 percent value that I quoted, that's the

21   difference in the SRAC energy price.  The volatility in the

22   example I used for the Burner Tip gas price was 127 percent.

23   Q.    So at that 65 percent rate, then, you have not blended in

24   the -- the capacity payment in order to understand how much

25   additional volatility there would be in that number, in that

1   payment?

2   **A.**   No, I have not done that calculation.

3   **Q.**   So would a fixed capacity payment reduce volatility?

4   **A.**   If you looked at the overall revenue stream, given the

5   relative sizes of the payment streams -- in other words, the

6   relative magnitude of the capacity dollar is in the relative

7   magnitude of the energy payment dollars.  It would -- a fixed

8   capacity price would reduce the -- the overall volatility

9   slightly, you know, perhaps by 20 percent.

10          **THE COURT:**  By how many?

11          **THE WITNESS:**   Perhaps 20 percent.

12      So it might go from 65 percent volatility to, roughly,

13   50 percent volatility.

14          **THE COURT:**  How are you coming up with the

15   20 percent?

16          **THE WITNESS:**  The capacity -- for an intermittent

17   resource like a solar plant or a wind facility, the capacity

18   payment is adjusted downwards to reflect the as-available

19   capacity.

20          For a solar facility, which obviously doesn't generate

21   power at night, it's reduced by -- it's basically calculated

22   based on its actual availability over a month.  How much power

23   did it actually produce in that month?

24          So when you reduce -- take a solar plant.  You take the

25   capacity factor and you reduce it to reflect how much the solar

1    plant was actually available, the capacity dollars go way down

2    relative to the energy dollars.

3        If instead you had, say, a qualifying facility that was a

4    co-generation plant that was operating 24 hours a day, the

5    capacity component is going to be much larger.

6        **THE COURT:**  But how does that lead to the concrete

7    figure of 20 percent?

8        **THE WITNESS:**  That's a rough estimate.

9        **THE COURT:**  Rough estimate?

10       **THE WITNESS:**  Yes.

11       **THE COURT:**  Okay.  Plus or minus what?

12       **THE WITNESS:**  Can't tell you that.  Don't know.

13       **THE COURT:**  Go ahead, counsel.

14   **BY MS. BONE**

15   **Q.**   So, Dr. Lesser, is it your position that compliance with

16   Section 304 (d)(2)(ii) requires an administrative determination

17   of the utility's avoided costs using long-term forecasts?

18   **A.**   Could I see that little -- little (i) or (ii) again,

19   please?

20   **Q.**   Yes.  The (ii) is for the contract executed at the time,

21   the price executed at the time of the contract.

22   **A.**   I'm sorry.  It just vanished from the screen.  You're

23   referring to the obligation as incurred?

24   **Q.**   Yes -- no.  Incurred at the time of contract, yes, (ii).

25       **THE COURT:**  Why don't you repeat your question again?

1      **MS. BONE:**  Sorry.

2    **BY MS. BONE**

3    **Q.**   So in order to get the kind of contract Winding Creek

4    wants, which is under (ii), as I assume, is it your position

5    that compliance with that provision of the regulations requires

6    an administrative determination of the utility's avoided costs

7    using long-term forecasts?

8    **A.**   Okay.  I just -- I want to make sure we're talking about

9    (2) Romanette (ii), the bottom line on this slide:

10             "The avoided costs calculated at the time the

11             obligation is incurred."

12   **Q.**   Yes, we are.

13   **A.**   Thank you.

14   **Q.**   Sorry about that.

15   **A.**   And your question is whether it requires a long-term

16   forecast?

17   **Q.**   Yes.

18   **A.**   It could require -- it requires a known long-term price

19   over the life of the contract.  Whether that's based on a

20   forecast, whether it's based on just an administratively set

21   number, someone says the number -- the CPUC, I suppose, could

22   say the number is $100 per megawatt-hour.  That's how we're

23   defining it over the 10-year contract.  We're done.

24        They could do that.  The key issue is the -- the certainty

25   of the price.

1  **Q.**  And would there be any certainty in that price?

2  **A.**  If the CPUC were to say the price is "X" for the life of

3  the contract, then barring the CPUC later saying that we're

4  changing our minds, then I would say yes, that's certain.

5  **Q.**  So there would be certainty for the QF generator.  Would

6  there be certainty for utility ratepayers; that they are

7  actually paying actual avoided costs?

8  **A.**  Well, that gets into a far more difficult question of

9  utility rate making.

10  And so under the current SRAC, are utilities actually --

11  are customers actually paying avoided costs?  That's based on a

12  hypothetical gas generator.  At any given moment a gas fired

13  generator may not be on the margin and so the marginal

14  generator may be something entirely different.

15  So, and then you have the issue of are -- are ratepayers

16  paying the actual avoided costs depends on how those costs are

17  getting allocated amongst the different ratepayer groups.  So

18  it's actually a more complicated question.

19  **Q.**  I think we can agree on that.

20  So is it your position that in order to comply with this

21  (2)(i) requirement, that the rate, the formula, contains no

22  market based mechanisms?  It all has to be fixed, determined

23  prices?

24  **A.**  In my opinion, the SRAC formula to meet the avoided cost

25  calculated at the time the obligation is incurred has to have

1    known values.  In other words, the inputs have to be known so

2    the output can be calculated.  And that has to be known at the

3    time the obligation is incurred.  That's -- to me, that's the

4    plain language.

5    **Q.**    So what about Time of Delivery factors, which impact how

6    much the QF is paid at the time of delivery.  Are those factors

7    acceptable in a -- in a payment that would comply with the

8    requirement to have an avoided cost calculated at the time that

9    the obligation is incurred?

10   **A.**    The Time of Delivery factors are known and published in

11   the tariff.  So in PG&E's case, Appendix C of their current

12   tariff lists those time of day factors.

13        So QF generator, if they know that the -- the energy price

14   before the Time of Delivery adjustment, let's use an example,

15   is, say, $100 per megawatt-hour, they will then know that the

16   amount, when they generate power during a peaking time in the

17   summer, between June and September, or July and September, will

18   be multiplied by a factor of approximately 1.47.  So they know

19   they will be paid $147 per megawatt-hour.

20        And then a generator like a solar facility, obviously,

21   they have -- you can -- you have solar data.  You know when the

22   sun is going to be shining, when it's not going to be shining.

23   So you can get a very good estimate of how much electricity a

24   solar facility will be generating, you know, each month, each

25   year.

1    So there is -- while there is uncertainty in terms of --

2  you know, any generator can have a forced outage, or in the

3  case of a solar plant, you know, you can have a cloudy day; but

4  over time you know -- you have very good data to limit that

5  uncertainty and so you can predict it.

6    So the Time of Delivery factor, because those are actually

7  known and published, I don't see that as -- as problematic at

8  all for a -- to meet the statement under (2)(ii).

9  Q.   So as I understand it with regard to Time of Delivery

10  factors, the risk of performance, how the generator performs,

11  is put on the generator, not the ratepayer, and how the

12  generator performs will determine how it is paid; is that a

13  fair assessment of what you've just been discussing?

14  A.   I think that's true of any generator; that if they don't

15  actually generate power, customers don't have to pay for that.

16    So to that extent, if you want to say then the risk is on

17  the generator, sure, that's absolutely correct.

18  Q.   But if the generator is receiving a capacity payment and

19  they don't generate, do they still get paid?

20  A.   It would be based -- for a solar, if they are not actually

21  generating anything -- for example, a solar facility doesn't

22  generate any power for an entire month for some reason.  Then

23  my understanding of the way the capacity payment is calculated

24  is that they wouldn't be -- they -- they're available.

25  Capacity would be zero and so the capacity payment would be

1    zero.

2    **Q.**    Okay.  Going back to trying to understand what your

3    position is with regard to 304(d)(2)(i), what I hear you

4    saying -- and tell me if this is right -- is that when the

5    California Public Utilities Commission sets a rate to comply

6    with that regulation, it either has to pick a number or use

7    forecasts; is that correct?

8    **A.**    For (2)(ii)?  You said (i).

9    **Q.**    Sorry.  (ii).

10    **A.**    (ii).  They could -- it's either -- it's some sort of

11    known number.  Whether it's based on a forecast, whether it's a

12    specific value, but it would be a known value to the QF at the

13    time the obligation is incurred.

14    **Q.**    You have participated in many regulatory proceedings,

15    haven't you?

16    **A.**    A number of them, yes.

17    **Q.**    And you understand that when a utility commission picks a

18    number or sets a number, that it has to be based on evidence

19    before it?

20    **A.**    That I would -- given my experience, I might question that

21    statement as not entirely accurate.

22        In theory, one would expect that a utility commission

23    would rely on evidence, but I haven't seen that entirely.

24    **Q.**    Okay.  In a 2007 article on feed-in tariffs, which is --

25    it's included in Defendant's Exhibit 108.  Do you have the

1    binder in front you?

2    **A.**    Of the plaintiff's exhibits?

3              **THE COURT:**  Plaintiff's or defendant's?

4              **MS. BONE:**  Sorry, defendant's.

5              **THE COURT:**  108?

6              **MS. BONE:**  Yes.

7    **BY MS. BONE**

8    **Q.**    And then we're going to turn to Bates stamp 0321.  The

9    article starts at 0320 and goes to 0321.

10   **A.**    I'm sorry.  I saw a transcript and thought -- this isn't

11   it.  Okay.

12   **Q.**    Yes.  There are a number of different documents in that

13   exhibit.

14   **A.**    Okay.  0320?

15   **Q.**    Yeah, that article.

16   **A.**    I'm there.

17   **Q.**    Okay.  And I'm looking at --

18             **THE COURT:**  Hold on.  The judge isn't there.

19             **MS. BONE:**  Sorry.

20             **THE COURT:**  All right.  Go ahead.

21             **MS. BONE:**  Okay.

22             **THE COURT:**  What is this?

23             **MS. BONE:**  This is an article that I believe was

24   written by Jonathan Lesser and co-authored with another person.

25

1    **BY MS. BONE**

2    **Q.**    Is that correct?

3    **A.**    Xuejuan Su.

4    **Q.**    Thank you.

5          And do you recall this article?

6    **A.**    I do, yes.

7    **Q.**    And does it look like -- I believe it's already been

8    authenticated by the plaintiffs.

9              **THE COURT:**  Just go to the substance.

10             **MS. BONE:**  Excuse me, your Honor?

11             **THE COURT:**  Just go to the substance.

12             **MS. BONE:**  Okay.

13             **THE COURT:**  If I have any qualms, as I said earlier,

14   I will pull the evidentiary trigger later, but let's just get

15   it in now, okay?

16   **BY MS. BONE**

17   **Q.**    As you've argued here today, you state that:

18             "Long-term forecasting is notoriously imprecise

19        and inaccurate given the multitude of uncertainties

20        that affect the future."

21        Correct?

22   **A.**    That's correct.

23   **Q.**    And in your introduction to that article you also talk

24   about what happened in California as a result of using

25   long-term forecasts of fossil fuel prices to set avoided costs

1  during the 1980's, didn't you?

2  **A.**  Are you looking at the abstract?  Where are you looking?

3  **Q.**  Actually, I'm looking at the second page across from the

4  abstract.  And I'm looking at the top -- the column on the

5  right-hand side, the very top.

6  **A.**  All right.  I'm there.

7           **MS. BONE:**  That would be for the Court, Bates No.

8  0321.

9           **THE COURT:**  Which sentence are you looking at?

10          **MS. BONE:**  I'm looking at the top of -- the start of

11  the column on the right-hand side:

12          "Since there were no direct market prices that

13          could be used, such as futures markets, avoided costs

14          were administratively established and approved by

15          state energy regulators, who typically relied on

16          various forecast models to estimate future fossil fuel

17          prices and electric prices."

18  **BY MS. BONE**

19  **Q.**  Dr. Lesser, can you talk about what happened in California

20  as a result of the reliance on those fossil fuel forecasts?

21  **A.**  Well, a number of things happened.  One of the things that

22  I talked about are the -- what are the so-called Standard Offer

23  4 Contracts, which were -- essentially provided payments for

24  generators that never actually produced any electricity.  And

25  so all the risk was on ratepayers, if you like, because unlike

1    the current program, they could generate nothing.

2         These are all the abandoned wind turbines you'll see in

3    Tehachapi Pass and Altamont Pass.  They were paid for no

4    output.

5    **Q.**   And did you conclude in that article that:

6              "The administratively set avoided costs that

7         these generators were paid were too high, lasted too

8         long, and needlessly subsidized QFs creating

9         inefficiencies and negative impacts on consumers"?

10   **A.**   Are you reading -- quoting from the article?

11   **Q.**   I am.  And I'm wondering -- okay.  That's about halfway

12   down on the same page, "Like avoided cost rate set under

13   PURPA..."

14        Maybe an easier question is:  What happens when avoided

15   cost rates are set too high?

16   **A.**   Well, like any other subsidy, there is a welfare loss to

17   society.  Society does not benefit from having subsidies.

18   **Q.**   And does reliance on forecasts generally lead to

19   inaccuracies that result in subsidies?

20   **A.**   Not necessarily.  Forecasts, because of the uncertainty,

21   can lead to prices that are too high or too low.

22        And that's my point, that there is such significant

23   uncertainty that if you want to finance QFs -- and, again, the

24   other witness will talk about this -- you need greater revenue

25   certainty.

1      If you're asking about broader social policy associated

2  with subsidized electricity generation, PURPA, that's a much

3  more -- that's a very long discussion.

4  **Q.**   If a state sets avoided costs too high under

5  304(d)(2)(ii), is it obligated to make that avoided cost

6  available to all QFs or does it have the ability to suspend the

7  program and readjust to a lower avoided cost?

8  **A.**   You're asking me a legal question and I don't know the

9  answer to that.

10  **Q.**   Okay.  Fair enough.

11      Is the state required to keep the backstop program the

12  same -- I'm sorry.  Strike that.

13      Is it your position that a utility's avoided cost under

14  PURPA can only be set using non-QF power?

15  **A.**   My understanding of a -- how I define an avoided cost is

16  it's but for what the utility would otherwise be obligated

17  to -- or would have to obtain.

18      So for -- to me, it's sort of circular to say the avoided

19  cost of -- for one QF is what the utility would pay for another

20  QF because the other QF's price would then be an avoided cost

21  of still another QF.  So you end up in a circle.

22      So my understanding of PURPA is that an avoided cost for a

23  QF is what the utility would otherwise pay for a non-QF

24  resource.

25  **Q.**   Okay.  So is the answer to the question yes?

1  **A.**    I think so.

2  **Q.**    And is that a legal opinion?

3  **A.**    No.  That's -- to me, that's just, you know, sort of a

4  basic opinion and it's based on my understanding of what it

5  costs.

6  **Q.**    There was a question previously, I believe, from the judge

7  about whether the SRAC payment complies with 304(d)(2)(i),

8  just one, so that the SRAC payment would be an avoided cost

9  calculated at the time of the delivery.

10     Do you recall that question?

11 **A.**    Not specifically, but I -- I think it would, yes.

12 **Q.**    You think it would comply, okay.

13          **THE COURT:**  Let me just jump in.  So what would that

14 number be?  How would that number be determined under (d)(i).

15          **THE WITNESS:**  It's the SRAC formula, your Honor.

16          **THE COURT:**  So then you just use the day's value?

17 How do you figure those these variables that are open ended?

18          **THE WITNESS:**  Well, they are calculated -- at the end

19 of the month the utility would go back and calculate those --

20 those specific values for that month.

21          **THE COURT:**  So just to jump in.  There would be

22 values set every 30 days based on data available to the

23 utility.

24          **THE WITNESS:**  Right.  So the Burner Tip Efficiency is

25 based on a 12-month forecast of gas heat rates.  Then the

1    natural gas prices are what the actual delivered prices were

2    for that month.  And then the Locational Adjustment is based on

3    whatever the market trading prices at the hub were.

4             THE COURT:  So under (d)(i) you would be effectively

5    running the SRAC every 30 days to determine the as-delivered

6    price?

7             THE WITNESS:  Yes, and that's what PG&E does.  They

8    publish every month an updated price.

9             THE COURT:  Okay.  Go ahead.

10            MS. BONE:  Thank you, your Honor.

11   BY MS. BONE

12   Q.   So is the SRAC payment, would you consider it to be a spot

13   market price?

14            THE COURT:  Under (d)(i)?

15            MS. BONE:  Just a spot market price in general, given

16   what Dr. Lesser knows about spot market prices.

17            THE COURT:  Okay.

18   A.   It's similar to a spot market price.  It's not exactly a

19   spot market price, because a true spot market price would be --

20   you would look at, say, the actual market clearing prices for

21   that day, that hour, and you would -- you know, the generator

22   would be paid that wholesale market price every hour.  That's

23   not how the SRAC works.

24   BY MS. BONE

25   Q.   And is the gas index portion of the SRAC price, is that a

1    spot market price?

2    **A.**    It's based on actual gas prices for the previous month.

3    Then it -- then adjusted with an actual delivery cost.  So,

4    yeah, it's a spot market price, I'd say.

5    **Q.**    Would you agree that the Burner Tip gas price, the index

6    that is created, is based upon a -- an average of many

7    different gas prices?

8    **A.**    Depends on how you define the term "many."  I believe it's

9    more than one, but I'd have to look at the formula again to --

10   which I don't have in front of me to check.

11   **Q.**    So is the Bid Week Gas Index, does it change each day with

12   the markets or is it one number set for a month?

13   **A.**    I'm sorry.  I don't understand your question.

14   **Q.**    I'm sorry.  I'll rephrase that.  There is a gas index in

15   the SRAC formula, correct?

16   **A.**    Yes.

17   **Q.**    It's based on the bid week price of gas that's identified

18   on the first business day of each month, correct?

19   **A.**    That's correct.

20   **Q.**    Does that number change for that month?

21   **A.**    It changes each month.

22   **Q.**    It changes each month.  But for -- for example, if the bid

23   week price of gas is set on the first business day in February,

24   that number stays the same for the entire month of February,

25   does it not?

1    A.    If you're referring -- I'm sorry, counselor.  I'm

2    struggling to understand your question.

3         Are you referring to the price in the SRAC formula, the

4    market price -- the delivered price of gas in the formula?

5    Because that's set at the end of the month.  So the

6    February 1st example you're using would not apply for the month

7    of February.  It would apply backwards to the month of January.

8         So if I'm misunderstanding your question, I apologize.

9    Q.    Oh, I think we do have a misunderstanding.

10   A.    Okay.

11   Q.    So in your understanding of the SRAC formula, the gas

12   index -- is it correct to say that the gas index is identified

13   on the first business day of February and then is applied to

14   January SRAC payments?

15   A.    That's the -- my understanding of the formula, the way the

16   formula works is that the gas price for the month -- so if you

17   look at this, the gas price for the month is based on the

18   historic prices.

19        So on February 1st, it would be calculated for the month

20   of January.  That's why the prices aren't determined.  You're

21   not -- you don't know what you're going to be paid for a given

22   month until the beginning of the following month.

23   Q.    Okay.  So when a utility posts the SRAC prices on the

24   seventh business day of the month of February, which month do

25   those prices apply to based on your understanding?

1  A.   My understanding is those prices apply to the previous

2  month.

3       Now, I'd have to look at the formula again.  Again, I

4  don't have that -- the specific tariff details in front of me.

5  Q.   And let's go back to this idea that the gas index in the

6  SRAC formula is a type of spot market price.

7       Can you explain -- can you describe -- there is a

8  fairly -- strike that.

9       There is a fairly robust spot market in gas, isn't there?

10 A.   Define "robust."

11 Q.   Active.  There is lots of trading.  You can know gas

12 prices on a daily basis, can you not?

13 A.   That's true.

14 Q.   So would a gas price that is calculated for an entire

15 month and is fixed, are you still suggesting that that's a spot

16 market price?

17 A.   It's an average of the spot market prices for the month.

18 Q.   But it's not --

19 A.   Is my understanding.

20 Q.   But it's not a spot market price in and of itself, is it?

21 A.   Under the SRAC formula, the price is not an hourly or

22 daily price.  It's calculated as an average, a monthly price.

23 And so the gas prices in the formula are necessarily an average

24 of the daily market prices.

25      So I -- I think it's really an issue of semantics, whether

1   you want to call it a true, you know, real time spot market

2   price. Clearly, it's not. It's certainly based on spot market

3   prices, you know, for the delivered price of gas.

4   **Q.** When we talk about compliance with 292.304(d)(2)(i) came

5   in at the time of delivery, would it not be more precise from

6   an economic perspective to simply pay a generator the spot

7   market energy price at the time?

8   **A.** Could you repeat your question again?

9   **Q.** In order to comply with the requirement to provide an

10   avoided cost calculated at the time of delivery, would it not

11   be -- would it be more economically precise to use a spot

12   market that's available on a daily or hourly basis when the

13   power is actually delivered rather than a formula rate?

14   **A.** I'm not sure what "economically precise" means.

15   Certainly, that would be an alternative that, you know, if --

16   the payment could be the time of delivery in each hour, every

17   15 minutes, because prices are adjusted every 15 minutes on Cal

18   ISO. You could do that.

19       **MS. BONE:** Your Honor asked at the beginning of

20   Dr. Lesser's testimony who has signed up for the Standard Offer

21   Contract, and I believe Dr. Lesser did not know.

22      We do have an exhibit. It was Plaintiff's Exhibit No. 21.

23   With regard to PG&E, we can identify who has signed up for a

24   Standard Offer Contract.

25       **THE COURT:** 21?

1          **MS. BONE:**  Yes.

2          **THE COURT:**  Okay.

3          **MS. BONE:**  Your Honor, I don't know the best way to

4     go about this, because I don't think that Dr. Lesser is someone

5     to speak to this particular issue.

6          **THE COURT:**  How about Mr. Colvin?  Can he do that?

7          **MS. BONE:**  But if you look at Bates stamped, the

8     third page of this exhibit, 0981 and at the top it says

9     "Co-generator."

10         What you can do is if you look at the second-to-last

11    column on the right-hand side, "Operating Start Date," if you

12    look for anything after 2010, that's essentially a generator

13    that has signed a Standard Offer Contract under the QF

14    Settlement.

15         **MR. BHABHA:**  Your Honor, can we just object to this.

16    I think it's outside the scope of Dr. Lesser and our next

17    witness, Mr. Whitman, would be able to -- we will address this

18    issue with him.  I just think it's outside the scope of

19    Dr. Lesser's direct testimony.

20         **THE COURT:**  He can say he didn't know.  He did say he

21    didn't know.  So why don't you have Mr. Colvin or somebody else

22    handle that?

23         **MS. BONE:**  Right.

24         **THE COURT:**  Okay.  Are you all set?

25         **MS. BONE:**  Could I have just a moment to review my

1   notes?

2           **THE COURT:**  Sure.

3           **MS. BONE:**  Thank you.

4       (Brief pause.)

5           **MS. BONE:**  That's it, your Honor.  Thank you.

6           **THE COURT:**  Any brief redirect.

7           **MR. PRICE:**  Just brief redirect.  Thank you.

8                   <u>**REDIRECT EXAMINATION**</u>

9   **BY MR. BHABHA**

10  **Q.**   Dr. Lesser, you were asked on cross examination about

11  capacity and energy prices, is that correct?

12  **A.**   That's correct.

13  **Q.**   And is it correct to say that capacity is, in essence, the

14  commitment to provide energy at some point in the future?

15  **A.**   That's certainly a good way of putting it, yes.

16  **Q.**   So in order to help grid operators plan for energy demand

17  in, say, two years from now, generators will sell capacity,

18  essentially saying:  I promise that in two years from now if

19  you call on me to provide energy, I will be there to provide

20  energy.

21  **A.**   That's true.

22  **Q.**   So for a solar facility or an intermittent resource, they

23  have less of an ability to make this future commitment because

24  a solar resource may have less certainty on whether the sun is

25  going to be shining on a particular day two years in the

1  future, is that correct?

2  **A.**    That's correct.  That's why they are referred to as

3  intermittent resources.

4  **Q.**    And so when you were asked about the difference between

5  capacity and energy prices, you said that for a solar facility,

6  because they are an intermittent resource and, thus, cannot

7  with certainty predict how much -- where they are going to be

8  in two years, 80 percent of their revenue comes from actually

9  producing energy and only 20 percent comes from this capacity

10  commitment in the future to provide energy, is that correct?

11  **A.**    That's an approximation, but that's correct.

12  **Q.**    Okay.  Dr. Lesser, you were also asked about a so-called

13  Time of Delivery factor, is that correct?

14  **A.**    Correct.

15  **Q.**    I would just like to pull up plaintiff's demonstrative on

16  this point.

17      (Brief pause.)

18  **Q.**    While we're doing that, let me ask you, Dr. Lesser, a Time

19  of Delivery factor takes into account the different time of the

20  day or different season in the year that a generator provides

21  energy, is that correct?

22  **A.**    It takes into account both, yes.

23  **Q.**    And when it takes this into account, it's an

24  acknowledgment of the fact that it may be more valuable or may

25  be more expensive to provide energy at one point versus

1  another, is that also correct?

2  **A.**    That's correct.

3       (Document displayed)

4  **Q.**    So if we can look at the demonstrative that's appearing on

5  the screen here, can you identify for the Court, in this simple

6  picture here, what is the Time of Delivery factor in the image

7  on the left with the sun?

8  **A.**    The Time of Delivery factor on the left is the 1.479

9  value.  And that reflects a peaking -- that reflects the

10 additional value of providing electricity in the PG&E service

11 territory during the day when demand is peaking.

12 **Q.**    When you say when "demand is peaking," you mean that there

13 was a great demand for energy, thus, it's more valuable to

14 provide energy at that time?

15 **A.**    That's correct.

16 **Q.**    Okay.  And, likewise, if we can go to the moon on the

17 right, which is the Time of Delivery factor there?

18 **A.**    That's 1.087.

19 **Q.**    And, likewise, that is a reflection of the fact that

20 energy is slightly less valuable in the evening because the

21 demand is a little bit less than it is during the day?

22 **A.**    That's generally correct, yes.

23 **Q.**    And do these numbers change, the 1.479 and 1.087?

24 **A.**    They are fixed numbers in the tariff.  I assume the tariff

25 can be updated, but any generator knows these will be the Time

1  of Delivery factors; that whenever they provide energy,

2  whatever they are paid at that -- for that specific -- those

3  specific hours and those specific months, the price they

4  actually obtain will be adjusted by those known factors.

5  **Q.**  So it's fair to say that even though providing energy in

6  the morning, there is one Time of Delivery factor, and

7  providing energy in the evening there is a different.

8      We know now that, unless the tariff changes, in 2020 in

9  the morning actual multiply the amount of energy by 1.47 in the

10 morning and in the evening by 1.087?

11 **A.**  That's correct.

12     **MR. BHABHA:**  Can we put up the regulation slide?

