JENNER & BLOCK LLP
MATTHEW PRICE (*pro hac vice*)
ISHAN BHABHA (*pro hac vice*)
1099 New York Avenue NW Suite 900
Washington, DC 20001
Telephone: (202) 639-6873
Facsimile:   (202) 661-4802
mprice@jenner.com

THOMAS MELONE (*pro hac vice*)
MICHAEL MELONE (*pro hac vice*)
ALLCO RENEWABLE ENERGY LIMITED
14 Wall St., 20th Floor
New York, NY 10005
Telephone: (212) 681-1120
Facsimile:   (801) 858-8818
Thomas.Melone@AllcoUS.com
MJMelone@AllcoUS.com

*Attorneys for Plaintiff*

FUTTERMAN DUPREE DODD CROLEY MAIER LLP
JAMIE L. DUPREE (158105)
JAIME G. TOUCHSTONE (233187)
180 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3906
Facsimile:  (415) 399-3838
jdupree@fddcm.com
jtouchstone@fddcm.com

*Local Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| WINDING CREEK SOLAR LLC, | Case No. 3:13-cv-04934-JD |
| Plaintiff, | **PLAINTIFF'S PROPOSED FINDINGS OF FACT** |
| v. | |
| MICHAEL PEEVEY, MICHAEL FLORIO, CATHERINE SANDOVAL, CARLA PETERMAN, and MICHAEL PICKER, in their official capacity as Commissioners of the California Public Utilities Commission, | Trial Date:  April 4, 2017<br>Time:  9:00 a.m.<br>Courtroom:  11, 19th Floor<br>Judge:  Hon. James Donato |
| Defendants**.** | |

# I. The Parties & Background

1. Plaintiff Winding Creek Solar LLC ("Winding Creek") is a developer of solar generating facilities. (ECF No. 89-2 at 1-2). It is currently seeking to develop a 1MW solar generating facility in Lodi, California. (*Id.*). The facility Winding Creek seeks to develop in Lodi is a Qualifying Facility ("QF") pursuant to the Federal Energy Regulatory Commission's ("FERC") regulations (ECF No. 75 at 9).

2. Defendants are the Commissioners of the California Public Utilities Commission.

3. Defendants have identified only two programs in California that they claim satisfy their obligations under the Public Utility Regulatory Policies Act of 1978, Pub. L. No. 95-617, 92 Stat. 3117: the Renewable Market Adjusting Tariff ("Re-MAT") and the Standard Contract. (Trial Tr. 189:4-7).

4. California has not suspended PURPA's "must-take" obligation – requiring utilities to purchase "any energy and capacity which is made available from a qualifying facility," 18 C.F.R. §292.303(a)(1) – for QFs 20 MW or less. (Trial Tr. 131:4-6; Colvin Dep. 13:23-14:1).

# II. The Re-MAT Program

## A. Caps on Procurement

5. California has placed a 750 MW overall cap on the quantity of Qualifying Facility ("QF") generation utilities are obligated to purchase under the Re-MAT program. (CPUC Decision 12-05-035 (May 24, 2012) (ECF 89-3 at Ex. 2) ("CPUC May 2012 Order") at 76; (ECF 130 at 7 ¶ 25)).

6. That 750 MW overall Re-MAT obligation is allocated among California's investor-owned utilities proportionate to their customers' share of the state-wide peak electricity demand. (CPUC May 2012 Order at 79-80).

7. Pursuant to this allocation, Pacific Gas & Electric Co.'s ("PG&E") obligation to purchase electricity from QFs under the Re-MAT is capped at 218.8 MW. (CPUC May 2012 Order at 80; ECF 89-3 at 297; ECF 130 at 7 ¶ 25).

8. Furthermore, utilities are permitted to subtract from their Re-MAT obligation any

electricity already under contract with a prior CPUC program. This adjustment leaves PG&E with a total Re-MAT purchase obligation of 149.8 MW. (ECF 89-3 at 297).

