JENNER & BLOCK LLP
MATTHEW PRICE (*pro hac vice*)
ISHAN BHABHA (*pro hac vice*)
1099 New York Avenue NW Suite 900
Washington, DC 20001
Telephone: (202) 639-6873
Facsimile: (202) 661-4802
mprice@jenner.com

THOMAS MELONE (*pro hac vice*)
MICHAEL MELONE (*pro hac vice*)
ALLCO RENEWABLE ENERGY LIMITED
14 Wall St., 20th Floor
New York, NY 10005
Telephone: (212) 681-1120
Facsimile:  (801) 858-8818
Thomas.Melone@AllcoUS.com
MJMelone@AllcoUS.com

*Attorneys for Plaintiff*

FUTTERMAN DUPREE DODD CROLEY MAIER LLP
JAMIE L. DUPREE (158105)
JAIME G. TOUCHSTONE (233187)
180 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3906
Facsimile:  (415) 399-3838
jdupree@fddcm.com
jtouchstone@fddcm.com

*Local Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| WINDING CREEK SOLAR LLC,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL PEEVEY, MICHAEL FLORIO, CATHERINE SANDOVAL, CARLA PETERMAN, and MICHAEL PICKER, in their official capacity as Commissioners of the California Public Utilities Commission,<br><br>Defendants. | Case No. 3:13-cv-04934-JD<br><br>**PLAINTIFF'S POST-TRIAL BRIEF**<br><br>Trial Date:  April 4, 2017<br>Time:       9:00 a.m.<br>Courtroom:  11, 19th Floor<br>Judge:      Hon. James Donato |

JENNER AND BLOCK
LLP

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. 3:13-CV-04934-JD

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

1. IS THE USE OF A SINGLE PRICING FORMULA OR PROGRAM UNDER 18 C.F.R. § 292.304(D)(2)(I) AND (D)(2)(II) PERMISSIBLE UNDER PURPA? ........... 1

   SHORT ANSWER: NO.

2. WHAT PRICING PROGRAM OR CONTRACT OPTION AVAILABLE TO WINDING CREEK, IF ANY, MEETS THE REQUIREMENTS OF 18 C.F.R. § 292.304(D)(2)(II)? ................................................................................................. 4

   SHORT ANSWER: NONE.

3. IS PRICING UNDER RE-MAT BASED ON A UTILITY'S "AVOIDED COSTS" AND IF SO, HOW? ............................................................................................. 8

   SHORT ANSWER: EXCEPT FOR THE INITIAL PRICE OF $89.23 PER MWH, NO.

4. HOW ARE "AVOIDED COSTS" DEFINED AND DETERMINED FOR PURPOSES OF 18 C.F.R. § 292.304(D)(2)? ....................................................................... 13

   SHORT ANSWER: AVOIDED COSTS ARE THE COSTS A UTILITY WOULD INCUR FOR PURCHASING ENERGY AND CAPACITY FROM A NON-QF SOURCE. CONSISTENT WITH THIS DEFINITION, THERE ARE VARIOUS WAYS AN AVOIDED COST RATE CAN BE CALCULATED.

5. WHAT IS THE ORIGIN AND PURPOSE OF THE 5 MW BI-MONTHLY CAP UNDER RE-MAT FOR PG&E AND HOW DOES THAT COMPLY WITH OR VIOLATE A UTILITY'S OBLIGATION TO PURCHASE ALL ENERGY AND CAPACITY MADE AVAILABLE BY QFS UNDER PURPA? ................................... 14

   SHORT ANSWER: THE 5MW BI-MONTHLY CAP ORIGINATED IN CPUC DECISION NO. 13-05-034, AND IT FLATLY VIOLATES THE "MUST-TAKE" OBLIGATION UNDER PURPA.

CONCLUSION................................................................................................................ 16

# TABLE OF AUTHORITIES

**CASES**

*Allco Renewable Energy Ltd. v. Massachusetts Electric Co.*, 208 F. Supp. 3d 390 (D. Mass. 2016), *appeal docketed on other grounds*, No. 17-1296 (1st Cir. Mar. 29, 2017)..........8

*American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402 (1983)..................................................................................................................8, 12

*American Ref-Fuel Co.*, 107 FERC ¶ 61,016 (2004)...................................................................13

*FLS Energy, Inc.*, 157 FERC ¶ 61,211 (2016)..................................................................2, 15, 16

*Hydrodynamics, Inc.*, 146 FERC ¶ 61,193 (2014)................................................................2, 6, 12

*Independent Energy Producers Ass'n v. California Public Utilities Commission*, 36 F.3d 848 (9th Cir. 1994)..................................................................................................12

*JD Wind*, 130 FERC ¶ 61,127 (2010) .....................................................................................2, 3

*Windham Solar LLC*, 156 FERC ¶ 61,042 (2016) ...........................................................12

*Windham Solar LLC*, 157 FERC ¶ 61,134 (2016) ..........................................................2, 6

**STATUTES**

16 U.S.C. § 824a-3(b)...................................................................................................13