13     (Document displayed)

14 **BY MR. BHABHA**

15 **Q.**  Dr. Lesser, we have been over this a number of times so

16 I'll try to keep this brief.

17     As we said, the only rate in the Standard Contract for the

18 price of energy for a qualifying facility is the so-called SRAC

19 rate, is that correct?

20 **A.**  That's correct.

21 **Q.**  And that rate is a formula with the fixed and variable

22 components that we've already discussed, is that correct?

23 **A.**  That's correct.

24 **Q.**  I'm just going to...

25     (Brief pause in the proceedings)

1  Q.   And I think we have now in our memory what (i) says, which

2  is at the time the energy is delivered.

3         MR. BHABHA:   Yeah.   The regulation, please.

4       (Document displayed)

5  BY MR. BHABHA

6  Q.   So using the SRAC rate, with the fixed and the variable

7  components that we know, under (i) if a qualifying facility is

8  providing energy, you take the SRAC formula and at the time of

9  delivery you plug in the numbers for the price of natural gas

10  and the other varying facts and that gets you the rate under

11  (i), is that correct?

12  A.   That's correct.

13  Q.   Okay.   If the SRAC -- hypothetically, if the SRAC formula

14  also satisfied (ii), what would be the difference between (i)

15  and (ii)?

16  A.   The inputs in the formula would have to be known

17  beforehand, and they would have to be known for the length of

18  the contract.   So without -- you can't figure out the output

19  without knowing the inputs.

20  Q.   So even if you know the input, if you sign a contract

21  today, in April of 2017, and you know what the formula is, if

22  the contract is for five years, in April of -- in April of

23  2019, two years hence, you will not be able to know what the

24  output from the SRAC formula is because you don't know what the

25  inputs are, is that correct?

1   **A.**   That's correct.

2   **Q.**   Okay.

3   **A.**   One could use an analogy of an adjustable rate mortgage,

4   where the mortgage rate is set to the prime rate plus

5   something, five percent, whatever.

6       Well, what's the prime rate going to be 10 years from now?

7   I don't know.  So I don't know what the mortgage is going to

8   be.

9       **THE COURT:**  Isn't that helpful for you?  Because

10  banks make those loans all the time.

11      You're trying to tell me that banks won't make loans when

12  they have that kind of uncertainty?

13      **THE WITNESS:**  Banks will loan on an adjustable rate

14  mortgage, because that's good for them.  Whether you want to --

15  whether an individual wants to have an adjustable rate

16  mortgage, and lot of people found out when the interest rates

17  spiked some years ago, that having an adjustable rate

18  mortgage --

19      **THE COURT:**  Your point earlier was SRAC is fatally

20  uncertain for lenders.

21      Now you're telling me that an ARM is equally uncertain,

22  but ARMs are given for 7, 10, 15 year periods all the time.

23      **THE WITNESS:**  The difference is a lender is lending

24  money based on an expectation of a repayment stream in the case

25  of a QF.

1     In the case of an adjustable rate mortgage, the lender is

2  then tying their -- the payment they receive to varying

3  mortgage -- varying interest rates.  So I see that as totally

4  different.

5        **THE COURT:**  Okay.

6        **MR. BHABHA:**  Two more points if I might, your Honor?

7        **THE COURT:**  Then we're going to take a very short

8  morning break and then we'll go on.

9        **MR. BHABHA:**  Okay.  I'm sorry.  Shouldn't be more

10  than a couple minutes.

11        **THE COURT:**  Take your time.  Go on.

12  **BY MR. BHABHA**

13  **Q.**  Dr. Lesser, in your opinion if all (ii) required is a

14  formula which you then plugged in the actual numbers at the

15  time energy was delivered, wouldn't (ii) be the same thing as

16  (i)?

17  **A.**  So let me see if I understand your question.  If you're

18  saying that the formula --

19  **Q.**  Let me repeat my question.

20  **A.**  Thank you.

21  **Q.**  If all (ii) required was a formula, not a set number but

22  just a formula, then wouldn't the requirement in (ii) be

23  exactly the same as the requirement in (i)?  Because, as I

24  understood it, you said what (i) requires is a formula.  Then

25  at the time of delivery, you plug in the numbers and you get a

1   dollar value.

2       So if that's all that (ii) requires, wouldn't (ii) and (i)

3   be the same thing?

4   **A.**   Yeah.  I think they would be, yes.

5   **Q.**   And as you can see in the regulation, a qualifying

6   facility is given the choice to choose either a (i) rate or

7   (ii) rate, correct?

8   **A.**   That's correct.

9   **Q.**   Mr. Lesser, you were asked in cross examination about an

10  article that you had written, is that correct?

11  **A.**   Correct.

12  **Q.**   And in that article you noted that whenever you have a

13  fixed rate, if market rates go up or down, one side or the

14  other could have made a bad bet.  Because market rates could go

15  up and, therefore, the qualifying facility gets paid less than

16  it would have, or market rates could go down and, therefore,

17  the utilities are paying more than they could have; is that

18  correct?

19  **A.**   That's correct.

20          **MR. BHABHA:**  And if we could just go to the slide?

21  (Document displayed)

22  **BY MR. BHABHA**

23  **Q.**   And is it your understanding when making PURPA, in the

24  PURPA rule making, FERC, in fact, acknowledged the same thing.

25      It said:

1        "Many commentators have stressed the need for

2    certainty with regard to return on investments in new

3    technologies.  The Commission agrees with these

4    arguments and believes in the long run, over

5    estimations" -- which is, I think, one of the things

6    you referred to -- "and underestimations, the avoided

7    costs will balance out."

8    A.   That's correct.

9    Q.   Finally, Dr. Lesser, you were asked at the end of your

10   cross examination about when the market price for gas, if it's

11   set on February 7th, does that rate apply for January or does

12   that rate apply for February?  Do you remember you were asked

13   those questions?

14   A.   Yes.

15   Q.   Now, regardless of whether the February 2017 rate applies

16   for January or February, it's your testimony that that rate

17   will be only for that month, correct?

18   A.   That's correct.

19   Q.   Because in March 2017, whatever the market price is for

20   natural gas will change that rate, correct?

21   A.   That's correct.

22        MR. BHABHA:  Your Honor, we have no further

23   questions.

24        THE COURT:  Okay.

25        MS. BONE:  Your Honor, I have a slight redirect --

1          **THE COURT:** Sure.  Yes.

2          **MS. BONE:** Recross.

3          **THE COURT:** Recross.  Okay.

4          **MS. BONE:** Thank you, your Honor.

5                    **RECROSS EXAMINATION**

6    BY MS. BONE

7    **Q.**   Dr. Lesser, going back to your article that we have been

8    talking about, which is Defense Exhibit 108.

9          Just generally, was this article, in your opinion,

10   critical of administratively determined avoided costs?

11   **A.**   I would say, yes, it was, because the objective of this

12   article -- this article is not addressing PURPA.  This article

13   was based on an assignment I performed for the California

14   Energy Commission, which looked at -- our initial task was:

15   Can you tell us what feed-in tariff rate should be?

16         And we said:  Well, why don't you -- if you want to

17   improve economic efficiency, use an auction mechanism.

18         And subsequently the CPUC adopted an auction mechanism in

19   Re-MAT, although it's rather a bastardization of what the

20   mechanism we suggested was, but it's more if -- if the goal is

21   strictly economic efficiency, ignoring PURPA -- because this

22   article, again, has nothing to do with PURPA -- then it would

23   be more economically efficient, in my view, in my coauthor's

24   view, to obtain whatever -- whatever generation you wanted

25   using the auction mechanism described in this -- in this case

1    and then you have a known auction price, obviously, so the

2    auction winner has certainty as to what price will be paid

3    versus something where it's just set -- the price is set

4    administratively, which could be too low or too high.

5    **Q.**    In this article did you take the position that, in fact,

6    the auction mechanism would induce more renewable deployment?

7    **A.**    No, that's not the point.

8    **Q.**    Then what was the point?

9    **A.**    The point, counselor, was if a -- if a regulatory

10   commission wants to obtain a specific quantity of renewable

11   generation of some type, for whatever reason -- and one can

12   debate whether that is itself economically efficient or not --

13   then this auction mechanism is a more efficient way of

14   acquiring that amount of generation, the specific amount of

15   generation that's desired, than, say, setting a cost, just

16   setting a specific fixed feed-in tariff rate.

17       If the feed-in tariff rate was set below -- below the

18   appropriate market rate, you might not get all that you want.

19   You could say the feed-in tariff rate is a dollar a

20   megawatt-hour and you will discover that no one actually

21   bids --

22          **THE COURT:**  Let me jump in.

23       I think we're getting a little bit far afield.  Do you

24   have anything else to add?

25

1  BY MS. BONE

2  Q.   Well, all I was going to ask was that, as I understood it,

3  part of the purpose of this proposed feed-in tariff that they

4  are proposing in this article was to provide long-term

5  financial stability for investors in renewable technologies,

6  and that it was, in fact, intended to provide a mechanism that

7  would encourage investment in renewables.

8  A.   By having -- well, your question was slightly different.

9  Your question, as I interpret it, was:  Will this mechanism

10  encourage, in the aggregate, more renewables than an

11  administratively set feed-in tariff value --

12        THE COURT:  Let me just jump in here.

13     Why don't you make that a question and see what Dr. Lesser

14  says, okay?

15        MS. BONE:  Okay.

16        THE COURT:  Start with that and we'll wrap it up.

17  BY MS. BONE

18  Q.   So was the point of your proposal, the feed-in tariff, to

19  provide long-term financial stability for investors in

20  renewable energy technologies?

21  A.   That's certainly one offshoot of the approach set out in

22  the article.  The focus of the article is to improve economic

23  efficiency.

24  Q.   Thank you very much.

25        THE COURT:  Okay.  You can step down.  Be careful on

1    the way down, and we'll be back in 10 minutes.

2         **THE WITNESS:**  Thank you, your Honor.

3         **THE CLERK:**  All rise.  Court is in recess.

4    (Whereupon there was a recess in the proceedings

5      from 10:53 a.m. until 11:04 a.m.)

6         **THE COURT:**  Okay.  Who do we have next?

7         **MR. BHABHA:**  Your Honor, plaintiff would like to call

8    Christopher Whitman to the stand, please.

9         **THE COURT:**  All right.

10                   **CHRISTOPHER WHITMAN,**

11   called as a witness for the Plaintiff herein, having been duly

12   sworn, testified as follows:

13        **THE WITNESS:**  Yes, I do.

14        **THE CLERK:**  Please be seated.

15        **THE WITNESS:**  Thank you.

16        **THE CLERK:**  Please state your full name for the Court

17   and spell your last name.

18        **THE WITNESS:**  Christopher Whitman, W-H-I-T-M-A-N.

19        **THE CLERK:**  Thank you.

20                   **DIRECT EXAMINATION**

21   BY MR. BHABHA

22   **Q.**   Mr. Whitman, did you file direct testimony in this matter?

23   **A.**   Yes, I did.

24        **MR. BHABHA:**  May I approach, your Honor?

25        **THE COURT:**  Yes.

1    (Whereupon document was tendered to the witness.)

2  **BY MR. BHABHA**

3  **Q.**    Mr. Whitman, is this document I handed you, marked ECF

4  137, your pre-filed written direct testimony?

5  **A.**    Yes, it is.

6  **Q.**    And do you affirm that testimony is true and correct?

7  **A.**    I do.

8         **MR. BHABHA:**  We would like to introduce Mr. Whitman's

9  pre-filed direct testimony as Exhibit No. 23.

10         **THE CLERK:**  23 or 24?

11         **MR. BHABHA:**  I'm sorry, 24.

12         **THE COURT:**  All right.  It's admitted.  Go ahead.

13    (Trial Exhibit 24 received in evidence)

14  **BY MR. BHABHA**

15  **Q.**    Mr. Whitman, could you tell the judge about your personal

16  experience in obtaining financing for qualifying facilities,

17  just to describe your background in that area?

18  **A.**    I have been working in the financing area for equipment

19  and renewable energy projects and then, also, some conventional

20  energy projects for about 20 years.

21    I am a lawyer by training, initially.  I left the law to

22  join an advisory shop that worked on large asset financings.

23  And then over time we moved into and formed a company to do

24  solar and wind financing, where we advise banks and financial

25  institutions on their investments in both loans, leases and tax

1    equity investments in these areas.

2        We have helped develop some of the structures that are

3    presently used by developers and banks in these financing

4    circumstances.  And I have probably worked on four banks and

5    financial institutions and/or developers on the other side.  I

6    have probably looked at 700 to 800 facilities, of which

7    probably 325 to 350 have been actually financed, and the values

8    are about 900 million to a billion dollars, somewhere in that

9    range, of the projects that were actually financed.

10   Q.   And in the 300 to 400 projects that were actually

11   financed, what was your role, vis-a-vis the bank and the --

12   A.   Most of those -- I advised banks and financial

13   institutions.  Most of those were for sale, lease-back

14   transactions where we would evaluate, price up and work with

15   the banks on their credit backgrounds and other things for the

16   transactions.

17   Q.   And these transactions that you worked on, are these

18   transactions where bankers deciding whether or not to fund the

19   construction of a generator?

20   A.   Yes.  Fund both construction and/or the long-term

21   financing on the generator over the course of the term of the

22   contracts to sell power or REX for those deals.

23   Q.   So you are familiar with and have experience in the

24   criteria through which banks make these financing

25   determinations, is that correct?

1    **A.**    Absolutely.

2          **MR. BHABHA:**  Your Honor, we would like to offer Mr.

3    Whitman as our expert in the issue identified for trial, but

4    also the connected issue of financing of qualifying facilities

5    by financial instructions.

6          **THE COURT:**  Any objection?

7          **MS. BONE:**  No, your Honor.

8          **THE COURT:**  All right.  He's admitted.  Go ahead.

9    **BY MR. BHABHA**

10   **Q.**    Mr. Whitman, qualifying facilities get paid for both

11   capacity and energy, is that correct?

12   **A.**    That's correct.

13   **Q.**    And can you describe for the Court the relative importance

14   to a qualifying facility of the capacity versus the energy

15   payment?

16   **A.**    Well, to be honest with you, banks look at the revenues

17   that are generated by facilities in totality.  They want to

18   know what kind of revenue is going to be generated so that they

19   can size their loans or their least payments in a manner that

20   makes sure that they get paid back, okay?

21          So if you're talking about the difference between capacity

22   payments and energy payments, they view the capacity payments

23   as fixed payments and, therefore, can be included in the

24   revenue that they basically size their loans or lease payments

25   off of.

1    As far as the energy payments are concerned, if those

2  energy payments are fixed, they will also add that revenue in

3  to what they will consider for purposes of sizing their loans

4  or lease facilities.

5    If the revenue is not fixed and it's variable, there is

6  only two ways to deal with variable revenue, and that is either

7  to exclude it, or variable revenue can be things like, as we've

8  talked about, a solar facility has variable production,

9  depending on how sunny it is.  They will introduce coverage

10  ratios, hire experts to determine what actual production from

11  the facility would be and then have them analyze what they call

12  the variances of production over time to determine the size of

13  the loans.

14  **Q.**    So could you explain what a coverage ratio is?  You used

15  that term in your testimony.

16  **A.**    A coverage ratio is basically -- let's assume that a --

17  let's assume that a facility has what's called a proforma

18  financial statement.  That proforma financial statement will

19  list the revenues that are generated by the facilities, the

20  expected revenues.  It will also have the expenses from the

21  facility that are expected to be paid.  I mean, a solar

22  facility you have to mow and wash and insure and basically do

23  operations and maintenance on.

24    That will provide a net revenue figure.  Expected revenue

25  vis-a-vis expenses.  What they will do is take that net revenue

1    figure and say, okay, there are variances and variables here.

2    So if we are expecting the facility each year to generate $100

3    of revenue, we will size our loan facility to require payments

4    equal to, let's say, 100 divided by 1.2.  And that 1.2 would be

5    a coverage ratio, which would make the payment someplace around

6    87 or 88.

7         So that there is an additional revenue in case the

8    facility underperforms or the revenue does not come in for

9    other purposes.  But then they will go back and that coverage

10   ratio is basically determined by them getting an expert to come

11   in and say, with 99 percent certainty this will have this much

12   revenue to pay us back.

13   **Q.**   Because banks, when they decide to make these loans to

14   qualifying facilities, make a revenue projection and determine

15   is that revenue projection going to be sufficient to cover the

16   loan that we're giving to the qualifying facility?

17   **A.**   Yes.  The loan payments that will be due or the lease

18   payments that will be due.

19   **Q.**   So when Mister -- Dr. Lesser testified, and you were in

20   the court for this, you heard he specified there was a capacity

21   payment which he estimated generally comes about -- provides

22   about 20 percent of revenue --

23   **A.**   Correct.

24   **Q.**   -- for a qualifying facility.

25        And there was an energy payment that generally provides

1    about 80 percent?

2    A.    Correct.

3    Q.    Does that sound about, right to you?

4    A.    Yes, it does.

5    Q.    Okay.  So I would like to focus now just on the energy

6    payment, which comprises about 80 percent of a qualifying

7    facility's revenue.

8         And I take it that in your experience, the energy payment

9    for a qualifying facility will be the thing the bank cares

10   about because it's an 80 percent of revenue, as opposed to a

11   capacity payment, which they may care less about, because

12   that's a much smaller portion of the bank's -- of the

13   qualifying facility's revenue; is that a fair statement?

14   A.    Then care a lot more about the energy payments because

15   it's 80 percent of the revenue.

16   Q.    Okay.  Is it your understanding that the only energy

17   payment rate specified in the Standard Contract we have been

18   discussing in this case is the so-called SRAC rate?

19   A.    Yes.

20   Q.    Okay.  And as we were reviewing with Dr. Lesser, and I

21   won't try and make it magically and here, the SRAC rate has

22   three variable components and the rest are fixed, is that

23   correct?

24   A.    That's correct.

25   Q.    So in light of the fact that it has three variable

1  components, the SRAC rate cannot be set without knowing what

2  those variable components might be at any given time, is that

3  correct?

4  A.   Yes, that's correct.

5  Q.   So one of the variable components in the SRAC rate is the

6  price of natural gas, is that correct?

7  A.   Yes.

8  Q.   Okay.  Now, the SRAC price varies based on the price of

9  natural gas, is that correct?

10  A.   Yes.

11  Q.   And do you have experience through your work in financing

12  these sort generators in the variability within the price of

13  natural gas?

14  A.   Natural gas and -- had incredible variability over the

15  last 10 to 15 years.  Incredible.

16      I mean, you know, if we are talking about the way banks

17  have viewed the variability of natural gas in general, they

18  will not take that risk.

19  Q.   So let me ask you a little bit about that.  The judge

20  asked Dr. Lesser whether or not there is data sufficient to

21  predict with any degree of certainty or with reasonable

22  certainty the price of natural gas out into the future.  And I

23  wanted to know whether you think there is such data available?

24  A.   I do not believe it's available.  And I will tell you that

25  the banks and financial institutions I work with do not believe

1    it's available or it's -- it has any -- enough certainty or

2    concreteness to it to finance based on it.

3  **Q.**    And why is that?

4  **A.**    Why is that?  Because there has been huge swings back and

5    forth on the price of these.  Many of them have finance

6    facilities that have natural gas as an input component to it

7    and have been burned in the past because of large swings in

8    natural gas costs.

9  **Q.**    Now, obviously, when a bank is deciding whether or not to

10    fund a qualifying facility -- say, for example, a solar

11    facility -- it has to make a forecast about how much the sun is

12    going to shine because solar facilities require sun, is that

13    correct?

14  **A.**    That's correct.

15  **Q.**    But banks feel comfortable making that kind of a

16    forward-looking projection?

17  **A.**    Yes.

18  **Q.**    And why is that?

19  **A.**    It has much lower variability than natural gas has over

20    the last 10 years.

21        Basically if you look it up, the amount of sunshine that

22    occurs on an annual basis every year, it does vary from year to

23    year.  But the variances are 99 times out of 100 within 15 or

24    20 percent.

25        And they can deal with that variability by introducing

1   coverage ratios into the deal which sets the ultimate payback

2   that they are expecting from the facility at a level that they

3   can have 99 percent certainty it will occur.

4   **Q.**   So if you can forgive me, I was a major in government.

5   Can you just unpack your statement?

6       99 out of 100 percent, it will vary 15 to 20 percent.  Can

7   you just explain that?

8   **A.**   What that means is that if you take any given 20 years,

9   let's say, or any given 100 years, let's say -- that's even a

10  better example -- I can say with relative statistical certainty

11  that based on the past, the past amount of sunlight -- and

12  there has been, as for these solar installation stations at

13  every airport in the country for years and years and years.

14  You basically have a situation where 99 times -- 99 of those

15  years will fall within a band of 80 percent of what's expected

16  to 120 percent of what's expected.  That they will be able to

17  deal with and they deal with on a regular basis and set

18  coverage ratios so it gives them that certainty that if this

19  falls within this range, that they get paid.

20          **THE COURT:**  So if I may jump in.

21      So in your experience, Mr. Whitman.

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  You're saying that a bank will accept a

24  plus or minus 20 percent swing and still finance a project?

25          **THE WITNESS:**  They will allow that because they set

1   their payments at the negative 20 percent number.

2          THE COURT:  Okay.  So if the SRAC formula produces

3   roughly a 20 percent swing, you would expect a bank to be

4   comfortable with that.

5          THE WITNESS:  I would think if the swing -- see, it's

6   a house of cards though, too.  You have the variability of

7   production.  You have some expense variability, and then you

8   have the variability on potential prices.

9       I have looked at this and said, natural gas prices have

10  been anywhere from $250 to $213 per Dekatherm over the last

11  decade --

12         THE COURT:  Let's get to that in a moment, but for my

13  question you're saying in your experience if the SRAC output,

14  the price, the formula generated a price that had a plus or

15  minus 20 percent volatility or variability, you would say a

16  bank would have no problem with that, is that right?

17         THE WITNESS:  In my experience I think they would --

18  it would be something that they would consider financing, if an

19  expert could come in and tell them with relative certainty that

20  based upon historical prices, that it's pretty certain that

21  they would get that revenue in the future.  And I'm not sure an

22  expert could come in and do that.

23         THE COURT:  Okay.  Let's try for more a plain spoken

24  answer.  Is the answer "yes" or "no"?

25         THE WITNESS:  I'd say the answer is -- plain spoken,

1    I'd have to talk to the banks, but my -- my thoughts on this

2    were they would consider it.  Yes, they would consider it.

3    Would they finance it is --

4            THE COURT:  Well, of course, there are other details.

5    But they are in the realm of possibility.

6            THE WITNESS:  It's in the realm of possibility.

7            THE COURT:  More than possibility.  They are in the

8    realm of being open to financing that kind of a swing under

9    SRAC.

10           THE WITNESS:  Right.  But basically --

11           THE COURT:  Let me ask you this.  This is a little

12   far afield -- look, I'm here to construe Congress' will in

13   PURPA.  This is a little bit far afield.  I'm going to let you

14   go forward.

15       Let me ask you this.  What is the volatility line that in

16   your experience a bank will not cross?

17           THE WITNESS:  Of what?

18           THE COURT:  When does that volatility or the variance

19   become so high -- what number over 20 percent is -- in your

20   experience, okay?

21       Based on your experience, what number over 20 percent is

22   the line over which a bank will not cross?  Is it 50 percent,

23   40 percent, 60 percent?

24           THE WITNESS:  It's probably 25 percent.

25           THE COURT:  25 percent.  And what is that based on?

1          THE WITNESS:  What is that based on?  That is --

2     that's based upon the fact that they need certainty that they

3     are going to be repaid or relative certainty.

4          They can't be 100 percent certain in any event that they

5     are going to get repaid, but the minute they vary away from

6     that -- you know, as I said, that 99 percent certainty, that's

7     when they start to shy away from funding these deals or

8     financing these deals.

9          THE COURT:  Have you been involved in a deal where a

10    bank declined to fund a qualifying facility because the

11    as-incurred price was too low?

12         THE WITNESS:  Multiple facilities.

13         THE COURT:  Tell me about any -- any in California?

14         THE WITNESS:  California, we have not seen any

15    qualifying facilities come through in California on the solar

16    side or in the areas I have worked with.

17         I have seen multiple of these facilities in New Jersey, in

18    Connecticut and other places where the developers have come to

19    the banks that I work with --

20         THE COURT:  Before you get to that, though, you have

21    not had firsthand experience with a bank declining to finance a

22    solar facility in California because the SRAC formula was too

23    uncertain, is that right?

24         THE WITNESS:  Most of the facilities that I have

25    financed in California -- and there have been probably about

1   100 of them -- have all been either through the feed-in tariff

2   program and/or the performance-based incentive programs that

3   have been outstanding and were outstanding in California for

4   the last seven to eight years.

5          THE COURT:  Okay.  So getting plainspoken again, the

6   answer to my question is yes?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.

9      Go ahead, Mr. Bhabha.

10         MR. BHABHA:  Thank you, your Honor.

11  BY MR. BHABHA

12  Q.   Just to follow on the judge's questions, you have

13  experience in the tremendous variability of natural gas prices

14  which, in turn, leads to tremendous variability in SRAC prices,

15  is that correct?

16  A.   That's correct.

17  Q.   Now, in your experience, you have not been able to secure

18  financing for any qualifying facilities, whether in California

19  or somewhere else -- in this case somewhere else -- that the

20  only revenue stream they can present to the bank is a variable

21  energy payment, but tied to the natural gas price?

22  A.   Banks will not finance variable revenue streams.

23  Q.   Okay.  And I'd actually like to skip ahead for a moment.

24         MR. BHABHA:  I believe we can now show Exhibit 21?

25         THE COURT:  21?

1          MR. BHABHA:  21, your Honor, yes.

2      I mean, we can go to the first -- can we close the Tools?

3      With the Court's indulgence, I know this is probably not

4   the way you normally see exhibits, but hopefully we can get

5   this across.

6      So if we can go to the first page of this to begin with,

7   so we can identify what this is.

8      (Document displayed)

9   BY MR. BHABHA

10  Q.   Okay.  So could you identify, Mr. Whitman, what is Exhibit

11  21?

12  A.   It's the "Cogeneration and Small Power Production

13  Semi-Annual Report" prepared by Pacific Gas & Electric.

14  Q.   And in plainspoken English, what is the "Cogeneration and

15  Small Power Production Semi-Annual Report" prepared by PG&E?

16  A.   It is a list of the facilities that they have contracted,

17  I believe, through PURPA for power.

18  Q.   For power.  So these -- this is a list of facilities that

19  have reached contracts under PURPA with PG&E, which is the

20  utility, to sell energy, is that correct?

21  A.   Yes.

22  Q.   Okay.

23          MR. BHABHA:  So now could we go to Page WC00984 of

24  this exhibit?