9. A utility's QF purchase obligation under the Re-MAT program is divided into three equal categories: one for "baseload" generation (such as biogas and geothermal facilities); one for "peaking as-available" generation (such as photovoltaic facilities); and one for "non-peaking as-available" generation (such as wind facilities). (CPUC May 2012 Order at 43-44).

10. Thus, for "peaking, as-available" QFs, like Winding Creek's proposed solar facility, PG&E's total purchase obligation under the Re-MAT is one-third of 149.8 MW, or 49.949 MW. (ECF 89-3 at 297).

11. PG&E has already signed contracts with some peaking as-available QFs. Thus, as of April 2017, PG&E is only obligated to procure 35.687 MW of generation from peaking as-available QFs like Winding Creek. (https://pge.accionpower.com/ReMAT/home.asp).

12. The Re-MAT program has established bi-monthly "program periods." In addition to the overall procurement cap for each category of QF, the Re-MAT program also places a cap of 5 MW on PG&E's procurement obligation for each category of QF in each program period. Thus, no matter how many solar QFs are actually willing to sell electricity to the utility during a particular program period, the Re-MAT program requires PG&E to buy no more than 5 MW. (CPUC Decision D.13-05-034 (May 23, 2013) ("CPUC May 2013 Order") at 12, 20; ECF 130 at 8 ¶¶ 29-30; ECF 130 at 8-9 ¶ 31).

13. Indeed, the bimonthly cap can, in practice, be even lower than 5 MW. This is because PG&E is not required to contract for *more* than 5MW, and thus if the next project in the queue would push PG&E over the 5 MW limit (say, for example if it had already contracted for 4 MW and the next project is 1.25 MW), then no further contracts will be offered and PG&E will deem the 5 MW allocation fully subscribed. (CPUC May 2013 Order at 20).

14. A developer that meets the various Re-MAT program requirements is eligible to submit a program participation request to the utility in whose service area the developer intends to

situate its project. (ECF 130 at 8 ¶ 28). Once a developer's application is accepted, it is placed in a queue on a first-come, first-served basis. (*Id.*). However, all the generators that submitted timely applications for the first program period, which began on November 1, 2013, were placed in the queue a random order. (*See* Trial Tr. 175:23-176:4).

15. Once the queue is established, for each bi-monthly program period the utility – in this case PG&E – proceeds in order of the queue, asking each generator if it will accept a contract at the program price for that period. (ECF 130 at 8-9 ¶ 31).

**B. Calculation of Contract Price**

16. For peaking as-available facilities like Winding Creek, the initial Re-MAT price offered by PG&E during the initial program period that began on November 1, 2013, was $89.23 per MWh. (ECF 77 ¶ 58).

17. This price was based on the result of a competitive solicitation for renewable power held in 2011 under CPUC's auspices. (CPUC May 2012 Order at 44-45). That competitive solicitation – known as the Renewable Auction Mechanism – was open to all renewable generators of less than 20 MW, regardless of whether they were QFs. (CPUC Decision D.10-12-048 at 73 (Dec. 16, 2010)).

18. Under the design of the Re-MAT program, after the price for the initial program period is set, the price for subsequent periods will adjust up or down based on QFs willingness to accept the previous period's offer price. (CPUC May 2012 Order at 47)

19. Specifically, if QFs are unwilling to supply at least 1 MW to PG&E at the previous period's offer price, and there at least 5 unaffiliated QF bidders in the queue, then the offer price will adjust upwards for the next period in $4 per MWh increments. (CPUC May 2013 Order at 13; CPUC May 2012 Order at 47-48).

20. If, on the other hand, QFs are willing to supply at least 5 MW to PG&E at the previous period's offer price, then the offer price will adjust downwards for the next period in $4 per MWh increments. (CPUC May 2012 Order at 49-50; CPUC May 2013 Order at 13).

21. Finally, if QFs are willing to supply at least 1 MW but fewer than 5 MW to PG&E at the

previous period's price, or there are less than 5 unaffiliated bidders in the queue, the offer price will remain the same for the next period. (CPUC May 2012 Order at 47).

22. These price adjustments, either up or down, are made pursuant to CPUC-devised formula. (CPUC May 2012 Order at 47-50; CPUC May 2013 Order at 13).