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 95-496(IV) (1977), *reprinted in* 1978 U.S.C.C.A.N. 8454...................................12

**ADMINISTRATIVE RULINGS**

CPUC Decision D.12-05-035 (May 24, 2012) ........................................................10, 11

CPUC Decision D.13-01-041 (Jan. 24, 2013) .................................................................11

CPUC Decision D.13-05-034 (May 23, 2013) .........................................................11, 14

**OTHER AUTHORITIES**

18 C.F.R. § 292.101(b)(6)....................................................................................8, 9, 10

18 C.F.R. § 292.303(a)(1)..................................................................................10, 15

18 C.F.R. § 292.304(b)(2)...........................................................................................13

18 C.F.R. § 292.304(d)(2)............................................................................................1

*American Heritage Dictionary of the English Language* (5th ed. 2011).......................................6

https://www.pge.com/pge_global/common/pdfs/for-our-business-partners/energy-supply/prices-for-qualifying-facilities-and-eligible-combined-heat-and-power-facilities/20170509-Historical-SRAC.pdf (April 2017 rate) .................................................7

Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214 (Feb. 25, 1980) ................................................................................................................3, 4, 12, 13

Pursuant to this Court's Order issued at the conclusion of trial, Plaintiff Winding Creek Solar, LLC ("Winding Creek") respectfully submits the following answers to the Court's questions.

1. **Is the use of a single pricing formula or program under 18 C.F.R. § 292.304(d)(2)(i) and (d)(2)(ii) permissible under PURPA?**

**Short answer: No.**

Under the plain language of § 292.304(d)(2), Qualifying Facilities ("QFs") that choose to enter long-term contracts with utilities for the sale of energy or capacity are entitled to *choose* between *two different methods* of calculating the avoided cost rate for the sale of their energy and capacity. Specifically, § 292.304(d) provides, in relevant part:

> **Purchases "as available" or pursuant to a legally enforceable obligation.** Each qualifying facility shall have the option either:
> …
> (2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, *at the option of the qualifying facility* exercised prior to the beginning of the specified term, *be based on either*:
>
> (i)  The avoided costs *calculated at the time of delivery*; *or*
>
> (ii) The avoided costs *calculated at the time the obligation is incurred*.

18 C.F.R. § 292.304(d)(2) (emphasis added). As the plain language of the regulatory text makes clear, FERC understood these to be two separate and distinct methods of calculating avoided costs. A rate under (d)(2)(i) is calculated based on the utility's avoided costs at the time the QF actually delivers the electricity to the utility. For example, a (d)(2)(i) rate might be equal to the spot market price for electricity at a given moment; or, it might be a formula (like the Standard Contract formula) that uses inputs such as the prevailing gas price at the time of delivery to calculate the utility's avoided cost. Meanwhile, a rate under (d)(2)(ii) is calculated based on the utility's avoided costs calculated at the time the QF and the utility enter a contract. As Dr. Jonathan Lesser explains, a (d)(2)(ii) rate will typically involve a projection or forecast of the costs that the utility will avoid over the contract term by purchasing from the QF. *See* ECF 138

(Lesser Direct) at 4:17-23.  As noted below in the answer to question 5, there are various ways in which such a forecast may be calculated.

FERC understood that these two methods may well yield different results, because a projection of the utility's avoided costs, made at the time the contract is entered, may (and indeed almost certainly will) differ from what the utility's avoided costs actually turn out to be when electricity is delivered.  For example, when the contract is entered, the utility may anticipate that gas prices will remain low for the duration of the contract term, and its calculation of avoided costs under (d)(2)(ii) will reflect that expectation.  But it may turn out over the life of the contract that gas prices rise.  A rate under (d)(2)(i) would reflect that increase, because it is based on the avoided costs calculated at the time of delivery.

FERC has emphasized, consistent with the plain language of its regulations, that a QF gets to <u>choose</u> which of these two methods are used in calculating its rate.  *See JD Wind*, 130 FERC ¶ 61,127, P.23 (2010) ("[FERC] has … consistently affirmed the right of QFs to … rates determined at the time the obligation is incurred, even if the avoided costs at the time of delivery ultimately differ from those calculated at the time the obligation is originally incurred."); *Hydrodynamics, Inc.*, 146 FERC ¶ 61,193, P.31 (2014) ("Under Section 292.304(d) of the Commission's regulations, a QF also has the unconditional right to choose whether to sell its power … at a forecasted avoided cost rate."); *FLS Energy, Inc.*, 157 FERC ¶ 61,211, P.21 (2016) ("Under section 292.304(d) of the Commission's regulations, a QF also *has the unconditional right to choose whether to sell its power* 'as available' or pursuant to a legally enforceable obligation at a forecasted avoided cost rate determined, *at the QF's option, either at the time of delivery or at the time that the obligation is incurred*." (emphasis added)); *Windham Solar LLC*, 157 FERC ¶ 61,134, P.4 (2016) (noting that 18 C.F.R. § 292.304(d)(2) "provides (*at the QF's option*) for pricing based on either avoided costs calculated at the time of delivery or at the time the obligation is incurred.  Thus, regardless of whether a QF can provide firm output, that QF has the option to sell its output pursuant to a legally enforceable obligation *with a forecasted avoided cost rate*." (emphasis added) (footnote omitted)) .