25      (Document displayed)

**BY MR. BHABHA**

Q.   So the top here says "Solar."  So can you just explain
what does this little section of this report contain?

A.   It contains every PURPA solar project that is obviously in
existence since 1993.

Q.   So this contains every qualifying facility of 20 megawatts
or less, solar qualifying facility -- so that's what, as I
understand it, Winding Creek wants to build, correct?

A.   Correct.

Q.   So this is every solar facility that has reached a
contract with PG&E for -- under 20-megawatts facility, is that
correct?

A.   Correct.

Q.   Okay.  So the only one that appears is the Villa Sorriso
solar facility in Napa, is that correct?

A.   That's correct.

Q.   Okay.  And the start date of that is April 16, 1993, is
that correct?

A.   Correct.

Q.   What year, Mr. Whitman, if you know, did the Standard
Contract that's at issue in this trial come into being?

A.   I'm not certain, but I know it was much later than this.

Q.   Much later than this?

A.   Yes.

Q.   So --

1    A.    So this facility was already in existence, had already

2    been financed and clearly was already operating prior to the

3    time that the Standard Contract was actually entered into.

4    Q.    So is it your testimony, Mr. Whitman, that there has not

5    been a single solar facility of less than 20 megawatts financed

6    and operational under PURPA since the Standard Contract was put

7    into -- put into force?

8    A.    Yes.

9    Q.    And we can see that plainly because the only facility

10   listed in the PG&E list --

11   A.    Is the 7 kW system for Napa.

12   Q.    Which came in in 1993?

13   A.    Which was already built and already --

14   Q.    Predating?

15   A.    Right.

16   Q.    In your expert opinion, Mr. Whitman, is the reason that

17   there was only one solar facility and it came before the

18   Standard Contract, is the reason for that because of the

19   volatility in SRAC prices which, as a result, makes banks

20   unwilling to finance these type of facilities?

21   A.    Yes.

22           THE COURT:   Well, it's a little conclusory.

23       What is the evidence for that?  Who did you ask?  What did

24   you look at?  How did you come to that opinion?

25

1    **BY MR. BHABHA**

2    **Q.**    Can you explain to the judge the basis of your opinion?

3    Then we'll go through a couple exhibits as well on that.

4    **A.**    My opinion is based upon the discussions with banks and

5    financial institutions, the clients that I have, along with

6    other banks and financial institutions that other clients of

7    mine have been working with.  I can tell you that many have

8    asked about financing PURPA.

9            As a matter of fact, Judge, I think you will be interested

10   in this.  We have looked at the avoided cost data historically

11   for many of these facilities.  And I'm going to bring up two or

12   three that we have specifically looked at.  They are not in

13   California, but they are in New Jersey and Connecticut.

14           **THE COURT:**  You know, those are just not that helpful

15   to me.

16           **THE WITNESS:**  Okay.

17           **THE COURT:**  I thought we had established in response

18   to my question that you had not been involved directly with a

19   qualifying facility that a bank had turned down due to too much

20   volatility or variance --

21           **THE WITNESS:**  That was only in California.

22           **THE COURT:**  Yes, you have -- this is like, yes, we

23   have no bananas.  Yes, you have not done that in California?

24           **THE WITNESS:**  Not in California.

25           **THE COURT:**  Okay.

1          **THE WITNESS:**  But other states I have.

2          **THE COURT:**  So I think the opinion "yes" is without

3     foundation.

4          So unless you have something that you can show that it's

5     California based, it's of no use to me Mr. Bhabha.

6          **MR. BHABHA:**  Okay, your Honor.

7          **THE COURT:**  I'm going to strike that testimony as

8     lacking foundation.

9          **MR. BHABHA:**  Okay.

10         **THE COURT:**  Okay.  Go ahead.

11    BY MR. BHABHA

12    **Q.**   So if we can just return briefly then to Exhibit 3.

13         (Document displayed)

14    **Q.**   So, again, if you can just briefly describe for the Court,

15    and Mr. Lesser covered this as well, what is Exhibit 3?

16    **A.**   That's the energy prices that are paid by PG&E

17    historically for qualifying facilities.

18    **Q.**   So these are the 80 percent prices it was, where we were

19    talking about the 20 percent for capacity and 80 percent for

20    energy.  This is the 80 percent component of that, is that

21    correct?

22    **A.**   Correct.

23    **Q.**   Okay.  So if we go to the very far right-hand column -- if

24    we can just hold one second?

25         At the top it says "Price Sent In Kilowatt Hours."  Can

1   you just explain what is "Sent In Kilowatt Hours"?

2   **A.**   It's the cents that they paid per kilowatt hour of

3   production that the facility uses and pumps into the grid.

4   **Q.**   Okay.  And if you can just scan your eye down, for

5   example, this W513 Bates stamp.  So the finally substantive

6   page.  You see there is -- would you say there is significant

7   variability in the price of the energy prices?

8   **A.**   It's a lot more than 20 percent, I will tell you that.  If

9   you look at it, you've got rates, you know, anywhere from 2.7,

10  it appears, up to, you know, very high fives.

11  **Q.**   And these are the SRAC rates that we have been discussing,

12  is that right?

13  **A.**   Correct.

14  **Q.**   And the SRAC rate is the only rate available to a

15  qualifying facility under the Standard Contract?

16  **A.**   Yes, it is.

17  **Q.**   And your previous testimony was that in your experience

18  banks would not finance facilities whose energy payment

19  variation was greater than 25 percent, I believe you --

20  **A.**   Yes.

21  **Q.**   And you observed here that the variation in SRAC energy

22  prices --

23          **THE COURT:**  I'm sorry.  Is that grounded in

24  experience in California, that 25 percent number?

25          **THE WITNESS:**  Grounded in experience?

1    THE COURT:  In California.

2    THE WITNESS:  Yes, it is in California.  Because

3  it -- it deals with California facilities that clearly have

4  other, you know -- you know, obviously, we have the solar

5  installation variability --

6    THE COURT:  I asked you a simpler question.

7    Just tell me what data you looked at that says in

8  California a bank will decline to finance a qualified facility

9  when the variability and the as-incurred price exceeds

10  25 percent.  How do you know that?

11    THE WITNESS:  Through discussions with the banks and

12  financial institutions that are actually financing these

13  projects.

14    THE COURT:  You've got to tell me what the facts are.

15  Who?  Where?  When?  What?  Give me a highlight.  It can be

16  representative.

17    THE WITNESS:  Okay.

18    THE COURT:  Pick the best one you have.

19    THE WITNESS:  Wells Fargo Bank, right here in

20  San Francisco.

21    THE COURT:  Tell me more.  What happened?

22    THE WITNESS:  Wells Fargo Bank, believe it or not, I

23  brought into financing solar through, say, lease-backs about

24  nine or ten years ago.  And we have approvals.  They have

25  financed projects all over the country, varying in sizes from

1   as small as 50 kW to as high as 50, 60 megawatts, very large

2   transactions.

3        So these have been projects that have been anything from

4   distributed generation projects to feed-in tariff contracts.

5   So it is -- it's been across the various California programs.

6            THE COURT:  When did this happen, 10 years ago?

7            THE WITNESS:  We started -- yes.  They started in

8   2007.

9            THE COURT:  Okay.  But my question is:  Under the

10  current SRAC regime --

11           THE WITNESS:  SRAC?

12           THE COURT:  -- have you had that experience?

13       What bank has told you under the current SRAC program,

14  okay, the current SRAC formula, what bank in California has

15  told you:  We will not finance a QF if the predictability of

16  the prices -- if the volatility of the prices is 25 percent or

17  more?

18           THE WITNESS:  What they have looked at, and what I

19  can say is based on my experience, when the variability has

20  increased beyond 25 percent, they have turned down those

21  projects for financing purposes.

22           THE COURT:  Who is the "they"?  And when did this

23  happen?

24           THE WITNESS:  The bank is Wells Fargo, De Lage Landen

25  Finance, PNC Bank --

1      **THE COURT:** For projects in California?

2      **THE WITNESS:** Yes.

3      **THE COURT:** Under the current SRAC?

4      **THE WITNESS:** Under the SRAC program.

5          As I have said, there have been very, very few done. They

6      have realized that they will -- the banks, the developers have

7      realized that they cannot get these things financed. Hence,

8      why we have not seen any other qualifying facilities show up on

9      these lists.

10      **THE COURT:** We're flying too high over the valley. I

11      want to know the nuts and bolts --

12      **THE WITNESS:** Okay.

13      **THE COURT:** -- not the punch line.

14          So I'm going to try it one more time and then we're going

15      to move on.

16          So what facts do you know to support your statement that a

17      bank has declined to finance a QF in California because the

18      variability or volatility of pricing under the SRAC exceeded

19      25 percent?

20      **THE WITNESS:** What they basically -- what has

21      occurred is --

22      **THE COURT:** No, no. I'm asking you for the name of

23      the bank. What bank has said that to you?

24      **THE WITNESS:** Wells Fargo has taken a look at QF

25      facilities in California for solar. They were asked to look at

1  it by two or three different developers, including Sun Edison,

2  and Sun Power.

3      They looked at it briefly and basically said:  We are not

4  interested in financing QF facilities due to the fact that

5  their variability in revenues and the term of the deal, neither

6  one was sufficient to have a certain amount of payback that

7  would allow them to finance it and obtain the internal credit

8  approvals that are necessary.

9          THE COURT:  Mr. Bhabha, let's wrap it up.

10          MR. BHABHA:  Okay.  Can I ask a couple more

11  questions, your Honor?

12          THE COURT:  Please, yes.

13          MR. BHABHA:  Okay.

14          THE COURT:  But with an eye towards passing the

15  witness.

16          MR. BHABHA:  I will pass him very soon, your Honor.

17  BY MR. BHABHA

18  Q.  Is it your experience -- in your experience do you know,

19  Mr. Whitman, whether, unlike California, other states actually

20  do offer qualifying facilities --

21  A.  Certain other states do, yes.

22          MS. BONE:  Objection, your Honor.

23          THE COURT:  Sorry?

24          MS. BONE:  Objection to this testimony regarding

25  other QF contracts in other states.

1        THE COURT:  I already said I don't think it's very

2   useful, but you can go ahead.

3        I mean, the pricing regimes are just too different for it

4   to be useful here.

5        MR. BHABHA:  I can proffer, your Honor, the reason we

6   believe it's useful is they say it's -- we're misreading what

7   the regulation means and that it's impossible to give this kind

8   of a rate because of all of the uncertainty.

9        The only purpose of this testimony is to show that in

10  Georgia and Oregon they actually do price out for 20 years for

11  QFs exactly the dollar price they are going to get in 2023.

12       THE COURT:  Okay.  Can you lay a foundation that he

13  actual knows that and how he knows that?

14       MR. BHABHA:  That's -- yeah.

15       THE COURT:  And we can go from there.

16       MS. BONE:  Objection, your Honor.

17       THE COURT:  Overruled.  Go ahead.

18  BY MR. BHABHA

19  Q.   Mr. Whitman, could you -- let me go exactly to the

20  exhibit.

21       Mr. Whitman, could you very briefly tell the Court about

22  your experience in securing financing for qualifying facilities

23  in Georgia under the PURPA regime?

24  A.   Yes.  We -- I will give you specific examples.  One of my

25  clients is De Lage Landen Finance, which is a subsidiary of

1  Rabobank.  They were -- have been approached to finance Georgia

2  Power, QF contracts with fixed rates for 20 years.  And they

3  have -- and we have financed two or three of those on that

4  basis.

5  **Q.**  Now, have you also financed contracts in Georgia for a

6  company called Shippan Renewable Energy Partners, Inc.?

7  **A.**  Well, yes.  We did do -- the De Lage Landen did finance

8  one of that -- that specific contract.

9  **Q.**  Okay.  And was that entered in approximately March 8th of

10  2013?

11  **A.**  Yes.

12       **MR. BHABHA:**  Your Honor, we move into evidence

13  Exhibit No. 19.

14       **THE COURT:**  Well, was this financing under

15  (d)(2)(ii), financing for avoided costs calculated at the time

16  the obligation is incurred?

17       **THE WITNESS:**  It was financed under the Georgia

18  program, which was set up to meet, I believe --

19       **THE COURT:**  (d)(2)(ii)?

20       **THE WITNESS:**  (d)(2)(ii), correct.

21  **BY MR. BHABHA**

22  **Q.**  Because (d)(2)(ii) is a FERC regulation, is that correct,

23  Mr. Whitman, which applies to all of these qualifying

24  facilities nationwide under PURPA, is that correct?

25  **A.**  Yes.

1           **MR. BHABHA:**  We move that into evidence, your Honor.

2           **THE COURT:**  Okay.  Admitted.

3       (Trial Exhibit 19 received in evidence)

4  **BY MR. BHABHA**

5  **Q.**    If we could go, please, to Page 000964 of that contract?

6       (Document displayed)

7  **Q.**    I believe that's appearing on the screen here are.

8       Can you explain to the Court what is an Escalating Price

9  Schedule here?

10 **A.**    This is the specific payment per kilowatt hour that

11 Georgia Power will pay for the power produced by the facility

12 every single year from now until 2034.

13 **Q.**    So it's your testimony that regardless of what happened

14 with natural gas prices, for this contract under 202 -- excuse

15 me, 304(d)(2), in 2025 this facility will be paid $0.1560 per

16 kilowatt hour?

17 **A.**    Correct.  15.6 cents per kilowatt hour.

18 **Q.**    Is it your testimony that this kind of a contract which

19 actually sets the dollar price complies with (ii) because it

20 sets the price at the time the obligation is incurred?

21 **A.**    Yes, it does.

22 **Q.**    And, again --

23           **THE COURT:**  Why is that?  How is this setting the

24 price at the time the obligation is incurred?

25           **THE WITNESS:**  Because this -- this is an exhibit to

1    the contract, so it is signed when the contract is signed,

2    obligating the developer to deliver the power and obligating

3    Georgia Power to purchase the power.  This is the scheduled

4    payments that they will get per kilowatt hour each year from

5    now until 2034.

6            **MR. BHABHA:**  Your Honor, if I might, if I could

7    quickly show that with the actual exhibit itself?

8            **THE COURT:**  That's fine.

9            **MR. BHABHA:**  If we could go to the first page of

10   Exhibit 19, please?

11       (Document displayed)

12   **BY MR. BHABHA**

13   **Q.**   Okay.  So this is the first page of the contract.  Is that

14   correct, Mr. Whitman?

15   **A.**   Yes, it is.

16   **Q.**   It's "Georgia Power Company's Advanced Solar Initiative

17   Medium Scale Solar Agreement," correct?

18   **A.**   Correct.

19   **Q.**   Okay.  And it says:

20            "The medium scale solar agreement is entered into

21       March 8th, 2013 between Georgia Power Company and a

22       solar generator Shippan Renewable Energy Partners for

23       the purchase and sale of participant's solar energy

24       and capacity."

25            **THE COURT:**  Okay.  Show me the punch line.  Where is

1    the (d)(2)(ii)?

2        **MR. BHABHA:**  Okay.  Then if we go to the second page,

3    your Honor.

4        (Document displayed)

5    **BY MR. BHABHA**

6    **Q.**   It says under "Selected Pricing":

7            "At the option of participant, Georgia Power will

8        pay participant either 13 cents per kilowatt hour or

9        an escalated price shown in Appendix B."

10   **A.**   So that basically means the developer was given two

11   options:  To have a flat rate of 13 cents over 20 years or the

12   level of escalated pricing on Appendix B.

13   **Q.**   Then if we go to Page 10 of the contract, or Bates No.

14   960, that is the signature when the date, the obligation was

15   entered, is that correct?

16   **A.**   That's correct.

17   **Q.**   And that date is, you signed it, it looks like

18   March 8th --

19   **A.**   March 8th, 2013.

20   **Q.**   -- 2013.

21       Make sure I get my question out before you answer so the

22   court reporter can get both of us.

23       And then we see Appendix A, which is just some basic

24   background information about the facility.

25       And then Appendix B, which is the actual prices that will

1    be paid years into the future, but signed in 2013, is that

2    correct?

3    **A.**    That's correct.

4         **MR. BHABHA:**    And, your Honor, just in the interests

5    of time, I won't go through it, but I would move into

6    introduction also Exhibit 20, which is the same example but in

7    the State of Oregon.

8         **THE COURT:**    That's fine.

9         (Trial Exhibit 20 received in evidence)

10   **BY MR. BHABHA**

11   **Q.**    Finally, Mr. Whitman, as the Court noted, the real

12   question here is what was Congress's intent when it passed

13   PURPA and what's the reason for this, the basis in this statute

14   that you should be able to get a rate set the day you sign a

15   contract, even with the knowledge that given the volatility of

16   prices, the actual price of energy might be very far into the

17   future.    That's your understanding of what we're here to

18   determine, is that correct?

19   **A.**    Yes.

20   **Q.**    And is it your expert opinion that is precisely because

21   these facilities need that revenue certainty in order to get

22   financing, that is the reason for the (ii) which gives the rate

23   at the time the obligation is incurred, as opposed to whatever

24   the price of energy is whenever the energy is delivered?

25   **A.**    In my opinion, there would be no need for (ii) if it

1    wasn't for the fact that you could not get financing with it.

2         So I believe, personally, that the intent of this was to

3    get fixed rate long-term contracts so that developers can build

4    these facilities.

5    Q.    And the final question.  As we noted earlier, in the PURPA

6    rule making itself --

7              MR. BHABHA:  And, your Honor, if I might, that's

8    Exhibit 2, which we believe the Court can just take judicial

9    notice of because it's part of the federal reg, but I can move

10   it into evidence if you like.

11             THE COURT:  That's  fine.  Go ahead.

12   BY MR. BHABHA

13   Q.    In the PURPA rule making FERC itself specifically

14   identified that in order to facilitate the funding of these

15   types of facilities, they needed the revenue certainty that

16   comes from giving the rate at the time the obligation is

17   incurred, is that correct?

18   A.    Yes.

19             MR. BHABHA:  Your Honor, I have no further questions.

20             THE COURT:  Let me ask you a question.  Did you say

21   you signed Exhibit 19?

22             THE WITNESS:  I signed it, yes.

23             THE COURT:  Why are you signing Exhibit 19?  Why did

24   you sign that contract?

25             THE WITNESS:  Why did I sign that contract?

1          **THE COURT:**  Yes.

2          **THE WITNESS:**  Because I do development work

3    occasionally on the solar side, so that's why I'm familiar with

4    Georgia Power.  I signed it.  That specific transaction then

5    was assigned to another party.

6          **THE COURT:**  But do you have a financial stake in the

7    outcome that contract?

8          **THE WITNESS:**  No, none.

9          **THE COURT:**  Why did you sign it?

10         **THE WITNESS:**  As a favor.

11         **THE COURT:**  As a what?

12         **THE WITNESS:**  As a favor to a friend of mine who

13   wanted to put --

14         **THE COURT:**  You signed a contract pledging to go

15   produce energy --

16         **THE WITNESS:**  At that point he had agreed --

17         **THE COURT:**  Hold on.

18      You signed a contract pledging to produce energy to the

19   Georgia PUC through 2034 as a favor to a friend?

20         **THE WITNESS:**  I had already assigned it.  It was

21   already in the process of being assigned and there was an

22   assignment agreement already drafted when I assigned it.

23         **THE COURT:**  I'm going to revisit the expert

24   designation later.

25      But go ahead.  Do you have any cross?

1    **MS. BONE:**  Yes, your Honor, I do.

2                    **CROSS EXAMINATION**

3    **BY MS. BONE**

4    **Q.**    Good afternoon, Mr. Whitman.

5    **A.**    Good afternoon.

6    **Q.**    I'm Traci Bone from the California Public Utilities

7    Commission.

8         I'm curious if you're aware of California's renewable

9    portfolio standard requirements.  Are you familiar with the

10   law?

11   **A.**    I am basically familiar with it.  I can't say that I know

12   the details.

13   **Q.**    So are you aware that we have a 33 percent renewables

14   requirement by 2020 and a 50 percent renewables requirement by

15   2030?

16   **A.**    Yes.

17   **Q.**    And are you aware that California is exceeding that goal

18   today?

19   **A.**    That's my understanding.

20   **Q.**    Okay.  You testified in your experience that the

21   uncertainty created by the SRAC energy payment in the QF

22   Standard Contract eliminates a QF developer's ability to obtain

23   financing and is an impediment to development of solar

24   generators, is that correct?

25   **A.**    Under QF, yes, that's correct.

1  **Q.**   Okay.  Is the Standard Offer Contract the only way the

2  solar developer can be incented to develop a Solar PV project

3  in California?

4  **A.**   No.

5              **THE COURT:**  Can I just jump in?

6      I don't think he's in the position to give any opinions on

7  these issues.  So I'm -- I don't think we need to -- I'm going

8  to disregard -- this is a significant conflict of interest.  He

9  has a stake in the outcome of the adjudication of these issues.

10  I was not clear --

11              **THE WITNESS:**  I have no stake in the --

12              **THE COURT:**  Don't interrupt me, Mr. Whitman.

13              **THE WITNESS:**  Sorry.  Excuse me.

14              **THE COURT:**  He has a financial interest in the

15  resolution of this case and I think that's a conflict that

16  makes him unsuitable as a witness.

17      So I'm going to dismiss him and we can move on to whoever

18  is next.

19              **MS. BONE:**  Thank you, your Honor.

20              **THE COURT:**  You may step down, Mr. Whitman.  Careful

21  on the way down.

22      (Witness excused.)

23              **THE COURT:**  All right.  Who do we have next?

24              **MR. BHABHA:**  Your Honor, our final witness, we

25  submitted some designations of testimony from Mr. Colvin, but

1  we thought -- the parties agreed it may be more efficient for

2  them to put him on and for us to cross examine.

3          **THE COURT:**  I was going to suggest that.  You can do

4  your cross and we will have the PUC start.

5          **MR. BHABHA:**  Okay.

6          **MR. HAMMOND:**  Your Honor, the CPUC calls Mr. Michael

7  Colvin to the stand.

8                          **MICHAEL COLVIN**,

9  called as a witness for the Defendant herein, having been duly

10  sworn, testified as follows:

11          **THE WITNESS:**  I do.

12          **THE CLERK:**  Please be seated.  Please state your full

13  name for the Court and spell your last name.

14          **THE WITNESS:**  My name is Michael Colvin, C-O-L-V,

15  like in Victor, -I-N.

16          **THE CLERK:**  Thank you.

17                      **DIRECT EXAMINATION**

18  **BY MR. HAMMOND**

19  **Q.**   Mr. Colvin, on whose behalf are you testifying today?

20  **A.**   I am testifying in my capacity as an employee of the State

21  of California as a senior regulatory analyst.

22  **Q.**   And do you have in front of you a document marked Exhibit

23  101?  That's Trial Exhibit No. 101, entitled "Prepared Direct

24  Testimony of Michael Colvin."

25  **A.**   I do.

1  Q.   Was this prepared by you?

2  A.   Yes.  I prepared this document.  I conferred with counsel

3  on some of the questions they asked me to respond back to.

4       Counsel also gave me some suggested edits, which I then

5  incorporated into my own words.

6  Q.   Thank you.

7       And going back to your qualifications.  Have you been

8  hired as an expert witness to testify today?

9  A.   No.  I'm an unretained expert.  This is just part of my

10 normal duty statement as an analyst at the CPUC.

11 Q.   So maybe we can just, at a high level, go through your

12 testimony?

13 A.   Of course.

14 Q.   Can you speak to your background and what qualifies you to

15 testify today?

16 A.   I have been an employee for the state for about nine years

17 now.  Before that I received an undergraduate degree in

18 environmental economics and a Master's degree in public policy

19 both from U.C. Berkeley.

20      In my capacity as an analyst at the state, I've worked on

21 a variety of qualifying facility issues.  Most notably, I was

22 one of the leading analysts during the time of the qualifying

23 facility settlement, and that's where my expertise will be

24 based.

25           MR. HAMMOND:  Your Honor, would it benefit the Court

1   to quickly go through this high level background of PURPA --

2           **THE COURT:** I think we're okay on that. Let's just

3   go right to the heart.

4           **MR. HAMMOND:** Okay.

5   **BY MS. HAMMOND**

6   **Q.** Mr. Colvin, can you describe the Standard Contract under

7   the QF contract for facilities 20 megawatts or less?

8   **A.** Sure. The Commission in 2010 approved a series of

9   contracts as part of the QF Settlement. One of them was for

10   qualifying facilities of 20 megawatts or less.

11       The contract allows for existing facilities a term of up

12   to seven years and for a new facility up to 12 years. The

13   contract has a capacity payment, which can be either for a firm

14   delivery or a capacity payment for a --

15           **THE COURT:** Let me jump in.

16       You're saying the maximum term of the Standard Contract is

17   12 years?

18           **THE WITNESS:** Under this particular contract, your

19   Honor. There is other qualifying facility programs that are

20   out there that have different term lengths, but under this

21   contract, a new facility, the maximum length is 12 years.

22           **THE COURT:** In the Standard Contract?

23           **THE WITNESS:** Yes.

24           **THE COURT:** Is 12 years?

25           **THE WITNESS:** Yes, maximum length.

1    **THE COURT:**  So if a qualifying facility, like Winding

2  Creek, elected to sign that contract now, the longest term

3  would be 12 years?

4    **THE WITNESS:**  Yes.

5    **THE COURT:**  Go ahead.

6  **A.**    Going back to your question.  The contract provides for

7  two types of payments; a capacity payment, and that capacity

8  payment can either be a firm payment or an as-available

9  payment.

10    The contract also allows for an energy payment, which is

11  what we will sometimes call a short-run payment or a Short-Run

12  Avoided Cost based payment.

13    I like to think of that first payment, that capacity

14  payment, as the Long-Run Avoided Cost and then the energy

15  payment as the Short-Run Avoided Cost.  But both of those

16  together really are the avoided cost based payment.

17  **Q.**    Can you explain to me the timing of the gas price, the

18  knowledge of the gas price input into the Short-Run Avoided

19  Cost?

20  **A.**    Sure.  So the way that Short-Run Avoided Cost works for

21  the energy payment, the utility will post the final -- all

22  the -- let me back up one second.

23    **THE COURT:**  Take your time.

24    **THE WITNESS:**  I apologize.  This is my first time

25  doing this.

1    THE COURT:  We've heard a lot today.  Are you talking

2    about the SRAC formula now?

3        THE WITNESS:  I'm talking about the SRAC formula.  So

4    for SRAC itself, SRAC is a formula based on a series of inputs.

5    It's --

6        THE COURT:  Excuse me.  We've seen the formula.

7        THE WITNESS:  Correct.

8        THE COURT:  And you agree the formula we've seen

9    today is the right formula, right?