23. The size of these price adjustments were "arbitrarily selected" by CPUC, and had nothing to do with a utility's avoided costs. (Trial Tr. 179:20-25).

24. CPUC's purpose in establishing this price adjustment mechanism in the Re-MAT program was not to mirror changes in utilities' avoided costs, but rather to generate ratepayer savings through a market-based mechanism that would yield the lowest price a QF would accept to sell generation. (CPUC May 2012 Order at 60-61; Trial Tr. at 182:13-21; ECF 130 (Lee Expert Report) at 18 ¶ 42).

25. The contract price for the current Re-MAT program period for peaking as-available facilities is $61.23 per MWh. (https://pge.accionpower.com/ReMAT/home.asp)

26. Numerous QFs that accepted Re-MAT prices less than $89.23 per MWh have abandoned their projects. (*See* Trial Ex. 116, Column entitled "Status (On-Schedule, Delayed, Operation, Terminated)" noting that numerous solar projects that accepted Re-MAT prices below $89.23 are now "terminated").

**C. Winding Creek's Participation in the Re-MAT Program**

27. On October 4, 2013 – prior to the initiation of the Re-MAT program – Winding Creek submitted its Re-MAT application. (ECF 89-2 at ¶ 7). That application was accepted on November 12, 2013, and the Lodi facility was placed in PG&E's queue for peaking as-available resources. (ECF 89-2 at 3 ¶ 7). Winding Creek's placement in the Re-MAT queue, as compared with other QF facilities who also submitted applications prior to the initiation of the Re-MAT program, was entirely random. (*See* Trial Tr. 175:23-176:4).

28. Winding Creek was randomly placed behind other QFs willing to sell at least 5 MW to PG&E at the initial $89.23 per MWh price applicable in the first program period, despite having timely applied. (ECF 89-2 at 3 ¶ 9). Winding Creek would have accepted a contract at $89.23 per MWh. (*Id.* ¶ 8). And, Winding Creek would accept a contract at

that price if offered it today.  (*Id.*; Trial Tr. 182:1-4).

29. Winding Creek was not permitted to enter a contract at $89.23 per MWh, however, because 5 MW of QFs ahead of it in the queue had already accepted a contract at that price, so the cap for that program period was reached.  (ECF 89-2 at 3 ¶ 9; Trial Tr. 176:5-8).

30. PG&E did not reach Winding Creek's place in the queue until the program period beginning on March 1, 2014.  By that time, the Re-MAT price PG&E was offering was $77.23 per MWh.  (ECF 89-2 at 3 ¶ 9).  That rate was insufficient to allow Winding Creek to move forward with development, so Winding Creek refused the offer and retained its place in the queue. (ECF 89-2 at 3 ¶ 9).

31. Winding Creek currently occupies the first place in PG&E's Re-MAT queue for peaking, as-available facilities.  (ECF 89-2 at 3 ¶ 1).

## III.    The Standard Contract

32. In December 2010, California adopted the "QF Settlement," an agreement between multiple entities that settled various disputes related to the terms and availability of contracts between QFs and utilities.  (ECF 134 at 1 ¶ 4, 9 ¶ 30).

33. Winding Creek was not a party to the QF Settlement.  (Trial Ex. 12 at 71).

34. One component of the QF settlement was the creation of the Standard Contract for QFs under 20 MW seeking a contract with utilities pursuant to PURPA.  (ECF 134 10 ¶ 36).

35. The Standard Contract contains the rate at which QFs under 20 MW are paid for the energy they sell to utilities.  (Colvin Direct 10:22-23).  The rate contained in the Standard Contract is an "avoided cost" rate, which is defined as a cost that the utility would otherwise incur if it had to buy power from a non-QF source.  Trial Tr. at 33:6-7.

36. There are various methodologies that can be used to calculate an "avoided cost" rate. One way of calculating an avoided cost "is to ask what the utility would have paid to buy the same quantity of electricity on the spot market.  Under this approach, if the price of electricity during the three o'clock hour of the afternoon is $100 per megawatt-hour ('$/MWh'), that is the utility's avoided cost in that hour."  (ECF 89-1 at 9 ¶ 24.).