FERC has explained that allowing a QF to choose between these two different methods for calculating its avoided-cost rate is important to achieving Congress's goal of encouraging renewable generation. A rate under (d)(2)(ii) enables a QF developer to "establish a fixed contract price for its energy and capacity at the outset of its obligation." Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214, 12,224 (Feb. 25, 1980) ("PURPA Rulemaking"). A potential investor in a QF can thereby determine the "financial feasibility" of a project before beginning construction and can have "reasonable certainty [of] the expected return on a potential investment before the construction of a facility." *Id*. at 12,218; *see also JD Wind 1 LLC*, 130 FERC ¶ 61,127, P. 23 ("[F]rom the beginning, [FERC's regulations] have given QFs *the option to choose* to have rates calculated at the time the obligation is incurred," because "'an investor needs to be able to estimate, with reasonable certainty, the expected return on a potential investment before construction of a facility.'" (quoting 45 Fed. Reg. at 12,218) (emphasis added))).

In the rulemaking establishing PURPA, FERC explained its view that, over the long run, ratepayers should be indifferent between the two distinct methods of calculating avoided costs, because, "in the long run, 'overestimations' and 'underestimations' of avoided costs will balance out." 45 Fed. Reg. at 12,224.

During trial, CPUC's expert witness Michael Colvin conceded that the Standard Contract does not offer QFs a choice between two different rates:

> THE COURT: Okay. So in your mind, in your view, there is no meaningful difference between (d)(2)(i) and (d)(2)(ii) in the way that the price paid to the QF would be calculated, is that right?
>
> THE WITNESS: Correct. For the purposes of this contract.

Trial Tr. 121:10-15. That concession conclusively establishes that the Standard Contract violates 18 C.F.R. § 292.304(d)(2).

**2. What pricing program or contract option available to Winding Creek, if any, meets the requirements of 18 C.F.R. § 292.304(d)(2)(ii)?**

**Short answer: None**

Under 18 C.F.R. § 292.304(d)(2)(ii), a QF must be given the option to choose a rate for energy or capacity that is based on "[t]he avoided costs calculated at the time the obligation is incurred." As discussed in greater detail in the answer to question 4 below, "avoided costs" as used in 18 C.F.R. § 292.304(d)(2), are "the costs to an electric utility of energy or capacity or both which, but for the purchase from a qualifying facility, the electric utility would generate or construct itself or purchase from another source." PURPA Rulemaking, 45 Fed. Reg. at 12,216.

Defendant Commissioners have identified two programs, and two programs only, as compliant with PURPA and FERC's implementing regulations: the Renewable Market Adjusting Tariff ("ReMAT") and the Standard Contract. *See* Pl.'s Proposed Findings of Fact ("PFF") ¶ 4.

For the reasons discussed in the answer to question 3 below, the Re-MAT program adjustment mechanism and cap do not comply with the requirements of 18 C.F.R. § 292.304(d)(2)(ii), because the rates provided in that program are not "based on … [t]he [utility's] avoided costs," as required by the regulation.

The Standard Contract likewise does not comply with § 292.3049(d)(2)(ii), although for a different reason. Under the Standard Contract, the rate at which a QF is paid for the electricity it sells to a utility is based on the utility's "avoided costs calculated *at the time of delivery*" – *i.e.*, it is a rate under (d)(2)(i) – and *not* on the utility's "avoided costs calculated *at the time the obligation is incurred*," as required by (d)(2)(ii).

The Standard Contract rate for energy is the Short Run Avoided Cost rate or "SRAC." *See* PFF ¶ 37. That is the only rate contained in the Standard Contract for the price of energy supplied by a QF to a utility. *See id*.

The SRAC formula is as follows:

Energy Price = ((Market Heat Rate x Gas Price) + Variable Operations & Maintenance) x Time of Use Factors + Greenhouse Gas Compliance Costs + Location Adjustment Factors

*Id.* ¶ 39.

It is undisputed that three of the elements of the SRAC formula are variable and cannot be calculated at the time the contract is entered, *see id.* ¶ 40:

- The market heat rate, which is a measure of the efficiency, varies monthly and that input to the SRAC formula is updated on the 5th business day of each month.  *See id.* ¶ 41.

- The burner tip gas price, which is the monthly market-based price for natural gas, varies monthly and that input to the SRAC formula is updated on the first business day of each month.  *See id.* ¶ 42.

- The location adjustment factor, which is a site-specific factor that varies to reflect the fact that the costs of energy from a particular location varies due to changes in the local energy markets, varies monthly and is identified 30 days after generation occurs and is then applied to the prior month's SRAC payment.  *See id.* ¶ 43.