10       THE WITNESS:  Yes.

11       THE COURT:  Okay.

12   **A.**  The gas price is determined based on the bid week from the

13   last month.  So the last five business days of the previous

14   month establishes what will be the prevailing gas price for the

15   next month.  That price is known the first business day of the

16   month.

17       Short-Run Avoided Cost, the all-in sheet that we've seen

18   some of the exhibits from PG&E showing, is posted on the

19   seventh business day of that month.  That's when the entire

20   formula is calculated.

21       THE COURT:  So let me unpack that a little bit.

22       THE WITNESS:  Of course.

23       THE COURT:  We've heard a lot this morning about it's

24   hopelessly undefined and open ended.  In other words, the

25   variables can't be filled in if a QF elects the as-incurred

1    contract option under (d)(2)(ii).

2        Does that all sound familiar?

3            **THE WITNESS:**  It sounds familiar.

4            **THE COURT:**  All right.  Is that right or wrong in

5    your view?

6            **THE WITNESS:**  In my view, your Honor, the formula

7    itself is completely known at the time and there is no -- the

8    Commission doesn't change what that formula is going to be.

9        So, for example, if you're talking about the gas price,

10   we're not going to suddenly say:  Oh, no, we're not going to

11   use gas prices any more.  The gas price is what the gas price

12   is going to be.

13       I think we can all agree that a gas price is going to

14   change.  It's going to go up and down over time.  But I don't

15   think there is any wild uncertainty that this is the source of

16   what that gas price is going to become.

17           **THE COURT:**  Okay.  Let's take that now.

18       The formula is fixed and it has three spots where you have

19   to input variables.  We've heard about the three spots.

20           **THE WITNESS:**  Yes.

21           **THE COURT:**  Okay.  Now, you agree with all that, that

22   those are three variable spots that have to be input under the

23   formula?

24           **THE WITNESS:**  Yes.

25           **THE COURT:**  Okay.  When, in your view -- if a QF is

1  going to elect to proceed under (d)(2)(ii), has incurred

2  payments, when are those variables filled in?

3       **THE WITNESS:**  The overall formula is filled in for

4  the qualifying facility on the seventh business day of the

5  month.

6       There is one of those adjustment factors, the last part of

7  the formula, the Location Adjustment, which is known the

8  following month.  And that's because it needs to -- it is a

9  true up that has to occur.

10      But in terms of what will be known for the facility, the

11  generic SRAC formula is designed and it is posted to the

12  utility's website on the seventh business day of the month

13  access to sort of market information would let a facility know

14  that even before that time, but it is posted and public at that

15  seventh business day.

16      **THE COURT:**  Okay.  Now, sorry.  Just to help out the

17  judge here.

18      **THE WITNESS:**  Of course.

19      **THE COURT:**  If a QF says to the PUC:  We're going to

20  take you up on (d)(2)(ii).  And PUC says:  Great, here is your

21  SRAC formula.  Is it your view then that every month that

22  formula would be run to pay the QF for its previous month's

23  energy production?  Over a 12-year contract it would be done

24  every month for those 12 years, is that right?

25      **THE WITNESS:**  The SRAC formula is updated every

1    month.  It is publicly published every month.  The qualifying

2    facility will know what it is paid for every month.

3         **THE COURT:**  Okay.  So if a QF takes you up under

4    (d)(2)(ii) for a 12-year contract, is it your view that the PUC

5    could project into the middle of year five what the QF would be

6    paid for a specific month?

7         **THE WITNESS:**  The formula itself, the Commission

8    doesn't need to project on, but what that formula will result

9    in is not going to be known.

10         **THE COURT:**  Okay.  Formula is fixed, I'm with you on

11    that.

12         **THE WITNESS:**  Yes.

13         **THE COURT:**  The output of the formula, the PUC cannot

14    say what that price will be at any given time in that 12-year

15    period until those variables are filled in by actual market

16    data, is that right?

17         **THE WITNESS:**  Yes.  I believe that's correct.

18         **THE COURT:**  Okay.  Go ahead.

19    **BY MR. HAMMOND**

20    **Q.**   Mr. Colvin, have you testified as to whether or not the

21    Standard Offer Contract complies with Section 292.304(d)(2)

22    (ii), and that is whether or not the avoided cost rate under

23    the Standard Offer Contract is a rate that is calculated at the

24    time the contract is executed?

25    **A.**   The Short-Run Avoided Cost is a formula that is known at

1    the time of contract execution and does not change in any way.

2    **Q.**    Thank you.

3    **A.**    Of course.

4    **Q.**    Who sets the avoided cost?

5    **A.**    So my understanding is the determination of avoided cost

6    can be a very complicated subject and each individual state is

7    given the discretion to make that determination.  So for

8    California, it's the Public Utilities Commission.

9    **Q.**    And for clarification, I'm sorry --

10   **A.**    Of course.

11   **Q.**    -- you were talking about avoided cost in general, as

12   opposed to the avoided cost under the Standard Contract?

13   **A.**    Yes.  Thank you for helping me clarify that.

14        So, in general, an avoided cost based rate, there is a lot

15   of different things that could be considered in terms of --

16        **THE COURT:**  Well, just to jump in and kick it up a

17   notch.  Avoided cost is just whatever the utility wouldn't have

18   to pay to create that same unit of energy, right?

19        **THE WITNESS:**  Yes.

20        **THE COURT:**  Okay.

21        **THE WITNESS:**  And determining that is --

22        **THE COURT:**  Complicated.

23        **THE WITNESS:**  -- complicated.

24        **THE COURT:**  And I don't need to get into it.  I don't

25   think I need to get into it.  Maybe I'm wrong, but I don't

1    think I need to get into it.

2         But anyway, go ahead.

3    **BY MS. HAMMOND**

4    **Q.**   Mr. Colvin, you testified you were present -- you helped

5    facilitate the discussions that let to the QF Settlement?

6    **A.**   Yes.

7    **Q.**   One part of which was this Standard Contract?

8    **A.**   Yes.

9    **Q.**   And how broad was the support for the QF Settlement,

10   inclusive of the Standard Contract?

11   **A.**   So the settlement in its totality covered a variety of

12   issues, as most settlement agreements would.  The Standard

13   Offer Contract was certainly a component of what was agreed to

14   as part of the settlement deal.  And like all settlements, it

15   was an all-in package.

16        The settlement was ultimately submitted by the state's

17   three largest investor-owned utilities, Pacific Gas & Electric,

18   San Diego Gas & Electric, Southern California Edison; four

19   different trade association groups representing primarily

20   cogeneration facilities for independent power producers; and,

21   also, two ratepayer advocacy groups, the Commission's own

22   Office of Ratepayer Advocates and a third-party ratepayer

23   advocate group known as TURN, The Utility Reform Network.

24        So those nine stakeholders all collectively signed the

25   settlement agreement.  And I would characterize it as very

1    broad-based support.  This was an all-party settlement, for

2    lack of a better word.

3    **Q.**   Do you have any corrections or clarifications you would

4    like to make to Exhibit 101?

5    **A.**   I do.  On Page 10 on Paragraph No. 35, at Line 8, the

6    sentence ends -- or the sentence reads:

7            "In part, this was done because the CPUC had

8        already approved other QF programs for renewable QFs."

9    I would like the sentence to end there.  And so strike the

10   comma, "such as Re-MAT."

11   **Q.**   Thank you.

12   And with that correction, does this constitute your

13   prepared direct testimony?

14   **A.**   It does.

15       **MS. HAMMOND:**  Your Honor, plaintiffs have proffered

16   an exhibit which consisted of deposition designations.  And the

17   CPUC does object to that exhibit as Mr. Colvin's prepared

18   direct testimony.  Mr. Colvin is here and present to testify.

19       **THE COURT:**  Well, let me defer that and see what

20   happens on cross.

21   Before we do, let me ask you a couple more questions.  So

22   thinking about the C.F.R. that we have been talking about all

23   day, Section 292.304, Mr. Colvin, what is the -- how is the

24   price -- the QF elects to go under (d)(2)(i), the price,

25   avoided cost calculated at the time of delivery.  How -- in

1   your understanding how does PUC -- how is that price set?  Not

2   PUC.  From your understanding how is that price set under

3   (d)(2)(i)?

4          THE WITNESS:  The -- there are two parts of this.

5   The first part is the fixed part, which is the capacity

6   payment.  And we can get into this later or not of what -- you

7   know, how large or small the capacity payment would be.  But

8   that is known and executed at the time of the contract.  It is

9   there.  It's a schedule.  It's written out.

10         THE COURT:  So that's a pre-defined amount?

11         THE WITNESS:  Yes.

12         THE COURT:  Okay.

13         THE WITNESS:  For the time of delivery, for the

14  energy payment, it is in my mind the formula of, well, what

15  was the -- it's the Short-Run Avoided Cost based formula.

16         THE COURT:  Same SRAC formula that we have been

17  talking about?

18         THE WITNESS:  Yes, yes.

19         THE COURT:  Okay.  So your testimony is under

20  (d)(2)(i), SRAC is used to calculate the energy portion of the

21  cost calculated at time of delivery, is that right?

22         THE WITNESS:  For the purposes of this contract, yes.

23         THE COURT:  For the Standard Contract.

24         THE WITNESS:  Yes.

25         THE COURT:  Okay.  And then under (d)(2)(ii) it's

1    all -- it's the same formula?

2              **THE WITNESS:**  It's the same combination of the

3    capacity payment and the energy payment.

4              **THE COURT:**  Okay.  So how then do (d)(2)(i) and

5    (d)(2)(ii), how are they different?  If it's the same formula

6    and same fixed capacity costs, what is a QF choosing between?

7              **THE WITNESS:**  Your Honor, for the purposes of this

8    contract, I don't know that there is a substantial difference

9    here.

10             **THE COURT:**  Okay.  So in your mind, in your view,

11   there is no meaningful difference between (d)(2)(i) and

12   (d)(2)(ii) in the way that the price paid to the QF would be

13   calculated, is that right?

14             **THE WITNESS:**  Correct.  For the purposes of this

15   contract.

16             **THE COURT:**  For the Standard Contract.  Okay.

17        Any follow up?

18             **MR. HAMMOND:**  May I ask this witness?

19             **THE COURT:**  Of course.

20   **BY MS. HAMMOND**

21   **Q.**   Mr. Colvin, do you see a difference between spot market

22   prices and what you've identified as the energy payment for the

23   purposes of 304(d)(2)(i)?

24   **A.**   I do.  The spot market price is truly known at the time

25   that the energy is delivered.  It is not something that is --

1    it is a clearing house price that is designed by -- or is

2    monitored and determined by the California independent system

3    operator.

4         The -- in my mind it's very different from what the

5    Short-Run Avoided Cost based formula thinks about.  The level

6    of input variability, I guess, is very different in a spot

7    market based price.

8         There is no sort of certainty.  There are times where a

9    spot market based price, the prices could be negative because

10   we have too much capacity.  We would not ever see a Short-Run

11   Avoided Cost based payment under the formula that we have

12   considered there.  We would never see a negative price in that

13   instance.

14        There's just a lot of differences between those two

15   things.

16   **Q.**   So you have testified that the spot market produces a

17   market clearing price?

18   **A.**   Yes.

19   **Q.**   And you've also testified that the Short-Run Avoided Cost

20   under the Standard Contract at issue here is a formula?

21   **A.**   Yes.

22        **MS. HAMMOND:**  Thank you, your Honor.  The witness is

23   available for cross.

24

25

**CROSS EXAMINATION**

**BY MR. BHABHA**

**Q.**   Good afternoon, Mr. Colvin.

**A.**   Good afternoon.

**Q.**   So to begin, just following up on the questions that the Court asked you, just to set a little background.

You agree that the only energy price -- I'm talking specifically about the energy price component, not the capacity.  The only energy price component available to a qualifying facility under the Standard Contract is the SRAC, or Short-Run Avoided Cost, rate that we have been discussing, is that correct?

**A.**   Under the QF Settlement, qualifying facilities were given -- at the time if they were a signatory to the settlement, they were given a couple of different pricing options.

My understanding of PURPA, as a non-attorney, is that if the buyer and seller can agree that this -- a different price could be an avoided cost based price, they could submit that to the Commission and the Commission could look at whether or not that was a fair representation of avoided cost and they could go with that.

And so there were several of those agreements that were executed at the time of the contract -- excuse me.  There were several of those contracts that were executed and submitted to

1  the Commission for approval during the time of the QF

2  settlement, and the Commission agreed to those.

3  **Q.**  But leaving aside any bilateral agreements that may have

4  taken place between facilities and utilities, under the

5  Standard Contract that is the subject of this case -- and we

6  can introduce that into evidence, but I'll just -- I mean, we

7  agree what the Standard Contract term sheet is that's at issue

8  in this case -- the only price available for qualifying

9  facility for the energy component is the SRAC price, which is

10  the formula that you've detailed in your expert report and that

11  Mr. Lesser also testified, is that correct?

12  **A.**  The Standard Offer Contract offers as a pricing -- offers

13  one pricing formula.  Whether or not a facility chooses to plan

14  the spot market or do other types of activities is --

15  **Q.**  Is --

16  **A.**  -- different.

17  **Q.**  Sorry.  Don't mean to interrupt you.

18      Fine.  But the Standard Offer Contract that is at issue in

19  this case has one pricing formula and that formula is the SRAC

20  formula; do you agree with that?

21  **A.**  Yes.

22  **Q.**  Okay.  And I won't go over this.  I was going to, but I

23  think you just agreed when asked.  The SRAC formula has these

24  three variable components and then the rest are fixed.  Do you

25  agree with that?  Is that correct?

1    **A.**    Yes.

2         (Document displayed)

3    **Q.**    Okay.  So if I was a qualifying facility and you were a

4    utility and we were signing a contract today, under the

5    Standard Offer Contract or the Standard Contract -- and if

6    we're looking here also we have on the screen 18

7    C.F.R. 292.304(d)(2).

8         So we know if I'm a qualifying facility of less than

9    20 megawatts, like Winding Creek is, my energy component price

10   is going to be the SRAC formula, right?

11   **A.**    Yes.

12   **Q.**    Okay.  And one thing we could do today, I have the option

13   (i).  I could say:  I want my energy prices calculated at the

14   time I deliver energy.

15        So that would mean that we have the SRAC formula.  And

16   then if it's a 12-year contract, in two years when I sell

17   energy to you, you or CPUC will look at the market gas price

18   for natural gas and the other variable contracts and you'll

19   come up with a price and that will be what I will get paid in

20   two years.  That's under (i), is that correct?

21   **A.**    Can you ask your question again, please?

22   **Q.**    Maybe I'll ask it slower, too.

23         **THE COURT:**  And shorten it down.

24         **MR. BHABHA:**  Okay.  Let me try both, slower and

25   shorter and better.

**BY MR. BHABHA**

**Q.**    Under the SRAC price, if I'm a QF and you're a utility,
and I elect for (i).  So I say:  I want my avoided costs
calculated at the time I deliver energy to you.  Under the SRAC
price in two years when I deliver energy we'll look up and see
what are the prices right now and that's what I'll get paid, is
that correct?

**A.**    So at the time the contract is executed, the utility and
the QF have the Short-Run Avoided Cost based formula that's
been agreed to and the utility will post what the actual inputs
are and, therefore, what the avoided cost energy rate is on a
monthly basis.

      And so two years from now the utility will post that
month's updated price and that will be what is paid for
prevailing QFs.

**Q.**    Okay.  And so that will be the price at the time of
delivery.  If I'm delivering in two years, we'll look up the
prices in two years.  We'll run the SRAC formula and we'll have
the price I'm going to get paid for my energy, is that right?

**A.**    That's the price.  It will not necessarily be the total
payment because we don't know how much energy you will have
produced.

**Q.**    We don't know how much --

            **THE COURT:**  Let me jump in.  I think I'm clear on
this point.

1              **MR. BHABHA:**  Okay.

2              **THE COURT:**  If you have something else, go ahead.

3              **MR. BHABHA:**  Okay.

4    BY MR. BHABHA

5    **Q.**   Are you familiar with the concept of a must take

6    obligation, Mr. Colvin?

7    **A.**   Yes.

8    **Q.**   And would you agree that under the must take obligation

9    imposed by FERC, a utility must purchase any power produced by

10   a qualifying facility?

11             **MR. MORRIS:**  Objection, your Honor.  Misstates the

12   law.

13             **THE COURT:**  It's a bench trial.  So whether I take it

14   into account or not remains to be seen, but you can certainly

15   go ahead.

16        If you feel comfortable answering, Mr. Colvin, you can go

17   ahead.

18   **A.**   The -- to the best of my understanding, the state itself

19   will determine what available need there is for electricity.

20   There will not be an endless amount of power plants that are

21   put onto the system at a certain point.  You just don't need

22   any more power.  So there is always going to be limits that the

23   state needs to do for procurement planning.

24        The other part of this is I can't build a power plant in a

25   day.  It takes time.  It takes time to do permitting.  It takes

1    time to do all sorts of things.

2         And so the state needs to have a reasonable amount of, you

3    know, allotted space of what we expect 10 years out, that there

4    is going to be this much power available in terms of capacity

5    and all sorts of factors.  Procurement planning is not

6    particularly easy.

7         And all of that is considered when the state is reviewing

8    the must-take obligation.  So it's not an infinite amount of

9    power forever and ever.

10   **Q.**   I understand.  And just for the record, you testified

11   about the must-take obligation during your deposition, is that

12   correct?

13        You answered questions -- let me be more colloquial.  You

14   answered questions about this obligation during your

15   deposition, is that correct?

16   **A.**   Yes.

17   **Q.**   And would you agree that the must-take obligation in

18   California has been suspended for qualifying facilities more

19   than 20 megawatts.  Thus, there isn't an obligation to purchase

20   everything a 20 megawatt or bigger qualifying facility

21   produces, is that correct?

22   **A.**   The must-take obligation for a qualifying facility

23   20 megawatts or larger has been suspended because there has

24   been shown to be other viable markets for those resources,

25   including the combined heat and power, request for Only Offer

1  Solicitation Program.  That was a part of the QF Settlement.

2  **Q.**   But for qualifying facilities like the one Winding Creek

3  wants to build, which are less than 20 megawatts, in California

4  the must-take obligation has not been suspended, so it's still

5  in place, is that correct?

6            **MR. MORRIS:**  Objection, your Honor.  Misstates the

7  law.

8            **THE COURT:**  You were a little far afield.  Where are

9  we going with this?  How is this relating to (d)(2)?

10           **MR. BHABHA:**  Well, your Honor --

11           **THE COURT:**  An overview.

12           **MR. BHABHA:**  Sure.  So the reason this relates to

13  (d)(2), your Honor, is that they seek to introduce testimony

14  from Ms. Lee regarding the Re-MAT program.  And at the time of

15  the deposition we hadn't been narrowed and they continue to

16  seek to introduce testimony from Ms. Lee.

17       And this testimony about the must-take obligation is

18  directly relevant to whether or not the Re-MAT program complies

19  with this regulation.

20       So if Ms. Lee is not going to be able to testify about

21  Re-MAT, I have no need to get into any of this.

22           **THE COURT:**  Well, I think I'm going to have her --

23  since you are all here, might as well just get it done.

24           **MR. BHABHA:**  So the --

25           **THE COURT:**  You're looking for the answer, is a QF

1  similarly situated to Winding Creek not subject to the

2  must-take regulation.

3          **MR. BHABHA:**  Right.  The --

4          **THE COURT:**  That's the question?

5          **MR. BHABHA:**  Yes.  Is there an obligation under the

6  regulations.

7          **THE COURT:**  "Yes" or "no"?

8          **THE WITNESS:**  Go ahead and restate your question.

9  There was a lot of back and forth.

10          **THE COURT:**  The witness has ruled.  Go ahead.

11  Restate your question.

12          **MR. BHABHA:**  Okay.  That's a good ruling.

13  **BY MR. BHABHA**

14  **Q.**  Under -- as you understand it, the must-take obligation,

15  by which we mean that the utility must purchase any power

16  generated by a qualifying facility, is in place for a

17  qualifying facility of less than 20 megawatts, like the one

18  that Winding Creek wants to build?

19          **MR. MORRIS:**  Your Honor, I have an objection.  This

20  goes Ms. Lee's testimony --

21          **THE COURT:**  I'm with you on that, but he's setting

22  the foundation for cross.  So I think it's okay.

23      Go ahead.

24          **MR. BHABHA:**  He testified to it in his deposition.

25          **THE COURT:**  This is the last time around the tree.

1    So, yes, no, you don't know; one of those three.

2            **THE WITNESS:**  Okay.

3    **A.**    For the purposes of this part of the QF program -- and I

4    won't speak to what Ms. Lee is going to talk about.  For the

5    purposes of this part of the QF program the must-take

6    obligation for 20 megawatts and under remains.

7        (Brief pause.)

8            **MR. BHABHA:**  Forgive me, your Honor.  I'm trying to

9    speed things up here.

10            **THE COURT:**  That's fine.

11   **BY MR. BHABHA**

12   **Q.**    You agree, Mr. Colin, that an avoided cost rate, as the

13   Court noted, is the rate that the utility would pay were it not

14   purchasing from a qualifying facility, correct?

15   **A.**    Correct.

16   **Q.**    And, thus, what the qualifying facility's actual cost in

17   producing energy are irrelevant for the purposes of an avoided

18   cost rate, correct?

19            **MR. MORRIS:**  Objection, your Honor.  This goes to Ms.

20   Lee's testimony.

21            **THE COURT:**  Okay.  Look, there is no jury here.  It's

22   just me.  We don't need to stand on formalities.  He's just

23   laying the table for Ms. Lee.  SO I think we're good and I

24   would like to, if we can, move it along.  I have a couple

25   questions myself.

1          But don't get derailed.  Just do what you want to do.

2     Brisk would be good.

3               **MR. BHABHA:**  I will be at brisk as I can, your Honor.

4               **THE COURT:**  Brisk as possible, but not too brisk.

5          Why don't you repeat the question?  We'll take it from the

6     top, Mr. Colvin.

7     **BY MR. BHABHA**

8     **Q.**    So do you agree that an avoided cost rate is the does that

9     a utility would spend to purchase that energy were it not

10    purchasing it from a qualifying facility?

11    **A.**    In general, yes.

12    **Q.**    Well, is there any -- without getting into the minutiae of

13    energy regulation, which I will get lost in myself, is there

14    any meaningful problem with the statement I made?

15    **A.**    No.

16    **Q.**    Now, because that was what an avoided cost rate means,

17    it's irrelevant for the purposes of what is an avoided cost

18    what the real costs for a qualifying facility are in producing

19    energy, is that correct?

20    **A.**    So in my mind there is lots of different ways that the

21    state could determine what is an avoided cost based rate.

22         And so for the purposes of this contract and this formula,

23    a QF's actual cost is outside of the scope of what the

24    Commission needs to know for determining whether or not this is

25    an avoided cost based rate.  There could be other reasons why

1    you would look at a facility's actual cost.

2        As I outlined in my testimony, for the purposes of this

3    program and this contract, and using very round numbers here,

4    if the prevailing price was $100, if a QF came out and was --

5    actual price was $95, we don't charge them the -- we don't pay

6    them the 95.  We pay them the 100.  But if their actual price

7    was 105, we still only pay them the 100.

8    **Q.**    So that's a very helpful clarification.  And just for

9    purposes of all my questions, I'm only referring to this

10   program and this contract.  I realize the energy regulation is

11   complicated beyond that.  But that was my question.

12       If a qualifying facility has some technological innovation

13   so it can actually provide energy at a rate below the avoided

14   cost, that doesn't change what the avoided cost rate is for

15   this program and this -- and this contract, correct?

16   **A.**    For this program and this contract going through 2020,

17   which is what the Commission has spoken to in terms of at this

18   point, the avoided cost determination does not consider changes

19   or technological improvements, as you characterize it.  It is

20   not part of the overall consideration.

21       I will note, however, there are market-based factors that

22   go into the Short-Run Avoided Cost based formula.  The heat

23   rate, which is essentially a way of determining how efficient

24   you are of gas in to electric out.  If there was an overall

25   major improvement in that efficiency marker over time, you will

1   see that and that will get reflected.

2   **Q.**   Understood.  And -- I understand that --

3             **THE COURT:**  Mr. Bhabha, may I jump in?  I want to ask

4   a couple of quick questions.

5             **MR. BHABHA:**  Of course.

6             **THE COURT:**  Now, let me start with this.  Now, you're

7   familiar with the Re-MAT program; is that fair?

8             **THE WITNESS:**  I'm generally familiar.  I don't want

9   to talk about specifics.  It's not a program I interact with on

10  a regular basis, but I know a little bit about it.

11            **THE COURT:**  Re-MAT is not in your in box, so to

12  speak?

13            **THE WITNESS:**  I know enough that I could speak at a

14  very high level, but I think Ms. Lee is a far more eloquent

15  speaker to this.

16            **THE COURT:**  All right.  Let me -- I just have a very

17  general question, one question about Re-MAT.

18       Is it your understanding that the pricing that will be

19  paid to a QF under Re-MAT is based on avoided costs, a

20  utility's avoided costs?

21            **THE WITNESS:**  I'm going to defer that question to Ms.

22  Lee.

23            **THE COURT:**  Okay.  Let's go back to your strength,

24  the Standard Contract.  That's your strength, right?

25            **THE WITNESS:**  Yes.

1      THE COURT:  Okay.  Let's go back to your sweet spot.

2      If I find that the SRAC formula -- and don't read anything

3  into this.  I'm just talking out loud.

4      If I find the SRAC formula is not compliant with PURPA or

5  the C.F.R., specifically under (d)(2)(ii), is there any other

6  program available that you believe would be compliant?  Is it

7  one shot, SRAC or bust?

8      Is there any alternative to SRAC?  That's what I'm asking.

9      THE WITNESS:  Understood, your Honor.

10     The -- it depends on the type of qualifying facility.  So,

11  for example, the Commission has for cogeneration facilities

12  that are new and highly efficient something called the AB-1613

13  feed-in tariff, which is another type of QF program that's

14  available.

15     THE COURT:  Would that apply to a solar producer?

16     THE WITNESS:  No.  It would be for a cogeneration

17  facility.

18     THE COURT:  Okay.  Let's just focus on solar

19  producers.

20     THE WITNESS:  Okay.

21     THE COURT:  Would there be an abstract alternative

22  that would be compliant, in your view, for a solar facility?

23     THE WITNESS:  In my mind, your Honor, there is -- so

24  California is one of the largest solar states in the country.

25     And I think the answer to your question is yes.  And the

1    reason why I can sort of point to that is we have a fairly

2    robust solar -- because we have so much robust solar activity

3    out there, I think that there are other viable options

4    available to solar facilities beyond this program and this

5    contract.

6         THE COURT:  What would they be?

7         THE WITNESS:  I think they can range from the Net

8    Metering Facilities Program, to the Re-MAT program, to

9    solicitations from -- that are offered underneath the renewable

10   portfolio standard.  There's lots of different ways to bring

11   solar online in this state.