Another approach would not be to look at, or approximate, the current market price, but rather to use forecasting methods "to ask what the utility would need to pay to enter a long-term contract of similar length with a non-QF resource or to build such a resource itself." (*Id.* ¶ 25.).

37. The Standard Contract does not allow QFs to choose the method for calculating the avoided cost rate that they receive for selling energy. (Trial Tr. 66:17-20). Rather, the only rate provided by the Standard Contract for QFs' sale of energy to utilities is the Short Run Avoided Cost Rate or "SRAC." (Trial Tr. 66:17-20).

38. The SRAC rate is a formula with six inputs: (i) the market heat rate; (ii) the burner tip gas price; (iii) variable operations and maintenance; (iv) a time of use factor; (v) greenhouse gas compliance costs; and (vi) a location adjustment factor. (ECF 134 at 12 ¶ 44).

39. The SRAC formula is as follows:

Energy Price = ((Market Heat Rate x Gas Price) + Variable Operations & Maintenance) x Time of Use Factors + Greenhouse Gas Compliance Costs + Location Adjustment Factors. (ECF 134 at 14 ¶ 45)

40. Three of the inputs to the SRAC rate are variable, and their values are updated monthly. (ECF 134 at 12 ¶ 44; ECF 138 at 7:7-8:4).

41. *First*, the market heat rate, which is a measure of efficiency, varies monthly and that input to the SRAC is updated on the 5th business day of each month (ECF 134 at 12 ¶ 44(A); ECF 138 at 7:4-5).

42. *Second*, the burner tip gas price, which is the monthly market-based price for natural gas, varies monthly and that input to the SRAC is updated on the first business day of each month. (ECF 134 at 13 ¶ 44(B); ECF 138 at 7:7-8).

43. *Third*, the location adjustment factor, which is a site-specific factor that varies to reflect the fact that the cost of energy from a particular location varies due to changes in the local energy markets, varies monthly and is identified 30 days after generation occurs and is then applied to the prior month's SRAC payment. (ECF 134 at 14 ¶ 44(F); ECF 138 at 8:2-4).

44. Because three of the six inputs to the SRAC formula are variable and change monthly,

the actual dollar rate at which a QF is paid by PG&E under the SRAC formula is calculated each month for the energy the QF delivers to a utility during that month. (Colvin Dep. 62:24-63:5; ECF 138 at 2:15-22). The SRAC formula does not provide QFs with a rate that can be calculated at the time the obligation to provide power to a utility is incurred. (Colvin Dep. 62:24-63:5; *see also id.* at 66:22-67:3).

45. There is significant volatility within the three variable elements of the SRAC formula, particularly the price of natural gas. (Trial Tr. 27:23-25). As a result, there is "high degree of volatility" in the SRAC prices. (Trial Tr. 31:21). The historical SRAC prices display no discernible seasonal pattern or other predictable pattern. (Trial Ex. 3, WC000509-000514.)

46. As a result of the volatility, the PUC cannot say what the SRAC price will be at any given time during a 12-year contract period until those variables are filled in month-by-month by actual market data. (Tr. 116:13-17).

47. For example, in January 2010, the price for electricity was 6.0048 cents/kWh, a figure that dropped by almost 50% to 3.0456 cents/kWh in January 2016. (Trial Ex. 3 WC000513). Likewise, in March 2012, the price was 2.9614 cents/kWh, by March 2014 the price had almost doubled to 5.9938 cents/kWh. (*Id.*).

48. No new solar facilities have entered an agreement to sell energy to PG&E under the Standard Contract. (ECF 134 ¶ 38; Trial Ex. 21 at WC000984)

Dated: May 19, 2017                         Respectfully submitted,

                                            JENNER & BLOCK LLP

                                            By: /s/ Matthew E. Price
                                            Matthew E. Price (*pro hac vice*)
                                            *Attorney for Plaintiff*
                                            Email: mprice@jenner.com