These three elements change month by month, and are calculated each month to yield an avoided cost rate that is applied to electricity delivered during that month.  *See id.* ¶ 44; *see also* Colvin Dep. 66:22-67:1 ("Qualifying facilities are paid for the gas price on the month that they have just experienced.  So you are not paid for your energy until the end of the month.  So you will know what the March 2017 short run avoided cost payment is at the end of March 2017."). Thus, the rate under the Standard Contract *cannot* be calculated "at the time the obligation is incurred," as required by § 292.304(d)(2)(ii).  Instead, it is a rate calculated at the time the energy is delivered.  Indeed, CPUC's expert Mr. Colvin conceded that the SRAC rate is a (d)(2)(i) rate (based on avoided costs calculated at the time of delivery):

> I think it is correct to say that the commission has determined that the short run avoided costs, the costs that the qualifying facility would be paid, should be best represented by what the individual generator unit would have been paid that a utility would have procured but for the QF *at the time that the energy is delivered*.

Colvin Dep. 62:24-63:5 (emphasis added); *see also id.* at 66:22-67:3 ("Qualifying facilities are paid for the gas price on the month that they have just experienced.  So you are not paid for your energy until the end of the month.  So you will know what the March 2017 short run avoided cost

payment is at the end of March 2017.  Q[uestion:] And not before that?  A[nswer:] Correct.");  PFF ¶ 44.

The CPUC cannot argue that the SRAC rate complies with (d)(2)(ii), even though the rate changes from month to month, on the theory that the formula nevertheless provides sufficient certainty to qualify as a (d)(2)(ii) rate.  For one thing, the plain language of the regulation makes clear that a (d)(2)(ii) must be "*calculated*" at the time the contract is entered.  A formula containing variables whose values cannot be known does not comply with the plain meaning of the regulation, because the rate cannot be ascertained.  *See The American Heritage Dictionary of the English Language* 263 (5th ed. 2011) (defining the term "to calculate" to mean "[t]o ascertain by computation").  For another, while FERC's intention in giving QFs the option of a (d)(2)(ii) rate was to ensure that they have reasonable certainty of their return before commencing construction, a rate still must satisfy the express terms of (d)(2)(ii).  And FERC interprets (d)(2)(ii) as requiring a *forecasted* rate—i.e., one that is known at the time the contract is entered, not a formula with variables that fluctuate and that can be known only at the time of delivery. *Hydrodynamics, Inc.*, 146 FERC ¶ 61,193, P.31 (2014) ("Under Section 292.304(d) of the Commission's regulations, a QF also has the unconditional right to choose whether to sell its power … at a forecasted avoided cost rate."); *Windham Solar LLC*, 157 FERC ¶ 61,134, P.4 (2016) (noting that a "QF has the option to sell its output pursuant to a legally enforceable obligation *with a forecasted avoided cost rate*."  (emphasis added)).

In any event, there is no evidence in the record that would allow the Court to conclude that the SRAC formula provides "reasonable certainty" to a developer regarding the rate it will receive over the term of its contract.  Mr. Colvin agreed that "the PUC cannot say what price will be at any given time in [a] 12-year [contract] period until those variables are filled in by actual market data."  Trial Tr. 116:13-17; *see also* PFF ¶ 46.  And, as demonstrated in the below graph, the actual historic data confirm that natural gas prices, and thus SRAC prices, are highly volatile and vary widely over time without any discernible pattern.

[Figure: SRAC Rate (cents/kWh) line chart, Jan-10 through Apr-17, ranging roughly from 2 to 6 cents/kWh]

Source: Trial Ex. 3 at WC000513 (Jan. 2010 – March 2017 rates); https://www.pge.com/pge_global/common/pdfs/for-our-business-partners/energy-supply/prices-for-qualifying-facilities-and-eligible-combined-heat-and-power-facilities/20170509-Historical-SRAC.pdf (April 2017 rate).

Indeed, there is not even any seasonal predictability in the SRAC rate. For example, in January 2010, the SRAC rate for electricity was 6.0048 cents/kWh, a figure that dropped by almost 50% to 3.0456 cents/kWh in January 2016. Likewise, in March 2012, the SRAC rate was 2.9614 cents/kWh, by March 2014 the rate had almost doubled to 5.9938 cents/kWh. *See* PFF ¶ 47. These examples, and others like them, led Winding Creek's expert Dr. Jonathan Lesser to conclude that the SRAC price contained a "high degree of volatility." *Id.* ¶ 45. It should therefore not be surprising that, in the seven years since the Standard Contract was promulgated, not a single solar new solar QF in the PG&E service territory has been constructed under the Standard Contract rate. *See Id.* ¶ 48.