12        THE COURT:  So in your view, though, in your

13   understanding, do those alternatives, SRAC, satisfy the

14   requirements of (d)(ii)?  Have you thought about that?

15        THE WITNESS:  I haven't thought about that before.  I

16   don't want to speculate.

17        THE COURT:  So you can't say one way or the other

18   right now whether those other programs would be compliant with

19   (d)(ii), is that right?

20        THE WITNESS:  I don't think I can with certainty.

21        THE COURT:  That's fine.  Okay.

22     Okay.  Any wrap-up?

23        MR. BHABHA:  That's it, your Honor.

24        THE COURT:  Okay.  Any redirect?

25     (No response.)

1     **THE COURT:**  Then what I think we'll do is -- how long

2  do you think Ms. Lee -- since she's here, I would like to hear

3  from her.  How long do you think that will take?

4     **MS. HAMMOND:**  Mine is one question --

5     **THE COURT:**  No, no, no.  For Ms. Lee, how long do you

6  think that will take?

7     I'm trying to decide whether we should have a 30-minute

8  lunch break or not.  If Ms. Lee is short, maybe we could skip

9  it.

10     Let me ask you this way.  Would you like to have a

11  30-minute lunch break?

12     **MS. HAMMOND:**  30 minutes?  Yes.

13     **THE COURT:**  The answer is yes?

14     **MS. HAMMOND:**  Yes.

15     **THE COURT:**   Yes, okay.  We will take a 30-minute

16  lunch break.

17     Anyway, why don't you wrap up with Mr. Colvin?

18                    <u>**REDIRECT EXAMINATION**</u>

19  **BY MS. HAMMOND**

20  **Q.**   Mr. Colvin, are you here to testify as a legal expert?

21     **THE COURT:**  I understand all that.  Don't worry about

22  it.

23     **MS. HAMMOND:**  Thank you, your Honor.

24     **THE COURT:**  I will police that line when the time

25  comes.

1          **MR. PRICE:**  Your Honor, if I may just before we

2     recess?

3          **THE COURT:**  Sure.

4          **MR. PRICE:**  I understand your ruling with regard to

5     Mr. Whitman, but for the record I would just like to make a

6     customer very quick points.

7          **THE COURT:**  Let me expand on that ruling.

8          I feel like I was misled about Mr. Whitman's role.  He is

9     clearly an interested party in the outcome of this case.

10         Now whether he's going to make any money immediately from

11    this or not, he's in the business, signing contracts that

12    arguably, if they were in California, would be affected by what

13    I hold in this case.  That is an unacceptable basis for expert

14    testimony.

15         You cannot have a financial stake.  Even if it's indirect,

16    you cannot have a financial stake in the outcome of a case.

17    That is not appropriate.

18         Second thing is, I am satisfied that a number of his

19    opinions were conclusory and lacked evidentiary foundation.  I

20    probed him long and hard for examples about the facts to

21    support the sweeping opinions he was making.  In my view, he

22    fell woefully short in being able to answer these questions.

23    His testimony was inconsistent and contradictory.

24         One thing I did establish is he has no personal foundation

25    for any opinions about these issues with respect to the issue

1    before me, and that is a California QF.

2        So I am satisfied that he is excludable on multiple

3    grounds and that will be my ruling.  Okay?

4        Thank you.  We will be back in half hour.

5            **MR. PRICE:**  Your Honor, may I make two points for --

6            **THE CLERK:**  All rise.  Court is in recess.

7        (Whereupon at 12:28 p.m.proceedings

8         were adjourned for noon recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **APRIL 4, 2017**                                              **1:05 P.M.** |
| 3 | ---o0o--- |

4           THE CLERK:  Okay.  We're back on the record in Civil

5    13-4934, Winding Creek Solar, LLC versus the CPUC.

6           THE COURT:  Okay.  Is that it for a Standard

7    Contract?

8           MR. PRICE:  I believe so, your Honor.

9           THE COURT:  Anything else from the PUC on the

10   Standard Contract?

11          MS. BONE:  To the extent that there are exhibits that

12   should be admitted to contradict some of the claims made by

13   plaintiffs, is now the time to address that with regard to the

14   Standard Offer Contract?

15          THE COURT:  Are those attached to a witness?

16          MS. BONE:  It's regarding the PG&E Semi Annual Report

17   that was characterized as a complete listing of all of PG&E's

18   QF contracts.  That was not accurate and we have another

19   exhibit that would supplement that.

20          THE COURT:  Okay.  But are there any other witnesses?

21          MS. BONE:  With regard to the Standard Offer

22   Contract, no, your Honor.

23          THE COURT:  None, okay.

24       All right.  Why don't you both come up?  I'm going to talk

25   a little bit about what makes best sense here.

1        I have found this to be actually quite helpful.  Now, I'm

2    going to ask PUC first.  In light of Mr. Colvin's testimony

3    now, okay, on (d)(i) and (d)(ii), little i and little ii, are

4    you all -- are you all arguing or are you going to argue to me

5    that there does not need to be a difference in the pricing

6    mechanisms under (d)(i) and (d)(ii); that it's perfectly okay

7    to use the same pricing mechanism?

8        **MS. BONE:**  No, your Honor.  We would not be arguing

9    that.

10       Critically important is that Mr. Colvin was a witness for

11   factual issues regarding how the QF Standard Offer Contract

12   payment is made.  He is not a legal expert on PURPA or the

13   implementation under 304(d)(2) and we would take a different

14   position from what he testified.

15       **THE COURT:**  Well, I'm with you on that, but this is

16   not a legal issue.

17       So he said as a matter of fact the same SRAC formula is

18   used under (d)(i) and (d)(ii).  That's not a legal issue.

19   That's a description of what the program is.

20       So given that fact basis, what are you going to do with

21   it?

22       **MS. BONE:**  I'm not sure that that fact is accurate,

23   your Honor.

24       We're not prepared to discuss 304(d)(2)(i) and did not ask

25   him to address that issue.  We asked him to focus on the facts

1   of how the Standard Offer Contract payments are paid to a

2   certain type of QF, which is what he testified on.  When he

3   answered that question, he went beyond what we had been

4   prepared to address.

5           **THE COURT:**  Well, he's worked there for nine years

6   and he said the Standard Offer Contract is his wheelhouse.  Who

7   is going to know better than Mr. Colvin?

8           **MS. BONE:**  Commission decisions speaking to the issue

9   would be the primary source of our information.

10          **THE COURT:**  Well, who is the witness who is going

11  to -- and by the way, the topic of testimony was compliance

12  with (d)(2), not (d)(2)(ii).  So you are all adequately, in my

13  view, on notice that this issue is going to come up.

14      So I don't buy the fact that he spoke out of school.  He

15  didn't.  That was not -- my setting of the trial topic was not

16  so finely grained that it was limited to (d)(2)(ii).  That is

17  not correct.

18          **MS. BONE:**  Okay.

19          **THE COURT:**  So you had a fact witness who said:  As

20  far as I understand it, and this is what I do for the PUC,

21  there isn't a lick of difference in the way we calculate (d)(i)

22  and (d)(ii).

23      Now, are you telling me you're going to hang that out to

24  dry and try to rebut it?  What are you going to do with it?

25      I'm trying to understand if that's the case, and it

1  appears to be given the facts that have been adduced at the

2  trial, where does that leave your legal argument about

3  compliance with (d)(ii) generally?

4     I mean, it's supposed to be a different -- is it -- do you

5  believe it's okay to have one formula for both subsections or

6  do you think you need to have a different one?

7        MS. BONE:  Your Honor, I haven't had time to confer

8  with the other attorneys in my group.  So I'm not really

9  prepared to answer that question from a legal perspective.

10       THE COURT:  All right.  That's fine.  Okay.  I had a

11 feeling that might be the case.

12    Now, the other thing I want to talk about is do you all on

13 the Winding Creek side feel prepared to go forward with Re-MAT

14 today or do you need more time to prepare for Ms. Lee?

15       MR. PRICE:  I think we can be prepared to go forward,

16 your Honor.  We're anxious to get this done.

17       THE COURT:  Okay.  So you don't feel like you need

18 any more time.  You're ready to blaze ahead.

19       MR. PRICE:  I'm ready to blaze ahead, your Honor.

20       THE COURT:  All right.  We will put an asterisk next

21 to that question because I do want some guidance from the PUC

22 on what they are going to do with that fact.  Okay?

23    I do not -- it would be a mistake to try to take refuge in

24 the idea that this was beyond the scope of the trial.  It was

25 not.

1      **MS. BONE:**  Understood.

2      **THE COURT:**  I want a good, reasoned analysis on why

3  this is or is not, you know, a problem for the PUC's position.

4      I mean, I've got to be honest with you.  What I'm hearing

5  so far is giving me some pause about whether the PUC's approach

6  under (d)(2)(ii) is PURPA compliant.  So, and the testimony

7  today helped clarify that for me in a way that has strengthened

8  my concern about the compliance issue.

9      So now I'd like to hear about Re-MAT.  And the main issue

10  I'd like to get into on Re-MAT is whether it is or is not on

11  its own PURPA compliant.  And I think that's relatively

12  straightforward.

13      For example, the issue might be mostly, if not completely,

14  dealt with by just saying does Re-MAT use avoided cost?  Okay?

15  If the answer to that is no, it seems to me it's already out of

16  the ballpark on (d)(ii).

17      Now, there may be nuances that I'm missing, but (d)(ii)

18  says you have to use avoided costs.  From what I've heard about

19  Re-MAT, and certainly from what I've seen in the briefs, Re-MAT

20  is based on a starting point that then goes into its own sort

21  of internal gyrations based on non-avoided costs grounds.

22  Okay?

23      Now, it's possible that I misconstrued the briefs.  I

24  don't think I did, but maybe Ms. Lee will lead me in the right

25  direction.

1    By the way, when I'm saying (d) one, I'm talking about

2 subsection one of (d)(2).  I'm not talking about (d) Roman

3 numeral one.  I'm talking about (d) little number one and (d)

4 little number two.  Okay?

5    **MS. BONE:**  Okay.  Your Honor, I -- I will admit that

6 Ms. Lee is not here as a legal witness and I -- and we have

7 never directed her to think about whether the Re-MAT program

8 complies with PURPA or not.

9    **THE COURT:**  Let me be clear.  First of all, it's of

10 no use for me for a witness to say that, that is my decision.

11 And I have been crystal clear.  This is a bench trial.  I hope

12 it's been crystal clear.  It is of no import at all whether

13 somebody strays into what I think.  In a jury trial it would be

14 a legal conclusion.  Okay?  That's not an issue, okay?

15    I will make the legal conclusions.  She needs to lay the

16 table with the facts, just like Mr. Colvin did.

17    **MS. BONE:**  Okay.  So that would be things like

18 explaining how the Re-MAT program operates and how the price is

19 determined?

20    **THE COURT:**  Yes.

21    **MS. BONE:**  Okay.

22    **THE COURT:**  And anything else you want to add on

23 that, that you believe adds up to the conclusion this is PURPA

24 compliant on its own.

25    **MS. BONE:**  Okay.

1          **THE COURT:**  ?  Or Winding Creek side, it's not PURPA

2    compliant and it can never be.

3          **MS. BONE:**  Got it.

4          **THE COURT:**  Okay.

5          **MS. BONE:**  Thank you.

6          **THE COURT:**  Ready?

7          **MR. PRICE:**  Yes.  Thank you very much.

8          **MS. BONE:**  So the CPUC would like to call Cheryl Lee

9    to the stand, please.

10                        **CHERYL LEE**,

11    called as a witness for the Defendant herein, having been duly

12    sworn, testified as follows:

13          **THE WITNESS:**  Yes.

14          **THE CLERK:**  Please be seated.

15       Please state your full name for the Court and spell your

16    last name.

17          **THE WITNESS:**  My name is Cheryl Lee.  Last name is

18    L-E-E.

19          **THE CLERK:**  Thank you.

20                     **DIRECT EXAMINATION**

21    BY MS. BONE

22    **Q.**   I have a document in front of me labeled Electronic Court

23    Filing No. 30, which includes your -- a declaration of Cheryl

24    Lee, as well as an attached expert report with two additional

25    exhibits.  Is this your testimony in this case, Ms. Lee?

1    **A.**    Yes.

2    **Q.**    Okay.  We'll come back to corrections later.  There are

3    some minor corrections that you need to make, is that correct?

4    **A.**    Correct.

5              **THE CLERK:**  What exhibit is that going to be?

6              **MS. BONE:**  These are Defendant's Exhibits 112 --

7              **THE CLERK:**  That's what you just handed her, 112?

8              **MS. BONE:**  Through 115 -- through 116.  It's all one.

9              **THE CLERK:**  Okay.

10             **MS. BONE:**  113 through 116 covers all of those

11   documents that I've just described.

12   **BY MS. BONE**

13   **Q.**    Ms. Lee, what is the Re-MAT program?

14   **A.**    The Re-MAT program is a procurement program for renewable

15   energy.  It is for facilities in size three megawatts and

16   smaller.

17        It is a mandated program by the PUC.  It's based in the

18   statute and the three large California investor-owned utilities

19   are obligated to offer the Standard Contract.

20   **Q.**    Okay.  And your testimony at Paragraph 20 -- sorry.  Your

21   expert witness report at Paragraph 20 describes three

22   different -- three principal components that compromise the

23   Re-MAT program.

24        Could you talk about those, please?  It's on Page 6 of

25   your expert report, Paragraph 20.

**A.**     Right.   So the Re-MAT program includes three different categories or product types.   Those are base load peaking as available and non-peaking as available.   Those are based on essentially the product that is offered, the generation and when it's offered.

The program has -- characterizes by program periods, which are two months in length, and the payments are based on the adjustment mechanism which goes along with the two-month program period.   And then the -- it's part of a tariff and it has a Standard Contract to where -- where it is executed as a long-term contract with either 10, 15 or 20 years.

**Q.**     So the Re-MAT contract -- the Re-MAT program provides for an auction every two months, correct?

**A.**     Correct.

**Q.**     And what happens after that auction occurs if -- if renewable facilities have bid into it and want to take the contracts?

**A.**     So the program works to where the period opens and the offered price is notified to the eligible participants.   The eligible participants have the option to go forward and accept that price that's offered or decline it.

Then the utility goes to the bidders that are willing to accept that price and will sign the contract up to the amount allowed in the program period.

**Q.**     And for PG&E, how much is allowed in the program period?

1  A.    Five megawatts.

2  Q.    And could you explain why there is this five megawatt

3  limit in PG&E's program period?

4  A.    Right.  It is to allow for the adjustment part of the

5  program.  So after each program period, the program -- the

6  ability for the price to adjust based on the market interest.

7  So the price could go up, down or stay the same for the next

8  period based on the previous period's interest.

9  Q.    And are you aware that Winding Creek was prepared to

10 accept the offer price when Re-MAT first opened?

11 A.    I have become aware through this case that they were

12 interested.

13 Q.    And is it your understanding -- strike that.

14     Once somebody accepts the offer price in the Re-MAT

15 program, what kind of contract do they obtain?

16 A.    They obtain the Re-MAT program Standard Contract, which

17 was approved by the Commission in a decision.

18 Q.    And is that a long-term contract?

19 A.    Yes.  It can be 10, 15 or 20 years.  It is up to the

20 seller to decide.

21        THE COURT:  Just so we're clear here.  Have you been

22 here all day?

23        THE WITNESS:  I'm sorry?

24        THE COURT:  Have you been here all day?

25        THE WITNESS:  Yes.

1          **THE COURT:** So the phrase "Standard Contract" was

2     this morning's -- when you say "Re-MAT Standard Contract,"

3     you're talking about something totally different from what we

4     talked about this morning, right?

5          **THE WITNESS:** Right. It is a different Standard

6     Contract than the contract that is part of the QF Settlement

7     which was talked about earlier.

8          **THE COURT:** Good, okay. Go ahead.

9     **BY MS. BONE**

10    **Q.** If the QF doesn't come online in a two-year period, what

11    happens to that contract?

12    **A.** The contract terminates. It's the terms of the contract

13    to where the seller has two years to come online from the

14    execution of the contract. There is a small exception for

15    certain reasons that that two-year timeline could be extended

16    by six months.

17    **Q.** And what is the reason for that two-year termination

18    provision?

19    **A.** The idea for the program was to write a procurement

20    program, but also market development and did not want the

21    potential -- the program to be potentially clogged up with

22    projects that were unable to develop. So they have a limit in

23    terms of when they need to come online by and if not, then the

24    pass that was allocated to that seller is put back into that

25    program.

1  **Q.**  So that situation is actually -- was the subject of your

2  declaration, was it not, where we had a number of contracts

3  that had been terminated in the last few years in Re-MAT for

4  PG&E, therefore, opening up more megawatts to be available in

5  the Re-MAT program; is that accurate?

6  **A.**  Yes.  Projects have terminated in the Re-MAT program for

7  PG&E, yes.

8  **Q.**  And as a result of that occurrence, what is the shortest

9  amount of time that PG&E's Re-MAT program would be available?

10  **A.**  So in my testimony at the time there could be as little as

11  eight program periods, which are two months each.  So 16 months

12  from when all the as-available peaking megawatts could be

13  completed.  And then once all of those megawatts are -- have

14  been contracted, the program could close two years after that.

15  **Q.**  If all of the megawatts didn't come online during that

16  two-year waiting period, what would happen?

17  **A.**  Those megawatts would go back into the program and the

18  opportunity for contracting would open to any of the programs

19  that are in the Re-MAT program cue.

20  **Q.**  So let's go ahead and talk about the price adjustment

21  mechanism.  Your discussion of that starts on Page 10 of your

22  expert witness report at Paragraph 37.  And can you first

23  explain the Re-MAT payment to the generator?

24      Is it an all-in price for the generation or do they get a

25  capacity and an energy payment?

1    A.    The price is an all-in payment, which includes energy in a

2    capacity that was included, as well as the renewable energy

3    credit or REC.

4    Q.    And how was the starting offer price for the first Re-MAT

5    option set?

6    A.    The starting offer price was determined based on another

7    renewable energy purchase program known as the Renewable

8    Auction Mechanism, which was available to renewable sellers at

9    the time and it was the -- the starting price was the average

10   of the highest executed price -- contract's highest price,

11   executed contracts from that program.

12   Q.    And why did you believe these were the appropriate prices

13   to use for the Re-MAT program?

14   A.    As I mentioned, it was a renewable energy purchasing

15   program and it was of the same type of eligible technologies

16   and it was of similar product size.

17   Q.    Would you characterize the prices that came out of the

18   Renewable Auction Mechanism, or the RAM, as market based

19   prices?

20   A.    Yes.

21   Q.    Now, Re-MAT has a price adjustment mechanism that actually

22   explains the name of the program, correct?

23   A.    Correct.  The market adjusting tariff, or Re-MAT, yes.

24   Q.    So can you explain why we have a market adjusting tariff

25   change in the Re-MAT program?

1    A.    So in the feed-in tariff program, when it's -- was being

2    implemented, it was determined -- it was known that it is hard

3    to set a price for the purchase for renewable energy.  It's

4    likely to either set something that is too high and not a

5    benefit to the ratepayers or too low to where -- not able to

6    have the sellers be willing to enter the market.

7          So the idea of the adjusting tariff is that the price

8    would be able to adjust to what the market is willing to sell

9    at and what the ratepayers should reasonably be paying for the

10   electricity.

11         THE COURT:  Can I just jump in?

12         So is feed-in tariff the same as Re-MAT?  Are they the

13   same?  Are they interchangeable words for the same thing?

14         THE WITNESS:  For California, the renewable feed-in

15   tariff is known as Re-MAT because of the adjustable mechanism

16   for the price.

17         THE COURT:  All right.  So we can call it Re-MAT or

18   feed-in tariff and we're all talking about the same single

19   thing, right?

20         THE WITNESS:  Well, there is another bioenergy

21   specific feed-in tariff in California, which is known as;

22   BioMAT.

23         THE COURT:  We're just talking about solar here.

24         THE WITNESS:  Right.  So we do differentiate by what

25   we call the program name instead of the procurement type, which

1    would be a feed-in tariff.

2            **THE COURT:**  But in the context of solar, this case.

3            **THE WITNESS:**  It's only Re-MAT, yes.

4            **THE COURT:**  Re-MAT and feed-in tariff are synonyms,

5    right?

6            **THE WITNESS:**  We can say that, yes, for this case.

7            **THE COURT:**  Okay.  Go ahead.

8    **BY MS. BONE**

9    **Q.**    But there are other programs for solar in California, are

10   there not?

11   **A.**    Yes, there are.

12   **Q.**    And what programs are those?

13   **A.**    So there is -- the Renewable Portfolio Standard Program

14   has several procurement options which solar can participate in.

15   One is the annual auctions, which has been the primary source

16   of solar development in California.

17        There is also available the California Solar Initiative

18   Program, which has been known for putting a large number of

19   Solar PV systems on rooftops, primarily residential.

20        And then there is the NEM program as well, where the

21   customer could install renewable facilities and use the energy

22   and export the extra.

23   **Q.**    And the solar programs taken as a whole, Re-MAT and all of

24   the others, have they been successful in California?

25   **A.**    Yes, very successful.

1      THE COURT:  What do those other solar programs do?

2  Do they set prices for the QF?

3      THE WITNESS:  For the large solicitations, the

4  program is open to QFs and non-QFs and they are typically --

5  contracts are executed through a solicitation mechanism.  So

6  the seller is -- bids in their project and pricing and the bids

7  are evaluated.  It's technology neutral to where solar is one

8  option.

9      THE COURT:  Well, let's just talk about solar.  I

10  know there is a whole world of other -- we're just talking

11  about solar here.  I don't need to hear about biomass or

12  anything else, but just with respect to solar and those

13  programs that you just mentioned.  Okay?

14    All. right.  We're here talking about pricing for QFs

15  energy outputs between the QF and a utility like PG&E.  Do any

16  of those other solar programs address the pricing between a QF

17  and a utility?

18      THE WITNESS:  The NEM program, if they sell excess,

19  they are qualifying facilities.  Where -- so you can -- as a

20  customer of the utility, you could choose to put solar panels

21  on your house and you could choose to put up as much as you

22  need or you --

23      THE COURT:  Let me just jump in on that.

24    Just thinking about Winding Creek, okay?  Not about any

25  possible solar provider, like me.  I know the net monitoring

1    program because I looked at it.  But just looking at a

2    qualifying facility like Winding Creek, all right?  A solar

3    farm, let's just call it that.  What, if any, of those programs

4    would be a pricing mechanism that would define the price that

5    Winding Creek would get for the energy that it supplied to a

6    utility?  Do any of those programs do that?

7          **THE WITNESS:**  I'm sorry.  You said set the --

8          **THE COURT:**  Set the price.  Do any of those programs

9    set the price that Winding Creek would get for the power that

10   it sends to a utility, like PG&E?

11         **THE WITNESS:**  My understanding of the NEM program is

12   that it is set.  It's a net surplus compensation rate that

13   would be paid for the excess as long as Winding Creek is the

14   customer of that utility.  They need to be a customer of the

15   utility.

16         **THE COURT:**  All right.  So of all those programs you

17   mentioned, the only possible program that might set the price

18   between Winding Creek and a utility for Winding Creek's energy

19   output would be the net metering program?

20         **THE WITNESS:**  Of the other ones, yes.

21         **THE COURT:**  Okay.

22   **BY MS. BONE**

23   **Q.**    But Re-MAT would also set the price --

24   **A.**    Correct.

25   **Q.**    -- right?

1      And if Winding Creek would -- would Winding Creek qualify

2  for any of the RFO's that the utilities hold?

3  **A.**   Yes, they could.

4          **THE COURT:**  What is an RFO?

5          **THE WITNESS:**  A Request for Offers, also known as a

6  solicitation.

7          **THE COURT:**  What does that have to do with pricing?

8          **MS. BONE:**  Your Honor, PURPA allows us to set prices

9  based on market rates and so the price in the RFO's are market

10  rates, the same way that the price in the Re-MAT price is a

11  market rate.

12  **BY MS. BONE**

13  **Q.**   Let's go back to Re-MAT.  For the Re-MAT price to increase

14  or decrease, two conditions must be met.  One of them is that

15  there must be at least five unaffiliated projects in the IOUs

16  product category queue, correct?

17  **A.**   Correct.

18  **Q.**   Can you explain the reason for having five unaffiliated

19  projects?

20  **A.**   So the program was set to be related to the market.  So

21  the idea is that you would need more than just one seller to

22  form a market.  So it was determined to be set at five

23  unaffiliated sellers.

24  **Q.**   And then what is the other requirement in order for the

25  price in Re-MAT to change?

1  **A.**   It is related to how many of those unaffiliated sellers

2  are either willing to accept the price or decline the offered

3  price.

4  **Q.**   And in that situation are you trying to create some level

5  of a competitive market?

6  **A.**   Yes.   It is looking to determine what is the actual --

7  essentially the market price for that electricity.

8  **Q.**   So when Winding Creek was in the first solicitation and

9  they weren't selected because they were not high enough up in

10 the queue, why did the price then come down?

11 **A.**   It came down based on the rules in terms of their -- the

12 eligibility criteria for the adjustment had been met.   So where

13 there was five or more unaffiliated sellers that were willing

14 to accept their price and then that -- the amount that was --

15 and that the total amount of that was greater than the offered

16 capacity at that period.   So the --

17       **THE COURT:**   Let me just ask two questions, see if you

18 can help me out here.

19      So the program, the Re-MAT program started with the

20 $89.23, right?

21       **THE WITNESS:**   Correct.

22       **THE COURT:**   Now, what, if any, is your

23 understanding -- what is your understanding of the

24 relationship, if any, between that $89.23 and a utility's

25 avoided cost?   Is there any relationship in your mind?

1        **THE WITNESS:**  The general understanding of what it

2    would cost is what they would be able to buy otherwise.  So the

3    Renewable Auction Mechanism was an alternative procurement

4    program for them to buy renewable energy.

5        **THE COURT:**  Are you saying that the $89.23 was an

6    avoided cost figure?

7        **THE WITNESS:**  In my understanding of avoided cost,

8    where it was another -- another procurement option for the same

9    product, yes.

10        **THE COURT:**  Let me try that again.  I'm not sure what

11    you're saying.

12        Is the $89.23 in your understanding an avoided cost for a

13    utility?

14        **THE WITNESS:**  Yes, because it's for the same product,

15    which would be a renewable electron.

16        **THE COURT:**  Okay.  I think you're -- Ms. Hammond --

17    Hammond, right?

18        **MS. HAMMOND:**  Yes.

19        **THE COURT:**  Oh, sorry.

20        **MS. BONE:**  Ms. Bone.

21        **THE COURT:**  Ms. Bone, okay.