Thus, the Standard Contract rate does not satisfy (d)(2)(ii). It is not a rate based on avoided costs "calculated at the time the obligation is incurred." That conclusion accords not only with the plain language of the regulation as applied to the facts of this case, but also with the

decision of the District Court of Massachusetts in *Allco Renewable Energy Ltd. v. Massachusetts Electric Co.*, 208 F. Supp. 3d 390 (D. Mass. 2016), *appeal docketed on other grounds*, No. 17-1296 (1st Cir. Mar. 29, 2017).  In that case, the court invalidated a state procurement program under PURPA for precisely the same reason that Winding Creek argues that the Standard Contract is illegal, namely that the program only provided QFs with an as-delivered rate – under (d)(2)(i) – and not an "as incurred" rate under (d)(2)(ii).  *See id.* at 398 ("[U]nder FERC's regulations, if a QF chooses to provide electric energy pursuant to a 'legally enforceable obligation,' the QF must have the option to receive the avoided costs 'calculated at the time of delivery' or 'calculated at the time the obligation is incurred.'  The [Massachusetts] rule, by providing only the spot market rate, eliminates the QF's ability to choose the latter pricing option.  As such, the [Massachusetts] rule fails to properly implement FERC's regulations, as mandated by PURPA section 210(f)(1).").

### 3. Is pricing under Re-MAT based on a utility's "avoided costs" and if so, how?

**Short answer: Except for the initial price of $89.23 per MWh, no.**

Subsequent to passage of PURPA, FERC promulgated 18 C.F.R. § 292.304(b)(2), providing that the required rate for purchase of energy and capacity from QFs must "equal[] the avoided costs" of the utility.  *See also Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 417 (1983) (upholding FERC regulation requiring utilities to purchase electricity from qualifying facilities at the "maximum rate authorized by PURPA," namely a utility's full avoided cost).  FERC defined "[a]voided costs" to mean "the incremental costs to an electric utility of electric energy or capacity or both which, *but for the purchase from the qualifying facility or qualifying facilities*, such utility would generate itself or purchase from another source."  18 C.F.R. § 292.101(b)(6) (emphasis added).  The Re-MAT program does not comply with PURPA, because, as we explain below, the price it offers is not based on the costs the utility would incur *but for* its purchase from QFs.  Instead, the Re-MAT price is based on the price at which QFs are willing to sell.

The pricing under Re-MAT is best understood in two parts: the initial price offered under the program at its inception, and subsequent price adjustments that have occurred since that time.

1 2 3 4 5 6 The initial Re-MAT price, for the first two-month "program period" beginning on November 1, 2013, was $89.23 per MWh. PFF ¶ 16. This price was based was based on the result of a competitive solicitation for renewable power held in 2011 under CPUC's auspices. *See id.* ¶ 17. Winding Creek does not dispute that this *initial* rate because the rate was within a reasonable range of the Market Price Referent, which was the long-term avoided cost rate that the CPUC previously used for the program the Re-MAT replaced.

7 8 9 10 11 12 13 14 15 16 17 18 19 20 However, and critically for the purposes of this case, the subsequent price adjustments that have occurred since the initial $89.23 per MWh rate have absolutely nothing to do with the costs that the utility would incur "but for the purchase from the qualifying facility or qualifying facilities." 18 C.F.R. § 292.101(b)(6). Thus, they do not reflect "avoided costs." As explained in CPUC's May 2012 Order establishing the Re-MAT program, after the initial program period the price in the next period can adjust either up or down by $4 increments depending on the extent to which QFs in the queue accept the price offered in the first period. PFF ¶ 18. If QFs are willing to supply at least 5 MW to PG&E at the offer price, then the offer price will adjust downward by $4 for the next program period, two months later. *See id.* ¶ 20. If, by contrast, QFs are unwilling to supply at least 1 MW to PG&E at the offer price, and there are at least 5 unaffiliated bidders in the queue, then the offer price will adjust upward by $4 for the next program period. *See id.* ¶ 19. And, if QFs are willing to supply at least 1 MW but fewer than 5 MW to PG&E at the offer price, or if there are fewer than 5 unaffiliated bidders in the queue, then the offer price will remain the same for the next program period. *See id.* ¶ 21.

21 22 23 24 25 26 27 28 As CPUC's expert witness Ms. Lee testified under questioning from the Court, these administratively set $4 per MWh increments were "arbitrarily selected," and have absolutely nothing to do with changes in utilities' avoided costs. *See id.* ¶ 23. That testimony is confirmed by the text of the relevant CPUC decisions, in which CPUC explains that the rationale for the price-adjustment mechanism was to identify the lowest price at which a QF would be willing to supply the desired quantity of electricity to utilities *based on the costs faced by the QF generators*: "[Re-MAT] allows generators to set the market price through the bidding process, which theoretically will ensure the price is neither too high nor too low but, instead, will be

*reasonable to cover the generator's costs and encourage broad participation in the market.* CPUC May 2012 Decision at 63 (emphasis added); *see also* Trial Tr. at 179:13-19 (noting that the basis for a $4 adjustment was the knowledge of what QF generators were willing to accept as a price in the previous program period). But a rate adjustment mechanism based on a *QF's* willingness to accept a certain price based on its *own* costs says nothing about the costs a *utility* would avoid by purchasing electricity from a generator *other than* a QF. It is undisputed that the Re-MAT program does not even attempt to model the costs the utility would incur *but for* its purchase from QFs. For that simple reason, pricing under Re-MAT is not based on avoided costs as required by §§ 292.304(b)(2) and 292.304(d)(2).