22        When Ms. Bone has been referring to the price adjusting

23    mechanism.  So you take that $89.23 and over time, for the

24    reasons you discussed, that number goes up or down.

25        When that number goes up or down is that, in your view,

1   still a measure of the utility's avoided cost?

2          THE WITNESS:  So if -- are you asking if that new

3   price is still an avoided cost?

4          THE COURT:  Yeah.  As the $89.23 left the launching

5   ramp and has traveled through time under the Re-MAT price

6   adjustment mechanism, is that number still, in your view, a

7   figure that is equal to a utility's avoided cost?

8          THE WITNESS:  Yes, because the avoided cost could

9   change for the utility based on what is out there in the

10  market.  We have seen market prices change dramatically for

11  solar over the years.

12         THE COURT:  Do you have any insight into how that

13  Re-MAT repricing mechanism captures a utility's avoided costs?

14  Can you tell me how that works?

15         THE WITNESS:  Well, they are able to procure at that

16  price and able to buy those renewables under the Re-MAT program

17  versus buying other renewables versus one of the other

18  programs.  So it continues.

19     The utilities also have the requirement to buy a certain

20  amount of renewable energy, so they have many choices on how

21  they procure to meet that requirement.  So they are making

22  choices between what they are procuring.

23         THE COURT:  Ms. Bone.

24     MS. BONE:  Yes.

25

1  **BY MS. BONE**

2  **Q.**   You were just talking about the $89.43 [sic] price that

3  the first Re-MAT auction was started at.  It was fully

4  subscribed, correct?

5  **A.**   For that first period, correct.

6  **Q.**   Okay.  And there were more than five unaffiliated

7  providers and so the price went down, correct?

8  **A.**   Correct.

9  **Q.**   And what do you determine based on the fact that the price

10 came down?  Did you reach any feelings about whether perhaps

11 the avoided cost was set too high or too low?

12 **A.**   Yes.  I mean, the general thought was that, yes, it was

13 too high knowing that there were that many little sellers at

14 that price.

15 **Q.**   And I know we haven't asked you to look at this, but when

16 the price went down were further Re-MAT -- was the next one

17 fully subscribed as well?

18 **A.**   I believe so, yes, because I believe the price continued

19 to go down.

20 **Q.**   Okay.  So as the price continued to go down, you were

21 still fully subscribed until a certain point.  Do you know what

22 that point was?

23 **A.**   I would have to go back and look at my testimony to know

24 for sure.

25 **Q.**   Would the chart that we prepared help you with that?

1   PG&E's chart?

2   **A.**   Yes.

3           **THE COURT:**  What are we looking at?

4           **MS. BONE:**  I can't remember what exhibit number this

5   is.

6           **THE COURT:**  Defendant's?

7           **MS. HAMMOND:**  116, and we have a demonstrative.

8           **MS. BONE:**  So it's Defendant's Exhibit 116, but then

9   we -- it's so hard to read that we made a giant one for

10  demonstrative purposes and, also, we added letters across the

11  top to show the -- columns and numbers to show the lines

12  because -- let's just establish a little foundation for this

13  document.

14          **THE COURT:**  Do I have one?

15          **MS. HAMMOND:**  The demonstrative was not filed or

16  provided --

17          **MS. BONE:**  Oh, it's not?

18          **THE COURT:**  Pass it around.

19          **MS. BONE:**  We're going to pass it around.

20          **THE COURT:**  Hand one to my clerks.

21      (Document tendered the Court, counsel and the law

22       clerks.)

23          **THE COURT:**  All right.

24  **BY MS. BONE**

25  **Q.**   Okay.  So at what point -- can you tell at what point the

1   Re-MAT prices stopped adjusting downward due to full

2   subscriptions?

3              **THE COURT:**  Before you do that, what is this?

4          **MS. BONE:**  Ahh.  What is this?

5          **THE COURT:**  Yes.

6          **MS. BONE:**  Yes.  Thank you, your Honor.

7   **BY MS. BONE**

8   **Q.**   As I understand it, you downloaded from PG&E's Re-MAT

9   website a copy of this chart on or around February 23rd or

10  24th?

11  **A.**   Yes.  As part of the Re-MAT program, the utility has to

12  regularly report on the contracts that have been executed

13  through it.  So this is referred to as the 10-day report.  It

14  is produced by PG&E and available from PG&E's website.

15         **THE COURT:**  So this is a list of all of PG&E's Re-MAT

16  contracts?

17         **THE WITNESS:**  Correct.

18         **THE COURT:**  All right.  Go ahead.

19  **BY MS. BONE**

20  **Q.**   And can you -- how do you know which ones are the solar

21  contracts, Ms. Lee?

22  **A.**   Well, there's a technology Column I, and it lists what is

23  the technology.  So solar photovoltaic is Solar PV.

24         Also, you'll see that Column U will list what type of

25  product category, and Solar PV falls in the As Available

1    Peaking category.

2              **THE COURT:**  Where is the -- are these all

3    20 megawatts or below?

4              **THE WITNESS:**  They are actually three megawatts or

5    smaller.  For the Re-MAT program the eligibility is at

6    three megawatts.

7              **THE COURT:**  All three or smaller?

8              **THE WITNESS:**  Correct.

9              **THE COURT:**  Why is this chart different from the one

10   that I was shown earlier?

11             **THE WITNESS:**  This is --

12             **MS. BONE:**  Umm -- sorry.

13             **THE COURT:**  Is it different?

14             **THE WITNESS:**  My understanding is this is for the

15   Re-MAT program specifically and what was shown was related to

16   what my colleague, Michael Colvin, testified to, that program

17   which has its own reporting requirements.

18             **THE COURT:**  It's different types of facilities?

19   Different types of contracts?

20             **MS. BONE:**  It's different types of contracts, your

21   Honor.

22             **THE COURT:**  Okay.  All right.

23             **MS. BONE:**  So the -- the chart that you were

24   provided, the PG&E Cogeneration on Small Power Production Semi

25   Annual Report dated January 2017, that for PG&E only shows

1  PG&E's contracts under the Standard Offer Contract.

2  　　　　**THE COURT:**  I see, okay.  All right.  Go ahead.

3  **BY MS. BONE**

4  **Q.**   And all of the facilities that are reflected on this

5  chart, Ms. Lee, are they all QFs?

6  **A.**   Yes.  That's a requirement of the Re-MAT program.

7  **Q.**   And they are three megawatts and under, correct?

8  **A.**   Correct.

9  **Q.**   And you can see the size of them by looking in one of the

10  columns?

11  **A.**   Yes.  That's Column G, Contract Capacity in Megawatts.

12  **Q.**   And so to answer the question I had, putting you on the

13  spot, can you tell from looking at this chart when the Re-MAT

14  price stopped adjusting downward initially after the first set

15  of auctions?

16  **A.**   So looking at -- Column W is the Price Per Megawatts.  So

17  this is the price at which the contract was executed at.  So

18  for the As Available Peaking, it went as far down, I see, as

19  $57.23.

20  **Q.**   Okay.  So does that suggest to you that if -- if PG&E can

21  enter contracts today for $65 to $57, that the price of $89.43

22  when Re-MAT opened was perhaps too high of an avoided cost?

23  **A.**   Yes.

24  **Q.**   And I know that you weren't involved in creating the

25  Re-MAT program, but you have supervised it for awhile now.

1    Can you talk about what the concern was regarding solar

2  technology when Re-MAT was adopted and for the last few years?

3  **A.**    Yes.  So the first Commission decision adopting the

4  program was in 2012, and we had seen the RPS program have its

5  program successes and failures since about 2004.

6    During that time period of seeing the renewable prices

7  from the renewables for the standard program we had seen price

8  declines, were aware of potential technology efficiencies being

9  gained and concerns that the --

10    **THE COURT:**  Let me ask you a quick question.  Sorry.

11  Why does hydro keep getting the $89.23?

12    **THE WITNESS:**  I'm sorry.  Which?

13    **THE COURT:**  Why do the hydro producers keep getting

14  the $89.23 over time?

15    **THE WITNESS:**  So the pricing then for that category

16  has not changed, likely either due to the number of sellers

17  willing to accept that price during the program period or the

18  number of sellers in the program queue was not great enough to

19  affect the change.

20    **THE COURT:**  So is it -- you tell me if you agree or

21  not.  But is solar going down because there are more people

22  competing for the contract and that drives the price down?

23    **THE WITNESS:**  That would be my conclusion, yes.

24    **THE COURT:**  All right.  And for hydro, there are few,

25  if any, people competing, so the price has stayed the same.

1              **THE WITNESS:**  Correct.

2              **THE COURT:**  Okay.

3        All right.  Go ahead.

4    **BY MS. BONE**

5    **Q.**   Okay.  So what would happen if the Re-MAT price didn't

6    adjust up or down?

7    **A.**   Then it would likely -- if it were too high, it could

8    potentially be then costly for ratepayers in terms of paying

9    above the market; or if it were too low, then there would

10   potentially be no willing sellers to enter into contracts at

11   that price.

12   **Q.**   And was the goal in implementing Re-MAT to meet the

13   state's RPS requirements?

14   **A.**   Yes, that was one of the goals.

15   **Q.**   Okay.  And Re-MAT contracts are fixed price contracts,

16   correct?

17   **A.**   Correct.  The price is set at the time of execution and it

18   does not change.  It is adjusted by Time of Delivery factors,

19   but those are also set at the time of execution.

20   **Q.**   So if an auction price goes down, it doesn't impact the

21   prior executed contracts, is that correct?

22   **A.**   Correct.  If it went down, it would only affect contracts

23   signed in that period.  So if you look at this demonstrative,

24   on Line 45, on Emerson Investments, Grasshopper Flat, signed a

25   20-year contract at $89.23 per megawatt hour.  That's the rate

1    they are going to get for the entire 20-year term?

2            **THE WITNESS:**  Correct.

3            **THE COURT:**  Okay.  All right.

4    BY MS. BONE

5    **Q.**    So I go to Page 15 of your expert witness report.  And if

6    you could just summarize for the Court how many megawatts are

7    under contract in the Re-MAT program?

8        (Brief pause.)

9    **Q.**    It's Page 15, Paragraph 52.

10   **A.**    Sorry.  So currently for PG&E there are 30 Re-MAT projects

11   under contract; 11 have been terminated though.

12   **Q.**    And how many megawatts are in PG&E's portion of the

13   program?  I believe that's Table 3 on Page 17.

14   **A.**    So at the time the total available -- I'm sorry.  The

15   total contracted was 36.66.

16   **Q.**    And what's the difference between Tables 2 and 3?

17   **A.**    Table 2 listed -- lists the contract capacity by capacity,

18   so by megawatts.

19       And Table 3 is listing just the count or the number of

20   projects.  And that's for better online and development, not

21   including the ones that have been terminated.

22   **Q.**    And you also relied on the CSI report when you prepared

23   your expert witness report, did you not?

24   **A.**    Yes, I did.

25   **Q.**    And what did you find regarding California's solar

1    procurement with regard to the CSI program?

2    **A.**   The interest in that program has increased steadily and

3    produced a large number of installations, installations that

4    have actually been installed.

5        Also, found that the average cost has actually gone down

6    substantially to where it's decreased 62 percent for the

7    non-residential systems.

8    **Q.**   So cost decreases in solar have made it possible to deploy

9    more solar in California?

10   **A.**   I'm sorry.  I missed the beginning.

11   **Q.**   Cost decreases in solar technology have led to more

12   deployment in California?

13   **A.**   Correct.  That's my understanding as to whether the

14   increases have made it cheaper to build and more profitable to

15   sell the electricity or to provide payback if you're developing

16   your own system.

17   **Q.**   And did the CSI report also identify the price decreases

18   that have been experienced for non-residential solar systems?

19       **THE COURT:**  All right.  I'm willing to just sort of

20   assume Re-MAT has been great for solar, but we're looking here

21   at just the Winding Creek pricing issues.  Okay?

22       **MS. BONE:**  Okay.

23       **THE COURT:**  All right.  Let's stick with that.

24       **MS. BONE:**  Okay.  We're just about done, your Honor.

25

1  BY MS. BONE

2  Q.   So let's turn to your declaration which you prepared after

3  spending some more time studying PG&E's chart showing the

4  Re-MAT program, and specifically the as available peaking

5  products, which are Solar PV.

6       And in your declaration you summarize some of the findings

7  that you made, and one of those was that at least two

8  generators are already online, is that correct?  Solar PV

9  generators, as a result of the Re-MAT program?

10 A.   I don't recall.

11 Q.   Specifically, one solar generator Enerpac has come online

12 as of March 23rd, 2016?  This is on Page 3 of your declaration,

13 Line 6.

14 A.   Yes.

15 Q.   And then down at Line 11 there is another facility

16 Pristine Sun Fund executed a Re-MAT contract on June 27, 2014

17 for $65.23 and it became operational on December 19th, correct?

18 A.   Correct.

19 Q.   So two solar facilities have come online under Re-MAT thus

20 far and both are at prices less than the $89.23 starting price,

21 correct?

22 A.   Correct.

23 Q.   Does this provide you any information regarding whether a

24 QF under the Re-MAT program can obtain financing and become

25 operational?

1     **A.**    That would be my general conclusion in terms of that they

2   could become operational at that price and would need likely to

3   have some kind of financing to be able to do that.

4     **Q.**    And have you seen that there are other solar projects that

5   have obtained Re-MAT contracts that are currently in

6   development?

7     **A.**    Yes.

8     **Q.**    And can you estimate how many megawatts are currently in

9   development that you expect to come online within the next two

10   years?

11     **A.**    I would go back...

12     **Q.**    And you're looking at the spreadsheet, the PG&E

13   spreadsheet, 10-day sheet?

14     **A.**    There's both, so there's -- there is the number of

15   projects.  And in the spreadsheet I would look to Column E to

16   see any projects that are listed as on schedule or delayed, as

17   those are the projects that are still expected to -- or

18   potentially could come online underneath -- under the Re-MAT

19   program.

20     **Q.**    And this information changes often, doesn't it?

21     **A.**    Yes.  The -- the report is updated regularly, so the

22   information gets updated.

23     **Q.**    How often is it updated and what triggers an update?

24     **A.**    Every program period would trigger an update.  So the

25   program periods are two months.

1   Q.   Okay.  I just want to go over some housekeeping with

2   regards to your declaration.  Do you have any changes to make

3   to your declaration?

4   A.   Yes, some minor corrections.

5        On Page 2, Paragraph 5, on Line 20 the sentence starts:

6            "Exhibit 2 spreadsheet attached hereto has been

7        modified to highlight the as available peaking

8        contracts that use photovoltaic Solar PV technology."

9        I would strike that.  It did not actually include a

10  highlight.

11  Q.   And anything else?

12  A.   Yes.  On Page 4, Paragraph 11, I'd like to clarify that

13  sentence to add at the end:

14           "To reach the conclusions I made in

15       Paragraph 54," add "of my expert report."

16           MS. BONE:  And we would like to submit this into

17  evidence.

18           THE COURT:  Okay.  Pass the witness.

19           MS. BONE:  Done.

20                    <u>**CROSS EXAMINATION**</u>

21  BY MR. PRICE

22  Q.   Good afternoon, Ms. Lee.

23  A.   Good afternoon.

24  Q.   Ms. Bone asked you about a requirement that a qualifying

25  facility come online within two years; do you recall that?

1    **A.**    Yes.

2    **Q.**    It's correct that the clock for that two-year period

3    starts ticking once the contract is actually signed, right?

4    **A.**    Correct.

5    **Q.**    You're familiar with a must-take obligation under PURPA,

6    correct?

7    **A.**    Generally.

8          **MR. PRICE:**  Could you please put up --

9          (Document displayed)

10   **BY MR. PRICE**

11   **Q.**    You'll see on the screen before you is 18 C.F.R.

12   Section 292.303(a)(1).  Is it your understanding that this

13   represents the must-take obligation under PURPA?

14   **A.**    I'm sorry.  Is that a question?

15   **Q.**    Yes.  Does this reflect the must-take obligation under

16   PURPA?

17          **MS. BONE:**  Objection.  This witness is not a legal

18   witness, and that is a legal question.

19          **MR. PRICE:**  Okay.

20          **THE COURT:**  Well, do you know, Ms. Lee?

21          **THE WITNESS:**  I don't.

22          **THE COURT:**  All right.  Let's move on.

23   **BY MR. PRICE**

24   **Q.**    Okay.  The Re-MAT program has caps as to how much must be

25   procured by the utility, correct?

1  A.    It has a cap set in the statute of a feed-in tariff

2  reference 750 megawatts.

3  Q.    That's the overall cap for the program, correct?

4  A.    For the state.  For the -- not specifically for Re-MAT.

5  Q.    Is there a cap for each utility to purchase solar

6  generation under the Re-MAT program?

7  A.    Yes.  Each utility was assigned a certain amount of

8  megawatts.

9  Q.    What is the cap for PG&E right now, do you know?

10 A.    Last I looked, the amount available was 35.7 megawatts.

11 Q.    And there's also a cap for each program period, right?

12 A.    Correct.  The program was designed, the -- per period

13 varies by utility.

14 Q.    And a program period is two months, correct?

15 A.    Correct.

16 Q.    And so the cap for PG&E at any two-month period is

17 five megawatts, is that right?

18 A.    Correct.

19 Q.    Now, you referred to developers not moving forward on

20 Re-MAT contracts that they had signed; do you recall that?

21 A.    Not specifically, but generally that can happen, yes.

22 Q.    That wouldn't change -- you said -- you testified that

23 that expanded the number of megawatts available to PG&E under

24 the Re-MAT program; do you recall that testimony?

25 A.    I believe I said the -- if a contract were terminated,

1   those terminated megawatts would go back into the amount of

2   available megawatts.

3   **Q.**   But that wouldn't change the five-megawatts cap in any

4   two-month period, would it?

5   **A.**   No.  It just changes what would be available overall in

6   that category.

7   **Q.**   Now, if more than five megawatts of solar QFs want to sell

8   to PG&E in any particular program period at the Re-MAT price

9   for that period, they can't all sell, right?

10  **A.**   Correct.

11  **Q.**   And then the price would adjust downward in the next

12  program period, right?

13  **A.**   If they were from unaffiliated sellers.

14  **Q.**   And the ability of QFs to accept a price in any given

15  program period is a function of where they are placed in a

16  queue, is that right?

17  **A.**   They are -- well, it would depend on what the sellers in

18  the queue before them decide to do.

19         So, yes, in terms of the five megawatts are offered per

20  period and if the first two equal or exceed the five megawatts

21  and are willing to accept that price, then, yes, that third who

22  would also be willing would not be able to get the contract.

23  **Q.**   Now, for QFs that signed up before the first program

24  period, those QFs were randomly placed in the queue, is that

25  right?

1    **A.**    Yes.  When the program started, there were a number of

2    sellers that were all interested at the very beginning.  So it

3    was determined that they would be randomly put into the queue

4    into an order.

5    **Q.**    And in the first program period, the number of QFs that

6    wanted to accept the $89.23 price exceeded five megawatts for

7    solar in the PG&E territory, right?

8    **A.**    Based on the price declining, that is, yes, correct.

9    **Q.**    And the $89.23 price was a benchmark that was based on the

10   cost of procuring under some other California PUC program,

11   right?

12   **A.**    It was based on the Renewable Auction Mechanism program

13   based on the list price executed contracts from the most recent

14   auction of that program, also known as RAM.

15   **Q.**    And that included QFs and non-QFs as well?  The program

16   wasn't limited to QFs, correct?

17   **A.**    Correct.  It was not limited to qualifying facilities.

18   **Q.**    So in that first program period for PG&E, not all of the

19   solar facilities that wished to sell were able to sell, is that

20   right?

21   **A.**    Correct.  It appears that, yes, more were willing to

22   accept at that initial offering price than signed up based on

23   the price declining.

24   **Q.**    We know that because the price declined in the next period

25   to 85.23, right?

1   **A.**    Yes.  The price declined, meaning that there were more

2   than five unaffiliated sellers willing to accept that initial

3   price.

4   **Q.**    And the same thing happened in the next program period,

5   too, right?

6   **A.**    Yes.

7   **Q.**    The price declined to $77.23 for the third program period,

8   correct?

9   **A.**    Based on the PG&E report, yes.  Program period three did

10  execute contracts at $77.23.

11  **Q.**    So between the first program period and the second, the

12  price dropped $4.  Then between the second and the third, the

13  price dropped another $8, is that right?

14  **A.**    Correct.  And that is according to the adjustment of the

15  Re-MAT program.  If there are consecutive declines, then the

16  amount that the -- the difference in the decline increases and

17  it can be up to $12 per megawatt hour, either decrease or

18  increase.  So the adjustments are equal whether they go up or

19  down.

20  **Q.**    And what is the basis for of the $4 or $8 or $12

21  adjustment?

22  **A.**    That is based on the decision that adopted the Re-MAT

23  program.

24  **Q.**    Is there any connection between the size of those

25  adjustments and a utility's avoided cost?

1    **A.**    It is based on the record of decision.

2    **Q.**    Now, you referred in your testimony --

3          **THE COURT:**  What does that mean, "record of

4    decision"?

5          **THE WITNESS:**  The record of decision -- so that the

6    decision was the -- the Re-MAT program was adopted through a

7    Commission decision which implemented the statute.  So to

8    implement the statute, the Commission issued rulings.  There

9    was a stock proposal.  There were attorney comments.  All of

10   that is part of the record which the judge based the decision

11   on.

12   **Q.**    To your knowledge --

13         **THE COURT:**  Hold on one second, please.

14   So the question was:  There a connection between the size

15   of the adjustments and a utility's avoided cost?  And you said:

16   Yes, the record of decision.

17         What is the connection?  How is that connected to a

18   utility's avoided cost?

19         **THE WITNESS:**  So maybe I misheard the question then.

20         **MR. PRICE:**  That was my question.

21         **THE COURT:**  So the question was:  Is there -- this

22   may not be 100 percent right.

23         Is there any connection -- what is -- what is -- is there

24   a missing word --

25         **MR. PRICE:**  I can try ask my question.

1    **THE COURT:** Why don't you do it again. This is

2    important to me, at least.

3    I mean, I want to -- I'm particularly interested in this

4    answer, so let's take it from the top, okay?

5    **BY MR. PRICE**

6    **Q.** So the price adjusts based on multiples of $4 per megawatt

7    hour, depending on whether you have more than five megawatts of

8    interest in accepting at a particular price, right?

9    $4 adjustment or $8 adjustment or $12 adjustment,

10   depending on what happened in the previous program period, is

11   that right?

12   **A.** Correct.

13   **Q.** What is the basis for choosing $4 per megawatt-hour

14   multiples as the amount by which a price will adjust?

15   **A.** It was -- it's an incremental amount to adjusting knowing

16   that the market is -- was willing to accept at a previous

17   price, to which the alternative isn't an alternative to

18   procure. So it is adjustment to meeting the market price or

19   the avoided price of the next contract.

20   **Q.** Is there any reason to choose 4, 8 and 12 instead of 5, 10

21   and 20, or 3, 6 and 8, or any collection of random numbers?

22   **A.** Not to my knowledge.

23   **THE COURT:** So the 4, 8 and 12, it's your

24   understanding they are just kind of arbitrarily selected?

25   **THE WITNESS:** My recollection of the record is, yes,

1   it was proposed.  I was not part of the assigned analysts when

2   the decision was adopted and the program initially implemented.

3   So I do not know.

4           **THE COURT:**  Okay.  But is it your understanding that

5   they are just arbitrarily selected numbers?

6           **THE WITNESS:**  That could be a reasonable assumption,

7   yes.

8           **THE COURT:**  Go ahead, Mr. Price.

9           **MR. PRICE:**  Excuse me a minute.

10      (Brief pause.)

11  **BY MR. PRICE**

12  **Q.**   Now, you referred in your direct testimony to market

13  interest on the part of QFs.  Do you recall that?

14  **A.**   Generally.  Is there anything specific?

15  **Q.**   The price will adjust based on market interest.  Do you

16  recall that testimony?

17  **A.**   Generally, yes.

18  **Q.**   So do you mean by that that the price will adjust based on

19  the willingness of QFs to sell at any particular price?

20  **A.**   It is adjusting to the -- based on what there are willing

21  to sell in the Re-MAT program, yes.

22  **Q.**   So if many QFs are willing to sell at a price, then

23  there's lots of market interest and then the price drops,

24  right?

25  **A.**   I'm not sure I understand the question.

1  **Q.**  So if many QFs are willing to sell at a certain price,

2  then you'd say there's lots of market interest and the price in

3  the next program period will fall, right?

4  **A.**  Okay.  So you're talking specific to the program based on

5  -- yes.  So the idea of the adjustment was to adjust to what

6  the market is willing to pay, which would be what the -- the

7  market price of the renewables, so what they are willing to

8  execute at.

9  **Q.**  The market price of what the QFs are willing to execute at

10  determines whether the price is going to adjust in the next

11  period, right?

12  **A.**  What the participants in the program are willing to.

13         **THE COURT:**  Well, that's -- that's the QFs, right?

14  Those are the only participants in the program.

15         **THE WITNESS:**  Yes, but just being specific to not all

16  QFs willing to -- there are certain eligibility requirements

17  for the program.

18         **THE COURT:**  It's not -- not all QFs are participants,

19  but all participants are QFs.

20         **THE WITNESS:**  Correct.

21         **THE COURT:**  Okay.

22  **BY MR. PRICE**

23  **Q.**  Now, you have no reason to doubt that Winding Creek was in

24  the queue prior to the first program period, do you?

25  **A.**  No reason to doubt, that is correct.

1    Q.   And you have no reason to doubt that Winding Creek would

2    have accepted a $89.23 price, correct?

3    A.   Given that there were other participants willing, it could

4    be a safe assumption that they would be willing as well.  But I

5    do not know what the specific seller was thinking at the time

6    or their business model or any of their reasoning for choosing

7    to accept or not accept a price.

8    Q.   And you have no reason to doubt that Winding Creek didn't

9    have the opportunity to accept that price because of its

10   placement in the queue, right?

11   A.   I do not know of its specific spot in the cue at that

12   time, but they could have been willing if so.

13   Q.   Now, we talked about how the Re-MAT price can adjust

14   downward.  And is the policy rationale for that that if lots of

15   QFs are willing to sell for less, then the ratepayer should pay

16   less?

17   A.   Yes.  The idea is that the amount paid is reasonable for

18   all parties of the market, including the ultimate buyer, the

19   ratepayers, to where they should pay no more than the market or

20   the utility's avoided -- or opportunities to procure a similar

21   product elsewhere.

22   Q.   The goal is to try to get the price down to what the

23   market of QFs supplying under the Re-MAT program are willing to

24   sell at, isn't that right?

25        THE COURT:  I think -- I'm good with this point.

1     **MR. PRICE:** Okay.

2  **BY MR. PRICE**

3  **Q.** Now, earlier we talked about the must-take obligation.