It is no answer for CPUC to claim that the Re-MAT price reflects the costs that a utility avoids by purchasing from one QF instead of another QF. That is so for two reasons. *First*, FERC has defined "avoided costs" to mean the costs the utility would incur "but for the purchase from the qualifying facility or qualifying facilities." 18 C.F.R. § 292.101(b)(6) (emphasis added). That "but for" price is the costs of buying from a *non-QF*. *Second*, a utility is not permitted to avoid purchasing electricity from a QF. FERC's rules direct that "[e]ach electric utility shall purchase . . . *any energy and capacity* which is made available from a qualifying facility . . . [d]irectly to the electric utility." 18 C.F.R. § 292.303(a)(1) (emphasis added). This regulation – known as the "must take" requirement – requires the utility to purchase all electricity generated by a QF.[1] It would make no sense to define the utility's *avoided* costs in reference to the costs of purchasing electricity from another QF, when the utility is required to purchase from that QF too. *See* Trial Tr. at 55:18-21.

CPUC has not attempted to hide the reason it designed the Re-MAT program in the way that it did. In CPUC Decision 12-05-035, which promulgated the Re-MAT program, CPUC stated that it adopted a "market-based approach" – by which it meant an approach that required

---

[1] In imposing this requirement, FERC of course recognized that a utility was not required to purchase electricity from QFs that was in excess of the utility's needs, but CPUC has never argued that such a limit has been hit here. FERC may permit states to suspend the must-take obligation under 16 U.S.C. § 824a-3(m)(1), but, as Mr. Colvin testified, the must-take obligation in California has not been suspended for QFs of 20 megawatts or less. *See* PFF ¶ 3.

one QF to bid against another – because such an approach was "in the best interest of California electricity customers" by identifying the lowest price at which QFs were willing to sell.  CPUC May 2012 Order at 62-63.  CPUC observed that the Re-MAT pricing mechanism "allows generators to set the market price through the bidding process, which theoretically will ensure the price is neither too high nor too low but, instead, will be reasonable to cover the generator's costs and encourage broad participation in the market."  *Id.* at 63.  CPUC elaborated: "[T]he rationale for a market-based price is that all of the generator's costs are included in the price because a generator would not bid something lower than its costs.  In a market-based process, the seller determines the price it wishes to seek based on its understanding of the underlying project costs, and changes in those costs."  CPUC Decision 13-01-041 (Jan. 24, 2013) at 6; *see also id.* ("[B]ecause the Re-MAT is a market-based price, it should include all of the generator's costs…").

CPUC observed that "the state's renewable energy market has matured and prices have decreased," and it reasoned that "[t]he market-based pricing methodology adopted today allows customers to realize the benefits of changing market conditions that result in potentially lower costs."  CPUC May 2013 Order at 62-63.  CPUC's expert, Ms. Cheryl Lee, made exactly the same point during trial:

> Q. Now, we talked about how the Re-MAT price can adjust downward.  And is the policy rationale for that that if lots of QFs are willing to sell for less, then the ratepayer should pay less?
>
> A. Yes.  The idea is that the amount paid is reasonable for all parties of the market, including the ultimate buyer, the ratepayers, to where they should pay no more than the market or the utility's avoided – or opportunities to procure a similar product elsewhere.

Trial Tr. at 182:13-21; ECF 130 (Lee Expert Report) at 5 ¶ 18 (noting that when CPUC promulgated the Re-MAT program it sought "to create a market for small renewable distributed generation that harness renewable market forces to set a program price that minimizes costs to ratepayers, prevents overpayment, and stimulates market demand.  We also seek to maximize contract value to the ratepayer and utility by using the market to determine the price and to prevent speculative projects from occupying limited program capacity"); PFF ¶ 24.

The CPUC's policy goal—getting QF power at the lowest possible rate through a competitive process—may be laudable, but Congress chose a different policy goal when it enacted PURPA: to "accelerate the development of renewable … energy sources and convert the national economy to alternative fuel resources…".  H.R. Rep. No. 95-496(IV), at 14 (1977), *reprinted in* 1978 U.S.C.C.A.N. 8454, 8466.  Indeed, FERC has *specifically* held that "requiring a QF to win a competitive solicitation as a condition to obtaining a long-term contract imposes an unreasonable obstacle to obtaining a legally enforceable obligation."  *Hydrodynamics Inc.*, 146 FERC ¶ 61,193, P.32 (2014); *see also Windham Solar LLC*, 156 FERC ¶ 61,042, P.5 (2016) ("The Commission likewise has determined a state regulation to be inconsistent with PURPA and the Commission's PURPA regulations to the extent that it offers the competitive solicitation process as the only means by which a QF . . . can obtain long-term avoided cost rates" (internal quotation marks omitted)).  Yet the Re-MAT program is, unabashedly, exactly that.