4  When -- when a QF -- when a utility pays a QF a certain price

5  for -- under the Re-MAT program, the utility can't avoid buying

6  from that QF by purchasing from a different QF instead, can it?

7     **THE COURT:** I wasn't following that. Why don't

8  you --

9     **MR. PRICE:** I was trying to speed things up, but I

10  think I slowed things down.

11     **THE COURT:** Let's not sacrifice clarity for speed.

12  Try it again.

13     **MR. PRICE:** Fair enough. Very good.

14  **BY MR. PRICE**

15  **Q.** Earlier when we talked about the must-take obligation, is

16  it consistent with your understanding of that obligation that a

17  utility can't avoid purchasing power from a QF?

18     **MS. BONE:** Objection. Calls for a legal conclusion.

19     **THE COURT:** Well, Ms. Lee, do you have any

20  understanding about that?

21     **THE WITNESS:** I have an understanding of the program

22  in terms of at the offered price, if a seller is willing to

23  accept at that price, the utility must sign the contract with

24  that particular seller.

25     **THE COURT:** All right.

1    BY MR. PRICE

2    Q.   When a utility pays -- let's say a utility pays a QF a

3    certain price for its power.  Could it decide:  I want to avoid

4    paying that by purchasing instead from a different QF?

5    A.   For the specific -- specific to the Re-MAT program?

6    Q.   Ever.

7    A.   So that's beyond my knowledge of must-take.

8         THE COURT:  Okay.  That's good.

9    BY MR. PRICE

10   Q.   In the current Re-MAT price for solar and PG&E's --

11        THE COURT:  Let me just jump in.

12   You know, just answer what you know.  Okay?  If you don't

13   know, it's perfectly fine to say, "I don't know."  Don't -- I

14   mean, tell what you know.  If you don't think you can answer

15   it, just say so.  Okay?

16        THE WITNESS:  Okay.

17        THE COURT:  Go ahead, Mr. Price.

18   BY MR. PRICE

19   Q.   The current price for solar under the Re-MAT program in

20   PG&E is what, do you know?

21   A.   I believe it's $61.23.

22   Q.   Now, if I could direct your attention to the demonstrative

23   which reflects Exhibit 116, Defendant's Exhibit 116?  And if I

24   could call your attention to Lines 41 and 42 of that exhibit.

25   Do you see that?

1   **A.**   41 and 42?

2   **Q.**   That's right.

3   **A.**   Okay.

4   **Q.**   So on Line 41 that reflects a hydro facility, is that

5   right?

6   **A.**   Correct.

7   **Q.**   And it entered a contract program period 14, is that

8   right?

9   **A.**   For Line 41, yes, that's right.  That's program period 14.

10  **Q.**   And it received a rate of $89.23, right?

11  **A.**   Correct.

12  **Q.**   Now, on Line 42 that's a solar facility, is that right?

13  **A.**   Correct.

14  **Q.**   And it also signed a contract in program period 14, is

15  that right?

16  **A.**   Correct.

17  **Q.**   And it received a rate of $61.23, is that right?

18  **A.**   Yes.

19  **Q.**   When a utility avoids buying energy from a QF at

20  4:00 p.m. on a summer afternoon -- sorry.

21       When a utility avoids buying energy at 4:00 p.m. on a

22  summer afternoon because it's buying from a QF instead, does it

23  matter how the QF produces that power?

24  **A.**   I'm sorry.  I'm not sure how you're avoiding.

25  **Q.**   Well, a utility buys from a QF.  It avoids the purchase of

1    energy from somewhere else, right?

2    **A.**    Not if all of that energy is needed, it's not avoiding.

3    **Q.**    The utility needs a certain amount of energy at that

4    moment, 4:00 p.m. on a summer afternoon, correct?

5    **A.**    Correct.

6    **Q.**    And if a QF comes in and says, "I will supply the energy

7    at 4:00 p.m. on a Sunday afternoon," the utility doesn't need

8    to buy as much some from some other place.  Would you agree

9    with that?

10   **A.**    If the assumption is that it's a -- I guess you're saying

11   a closed system, to where buying more than your set limit, then

12   yes, they would not need that extra, that additional amount.

13   **Q.**    And the cost that the utility avoids by buying from the

14   QF, as opposed to, say, from the market, doesn't depend on how

15   the QF generates its electricity at 4:00 p.m., does it?

16          **THE COURT:**  May I jump in?

17      Do you have an understanding, Ms. Lee, of whether a

18   utility's avoided cost changes if it's buying power from, say,

19   a hydro producer versus, say, a solar producer?  Is it a

20   different avoided cost in that circumstance or is it the same

21   for both sources?

22          **THE WITNESS:**  I do not know.  My assumption is --

23          **THE COURT:**  Don't assume.  Do you know?

24          **THE WITNESS:**  No.

25          **THE COURT:**  Okay.  In other words, you don't know

1    much about how the avoided cost figure gets calculated?

2         THE WITNESS:  Correct.

3         THE COURT:  Okay.  Why don't we move on?

4         I do have one question.  I'm sorry.  Then you can round it

5    up, Mr. Price.

6         So on Line 42, that demonstrative, the Green Light Energy

7    Corporation is reported to have a 20-year term contract, okay?

8    Do you see that here?

9         THE WITNESS:  Yes.

10        THE COURT:  Line 41.  And they are going to get

11   $61.23 for 20 years for each megawatt-hour, right?

12        THE WITNESS:  Correct.  Time of Delivery adjusted, so

13   the payment will be --

14        THE COURT:  With the TOD adjustment, the base is

15   going to be $61.23, right?

16        THE WITNESS:  Right, for what's produced.

17        THE COURT:  Now, do you have any understanding of how

18   that $61.23 is related in any way to a utility's avoided cost?

19        THE WITNESS:  Just that it's the -- the cost to

20   buying the renewable to where if they were to meet the RPS,

21   then that would be what they would be buying instead of

22   whatever else they would need to meet for this program or the

23   renewable requirement.

24        THE COURT:  I'm trying to put just a little finer

25   point.  If you don't know, that's fine, you can just tell me,

1    but I want to see if you do.

2        Do you know how that $61.23 that Green Light Energy

3    Company is going to get per megawatt hour relates to PG&E's

4    avoided costs?  Do you have any understanding of that?

5            THE WITNESS:  No.

6            THE COURT:  Because you just don't know?  It's not

7    what you do?

8            THE WITNESS:  Correct.

9            THE COURT:  All right.  I think that's probably

10   enough here.

11           MR. PRICE:  I was going to ask --

12           THE COURT:  Go ahead.

13           MR. PRICE:  I was going to ask about the other

14   programs, but if the Court is not interested in that.

15           THE COURT:  Which other programs?

16           MR. PRICE:  She mentioned a bunch of other solar

17   programs in California and I just wanted to make --

18           THE COURT:  They sound to me like they are unrelated.

19   Are you trying to demonstrate that they are unrelated?  I

20   think I'm already convinced that they are.

21           MR. PRICE:  Okay.  Then I will stop.  Thank you, your

22   Honor.

23           THE COURT:  Any brief redirect?

24   I'll tell you what, Mr. Price.  Do you have a lot on the

25   other programs?  Why don't you go ahead and do it?

1      MR. PRICE:  I was just going to ask the one question.

2      THE COURT:  Go ahead.

3  BY MR. PRICE

4  Q.   Ms. Lee, you mentioned a number of other solar programs

5  that California has.  Are any of them intended to be programs

6  designed to implement PURPA?

7  A.   No.

8      MR. PRICE:  Thank you.

9      THE COURT:  All right.  Thank you.

10     Okay.  Any brief redirect?

11     MS. BONE:  I can do some redirect.

12                    <u>REDIRECT EXAMINATION</u>

13  BY MS. BONE

14  Q.   To your knowledge, is there just one type of an avoided

15  cost?

16     THE COURT:  Well, we just had a back-and-forth about

17  how she doesn't know anything about avoided costs.  So you want

18  to lay a foundation for that first?

19     I'm -- we just had a whole line questions and the answer

20  to which is "I don't know."  That's fine.  You can try to lay a

21  foundation, if you want to.

22     You want to do that?

23     MS. BONE:  Mr. Morris?

24     THE COURT:  Okay.

25     MR. MORRIS:  I have a question.

1    **THE COURT:**  Okay.

2                    <u>**REDIRECT EXAMINATION**</u>

3    **BY MR. MORRIS**

4    **Q.**   If you look at the demonstrative exhibit, you were asked

5    questions about the Green Light Energy Corporation with the as

6    available peaking and sell at $61.23.  And you compared it to

7    hydro, which is called base load.

8         Is base load a different product than as available

9    peaking?

10   **A.**   Yes.

11   **Q.**   And is that a reason for differentiation of the price?

12   **A.**   Yes.  The pricing adjusts differently for the different

13   categories.

14   **Q.**   Okay.

15   **A.**   Product categories.

16   **Q.**   And when you set the price at $89.23 originally and too

17   many companies were bidding, was the auction mechanism used,

18   the five megawatts used to reduce the price?

19   **A.**   Yes.  The -- each period is able to adjust the price based

20   on the previous period.

21   **Q.**   You were calling those market prices, right?

22   **A.**   Yes, Market Adjusting Tariff.

23   **Q.**   Right.  And is the market price the same as the avoided

24   cost?

25   **A.**   It's -- in general, what I said before about the -- the

1    other opportunities for procuring renewable energy.  It's not a

2    problem procuring.  So it's what it's -- what it's procuring

3    instead.  Procuring instead versus avoiding that purchase.

4           THE COURT:  Let me just jump in here.  So the

5    question was -- one second here.  Screen changed.

6        So the question is:  Is the market price the same as the

7    avoided cost?  Is the answer "yes" or "no" or "I don't know,"

8    or is it "let me explain"?

9           THE WITNESS:  I mean, it's -- avoided of what the

10   other renewables options are.

11          THE COURT:  Okay.  But is it -- all right.  Go ahead.

12   BY MR. MORRIS

13   Q.   You also said that there are other solar programs in

14   California?

15   A.   Yes.

16   Q.   And that that energy metering program is one of those

17   other programs, right?

18   A.   Correct.

19   Q.   And at the end of 12 months, there is access generation

20   sold, that's sold into the market.  It's -- that's -- does it

21   have to be a qualifying facility to sell that excess energy to

22   the market?

23   A.   That is my understanding, yes.  It has to be a qualifying

24   facility for that to happen.

25   Q.   Have you -- are you familiar with FERC orders on the

1  subject of avoided cost?

2  **A.**    No.

3  **Q.**    Okay.

4       **MR. MORRIS:**  I suggest we do post trial briefs, your

5  Honor.

6       **THE COURT:**  Sorry?

7       **MR. MORRIS:**  I suggest we do post trial briefs.

8       **THE COURT:**  Well, we are.  I have some questions

9  we're going to answer, but this is the time for evidence.  So,

10  anything else?

11       I have one quick question for you.  So when you say

12  that -- maybe it's just late in the day, but when you say the

13  market price is the same as the avoided of what the other

14  renewables options are, what -- can you tell me -- maybe give

15  me an example of names of companies or utility and solar

16  company or whatever?  Just, I'm having trouble understanding

17  what you mean by that.

18       **THE WITNESS:**  In general, what I work on is

19  overseeing utilities and their procurement of renewables.  And

20  for us, we're looking at the renewable energy market as a

21  whole.  So we look to see what is procured and whether or not

22  it's reasonable based on what else is available in the market.

23       So they have to go and procure up to 50 percent now and

24  there is more out there in the market to be sold then meeting

25  that requirement.  So looking at finding the least cost, best

1  fit renewables.  So you're comparing it against what is offered

2  in the market, so the other opportunities in the market.

3          THE COURT:  So you're looking at -- you're looking at

4  avoided cost in terms of the mandate to buy solar or QF power.

5  So you're looking at avoided cost only within that context, is

6  that right?

7      In other words, are you saying the utility has to go buy,

8  say, 36 megawatts of solar and hydro and --

9          THE WITNESS:  Yes.  The current requirements is they

10  procure a large amount of renewables which will meet their --

11  their requirements as an electric utility.

12          THE COURT:  So when you're looking at avoidable cost,

13  you're looking only at avoidable cost within the context of

14  buying renewable energy, not -- you're not adding into that

15  avoidable cost that could be from buying energy from a coal

16  plant or a nuclear plant or something like that?

17          THE WITNESS:  Right.  The avoided of other

18  renewables.

19          THE COURT:  Is that right?

20          THE WITNESS:  Yes.

21          THE COURT:  All right.  Anything else?

22          MS. BONE:  Your Honor, just as a clarification.

23                  **FURTHER REDIRECT EXAMINATION**

24  BY MS. BONE

25  Q.  So you have three product categories in Re-MAT, correct?

1  A.    Correct.

2  Q.    Okay.  So the idea is that a certain technology can

3  provide one type of product, and other technologies can provide

4  other products, correct?

5  A.    Correct.

6  Q.    And so you're comparing not necessarily all renewables

7  together, but in Re-MAT it looks at each product category

8  individually and sets a price for that product category, so

9  that the price of firm power could be different than the price

10 of as available peaking power, correct?

11 A.    Correct.

12       THE COURT:  So what does that mean?  You're saying

13 that the renewable category is even more finally diced?

14       MS. BONE:  Yes.

15       THE COURT:  So "avoided cost" means just avoided cost

16 from any solar producer.

17       MS. BONE:  Or from any as available -- any technology

18 that can provide as available peaking capacity.

19       THE COURT:  As solar does.

20       MS. BONE:  At this time that is just solar, yes.

21 BY MS. BONE

22 Q.    So would you characterize Re-MAT as a technology specific

23 feed-in tariff?

24 A.    It's a product specific feed-in tariff, yes.

25 Q.    But today that breaks down into, certain technologies fit

1  into certain categories?

2  **A.**   Yes.  It is assumed that solar would be in the as

3  available non-peaking, as it's assumed that geothermal would be

4  in a base load.

5  **Q.**   And hydro would be in the --

6  **A.**   In the as available non-peaking category.

7  **Q.**   So they would only compete with other hydro providers or

8  others who can provide as available --

9  **A.**   Correct.

10 **Q.**   -- peaking?

11              **THE COURT:**  All right.  Anything else?

12              **MR. PRICE:**  Just one.

13              **THE COURT:**  Sure.

14              ### FURTHER RECROSS EXAMINATION

15 **BY MR. PRICE**

16 **Q.**   When you say that each technology is competing with other

17 providers of that same technology under the Re-MAT program,

18 you're talking about QFs that are competing with each other, is

19 that right?

20 **A.**   Because they need to be QFs for the Re-MAT program, then

21 yes, they are competing in -- in that category and Re-MAT.

22 **Q.**   And so if some QFs are willing to sell more cheaply than

23 other QFs, then over time the price of the Re-MAT will come

24 down and it's only the most efficient QFs that will end up

25 being able to sell under the Re-MAT program, right?

1    **A.**    I'm not sure I can make that assumption for the whole

2    market.

3            **MR. PRICE:**  Thank you.

4            **THE COURT:**  Okay.  You can step down.  Be careful on

5    the way down.

6        (Witness excused.)

7            **THE COURT:**  Is that it?  Yes?

8            **MR. PRICE:**  Would you like anything further, your

9    Honor?

10           **THE COURT:**  Let's see.  Is there someone else?

11           **MS. BONE:**  Your Honor, we would like to do a closing,

12   but we would also like a short break before doing that.

13           **THE COURT:**  Well, I have three questions.  I'm -- all

14   right.  You just want to wrap it together a little bit and

15   we're going to get some trial briefs.  That's fine.

16       Let's take a 10-minute break.  I have to stop a little bit

17   after 3:00.  All right.  Okay?  So be back in about 10 minutes.

18           **THE CLERK:**  All rise.  Court is at recess.

19       (Whereupon there was a recess in the proceedings

20        from 2:33 p.m. until 2:47 p.m.)

21           **THE CLERK:**  Okay.  We're back on the record in Civil

22   13-4934, Winding Creek Solar, LLC versus California Public

23   Utilities Commission.

24           **THE COURT:**  All right.  So there is going to be a

25   written portion of our proceedings, but go ahead and hit any

1   high level points you want.

2           **MR. BHABHA:**  I will, your Honor.

3       With the Court's indulgence, when we had Mr. Lesser on

4   direct, we didn't ask him any questions about Re-MAT at all

5   because we were only focusing on the Standard Contract.

6           **THE COURT:**  Yes.

7           **MR. BHABHA:**  I realize it's late in the day.  I have

8   one question that I would put to Mr. Lesser on the stand.

9   Given that he's here in the courtroom, could we put him on for

10  simply one question regarding the Re-MAT?

11          **THE COURT:**  One question.

12          **MR. BHABHA:**  One question only.

13          **THE COURT:**  What's the question?

14          **MR. BHABHA:**  The question is:  Why is the Re-MAT

15  program not an avoidable cost rate?

16          **THE COURT:**  Okay.  Yes, come on up.

17      Mr. Lesser, you're continuing to be under oath.  So go

18  ahead.

19                      **JONATHAN LESSER**,

20  called as a witness for the Plaintiff herein, having been

21  previously sworn, resumed the stand and testified further as

22  follows:

23              **FURTHER DIRECT EXAMINATION**

24  BY MR. BHABHA

25  **Q.**   You've heard my question, Dr. Lesser.  Why is the Re-MAT

1    program not an avoided cost rate?

2    **A.**    For two reasons.  One, the avoided cost rate is based on

3    what a utility would purchase, not of other QFs.

4    So, in other words, under Re-MAT the cost paid to QF A

5    depends on its perhaps avoiding QFs B, C, D, et cetera.  The

6    price that QF B would then pay depends on what QF A, C, D and E

7    are offered.  And so you end up in a circle.

8    The second reason is that the value of electricity at any

9    given time is not -- is independent of the types of generation.

10    Electrons are the same.  There are no red electrons, green

11    electrons.  They are just electrons.

12    So the market price at any given time is based on supply

13    and demand and it's based on an aggregation of all types of

14    supplies.  So there is no distinction.

15    For example, in the California independent system

16    operator's market price, it's just -- here is all the

17    electrons.  Here is the market clearing price.

18    **THE COURT:**  In other words, in your opinion, there is

19    no avoided cost based on the nature of the producer?  In other

20    words --

21    **THE WITNESS:**  Exactly, yes.

22    **THE COURT:**  All right.  Okay.

23    Any follow-up?

24    **MR. BHABHA:**  That's my question.

25    **THE COURT:**  Yes.  Thank you.

### FURTHER RECROSS EXAMINATION

**BY MS. BONE**

**Q.**  Hello, Dr. Lesser.

So your conclusion that Re-MAT is not compliant with PURPA is -- do I understand properly that it is, first of all, based on your legal conclusion that PURPA requires that you only use non-QF power to set avoided cost rates?

**A.**  It's based on an economic conclusion that my definition of an avoided cost is -- and my understanding, my layman's understanding of PURPA is what the utility would avoid.  It is not what the utility would avoid by purchasing from other QFs, because Re-MAT is specifically limited.

So assume Re-MAT was completely gone.  There is no Re-MAT. Well, what are you left with?  The utility -- there is still a PURPA obligation and the avoided cost would be based on what, besides QFs, the utilities would buy.

**Q.**  So are you not familiar with FERC's decisions finding that avoided cost can be set based upon the power that the utility is required to buy?

So, for example, if they are required to buy a certain amount of CHP power, avoided cost can be set based on the avoided costs of those CHPs.  Are you not familiar with those line of cases?

**THE COURT:**  Well, they are cases, so I --  can you give me one citation to that, Ms. Bone?

1    **MS. BONE:** Yes.  The CPUC case decided at FERC.  It's

2  133 FERC -- and somebody else is going to finish the rest.

3    **THE COURT:** 130 FERC?

4    **MS. BONE:** 133 FERC.  It's a FERC decision.

5    **MR. MORRIS:** Paragraph 61-059.

6    **THE COURT:** Okay.  And what year is that?

7    **MR. MORRIS:** 2010.  And it's --

8    **THE COURT:** And you all say that that stands for the

9  proposition that FERC thinks it's okay to define avoided cost

10  by the nature of the producer?

11    In other words, you could have an avoided cost that's

12  hydro-based only, solar-based only and so on.

13    **MR. MORRIS:** That's Page 61 through 67.

14    **THE COURT:** All right.  Well, I will read the whole

15  thing, but that is what you are telling me, Ms. Bone?

16    **MS. BONE:** Yes.

17    **THE COURT:** Okay.  All right.

18    Dr. Lesser, you can step down.

19    **MS. BONE:** Oh --

20    **THE COURT:** Sorry.

21    **MS. BONE:** Because he gave two reasons for why he --

22    **THE COURT:** Let's avoid asking about FERC.  He's not

23  here for FERC opinions.  So just keep it to the facts.

24  **BY MS. BONE**

25  **Q.**   This isn't a FERC decision I'm asking about, but I believe

1  in your textbook you describe that there are many different

2  ways to set avoided costs, is that correct?

3  **A.**    There are different methodologies, that's correct.

4  **Q.**    Okay.  Could you give some examples of what -- the

5  different methodologies overall?  There is an administratively

6  set avoided cost, is that correct?

7  **A.**    That's correct.

8  **Q.**    And there are also market based avoided costs?

9  **A.**    That's correct.

10 **Q.**    And if you did the two together at the same time, do you

11 think you'd come up with the same avoided cost if you did the

12 administratively determined avoided costs versus a market based

13 one?

14 **A.**    Counsel, your question is too vague to answer, because it

15 depends -- there are so many variables.  It just depends how

16 you're defining.

17      All I'm looking at is from the standpoint of my

18 understanding of PURPA, it's a utility's avoided cost.  What --

19 so it's a but-for purchasing that QF, the utility would go out

20 and have to procure non-QF sources of that amount.  And the --

21         **THE COURT:**  Let me just jump in.

22      That's probably going to be something I have to wrestle

23 with.  I think that's enough.

24 **BY MS. BONE**

25 **Q.**    All I'm asking the witness is to confirm that there are

1  many different ways to set avoided cost, correct?

2          THE COURT:  I think he's disagreeing with you.

3          MS. BONE:  Oh.

4          THE COURT:  Is that right?

5          MS. BONE:  No.

6          THE WITNESS:  No.  I'm saying that --

7          THE COURT:  You're saying there is one way?

8          THE WITNESS:  Well, in terms of the specifics.  How

9  it could be -- you know, the California Commission could say

10  avoided cost is X or avoided cost is Y.

11      What I'm saying is economically when I look at avoided

12  cost, it's based on  -- it's a but-for assumption of, in this

13  case, I'm not buying from a QF.  Well, what would the utility

14  go out and procure?

15      Now, it could be that the utility would just procure power

16  from the spot market, never -- never contract with anyone or

17  any type of resource.  It could be the utility would contract

18  over multiple years.

19      But, to me, the issue is more -- you know, in this case

20  you can't have an avoided cost rate for a QF set by other QFs

21  because you end up then just chasing your tail.

22          THE COURT:  I think you did touch on that this

23  morning.

24      Okay.  Last one.

25

BY MS. BONE

Q.   So the spot market price that would be generated would be an avoided cost?

A.   It could be, if the utility is not purchasing on the spot market, because it's -- it's -- it has a contract.

Q.   And a long-term contract could also produce an avoided cost?

A.   If the utility's only alternative was a specific long-term contract.

Q.   And it's possible that those two avoided costs would be different prices?

A.   It's possible they would be different.  It's possible they would be the same.

Q.   How likely is it possible that they would be the same?

A.   I haven't done any sort of probabilistic analysis to say what the likelihood would be.

Q.   That a long-term contract would be the same as a spot market price?

A.   At a given hour, I don't know.

Q.   Okay.  Thank you, Dr. Lesser.

        THE COURT:  Thank you.

    All right.  Very, very brief, Mr. Bhabha.

        MR. BHABHA:  No, no.  I have no redirect.

        THE COURT:  Okay, good.  You can step down Dr. Lesser.

1        **THE WITNESS:** Thank you.

2    (Witness excused.)

3        **THE COURT:** All right. You want to make some

4    closings?

5        **MR. BHABHA:** I will be very brief.

6        **THE COURT:** Yes.

7                    <u>**CLOSING ARGUMENT**</u>

8        **MR. BHABHA:** Your Honor, it's undisputed that the

9    facility that Winding Creek seeks to build is covered by PURPA

10    and it's covered by the FERC regulations implementing PURPA.

11        The CPUC has put forward two programs that they claim

12    satisfy the PURPA and Federal Energy Regulatory Commission

13    regulations under PURPA requirements; the Standard Offer

14    Contract or a Standard Contract, as we have been referring to

15    it, and the Re-MAT program.

16        We believe the evidence has shown today that neither of

17    those programs comply with PURPA and they don't comply with

18    them for different reasons. I want to very succinctly go

19    through why and I will reverse and start with Re-MAT because

20    that's what we were recently talking about.

21        Firstly 18 C.F.R. 292.303(a)(1) has the must-take

22    provision, which requires that utilities take all electricity

23    generated by qualifying facilities.

24        We believe the evidence has shown today in Ms. Lee's

25    testimony that the Re-MAT program has caps. It has an overall

1    cap.  It has a solar specific cap.  And it has a monthly cap

2    that PG&E enforces for qualifying facilities.

3         THE COURT:  Let me just jump in.  So isn't this all a

4    bit theoretical since the cap has never been hit?

5         MR. BHABHA:  Well, your Honor, we don't believe it's

6    theoretical and for this reason.  There is a monthly --

7         THE COURT:  A better way of putting it is, isn't this

8    unripe because the cap has not been hit?

9         MR. BHABHA:  No, your Honor.  We would have accepted

10   the 89.23 price in the first period if we were offered it.  But

11   because -- and Ms. Lee's testimony said this -- we were

12   randomly placed later down in the queue, even though we applied

13   in the first period.  We were outside those first

14   five megawatts.

15        THE COURT:  Well, that's a function of the

16   five megawatts line, not a function of the overall must buy

17   line.

18        MR. BHABHA:  And our complaint raises the five line

19   is a violation of PURPA, just as the overall line is.

20        THE COURT:  But the five line is not a cap.  The five

21   line was just a month-to-month buy level.  It was not intended

22   to any way undercut 303, or whatever that regulation was about

23   buying all available power.

24        MR. BHABHA:  With respect, your Honor --

25        THE COURT:  Let me just jump in.

1          MR. BHABHA:  Sorry.  Please.

2          THE COURT:  The regulation does not mean each and

3    every day or each and every month a utility must, no questions

4    asked, buy every megawatt of QF power available.  I don't think

5    it says that.

6          MR. PRICE:  Well, it says -- and we can call it up,

7    your Honor.  We believe it requires -- the must-take provision

8    is clear.  It has to purchase all QF power.

9          And I take your question to say:  Well, it's not ripe

10   because you haven't hit the high cap, so how were you injured?