Congress and FERC have taken instructed states to take a different route.  FERC believes that "the basis for the determination of rates for purchases should be the utility's avoided costs and should not vary on the basis of the costs of the particular qualifying facility."  PURPA Rulemaking, 45 Fed. Reg. at 12,222; *Indep. Energy Producers Ass'n v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 857 (9th Cir. 1994) ("[FERC's] regulations are clear that the rate to be paid by utilities for electric energy be determined according to the avoided cost to the utility of generating that energy or purchasing it elsewhere, and not according to the QF's efficiency.").  This approach leaves ratepayers indifferent between buying from QFs and non-QFs—so they are no worse off than they otherwise would have been—while simultaneously providing strong incentives for QF generators to enter the market.  *See Am. Paper Inst.*, 461 U.S. at 417 (affirming FERC's decision to require utilities to pay a rate equal to their avoided costs, which provides the "maximum incentive for the development of cogeneration and small power production"); PURPA Rulemaking, 45 Fed. Reg. at 12,222 ("[I]n most instances, if part of the savings from cogeneration and small power production were allocated among the utilities' ratepayers, any rate reductions will be insignificant for any individual consumer.  On the other hand, if these savings are allocated to the relatively small class of qualifying cogenerators and small power producers,

12

PLAINTIFF'S POST-TRIAL BRIEF
CASE NO. 3:13-CV-04934-JD

they may provide a significant incentive for a higher growth rate of these technologies."). Here, CPUC has wrongly elevated its goal of saving ratepayers money – despite Congress's clear instruction that ratepayers should merely be kept indifferent as to the source of generation – and in the process has frustrated Congress's clear intention to provide strong financial incentives for small renewable generators.

Because the Re-MAT price is not based on the costs a utility would incur *but for* its purchase from QFs, it is not an avoided cost rate under PURPA.

**4. How are "avoided costs" defined and determined for purposes of 18 C.F.R. § 292.304(d)(2).**

**Short answer: Avoided costs are the costs a utility would incur for purchasing energy and capacity from a non-QF source.  Consistent with this definition, there are various ways an avoided cost rate can be calculated.**

In PURPA, Congress specified that the rate utilities are required to pay QFs shall not "exceed[] the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a-3(b). Implementing that directive, FERC adopted a rule providing that the required rate for a utility's purchase of electricity from a QF must "equal the avoided costs" of the utility. 18 C.F.R. § 292.304(b)(2). As FERC has held, "'[a]voided costs' is defined as 'the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source.'" *Am. Ref-Fuel Co.*, 107 FERC ¶ 61,016, P.13 (Apr. 15, 2004) (quoting 18 C.F.R. § 292.101(b)(6) (2003)); *see also* PURPA Rulemaking, 45 Fed. Reg. at 12,216 (avoided costs are "the costs to an electric utility of energy or capacity or both which, but for the purchase from a qualifying facility, the electric utility would generate or construct itself or purchase from another source"). Or in more straightforward terms, as Dr. Lesser testified at trial: "An avoided cost is defined as a cost that the utility would otherwise incur if it had to buy power from a non-QF source." Trial Tr. at 33:6-7; *see* ECF 89-1 at 7 ¶ 17 ("Thus, an avoided cost is a *but for* price: *but for* purchasing electricity from QFs, an electric utility would be required to pay to obtain that electricity from another source."); PFF ¶ 35.

Provided that a calculation is consistent with the above definition, there are multiple ways

an avoided cost can be determined. 18 C.F.R. § 292.304(e) lists various factors that "to the extent practicable" should be taken into account when determining a utility's avoided cost. And, as Dr. Lesser explains, the actual methodology of calculating an avoided cost can vary. One way of calculating an avoided cost "is to ask what the utility would have paid to buy the same quantity of electricity on the spot market. Under this approach, if the price of electricity during the three o'clock hour of the afternoon is $100 per megawatt-hour ('$/MWh'), that is the utility's avoided cost in that hour." ECF 89-1 at 9 ¶ 24. Another approach might be to use a formula, like the SRAC rate in the Standard Contract, that uses variables whose values are contemporaneous with delivery and thus result in a weekly or monthly as-delivered price. Both of these would be permissible methods of calculating avoided costs under Subsection 292.304(d)(2)(i). Yet another approach would be to use forecasting methods "to ask what the utility would need to pay to enter a long-term contract of similar length with a non-QF resource or to build such a resource itself." *Id.* ¶ 25. *See* PFF ¶ 36. This is the approach described in Subsection 292.304(d)(2)(ii).

The key point here, however, is that whatever methodology a state uses, PURPA requires that QFs be paid based on the utility's avoided costs. For all the reasons stated in the answer to question number 3 above, the Re-MAT program fails to provide such a rate.