11   We were injured because they also impose a monthly cap and that

12   monthly cap precluded us from getting the original price, the

13   89.23 price.

14         THE COURT:  But there is nothing in the C.F.R. that

15   says you can have a -- you have an obligation as a utility at

16   each and every moment of the day to buy all available power.

17         And your argument is dependent on every month that

18   regulation says you have to snap up all the power that's

19   available.

20         MR. BHABHA:  Your Honor, that's -- we don't make that

21   argument for this reason.  There is an exception.  Obviously,

22   if there is too much energy for the grid, the utility doesn't

23   have to purchase above what it needs.  The utility doesn't have

24   to make that purchase.

25         But for qualifying facilities, less than one megawatt,

1  California has never made that Department of Corrections.

2  Mr. Colvin's testimony said this.  They -- they have never made

3  the determination that the must-take obligation should not

4  apply.  They have never hit that level where they don't need

5  the energy that we would be providing.

6      So that's our first argument.  But even if you disagree

7  with me on this cap point, even if you think that the five

8  megawatt a month cap isn't in the regulation and we -- we

9  believe it is, we believe that is a violation.

10      The second point is that because of that cap, we get to a

11  situation where we don't have an avoided cost rate.

12      They start with 89.23.  There was some testimony that that

13  was high back when this program began, to a market price.

14  Since then it has been adjusted up or down by increments of $4,

15  a randomly set administrative rate that has nothing to do with

16  what the qualifying facility -- sorry, what the utility would

17  otherwise have to spend.

18      And I think your Honor's question about the rate getting

19  paid to hydro exactly demonstrates this.  As Mr. Lesser's

20  testimony said, electrons aren't hydro or solar.  It's just

21  electricity.  The price for electricity at this very moment

22  that PG&E is paying isn't dependent on who is generating the

23  electricity.

24      And so the perversity of the Re-MAT program is that now

25  hydros are getting paid at 89.23 and solar, for giving exactly

1   the same electricity, is getting paid --

2           THE COURT:  Let me ask you this.  Let me just jump.

3       Now, if you took all renewables together, okay, co-gen,

4   hydro and solar, all right, would you agree that -- that an

5   avoidable cost, given the mandate to buy renewable energy,

6   might fairly be described as the sum total of all renewables,

7   but maybe parsing it by specific product of renewable may be

8   too much.

9           In other words, would you have a problem with lumping all

10  of the renewables together for avoided cost?

11          MR. BHABHA:  So I would like to give you a "yes" or

12  "no", but I think it has to give one sentence.  I would have no

13  trouble with looking at avoided cost rate as all renewables.

14  The problem is Re-MAT only looks at qualifying facilities.

15          And so the very thing that PURPA targets and these

16  regulations target, which is to say you can't pit one

17  qualifying facility against another qualifying facility, that

18  is what the Re-MAT program does.

19          So the hydro that you pointed to, that's a hydro

20  qualifying facility.  We're not looking at facilities -- at

21  general solar facilities and general co-gen.  We're only

22  looking at qualifying facilities.  And so because of that, this

23  regulation -- I'm sorry, this program violates PURPA.

24          Now, I think if it was only looking at renewables outside

25  of qualifying facilities, it would be a different -- it would

1   be a different case, but that's not the program they have here.

2        THE COURT:  Well, let me just -- I'm just thinking

3   out loud here.

4        But the evidence to my ear suggests that for a variety of

5   constraints the utility just can't buy hydro power for less

6   than $89.23 per megawatt hour.  There is no supplier out there

7   who feels compelled to offer a price below that.  Maybe that's

8   because there are a handful of hydro plants or there are some

9   other transmission issues or something else.

10       Solar is more competitive.  There are a lot of people who

11  are willing to say:  I'll price a dollar less than that person

12  down the street.  Enough people have said that that the price

13  is now down to these market adjustments to 61 -- $62 per

14  megawatt hour.  What is wrong with that?

15       MR. BHABHA:  So there are two things that are wrong

16  with that, your Honor.

17       The first one is that we don't believe the regulation

18  allows that.  The only reason we get to this situation is

19  because of these arbitrarily imposed caps.  And we'll argue

20  this in post trial briefing, too.

21       We can cite you to the FERC decisions we believe provide

22  under PURPA rule making as well; that it's only because they're

23  imposing these $5 a month caps that they're getting to this

24  situation where you have hydro at one price and solar at the

25  other.

1        **THE COURT:**  I was wondering, this was not in the

2   evidence, but are there any caps on hydro?  Are there the same

3   sort of monthly --

4        **MR. BHABHA:**  I think there are the same caps.

5        **THE COURT:**  Okay.

6        **MR. BHABHA:**  So that's one reason.

7   The other one is, again this circularity point.  They are

8   creating this situation where you have a lower price for one

9   versus the other because they are limiting what the meaning of

10  "avoided cost" is, which in a way we think is -- in a way that

11  we think is legally improper.

12  We don't think that the reading of these regulations and

13  the legislative history, the rule making, allows you to look at

14  an avoided cost only --

15       **THE COURT:**  Certainly pro consumer though.

16       **MR. BHABHA:**  Pardon me?

17       **THE COURT:**  Certainly pro consumer though.

18       **MR. BHABHA:**  Your Honor, the purpose of PURPA may be

19  pro consumer.  That's a policy question that we think Congress

20  could answer.  We think the regulations are very clear here.

21  And it's the same thing for --

22       **THE COURT:**  You agree it's pro consumer.  It's

23  getting solar at a lower price.

24       **MR. BHABHA:**  Well, your Honor, it's getting solar at

25  a lower price -- it's getting solar at a lower price right now,

 1   but that is not the rule in the regulation.  The regulation

 2   doesn't say, what is the lowest price you can get for a

 3   particular QF's energy?  It doesn't say that at all.  It says,

 4   what is the avoided cost rate not of the qualifying facility,

 5   but of something else.

 6        I mean, the principal of avoided cost rates is not

 7   necessarily to get the lower price for the consumer.  When

 8   PURPA was passed, there was great concern about energy

 9   security.  The purpose was to rise -- to increase renewable

10   generation, recognizing that perhaps you could have a renewable

11   generator who could give energy at $80.  Perhaps the cheapest

12   you could get it on the market was, you know, 95.

13        **THE COURT:**  Well, look.  This is a little bit off

14   field, but there are solar producers operating right now,

15   perhaps even generating electricity in this room, who are

16   accepting $62, or approximately, per megawatt hour.  They are

17   in operation.  They are making money.  They are repaying their

18   loans and presumably they are taking a little something home

19   for themselves.  Okay?

20        So what is wrong with that?  All I hear is that your

21   client -- this has been the theme from day one -- wants a

22   premium first class ride.  Other people are out there living at

23   $62 per megawatt hour.  What is the problem with that?

24        **MR. BHABHA:**  Your Honor, the problem with that is

25   that we -- firstly, we would have accepted the 89.23 that

1   others --

2           THE COURT:  There is no doubt.  That goes without

3   saying.  That's very much like saying, yes, I will accept a

4   seven figure annual salary from my firm.  It's hardly a

5   difficult choice.

6           MR. BHABHA:  I agree with you.

7           THE COURT:  Here is the choice.  Everybody else out

8   there who is in business today is making it happen at $62 an

9   hour, megawatt hour.

10          MR. BHABHA:  Your Honor, we believe the problem with

11  that is that the regulation provides that you don't look at

12  what -- the other qualifying facilities.  Then there would be

13  no purpose to having an avoided cost rate at all.  You just

14  say, there is a market price for solar.

15      So you -- PG&E should just set -- go into -- create a

16  market and set it up.  PURPA is the opposite of that.  It's a

17  replacement for a market based price.  It says you look at the

18  avoided cost for somebody else.

19      So I -- I hear your policy argument, your Honor, and

20  certainly from the perspective of a ratepayer I can understand

21  that argument.  But the point is the system Congress set up is

22  different than that, and the regulations and the PURPA rule

23  making indicates that.

24          THE COURT:  I think you shortchange Congress's

25  interest in low utility rates.

1    MR. BHABHA:  I think if they didn't have that belief,

2  they wouldn't have passed PURPA at all because there is a -- I

3  mean, you can always have a market based mechanism.  So there

4  would be no need to have an avoided rate cost.

5    So that's -- that's, in essence, why we think Re-MAT

6  doesn't comply with the clear text of the regulation, which is

7  you need an avoided rate cost and you need no caps.  Re-MAT

8  does give the price over 20 years, and that's our problem with

9  the Standard Contract.

10    THE COURT:  Let me ask you this.  It seems to me this

11  case can be resolved, if possible, just on the pricing

12  mechanism ground without reaching the cap issue.  Would you

13  agree with that?

14    MR. BHABHA:  That it doesn't provide an avoided rate

15  cost?  I think that --

16    THE COURT:  Let me put it to you this way.  If I

17  find -- and I'm just talking out loud.  Nobody should read

18  anything into this.

19    If I find that the pricing mechanisms are not compliant

20  with (d)(2)(i) and (ii) because they are not based on avoided

21  costs or some other reason, I do not need to reach the cap

22  issue.  But if I find that the pricing mechanisms are

23  compliant, then I do need to reach the cap issue.

24    MR. BHABHA:  That's right, your Honor.  They are

25  independent grounds for invalidating -- for finding that Re-MAT

1    is not valid under the regulations.

2            **THE COURT:**  Okay.  All right.  Any final -- there is

3    going to be a brief, so.

4            **MR. BHABHA:**  The only other point is that I think

5    we've trodden this ground well or into the mud, that the

6    Standard Offer Contract doesn't comply with PURPA and the

7    regulations for the separate reason, which is that it doesn't

8    provide a rate calculated at the time the obligation is

9    incurred.  And because that is what (ii) requires, the clear

10   implication of CPUC's position is to basically make (i) and

11   (ii) the same, i.e., to read (ii) out of the statute.

12       Thank you.

13           **THE COURT:**  Ms. Bone?  Oh, Ms. Hammond.

14                       **CLOSING ARGUMENT**

15           **MS. HAMMOND:**  Thank you, your Honor.

16       Your Honor had asked a couple of times what is the

17   relationship between, say, the 89.23 price under Re-MAT and

18   avoided cost, or what is the relationship between the $4

19   adjustments and avoided cost?  And I will point, your Honor,

20   to, I'm sorry, subsection (e) of 292.304?

21           **MS. BONE:**  Yeah.

22           **MS. HAMMOND:**  And that section talks about the

23   relationship between the availability of QF power and the

24   ability of the utility to procure.  Meaning, supply and demand.

25       A utility doesn't have to procure QF power if it doesn't

1   require it.  But the State of California has decided that it

2   would not decide at full stop, stop procuring.  There is

3   actually a dynamic relationship between procurement and -- and

4   supply, supply and demand.  And it moves.  And that's exactly

5   what Re-MAT does.

6       It's very responsive --

7           THE COURT:  Let me just jump in for a moment.

8       In what way is Re-MAT -- well, do you take the position

9   that Re-MAT satisfies either (d)(2)(i) or (d)(2)(ii)?

10          MS. HAMMOND:  That it does satisfy (d)(2)(ii).

11          THE COURT:  How does it do that?

12          MS. HAMMOND:  Well, it establishes a price that

13  remains unchanged over the term of the contract.  It's a

14  long-term contract.  There are TOD adjustments, but --

15          THE COURT:  How then -- how is the Re-MAT price

16  different under (d)(i)?  I mean, that sounds like (d)(i) to me.

17  But how is the Re-MAT price different under (d)(i) versus

18  (d)(ii)?

19      When would the Re-MAT price ever be different under that

20  statement that you just made?

21          MS. HAMMOND:  I'm sorry, your Honor.  If you can --

22          THE COURT:  (d)(i) and (d)(ii), okay?  Little ones,

23  little twos --

24          MS. HAMMOND:  At the time the obligation is incurred?

25          THE COURT:  -- are different pricing points.  And

1   what I keep hearing in the evidence, and I think what you just

2   said, maybe I misunderstood, keeps telling me that, in fact,

3   the PUC offers one price for both options or one mechanism for

4   determining the price for both options, which gets you to

5   basically the same price.

6       So how does Re-MAT offer a choice of pricing under (i) and

7   (ii)?  How are they different?

8           **MS. HAMMOND:**  I had just said that Re-MAT offers a

9   generator the option under (d)(2)(ii).

10          **THE COURT:**  Okay.  So there is no (d)(i) option,

11  (d)(2)(i) option under ReMAT?

12          **MS. HAMMOND:**  Not under Re-MAT.

13          **THE COURT:**  So the PUC's decision is Re-MAT is

14  compliant with (d)(2)(ii) only, is that right?

15          **MS. HAMMOND:**  Well, the CPUC has never --

16          **THE COURT:**  Just answer my question.  Okay?

17      The PUC's position is Re-MAT is compliant with (d)(2)(ii)

18  only, is that right?

19      (Brief pause.)

20          **THE COURT:**  That's what you just told me.

21          **MS. HAMMOND:**  That any one contract, yes, can only be

22  satisfying (d)(2)(ii).

23          **THE COURT:**  Okay.  Go ahead.

24          **MS. HAMMOND:**  Okay.

25      There has been a lot of testimony today going to some very

1  specific language in the regulation at issue.  The plaintiff

2  has stated a number of times in their pretrial brief about the

3  plain -- the plain and simple language of the statute.  And a

4  lot of the testimony has been distilled into whether or not the

5  operation of the program exactly matches the plain meaning of

6  the regulation.

7       But it's pretty apparent, as we can see today.  It has

8  been apparent through briefing, that rate making is not a

9  simple or plain endeavor.  Provision of utility service is not

10 simple or plain.  Procurement and generation of electricity is

11 not simple or plain.  There are so many variables that go into

12 this.

13      And I will go back to the Ninth Circuit in the *IEP*

14 decision where the Ninth Circuit faced a situation very similar

15 to what we're -- what plaintiff is asking.  What plaintiff is

16 asking is for a fixed price over a long term, administratively

17 set, based on a forecast.

18      They are also saying that the avoided cost can only be

19 based on procurement from non-QFs.  And that has become

20 apparent through the briefs and through testimony today.

21      But going back to the *IEP* decision, the Ninth Circuit

22 dealt with the situation very similar to what is being

23 requested here; that is, fixed price contracts, over long term,

24 administratively set, based on forecasts.  And the Ninth

25 Circuit was compelled to look at the history and the context

1    and the complexity of rate making and procurement and

2    regulation and it recognized the problems that derived from

3    those sorts of procurement and that were -- that those

4    problems, those costs, were imposed directly on ratepayers.

5         And in reviewing the administrative determination, which

6    has been submitted to the Court, the FERC -- the Ninth Circuit

7    considered a rule making, a then open rule making.  But it was

8    sympathetic to the circumstances that gave rise to that rule

9    making.

10        And it -- the contract at issue in *IEP* was a (d)(2)(ii)

11   contract.  And the Ninth Circuit suggested one solution to deal

12   with the problems inherent with tying in prices over the long

13   term and burdening ratepayers when avoided costs come down was

14   more flexible pricing mechanisms.  It didn't say different

15   prices, different price points; more flexible pricing

16   mechanisms.

17        And we submit, as was suggested by the Ninth Circuit, that

18   a formula is just that sort of more flexible pricing mechanism

19   that it wants, promotes small power production and protects

20   consumers.  It provides sufficient certainty for investors.

21        The Short-Run Avoided Cost has had uptake.  It has had

22   takers in California.  But an investor doesn't decide, oh, I

23   want the QF program; or, oh, I want the Re-MAT program

24   necessarily.  But an -- excuse me.

25        An investor can decide where to put their money.  CPUC

1   doesn't tell them where to put their money.  There are many,

2   many, many options in California for an investor to invest

3   their money.  And we've seen where programs have been

4   successful.  And a program shouldn't be immutable.  It should

5   be responsive to the market.

6        **THE COURT:**  Look.  No one is looking, and I'm

7   certainly not, to putting the PUC in a straightjacket.  But

8   there are Congressional statutes and C.F.R.s that have to be

9   observed.

10       So it's not a matter of run free or die.  It's a matter of

11  doing what you need to do within the discretion granted, to the

12  extent it is granted, by the law.

13       So I'm not -- you know, no one is looking to put you in a

14  shoebox, but at the same time there are obligations that have

15  to be respected.

16       Let me ask you a question and then we're going to close

17  this out.  I'm going to give everybody your assignments.

18       Just tell me a little bit about the monthly cap, the five

19  megawatt cap.  You heard Mr. Bhabha's position.  What is the

20  PUC's response?

21       **MS. HAMMOND:**  Well, there is a state-wide cap, but

22  there is a bi-monthly or program period hold on procurement.

23  And, you know, this reflects some of the difficulties of

24  reflecting a price that's appropriate to attract investment

25  and, yet, set a price that's low enough to protect consumers.

 1         **THE COURT:**  Let me jump in.

 2      So the theory, as I understand it, is C.F.R. requires

 3   utilities to purchase all available QF power and, yet, the

 4   state has said:  Well, you don't really have to do any more

 5   than five megawatts per month.

 6      So there is an alleged tension between those two positions

 7   and I'm wondering how you respond to that tension theory.  Is

 8   there a tension in the CPUC's view?

 9         **MS. HAMMOND:**  I don't think Congress ever intended

10   for utilities to procure more power than they need.  That just,

11   you know, creates a stranded cost.

12         **THE COURT:**  I'm willing to agree with that.  But

13   we're talking about the specific five megawatt number.  Okay?

14   That's set regardless of what somebody needs in a given month.

15      So there is a bright line five megawatt per month cap.

16   Okay?  How do you square that with, you need to buy all

17   available power?

18         **MS. HAMMOND:**  I square that with the consumer

19   protection provisions in the regulation; that the -- the

20   ratepayer shouldn't be burdened with more and higher cost of

21   electricity than they need.  It's a -- it's not a linear and

22   one dimensional endeavor to procure.  It's just a reflection of

23   the complexity of procurement and utility regulation, I'd have

24   to say.  It's built in to PURPA and the Energy Policy Act, of

25   which PURPA is a part.

1          **THE COURT:**  Okay.  Well, all right.

2      Okay.  Any final comment?  I mean, just for today?

3          **MS. HAMMOND:**  No.  Not at this time, your Honor.

4          **THE COURT:**  Okay.  Here is what we're going to do.

5  We're finally going to get this thing done.  We're going to

6  talk about the mechanics in a moment.  And I'll put this in the

7  minutes, but I want the following five issues to be

8  specifically briefed.

9      One.  Is it compliant with PURPA and its implementing

10 regulations to use the same price setting mechanism or contract

11 option for (d)(2)(i) and (d)(2)(ii)?

12     Two.  What pricing program or contract option available in

13 California generally satisfies (d)(2)(ii)?

14     Three.  I want an understanding of how, if at all, Re-MAT

15 pricing is based on an avoided cost to a utility?

16     Four.  How is an avoided cost to a utility determined for

17 purposes of Section (d)(2) two generally under both (i) and

18 (ii) subparts?  So how is avoided cost determined for (d)(2)(i)

19 and (d)(2)(ii)?

20     And then I also want to see the evidence about how the

21 five megawatt monthly cap was implemented by CPUC and what the

22 reasoning and evidentiary record was behind that.

23     Okay?  So those are the five questions you're going to

24 address.  You can include some other matters.

25     I'm going to let you two work out a proposed briefing

1    schedule.

2         I'm also going to ask for proposed findings of fact; not

3    conclusions of law, but just findings of fact based on the

4    testimony and the other materials in the record.  And I don't

5    want this to exceed more than -- it should not -- we have had

6    many rounds of briefing.  I think you can do this in 25 pages

7    or less at most, preferably less.

8         And I'm going to give you two other tips.

9         The first tip is this is a focused issue that is going to

10   revolve around costs and caps.  It is not useful for me in

11   California -- it is not useful for me to hear about experiences

12   in other states with other rules and other contracts.  So don't

13   feature that unless there is a good, compelling and plain

14   reason why I should look at them.  It's too much of a

15   distraction.

16        The second thing is I understand California has a

17   wonderful slate of pro solar programs.  It is confusing at best

18   and, you know, potentially just descends into chaos at worst to

19   keep hearing about all the solar programs that have nothing to

20   do with avoided cost pricing or the five megawatt cap.  So

21   don't -- I don't want to keep hearing about the 800 other

22   programs for solar that California has.

23        I've asked many questions today, the punch line of which

24   has been none of these have anything to do with PURPA pricing.

25   So don't tell me any more about those programs unless they are

 1  specifically related in a clear analytical way to the questions

 2  I've asked for these closing briefs.

 3      All right?  And the last thing is, we don't need to go

 4  through the whole history of, you know, utility regulations in

 5  California again.  Just be specific and on point on these

 6  issues.  That would be most helpful to me.

 7      Okay.  You all work out the timeframe on that.  Whatever

 8  you want to do is fine with me.

 9      Anything else I can help you with?

10      **MS. HAMMOND:**  Your Honor, we would like to move the

11  defendant's exhibits into the record, please.

12      **THE COURT:**  Any objections?

13      Look, the fact that they are moving them into the record

14  doesn't mean I'm going to rely on them or I'm going to do

15  anything with them.  So it's really --

16      **MR. BHABHA:**  And we'll move all of ours as well.

17      **THE COURT:**  All right.  Everybody gets in.  The hot

18  tub is full.

19      **MS. HAMMOND:**  Your Honor, the CPUC did register some

20  objections to some of the exhibits on the basis --

21      **THE COURT:**  What are the objections?

22      **MS. HAMMOND:**  The objections are the Colvin prepared

23  direct testimony on the basis of deposition designations, for

24  one.

25      **THE COURT:**  What specifically.

1      **MS. HAMMOND:**   Well, I mean, there is a certain

2   purpose for a deposition.   Mr. Colvin was presented as CPUC's

3   witness.   He was available for trial here.

4          **THE COURT:**   What is the objection?

5          **MS. HAMMOND:**   The objection is that deposition is

6   discovery and --

7          **THE COURT:**   It's sworn testimony.

8          **MS. HAMMOND:**   It's sworn testimony.   It is -- it's

9   used for a certain purpose.   He was the CPUC's witness, but

10   through cross examination plaintiffs were able to craft the

11   testimony and -- and objected to our --

12          **THE COURT:**   I don't understand what that means.   What

13   does that mean "craft the testimony"?

14      What is the fundamental point?   Was Mr. Colvin duped and

15   misled in some way and his testimony should be disregarded; is

16   that what you're saying?   I mean, it's a high bar to cross.

17          **MS. HAMMOND:**   It's just that it's selectively

18   crafted.

19          **THE COURT:**   If it's a matter of selection, you can do

20   counter designations.   Okay?   That's overruled.

21      Anything else?

22          **MS. HAMMOND:**   No.

23          **THE COURT:**   Okay.

24          **MR. PRICE:**   One other thing, your Honor.   In case

25   this wasn't clear earlier, we want to make sure we can rely on

1  Dr. Lesser's affidavit that was submitted as part of our

2  summary judgment motion.  That wasn't part of the direct

3  testimony we filed for trial because we didn't anticipate the

4  trial reaching the --

5          **THE COURT:**  The summary judgment materials are fine.

6  You can all go into your summary judgment materials as well.

7      All right.

8          **MS. HAMMOND:**  Your Honor, are all of the exhibits

9  sponsored by Mr. Whitman --

10         **THE COURT:**  Mr. Whitman is out and anything that he

11  had is out.  On the basis of the grounds, multiple grounds that

12  I outlined earlier today.

13     Yes.

14         **MR. MORRIS:**  And may we address the standing as an

15  issue?

16         **THE COURT:**  For what?  The cap?

17         **MR. MORRIS:**  Yes.

18         **THE COURT:**  The battleground appears to be on the

19  five megawatt level right now, and not the 36 or whatever the

20  bigger cap is.  So I think it's the monthly cap as opposed to

21  not annual state-wide cap.

22     So why don't we -- let's spend your 25 pages or less

23  focused on the five questions that I outlined.  Okay?  I think

24  that's a more productive use.  All right?

25     Now, any time you want to do it, just work it out and

1    we'll get it done, okay?

2         Anything else I can help you with.

3         (No response.)

4              **THE COURT:**  No?  No?  All right.

5         Thank you.  This is quite useful for me.  I appreciate it.

6              **THE CLERK:**  All rise.  Court is in recess.

7         (Proceedings adjourned.)

**I N D E X**

|  | PAGE | VOL. |
|---|---|---|
| Opening Statement by Mr. Price | 4 | 1 |
| Opening Statement by Ms. Hammond | 14 | 1 |
| Closing Argument by Mr. Bhabha | 204 | 1 |
| Closing Argument by Ms. Hammond | 214 | 1 |

**PLAINTIFF'S WITNESSES**

|  | PAGE | VOL. |
|---|---|---|
| **LESSER, JONATHAN** | | |
| (SWORN) | 16 | 1 |
| Direct Examination by Mr. Bhabha | 16 | 1 |
| Cross Examination by Ms. Bone | 41 | 1 |
| Redirect Examination by Mr. Bhabha | 63 | 1 |
| Recross Examination by Ms. Bone | 72 | 1 |
| | | |
| **WHITMAN, CHRISTOPHER** | | |
| (SWORN) | 75 | 1 |
| Direct Examination by Mr. Bhabha | 75 | 1 |
| Cross Examination by Ms. Bone | 107 | 1 |
| Redirect Examination by Ms. Hammond | 137 | 1 |
| | | |
| **LESSER, JONATHAN** | | |
| (PREVIOUSLY SWORN) | 197 | 1 |
| Further Direct Examination by Mr. Bhabha | 198 | 1 |
| Further Recross Examination by Ms. Bone | 199 | 1 |

- - -

**DEFENDANTS' WITNESSES**

|  | PAGE | VOL. |
|---|---|---|
| **COLVIN, MICHAEL** | | |
| (SWORN) | 109 | 1 |
| Direct Examination by Ms. Hammond | 109 | 1 |
| Cross Examination by Mr. Bhabha | 123 | 1 |

**I N D E X**

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **LEE, CHERYL** | | |
| (SWORN) | 146 | 1 |
| Direct Examination by Ms. Bone | 146 | 1 |
| Cross Examination by Mr. Price | 172 | 1 |
| Redirect Examination by Ms. Bone | 189 | 1 |
| Redirect Examination by Mr. Morris | 190 | 1 |
| Further Redirect Examination by Ms. Bone | 194 | 1 |
| Further Recross Examination by Mr. Price | 195 | 1 |

- - -

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 23 | 18 | | 1 |
| 24 | | 76 | 1 |
| 19 | | 101 | 1 |
| 20 | | 104 | 1 |
| All Plaintiffs Exhibits Received | | 223 | 1 |
| All Defendants' Exhibits Received | | 223 | 1 |

- - -

# CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, April 25, 2017