**5. What is the origin and purpose of the 5 MW bi-monthly cap under Re-MAT for PG&E and how does that comply with or violate a utility's obligation to purchase all energy and capacity made available by QFs under PURPA?**

**Short answer: The 5MW bi-monthly cap originated in CPUC Decision No. 13-05-034, and it flatly violates the "must-take" obligation under PURPA.**

CPUC promulgated the Re-MAT program in its Decision No. 12-05-035 in May 2012. In May 2013, in Decision No. 13-05-034, CPUC altered certain aspects of Re-MAT and, as relevant to this question, introduced the 5 MW monthly obligation for PG&E (and other utilities participating in the program). *See* PFF ¶ 12. Specifically, the May 2013 decision "direct[s] PG&E and SCE to offer 5MW for each of the three product types for each bimonthly program period until the available megawatts for that product type falls below 5MW." May 2013 Order at 12; *see also id.* at 20 ("Today, we adopt a limit on the amount of megawatts available in a

product type during a bi-monthly period."); PFF ¶ 12.  Indeed, the bimonthly cap can, in practice, be even lower than 5 MW.  This is because PG&E is not required to contract for *more* than 5MW, and thus if the next project in the queue would push PG&E over the 5 MW limit (say, for example if it had already contracted for 4 MW and the next project is 1.25 MW), then no further contracts will be offered and PG&E will deem the 5 MW allocation fully subscribed.  *See id.* ¶ 13.  Ms. Lee's testimony likewise makes clear that the 5MW cap is a real limitation on the ability of QFs to sell to utilities in any one program period:  "Q. Now, if more than five megawatts of solar QFs want to sell to PG&E in any particular program period at the Re-MAT price for that period, they can't all sell, right?  A. Correct." Trial Tr. at 175: 7-10.

This cap flatly violates FERC's must-take rule, adopted pursuant to PURA, that "[e]ach electric utility shall purchase . . . *any energy and capacity* which is made available from a qualifying facility . . . [d]irectly to the electric utility."  18 C.F.R. § 292.303(a)(1) (emphasis added).  FERC has emphasized that this requirement means that if a QF wants to sell to a utility at the utility's avoided cost rate, the utility *must* purchase from the QF.  A utility may not delay that purchase, nor may a state create a scheme that places hurdles in the path of a QF that desires to sell electricity to a utility.  *See FLS Energy, Inc.*, 157 FERC ¶ 61,211 at P.24 ("The Commission has explained that the term 'legally enforceable obligation; is broader than simply a contract between an electric utility and a QF, and that a state may not limit the methods through which a legally enforceable obligation may be created to only a fully executed contract. . .  The Commission explained in *JD Wind 1 LLC* [cited above] that *the establishment of a legally enforceable obligations turns on the QF's commitment, and not the utility's actions*." (emphasis added) (footnote omitted)).

The Re-MAT program ignores the must-take rule set forth in 18 C.F.R. § 292.303(a).  If a QF "makes available" energy and capacity to PG&E, but PG&E has already contracted for 5MW of generation from QFs within a two-month period, the CPUC purports to authorize PG&E *not* to purchase the available energy and capacity.  And, as the Court is aware, this limitation is not theoretical:  Winding Creek's injury in this case arises directly from the fact that it was randomly placed behind more than 5MW of QFs in the first program period, despite having

1 timely applied prior to the inception of the Re-MAT program.  PFF ¶¶ 27, 28.  Because of this random placement, Winding Creek was not allowed to accept the $89.23 per MWh price offered to the first group of QFs.  *Id.* ¶ 28.  By the time Winding Creek was offered a contract, for the period beginning on March 1, 2014, the Re-MAT price had fallen to $77.23 per MWh, a rate insufficient for Winding Creek to move forward with development.  *Id.* ¶ 30.  That violates FERC's rule, under which "the establishment of a legally enforceable obligations turns on the QF's commitment, and not the utility's actions."  *FLS Energy, Inc.*, 157 FERC ¶ 61,211 at P.24.  Because the Re-MAT program imposes a 5MW bi-monthly cap on PG&E's procurement obligation, Winding Creek was unable to sell energy and capacity it had available and wished to commit for the posted avoided-cost rate of $89.23 per MWh.

Compounding this illegality, the Re-MAT program uses the 5 MW caps to drive the price adjustment mechanism described in the answer to question 3, above.  FERC has made clear, in this exact context, that "the use of the term 'legally enforceable obligation' is intended to prevent the utility from delaying the signing of a contract, so that a later and lower avoided cost is applicable."  *FLS Energy, Inc., et al.*, 157 FERC ¶ 61211 at P.25.  Yet, by imposing an illegal cap and using that cap to force price reductions, that is precisely what CPUC has done here.

## CONCLUSION

For the foregoing reasons, in addition to those stated at trial and in Winding Creek's other submissions in this case, Winding Creek respectfully asks that the Court enter judgment in its favor.  The Court should declare that the Re-MAT program's price cap and price adjustments are unlawful, and it should order the CPUC to award Winding Creek with a contract for $89.23 per MWh—the price that Winding Creek would have received but for the CPUC's violations of law.

Dated: May 19, 2017              Respectfully submitted,

JENNER & BLOCK LLP

By: /s/  Matthew E. Price
Matthew E. Price (*pro hac vice*)
*Attorney for Plaintiff*
Email:  mprice@jenner.com

JENNER AND BLOCK LLP

16