1  AROCLES AGUILAR, SBN 94753
   HARVEY Y. MORRIS, SBN 87902
2  CHRISTINE J. HAMMOND, SBN 206768
   California Public Utilities Commission
3  505 Van Ness Avenue
   San Francisco, CA  94102
4  Telephone:  (415) 703-1086
   Facsimile:  (415) 703-4592
5  hym@cpuc.ca.gov

6
   Attorneys for Defendants Clifford Rechtschaffen,
7  Martha Guzman Aceves, Carla Peterman, Michael Picker,
   and Liane Randolph, in their official capacities as Commissioners
8  of the California Public Utilities Commission

9              UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO DIVISION

12

13  WINDING CREEK SOLAR LLC,

14                  Plaintiff,              Case No. 3:13-cv-04934 JD

15        vs.                              **POST-TRIAL BRIEF OF CPUC
                                           DEFENDANTS**
16  MICHAEL FLORIO, CATHERINE
    SANDOVAL, CARLA PETERMAN,              Trial Date:   April 4, 2017
17  MICHAEL PICKER, and LIANE              Time:         9:00 a.m.
    RANDOLPH, in their official capacity as Courtroom:    11, 19th Floor
18  Commissioners of the California Public Utilities Judge:        Hon. James Donato
    Commission,
19
20                  Defendants.

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................i

TABLE OF AUTHORITIES ........................................................................ ii

TABLE OF ACRONYMS AND TERMS .......................................................vi

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF RELEVANT FACTS....................................................3

III. DISCUSSION .........................................................................................6

    A.    "Is The Use Of A Single Pricing Formula Or Program Under 18 C.F.R. § 292.304(d)(2)(i) And (d)(2)(ii) Permissible Under PURPA?" ......................6

    B.    "What Pricing Program Or Contract Option Available To Winding Creek, If Any, Meets The Requirements Of 18 C.F.R. § 292.304(d)(2)(ii)?"...............................................................................8

    C.    "Is Pricing Under Re-MAT Based On A Utility's 'Avoided Costs' And If So, How?" .......................................................................................11

        1.    States Have Wide Latitude In Setting Avoided-Cost Rates Under PURPA, and Precedent Endorses A State's Many Ways To Calculated A Utility's Avoided Cost. .......................................12

        2.    FERC Has Expressly Endorsed The CPUC's Use of QF-Only Power to Establish Avoided-Cost Rates. .................................13

        3.    Re-MAT's Avoided-Cost Pricing Is Based On The Cost A Utility Must Pay To Buy The Next Increment Of Renewable QF Power To Comply With State Procurement Requirements Under Cal. Pub. Util. Code § 399.20..........................................................................15

    D.    "How Are 'Avoided Costs' Defined And Determined For Purposes Of 18 C.F.R. § 292.304(d)(2)?"...................................................................16

    E.    "What Is The Origin And Purpose Of The 5 MW Bi-Monthly Cap Under Re-MAT For PG&E, And How Does That Cap Comply With Or Violate A Utility's Obligation To Purchase All Energy And Capacity Made Available By QFs Under PURPA?".................................................18

IV. STANDING, RIPENESS, AND REDRESSABILITY .............................21

V. CONCLUSION .....................................................................................24

1

## **TABLE OF AUTHORITIES**

Page

## **FEDERAL CASES**

*Allco Finance Ltd. v. Klee*, 805 F.3d 89 (2d Cir. 2015) .............................................23, 24

*Allco Renewable Energy Ltd. v. Mass. Elec. Co. et al.*,
    208 F.Supp.3d 390 (2016) ....................................................................7, 23, 24

*Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988) ...................................5

*Auer v. Robbins*, 519 U.S. 452 (1997) ..........................................................................7

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................21, 22

*Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009) ...................21

*Entergy Nuclear Vt. Yankee LLC v. Shumlin*,
    733 F.3d 393 (2d Cir. 2013) ........................................................................ 18

*FERC v. Mississippi*, 456 U.S. 742 (1982) ......................................................1, 6, 20, 24

*Fournier v. Sebelius*, 718 F.3d 1110 (9th Cir. 2013)............................................................7

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ..................................................................................23

*Indep. Energy Producers v. Cal. P.U.C.*, 36 F.3d 848 (9th Cir. 1994) ....................*passim*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................21, 22

*New York v. FERC*, 535 U.S. 1 (2002) ..........................................................................18

*P.U.C. of Cal. v. FERC*, 254 F.3d 250 (D.C. Cir. 2001) ..............................................9, 10

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)..................................................................7

*Solutions for Utils. Inc. v. CPUC,* Case CV 11-04975,
    2016 WL 7613906 (N.D. Cal. Dec. 28, 2016) ............................................10

*United States v. Morgan*, 313 U.S. 409 (1941) ...............................................................23

1 **FERC CASES**

*Administrative Determination of Full Avoided Costs, Sales of Power to Qualifying Facilities, and Interconnection Facilities,* Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457 (March 16, 1988), 2015 WL 8610994 ...............................................*passim*

*Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059 (2010),
    2010 WL 4144227 ............................................................................................*passim*

*Energy Producers and Users Coalition*, 149 FERC ¶ 61,251 (2014),
    2014 WL 7205371 ..................................................................................................10

*Order 671,* 114 FERC ¶ 61,102 (2006), 2006 WL 250518 ...............................................2

*Order Terminating Proceeding* in the Administrative Determination
    NOPR (FERC Docket RM88-6-000), 84 FERC ¶ 61,265 (1998),
    1998 WL 770222 ......................................................................................................8

*Otter Creek Solar, LLC*, 143 FERC ¶ 61,282 (2013), 2013 WL 3243131,
    *reconsid. denied*, 145 FERC ¶ 61,192 (2014) .................................................................7

*Otter Creek Solar LLC,* 146 FERC ¶ 61,192 (2014),
    2014 WL 1097401 ..................................................................................................14

*Signal Shasta Energy Co.*, 41 FERC ¶ 61,120 (1987),
    1987 WL 118362 ........................................................................................12, 14, 17

*Southern California Edison Co.*, 143 FERC ¶ 61,222 (2013), 2013 WL 2477179..........10

*Winding Creek Solar LLC*, 151 FERC ¶ 61,103 (2015), 2015 WL 2151303.............*passim*

*Winding Creek Solar LLC*, 153 FERC ¶ 61,027, (2015), 2015 WL 6083932.................3, 7

**FEDERAL STATUTES AND REGULATIONS**

16 U.S.C. § 824a-3 ...................................................................................................*passim*

16 U.S.C. 824a-3(a) ...........................................................................................................6

16 U.S.C. § 824a-3(b).................................................................................................13, 18

16 USC § 824a-3(d) .........................................................................................................13

18 C.F.R. § 292.301(b) ......................................................................................................7

18 C.F.R. § 292.301(b)(1) ...............................................................................................14

18 C.F.R. § 292.301(b)(2) ...............................................................................................17

18 C.F.R. § 292.304(a)(1) ...............................................................................................13

18 C.F.R. § 292.304(a)(1) ...............................................................................................13

18 C.F.R. § 292.304(a)(2) ..........................................................................................13, 20

18 C.F.R. § 292.304(c)(3)(ii) ..........................................................................................17

18 C.F.R. § 292.304(d)(1) ...............................................................................................17

18 C.F.R. § 292.304(d)(2) ........................................................................................*passim*

18 C.F.R. § 292.304(d)(2)(i) ...................................................................................*passim*

18 C.F.R. § 292.304(d)(2)(ii).................................................................................*passim*

18 C.F.R. § 292.304(e) ....................................................................................................17

**CALIFORNIA DECISIONS**

*So. Cal. Edison Co. v. Pub. Utils. Comm'n,* 101 Cal. App. 4th 982 (2002).......................10

*So. Cal. Edison Co. v. Pub. Utils. Comm'n*, 128 Cal. App. 4th 1 (2005)..........................10

**CPUC DECISIONS**

D.12-05-035, 2012 WL 2049420 (May 24, 2012)............................................3, 16, 18, 19

D.13-05-034, 2013 WL 2446732 (May 23, 2013).............................................................3

D.14-05-026, *Winding Creek Solar LLC, et al.*, 2014 WL 2153806 (May 15, 2014)
   *reh'g denied*, D.14-11-044, 2014 WL 6693940 (Nov. 20, 2014)....................................4

## CALIFORNIA STATUTES AND REGULATIONS

Pub. Util. Code § 399.11 .........................................................................................11

Pub. Util. Code § 399.20 ................................................................................3, 17, 18

Pub. Util. Code § 8341(d)............................................................................................9

1

## TABLE OF ACRONYMS AND TERMS

2

3    **399.20 FiT:**  Original feed-in tariff implementing California Public Utilities Code § 399.20, enacted in 2006.

4

5    **AB 1613 CHP:**  A certain type of cogeneration facility (combined heat and power system), as defined in California Public Utilities Code § 2840.2.

6    ***Administrative Determination:***  *Administrative Determination of Full Avoided Costs, Sales of Power to Qualifying Facilities, and Interconnection Facilities*,  Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457 (March 16, 1988).

7

8    **Avoided Cost:**  The incremental cost to the utility of the electricity that, but for the purchase from the QF, the utility would need to generate or purchase from "another source," as defined by 16 U.S.C. § 824a-3(b), (d); and 18 C.F.R. §§ 292.101(b)(6), 292.304(a)(2).

9

10

11   **Capacity**:  Capacity is the ability to generate power - to actually be built and ready to generate when needed.  We typically measure capacity in MWs of *potential* production.  A capacity payment is a type of "stand by" payment and is made before the generator actually produces the electricity.

12

13

14   **CSI:**  California Solar Initiative.

15   **Energy**:  Energy is the actual electricity that is generated and transferred to the grid.  An Energy payment is made when the utility needs the energy and the QF actually generates electricity to meet this need.  We typically measure energy in MW-hours (MWh).

16

17   **FERC:**  Federal Energy Regulatory Commission.

18   **FiT:**  A feed-in tariff.

19

20   **IOU:**  Investor-Owned Utility regulated by the CPUC.

21   **kW:**  A kilowatt is 1,000 watts of power.  A watt hour is the basic unit of measure of electric energy consumption.

22

23   **kWh**:  A kilowatt hour is the amount of power necessary to produce 1,000 watts for one hour. For example, ten 100-wattlight bulbs burning for one hour uses 1,000 Wh of electric energy, or 1 kWh.

24

25   **MPR:**  The Market Price Referent reflects the construction, operation and maintenance costs of a proxy generator: a new, highly efficient 500 MW capacity combined cycle natural gas turbine.

26

27

28

**MW:** A megawatt is a million watts of power. For example, a MW is the amount of power needed to light 10,000 100 watt bulbs.

**MWh**: A megawatt hour is the amount of electric power delivered multiplied by the time over which the energy is consumed (measured in hours). A MWh is the amount of power needed to light 10,000 100 watt bulbs for one hour.

**NEM:** The Net Energy Metering program is one of several CPUC programs in the CSI that is designed to promote small scale solar installations located at the site of the utility customer. Customers in the NEM program can choose to sell to their interconnected utility any solar energy generated in excess of their on-site consumption at the Net Surplus Compensation rate, a PURPA avoided cost.

**PG&E**: Pacific Gas and Electric Company.

**PURPA:** Public Utility Regulatory Policies Act of 1978, codified generally at 16 U.S.C. § 796 and § 824a-3.

**QF:** A qualifying facility is an eligible cogeneration or small power production facility that is a qualifying facility under the requirements specified in Subpart B of FERC's regulations (18 C.F.R. § 292.101(b)(1), § 292.203).

**QF Settlement:** The comprehensive settlement among QFs, utilities, and ratepayer representatives approved and adopted by the CPUC in December 2010 in CPUC decision D.10-12-035, 2010 WL 5650671 (Dec. 16, 2010).

**RAM:** The Renewable Auction Mechanism was established by the CPUC in D.10-12-048 as the primary contracting tool for utility procurement from smaller renewable energy projects (up to 20MW in size) that are eligible for the California Renewables Portfolio Standard Program.

**Re-MAT:** Renewable Market Adjustment Tariff, the revised feed-in tariff program implementing amendments to California Public Utilities § 399.20.

**Re-MAT Product Category:** A category of energy product in the Re-MAT program based upon when the energy can be made available. The three Re-MAT Product Categories are: as-available peaking, as-available non-peaking, and baseload.

**Re-MAT Program Period:** An interval that occurs every two months in which the utility offers Re-MAT contracts up to 5 MW of capacity in order of the queue.

**RPS**: The Renewable Portfolio Standard is a utility procurement requirement mandated by California law (Article 16 of the Public Utilities Code, commencing with § 399.11). The RPS requires increasing utility procurement by CPUC-regulated utilities from eligible renewable energy resources.

1

2

3

**SRAC:**  Short-Run Avoided Costs are the short-run marginal costs for the production of one additional unit of electricity:  fuel costs, and certain operation and maintenance costs.   The SRAC payment is for the delivery of energy.

4

5

6

**Standard Contract for QFs 20 MW or Less:**  The power purchase agreement approved by the CPUC in Decision 10-12-035, and contained at Attachment A, Ex. 6 of that decision, that California's regulated utilities must offer QFs of 20 MW or less to the extent that the QFs' prices do not exceed the utilities' avoided costs as determined by the CPUC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.      INTRODUCTION**

Defendants Commissioners of the California Public Utilities Commission (CPUC) submit this Post-Trial Brief pursuant to the Court's "Order Re Post-Trial Submissions" filed April 6, 2017 (ECF 149).

The indispensable context to answering all five of this Court's questions are the holdings and findings of Supreme Court, Ninth Circuit and Federal Energy Regulatory Commission (FERC) cases that States have broad authority and wide latitude in deciding the avoided costs rates for Qualifying Facilities (QFs) under the Public Utility Regulatory Policies Act (PURPA), 16 U.S.C. §824a-3.  A State commission may comply with PURPA "by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules."  *See FERC v. Mississippi*, 456 U.S. 742, 751 (1982).  "[T]he states play the primary role in calculating avoided costs and overseeing the contractual relationships between QFs and utilities."  *Indep. Energy Producers Ass'n v. Cal. P.U.C.,* 36 F.3d 848, 856 (9th Cir. 1994) (*IEP*), citing FERC's *Administrative Determination of Full Avoided Costs, Sales of Power to Qualifying Facilities, and Interconnection Facilities,* Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457 at 32,173 (March 16, 1988), 2015 WL 8610994 (*Admin. Det'n*).

The Ninth Circuit recognized the problems inherent in executing long-term contracts with fixed avoided cost rates based on long-term energy forecasts and encouraged future contracts with "more flexible pricing mechanisms."  *Id.*, citing *Admin. Det'n* at 32,172-74.  To address the "danger of including forecasted fuel costs in the fixed rate structure of long-term contracts," the *Admin. Det'n* endorsed the use of "avoided cost" rates with both long-term, fixed capacity payments and more flexibility in energy payments.  *Admin. Det'n*, ¶ 32,457 at 32,173-32,174, CPUC RJN, Ex. 4 (ECF 129).

The CPUC attorneys of record have recently discovered facts that indicate that this case may concern more entities than WCS, and which indicate that Thomas Melone, Allco Finance Limited, and Allco Renewable Energy Limited could have exploited PURPA's

1  mandatory purchase obligation to secure long-term contracts with - and lock ratepayers into

2  paying – substantially higher than market and avoided-cost rates.

3       WCS has attacked the CPUC's Renewable Market Adjusting Tariff (Re-MAT)

4  program's 5 MW bimonthly cap and market adjusting mechanism used to set contract prices.

5  WCS has also attacked the CPUC's "primary PURPA program" – the QF Settlmeent's

6  Standard Contract for QFs 20 MW or Less – because the short-run avoided cost (SRAC) for

7  energy is a formula with a variable index input, not an immutable numerical price, while

8  ignoring the fixed capacity payment.  In the eyes of the Supreme Court, the Ninth Circuit,

9  FERC, district courts, and state courts, neither of these programs runs afoul of PURPA or

10  FERC's regulations implementing PURPA.  The very thing that WCS desires – price

11  immutability – is what the Ninth Circuit in *IEP* exhorted the CPUC to avoid.

12       The evidence in this case demonstrates that the Re-MAT program attracts investment

13  in new generation and prices move down to reflect market prices and declining production

14  costs.  Simply put, Re-MAT's 5 MW bimonthly procurement "pause," and market adjusting

15  mechanism work.  Re-MAT's initial offer price was $89.23/MWh.  As long as QFs expressed

16  an interest in accepting Re-MAT's offer prices, contract prices could continue to drop, which

17  they did, for example, to $77.23/MWh and $65.23/MWh.  Other QF projects that accepted

18  these prices have since become operational, and consumers benefitted from lower prices.

19       In its 2010 "Clarification Order" in favor of the CPUC, the FERC stated that States

20  may establish different avoided-cost formulas for QFs "using various technologies on the

21  basis of the supply characteristics of the different technologies."  *Cal. Pub. Utils. Comm'n*,

22  Order Granting Clarification And Dismissing Rehearing, 133 FERC ¶ 61,059, at P 23

23  (2010), 2010 WL 4144227 (Clarification Order).  FERC has also authorized the CPUC's

24  avoided cost rates based on market-based rates as opposed to administratively-set avoided

25  cost rates.  *Order 671,* 114 FERC ¶ 61,102, at PP 96-99, 2006 WL 250518 (2006).

26       When WCS sought enforcement and a declaratory order at FERC, WCS alleged that

27  the Re-MAT program's 750 MW statewide cap violates the mandatory purchase obligation

28  under PURPA.  FERC found, however, that the Re-MAT program did not violate PURPA

1    because QF procurement under the QF Settlement's 20 MW or Less Standard Contract is

2    not capped. *Winding Creek Solar LLC*, 151 FERC ¶ 61,103 (2015), 2015 WL 2151303

3    (Declaratory Order).  WCS then sought rehearing of the Declaratory Order, alleging that the

4    QF Settlement Standard Contract for QFs 20 MW or Less violates FERC's regulation 18

5    C.F.R. § 292.304(d)(2)(ii) (Subsection (ii)).  FERC rejected this argument and instead

6    declared that the QF Settlement Standard Contract for 20 MW or Less is California's

7    "primary PURPA program" pursuant to 18 C.F.R. § 292.301.  *Winding Creek Solar LLC*,

8    153 FERC ¶ 61,027, P 7 (2015), 2015 WL 6083932, *2 (Reconsideration Order).

9    **II.    STATEMENT OF RELEVANT FACTS**

10         The 2008 and 2011 amendments to Cal. Pub. Util. Code § 399.20 expanded the

11   CPUC's water and wastewater feed-in tariff (FiT) to include all statutorily eligible

12   renewable energy facilities, and the CPUC issued decisions in a rulemaking proceeding to

13   design and implement what became the Re-MAT program at issue in this case.  Lee

14   Unretained Expert Report, ¶¶ 14-16 (ECF 130; Trial Exh. 113), citing CPUC Decision (D.)

15   12-05-035, 2012 WL 2049420 (May 24, 2012) (the *Re-MAT Decision*) (ECF 89-3), and

16   D.13-05-034, 2013 WL 2446732 (May 23, 2013) (ECF 89-3).  After the utilities completed

17   implementation requirements ordered by the CPUC in D.13-05-034, Re-MAT became

18   operational in October 2013.  *See id.*, ¶ 17.

19         WCS applied to the Re-MAT program on October 4, 2013 and was placed in

20   PG&E's queue for "peaking, as-available" resources on November 12, 2013.  Melone Decl.,

21   ¶ 7 (ECF 89-2).  Given its place in PG&E's queue, WCS was not eligible to accept the first

22   program period's offer price, but first became eligible to accept an offer price for the

23   program period beginning March 1, 2014.  *Id.*, ¶ 9.

24         WCS filed a Petition for Enforcement at FERC on June 13, 2013.  Melone Decl.,

25   Exh. 2 (ECF 89-2).  Before FERC could act on WCS's Petition for Enforcement, however,

26   WCS on July 23, 2013, together with eight other complainants, filed a complaint (Verified

27   Complaint) at the CPUC, requesting that the CPUC order PG&E to execute the water and

28   wastewater FiT standard contracts with WCS and the other complainants.  A true and correct

1    copy of the Verified Complaint is attached as Exhibit 9 to the Declaration of Harvey Y.

2    Morris In Support of the CPUC's Request for Judicial Notice (Morris Decl.).

3         In the Verified Complaint, signed by Thomas Melone, WCS and eight other

4    complainants attested that they are the owners of 57 QF projects in PG&E's service territory

5    in California that desired immediately to execute a FiT standard contract with PG&E.  The

6    Verified Complaint listed the 57 separate projects that sought its own FiT contract; each

7    project was 1.0 to 1.5 MW in size; and combined, the 57 projects would have 84.5 MW of

8    generating capacity.  One other complainant was Allco Renewable Energy Limited (Allco

9    Renewable), and Thomas Melone was listed as President of each of the nine complainants.

10        On August 12, 2013, FERC issued a Notice of Intent Not to Act on WCS's first

11   Petition for Enforcement.  Melone Decl., Exh. 3 (ECF 89-2).   WCS then filed the instant

12   lawsuit in this Court on October 24, 2013.  Complaint (ECF 1 to 1-3).  WCS is 100% owned

13   by Allco Finance Limited (Allco Finance), and Thomas Melone owns 100% of Allco

14   Finance.  Certification of Interested Entities of Persons, pp. 1-2 (ECF 1-3).  WCS's

15   Certification did not list any other entity of which Thomas Melone was president; nor did it

16   list any other entity with a financial interest in the subject matter in controversy or in a party

17   to the proceeding, or with a non-financial interest in the subject matter in controversy, as is

18   required by Civil L.R. 3-15 (amended 2014).  This contradicts their position in the Verified

19   Complaint filed at the CPUC.

20        The CPUC dismissed with prejudice WCS's, Allco Renewable, and the seven other

21   complainant's Complaint on May 15, 2014.  *Winding Creek Solar LLC, et al.*, D. 14-05-026,

22   2014 WL 2153806 (May 15, 2014), *reh'g denied*, D.14-11-044, 2014 WL 6693940 (Nov.

23   20, 2014).  The CPUC dismissed the Complaint on the grounds that complainants' projects

24   were not eligible for the water/wastewater FiT, pursuant to the state statutory requirements

25   for such program.

26        During PG&E's first Re-MAT program period, when the offer price was $89.23 per

27   megawatt hour (MWh), WCS was not among the projects at or near enough the head of the

28   queue and so was not eligible to accept this first offer under the CPUC program rules.  As of

1    March 1, 2014, WCS's Lodi project's position in the queue made it eligible to accept

2    PG&E's Re-MAT offer price for "peaking, as-available services," and PG&E offered WCS

3    a long-term contract at with a fixed price of $77.23/MWh.  Second Amended Complaint

4    (SAC), p. 18 at ¶¶ 67-69 (ECF 61).  WCS declined to enter into a contract with PG&E.  *Id.*

5    Other QFs did sign up for the full program period capacity and the price dropped down to

6    $65.23/MWh.  *See id.*, ¶ 61.  Two months later, PG&E offered WCS a long-term contract of

7    $65.23/MWh and WCS declined this offer, as well.  *Id.*, ¶ 69.  Since that time, WCS has

8    remained eligible during every Re-MAT program period to accept an offer of a long-term

9    fixed price contract.  *See* SAC, ¶¶ 67-70; *see also* Lee Unretained Expert Report, ¶ 31 (ECF

10   130).  WCS alleges that WCS has suffered an injury-in-fact, because PG&E's offer of

11   $65.23/MWh was purportedly too low to enable WCS to obtain financing.  SAC, ¶ 75 (ECF

12   61).  The SAC never alleged that the $77.23/MWh was too low to obtain financing.

13          Since PG&E commenced operation of its Re-MAT program, the cost of solar panel

14   production has been declining.  This evidence of decreasing cost of production is not refuted

15   in the evidence.  *See* Lee Unretained Expert Report., Fig. 1 and ¶¶ 46, 57 (Trial Exh. 113);

16   *see also* Trial Tr., April 4, 2017, p. 166 (Lee) (ECF 152); *see also* CPUC's *California Solar

17   Initiative:  Annual Program Assessment*, June 2016, p. 10, at CPUC Req. for Judicial

18   Notice, Exh. 8 (ECF 129).  Indeed, WCS admits that the price of renewable generation has

19   fallen, even below the cost of fossil-fueled generation "[i]n many places," and WCS has not

20   since retracted or qualified this admission.[1]  WCS Reply Memo. in Support of Mot. for

21   Summ. J., p. 13, n.10 (ECF 95).

22          At April 4, 2017 the bench trial WCS provided two expert witnesses, WCS's expert

23   witness Dr. Lesser in the Summary Judgment phase, and WCS provided Christopher

24

25   ────────────────────

26   [1] The CPUC offered the relevant excerpt from ECF 95 as WCS's admission.  *See* Joint
     Exhibit List (ECF 144), pp. 6-7, identifying Trial Exh. 109 as a party admission, where
     statements contained in briefs *may* be treated as party admissions *within the discretion of the
27   court*, citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988).

28

1   Whitman as its expert witness on the issue of whether WCS could obtain financing at certain

2   prices for its solar projects.  This Court however decided that Mr. Whitman has a financial

3   interest in the resolution of this case, and, due to that conflict of interest, this Court

4   dismissed Mr. Whitman as unsuitable as a witness.  Trial Tr., p. 108:14-18 (Whitman); *see*

5   *also* Trial Tr., p. 225:10-12.

6   **III.     DISCUSSION**

7       The headings below capture the Court's questions followed by the CPUC's response.

8       **A.     "Is The Use Of A Single Pricing Formula Or Program**
    **Under 18 C.F.R. § 292.304(d)(2)(i) And (d)(2)(ii)**
9              **Permissible Under PURPA?"**

10      At the April 4, 2017 bench trial, the CPUC witness testified that the 20 MW or Less

11  Standard Contract complies with both 18 C.F.R. § 292.304(d)(2)(i) and (d)(2)(ii).  Trial Tr.,

12  119-121 (Colvin).  The CPUC witness was in error.  *See id*., 141-143 (Bone).  The CPUC

13  here concedes that the Standard Contract for 20 MW or Less is a contract under 18 C.F.R. §

14  292.304(d)(2)(ii), but is not a contract under 18 C.F.R. § 292.304(d)(2)(i).  See discussion in

15  Section III.B below.

16      In this question, the Court asks, "what is permissible under PURPA?"  PURPA itself

17  does not mandate the requirements under 18 C.F.R. § 292.304(d)(2)(i) and (ii).  Instead,

18  PURPA requires that FERC use its delegated general authority to prescribe rules necessary

19  to encourage cogeneration and small power production and to require electric utilities to

20  purchase and sell electricity from and to QFs.  16 U.S.C. 824a-3(a).  In addition to a

21  straightforward compliance with FERC's regulations, states may undertake "any other

22  action reasonably designed to give effect to FERC's rules" and in doing so should be

23  deemed to "comply with the statutory requirements" of PURPA.  *FERC v. Mississippi*, 456

24  U.S. at 751.  The CPUC did that by formally adopting the QF Settlement in its rulemaking

25  proceeding, and the Standard Contract for QFs 20 MW or Less is California's "primary

26  PURPA program."  This comprehensive QF Settlement included most of the QFs in

27  California at the time, the utilities, and ratepayer representatives.  The QF Settlement, and in

28

1  particular to Standard Contract for QFs 20 MW or Less, are described in detail at Colvin

2  Prepared Direct Test., Trial Exh. 101, ¶¶ 30-57.

3      Citing 18 C.F.R. § 292.301(b), FERC explicitly recognizes the CPUC's adoption of

4  the comprehensive QF Settlement as the CPUC's core implementation of PURPA, such that

5  the CPUC can pursue "alternative" PURPA programs." *Winding Creek Solar LLC*, 153

6  FERC ¶ 61,027, P 7 n.10 (October 15, 2015); *see also* Declaratory Order, 151 FERC ¶

7  61,103, PP 6-7, *citing Otter Creek Solar, LLC*, 143 FERC ¶ 61,282, P 4 (2013), *reconsid.*

8  *denied*, 145 FERC ¶ 61,192 (2014).  FERC reasoned that the CPUC's adoption of the

9  Standard Contract for QFs 20 MW or Less has the force of an appropriate CPUC PURPA-

10  implementation regulation that overcomes WCS's complaint, because there is no cap under

11  the CPUC's "primary PURPA program." *Winding Creek Solar LLC*, 153 FERC ¶ 61,027, P

12  7 n.10.  It is through the Standard Contract for QFs 20 MW or Less, that the CPUC satisfies

13  its obligations to implement PURPA.  FERC's determinations about California's primary

14  PURPA program are entitled to deference, as it is interpreting its own regulations.  *See Auer*

15  *v. Robbins*, 519 U.S. 452, 461 (1997); *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944);

16  *Fournier v. Sebelius*, 718 F.3d 1110, 1118 (9th Cir. 2013).

17      WCS has never sought an agreement in California under 18 C.F.R. §

18  292.304(d)(2)(i).  Its SAC and the Verified Complaint of WCS and its affiliates only

19  establish that they have sought long-term contracts under 18 C.F.R. § 292.304(d)(2)(ii).  Nor

20  has WCS referred to any party who was prejudiced, because it had sought an agreement in

21  California under 292.304(d)(2)(i).  Indeed, WCS's affiliate, Allco Renewable, challenged

22  the Massachusetts Department of Public Utilities (MDPU), because it had only offered

23  contracts at the delivered price (i.e., the spot market hourly price and the monthly capacity

24  price) and had no contracts with any long-term commitments.  *See Allco Renewable Energy*

25  *Ltd. v. Mass. Elec. Co. et al.*, 208 F.Supp.3d 390, 400 (2016).  In contrast, the CPUC's

26  comprehensive settlement provides a long-term Standard Contract for QFs 20 MW or Less

27  with a formula rate that includes a long-run capacity prices set for the entire length of the

28

1  contract, that can only go up in price, and short-run avoided costs based upon monthly

2  natural gas indexes.  *See* Colvin Prepared Direct Test., ¶¶ 39-49 (ECF 134; Trial Exh. 101).

3      Moreover, FERC has concluded with regard to a number of related issues, events

4  have overtaken the need for a contract under Subsection 292.304(d)(2)(i).  *See Order*

5  *Terminating Proceeding* in the *Administrative Determination* NOPR (FERC Docket RM88-

6  6-000), 84 FERC ¶ 61,265, 1998 WL 770222, *2-*3 (September 21, 1998).

7      To the extent that an entity was not a party to the QF Settlement and wants a

8  standard offer contract based upon the time of delivery under 18 C.F.R. § 292.304(d)(2)(i),

9  it can petition the CPUC to modify its order approving the comprehensive settlement.

10  Colvin Prepared Direct Test., ¶ 57 (ECF 134; Trial Exh. 101).  Thus far, no entity has

11  petitioned the CPUC for such a modification.  The CPUC is swamped with live

12  controversies and should not be expected to expend resources to develop a Standard

13  Contract under 18 C.F.R. § 292.304(d)(2)(i) when, to its knowledge, not a single QF ever

14  sought such a contract, and when the CPUC's adoption of the QF Settlement is recognized

15  by FERC as a reasonable implementation of the PURPA regulations.

16      **B.    "What Pricing Program Or Contract Option Available To**
        **Winding Creek, If Any, Meets The Requirements Of 18**
17      **C.F.R. § 292.304(d)(2)(ii)?"**

18      Both the Re-MAT program and the CPUC's "primary PURPA program" – the

19  Standard Contract for QFs 20 MW or Less – are two options consistent with 18 C.F.R. §

20  292.304(d)(2)(ii) (Subsection (d)(2)(ii)) that have long been, and still are, available to WCS.

21  Both options provide WCS with a long-term contract with "a specified term" with avoided

22  cost rates that are "calculated at the time the obligation is incurred."

23      WCS has twice admitted that the Re-MAT program provides a Subsection (d)(2)(ii)

24  contract.  ECF 89-2, pp. 29-30 of 83 (Tr. Ex. 107, CPUC000234-CPC000235); ECF 89-2, p.

25  71 of 83 (Tr. Ex. 107, CPUC000276).  FERC also noted that WCS in both of its

26  enforcement petitions conceded that Re-MAT satisfies (d)(2)(ii).  *See* Declaratory Order,

27  151 FERC ¶ 61,103, PP 4-5, 2015 WL 2151303, *1.  But the terms of the Re-MAT program

28  speak for Re-MAT itself.  The Re-MAT contract is a long-term contract of 10, 15, or 20

1   years.  Lee Unretained Expert Report, p. 16 (ECF 130; Tr. Ex. 113, CPUC000400).  The

2   price paid to the QF is "fixed for the entire length of the contract, with an all in combined

3   capacity, energy, and renewable energy credit payment … adjusted by time-of-delivery

4   ("TOD") factors that are based on the time of year and time of day the electricity is

5   generated."  *Id.*  The QF developer thus receives a "known payment stream over the life of

6   the contract, with only the amount of generation being a potentially unknown variable for

7   the developer."  *Id.*

8         The Standard Contract for 20 MW or Less also provides a payment stream that is

9   reasonably certain and thus satisfies the requirements of PURPA.  Capacity payments are

10  long-run avoided costs and are known and fixed for the terms of the contract, and they can

11  only increase.  Colvin Prepared Direct Test., ¶¶ 40-44 (ECF 134; Trial Exh. 101).  Payments

12  for energy are based on a formula that is defined at the time the obligation is incurred.  *Id.*,

13  ¶¶ 43-52; *see also* Declaratory Order, 151 FERC ¶ 61,103, P 6.  The SRAC formula has

14  three market-based variable inputs:  a market heat rate, a gas index,[2] and a location

15  adjustment factor.  Colvin Prepared Direct Test., ¶¶ 43-45 (ECF 134).  While the precise

16  number paid under SRAC will not be known the time of the contract's execution, the

17  formula itself is fixed, *id.*, and the capacity payment remains fixed.  The D.C. Circuit, which

18  has the most experience of all Circuit Courts in FERC ratemaking matters, has held upheld

19  FERC's determination that a formula is a rate, for FERC ratemaking purposes where all of

20  the inputs to the formula are identified at the time of the contract execution.  *P.U.C. of Cal.*

21  _____

22  [2] WCS's expert witness Dr. Lesser admits that the gas price input for the Standard Contract
    for QFs 20 MW or Less for any given month is <u>not</u> a spot market price.  *See* Trial Tr. 60:20-
23  61:2 (Lesser).  Instead, it is a monthly price.  "The SRAC energy price is valid for a month."
    Colvin Prepared Direct Test., ¶ 47 (ECF 134; Trial Exh. 101).  This gas input is determined
24  by the bid week (i.e., the last week) of the prior month.  It is determined on the first business
    day of the month, and the gas price is posted on the seventh business day of the month for
25  that month.  *Id.*, ¶¶ 46-47 (ECF 134; Trial Exh. 101); *see also* Trial Tr. 121:21-122:15
    (Colvin).

26  Pursuant to Cal. Pub. Util. Code § 8341(d) prevents utilities from procuring power from
    generators that exceed California's Emissions Performance Standard (EPS), which is based
27  upon the emissions from a combined cycle natural gas-fired power plant.

28

1  *v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001).  Such rates have been valid since the 1970s.

2  *Id.*  FERC's "acceptance of formula rates is premised on the rate design's 'fixed, predictable

3  nature,' which both allows a utility to recover costs that may fluctuate over time and

4  prevents a utility from utilizing excessive discretion in determining the ultimate amounts

5  charged to customers."  *Id.* (internal citations omitted).

6        Nowhere in 18 C.F.R. § 292.304(d)(2) does FERC mandate that avoided cost rates

7  require a fixed price based on long-run forecasts.  *See* ECF 68, p. 11 (WCS says it is entitled

8  to a long-run rate), pp. 12-13 (WCS pointing only to 18 C.F.R. § 292.304(d)(2)(ii)).

9        Subsection (d)(2)(ii) also provides for a contract for a specified term (length) at

10 avoided cost.  The Standard Contract for QFs 20 MW or Less is a contract for a term of 7 or

11 12 years.  *See* Trial Tr., p. 111 (Colvin).  In its Declaratory Order on WCS's petition, FERC

12 upheld the Standard Contract for QFs 20 MW or Less as PURPA-compliant with both a

13 fixed capacity component and an energy component based on the SRAC formula.

14 Declaratory Order, 151 FERC ¶ 61,103, P 6 & n.9, 2015 WL 2151303, **2.  *See also*

15 *Energy Producers and Users Coalition*, 149 FERC ¶ 61,251, P 16, 2014 WL 7205371, **4

16 (2014), *citing Southern California Edison Co.*, 143 FERC ¶ 61,222 (2013), 2013 WL

17 2477179 ("In *Southern California Edison Co.*, we determined that a Transition PPA which

18 is priced using SRAC and entered into pursuant to the QF/CHP Settlement reflects the

19 obligation of the electric utility to purchase pursuant to PURPA, and was entered into

20 pursuant to the state regulatory authority's implementation of PURPA.").  Two state court of

21 appeals decisions also recognized that the SRAC is PURPA compliant.  *See  So. Cal. Edison

22 Co. v. Pub. Utils. Comm'n*, 128 Cal. App. 4th 1, 10-11 (2005); and *So. Cal. Edison Co. v.

23 Pub. Utils. Comm'n,*101 Cal. App. 4th 982, 991-93 (2002).  And a federal court recently

24 found that the CPUC's Standard Contracts (with the SRAC) for 20 MW or Less, among

25 other CPUC programs, complied with PURPA.  *See* Order Granting Defs.' Mot. for Summ.

26 J., *Solutions for Utils. Inc. v. CPUC,* Case CV 11-04975, 2016 WL 7613906 (N.D. Cal. Dec.

27 28, 2016), *appeal docketed*, No. 17-55297 (9th Cir. March 7, 2017).

28

1    FERC too has interpreted "rates" not to necessarily be a fixed, immutable number.

2    Indeed, the Ninth Circuit in *IEP* noted that the CPUC must leave undisturbed existing long-

3    term Subsection (2)(d)(ii) contracts with fixed, immutable prices.  *IEP*, 36 F.3d at 852.

4    However, to address the problem of PURPA contracts whose prices proved to be above

5    utilities' avoided costs, the Ninth Circuit instead supported "more flexible pricing

6    mechanisms" in future Subsection (2)(d)(ii) contracts.  *Id.* at 858-59.  The SRAC formula is

7    such a "more flexible pricing mechanism."  FERC has never declared that a reasonable

8    revenue stream necessary to attract investment in new development is defined as a fixed

9    number; nor does such a principle by its own terms require a fixed number.  A reasonable

10   revenue stream should be *adequate* to *reasonably* project revenues, and SRAC does that.  It

11   provides a fixed capacity payment, which does not go down but can only go up, and a fixed

12   formula for energy payments.  Colvin Prepared Direct Test., ¶¶40-42 (ECF 134; Trial Exh.

13   101).  The Standard Contract for QFs 20 MW or Less thus provides a reasonably predictable

14   revenue stream for QFs to pursue this contract.

15       **C.    "Is Pricing Under Re-MAT Based On A Utility's 'Avoided**
          **Costs' And If So, How?"**

16

17       The short answer is an unequivocal, "Yes."  Re-MAT is based on a utility's avoided

18   costs because Re-MAT establishes the cost that a utility must pay to buy the next increment

19   (or unit) of renewable solar power to meet California's aggressive Renewable Portfolio

20   Standard (RPS) goals, which require utilities to use renewable energy to meet 33% of total

21   procurement by 2020 and 50% by 2030."[3]

22

23

24

25

26   _____

27   [3] Many of the legal requirements for the RPS program are codified starting at Public Utilities
     Code Section 399.11.

28

1

2

**1.    States Have Wide Latitude In Setting Avoided-Cost Rates Under PURPA, and Precedent Endorses A State's Many Ways To Calculate A Utility's Avoided Cost.**

3

4          States have "broad authority" to implement PURPA and play "the primary role in

5    calculating avoided costs and in overseeing the contractual relationship between QFs and

6    utilities operating under the regulations promulgated by [FERC]."  *IEP*, 36 F.3d at 856.

7    FERC similarly acknowledges that "states are allowed a *wide degree of latitude*" in

8    implementing PURPA because "[s]uch latitude is necessary in order for implementation to

9    accommodate *local conditions and concerns*, so long as the final plan is consistent with

10   *statutory* requirements."  *Signal Shasta Energy Co.*, 41 FERC ¶ 61,120,

11   P 61,295, 1987 WL 118362 (Oct. 30, 1987), *2 (*Signal Shasta*) (finding an SRAC formula

12   compliant with 18 C.F.R. § 292.304(d)(2)) (emphases added).  Further to a state's

13   accommodation of local conditions and concerns in PURPA implementation, state

14   determinations are "by their nature fact-specific and include considerations of many factors,

15   and *we [FERC] are reluctant to second guess the state commission's determinations*..."

16   Clarification Order, 133 FERC ¶ 61,059, P 24, 2010 WL 4144227 (Oct. 21, 2010), *7

17   (citations omitted; emphasis added) (ECF 91).

18          There are innumerable ways for a state to determine PURPA-compliant avoided cost

19   rates, those various ways can result in different avoided-cost determinations, and avoided-

20   cost determinations do not necessarily result in perfectly accurate and immutable numerical

21   prices.  States have "a great deal of flexibility … in the *manner* in which avoided costs are

22   *estimated*…"  *IEP*, 36 F.3d at 856, quoting *Admin. Det'n*, at P 32,173 (emphases added).

23   The Ninth Circuit noted that, after the costly lessons-learned from administratively setting

24   long-run avoided cost rates, FERC urged flexibility in pricing and contracting.  *See IEP* at

25   859, citing *Admin. Det'n*, at P 32,172-74.  Such flexibility could be, *e.g.*, the use of a fixed

26   capacity payment to ensure a "stable revenue stream" needed for a QF to attract financing,

27   together with a "variable energy component."  *Admin. Det'n*, at P 32,172-74.

28

1

2

             **2.**      **FERC Has Expressly Endorsed The CPUC's Use of QF-Only Power to Establish Avoided-Cost Rates.**

3          WCS claims that Re-MAT auction mechanism does not comply with PURPA

4 because the CPUC may only consider non-QF power when setting a utility's avoided cost.

5 Tr. pp. 33, 38, 55-56 (Lesser), ECF 120; MSJ, pp. 20-24, ECF 89.  Thus, WCS argues that

6 because Re-MAT relies upon prices set by competing QFs – rather than other generation

7 sources – it violates PURPA.  *Id.*  WCS cites no legal authority for this argument because

8 there is none.  PURPA, however, imposes no such requirement, and WCS's argument is

9 wholly inconsistent with FERC precedent, which expressly provides that the price of QF

10 power may be used to establish avoided costs under PURPA.  *See CPUC,* 133 FERC ¶

11 61,059 (2010), 2010 WL 4144227).

12          PURPA establishes that the rates paid to QFs cannot exceed "the incremental cost to

13 the electric utility of alternative electric energy."  16 USC § 824a-3(b).  PURPA defines this

14 as "the cost to the electric utility of the electric energy which, but for the purchase from [a

15 QF], such utility would generate or purchase from another source."  16 USC § 824a-3(d).

16 Nowhere does PURPA suggest that the next increment of power purchased must be from a

17 utility facility or another non-QF resource.

18          FERC's implementing regulation regarding the rates to be paid QFs contains

19 language similar to PURPA's:  nothing in the regulation requires any electric utility to pay

20 more than the "avoided costs for purchases." 18 C.F.R. § 292.304(a)(1).  "Avoided costs" is

21 defined as "the incremental costs to an electric utility of electric energy or capacity or both

22 which, but for the purchase from the qualifying facility..., such utility would generate itself

23 or purchase from another source."  18 C.F.R. § 292.304(a)(2).  *See also, Admin. Det'n,*

24 P 32,457 ("A utility avoided capacity cost depends on the cost of the utility's next unit of

25 required capacity.")  Like PURPA, nothing in FERC's implementing regulations require that

26 the next increment of power used to set avoided costs must be non-QF power.

27          This issue was specifically addressed by FERC in a 2010 decision responding to a

28 CPUC request for clarification:

> [I]n determining the avoided cost rate, just as a state may take into account the cost of the next marginal unit of generation, so as well the state may take into account obligations imposed by the state that, for example, utilities purchase energy from particular sources of energy or for a long duration. Therefore, the CPUC may take into account actual procurement requirements, and resulting costs, imposed on utilities in California.
>
> … [I]f a state required a utility to purchase 10 percent of its energy needs from renewable resources, then a natural gas-fired unit, for example, would not be a source "able to sell" to that utility for the specified renewable resources segment of the utility's energy needs, and thus would not be relevant to determining avoided costs for that segment of the utility's energy needs. Stated more generally, *SoCal Edison* supports the proposition that, where a state requires a utility to procure a certain percentage of energy from generators with certain characteristics, generators with those characteristics constitute the sources that are relevant to the determination of the utility's avoided cost for that procurement requirement.

*Clarification Order,* 133 FERC ¶ 61,059, PP 26-27, 2010 WL 4144227, citing *Southern California Edison Co.*, 70 FERC ¶ 61,215 at 61,675-76, reconsid'n denied, 71 FERC ¶ 61,269 (1995) (ECF 91); *see also id.,* P 29.

The FERC's *Clarification Order* is consistent with FERC regulations expressly stating that nothing in the regulations prevents parties from agreeing to a rate for any purchase that differs from the rates, terms, or conditions required by the regulations. 18 C.F.R. § 292.301(b)(1); *see also Otter Creek Solar LLC,* 146 FERC ¶ 61,192, at P 8 (2014) (recognizing there can be more than one avoided cost rate). It is also consistent with FERC precedent that "states are allowed a *wide degree of latitude* in establishing an implementation plan for section 210 of PURPA … 'Such latitude is necessary in order for implementation to accommodate *local conditions and concerns*, so long as the final plan is consistent with statutory requirements.'"  *Signal Shasta Energy Co.,* 41 FERC ¶ 61,120, P 61,295, 1987 WL 118362 (Oct. 30, 1987), *2 (*Signal Shasta*) (finding an SRAC formula compliant with 18 C.F.R. §292.304(d)(2)) (emphases added).

1
2
3

      **3.**     **Re-MAT's Avoided-Cost Pricing Is Based On The Cost A Utility Must Pay To Buy The Next Increment Of Renewable QF Power To Comply With State Procurement Requirements Under Cal. Pub. Util. Code § 399.20.**

4       As set forth in Ms. Lee's Expert Report, Re-MAT is a market-based RPS program

5  that provides a feed-in-tariff for renewable QFs sized up to 3 megawatts (MW).  Lee Exp.

6  Rpt., ECF 130, Ex. 1, ¶ 11.  It was designed as an alternative contracting mechanism to

7  encourage the procurement of power from small renewable generators who could not

8  otherwise compete against larger renewable generators in the standard RPS solicitations that

9  occurred in the earlier years of the RPS program.  Lee Exp. Rpt., ECF 130, Ex. 1, ¶ 11.

10      Eligible project developers are placed in a utility's Re-MAT queue on a first-come,

11  first-served basis.  *Id.*, ¶ 28.  PG&E offers to buy 5 MWs every Re-MAT program period –

12  every two months – to developers in its queue.  *Id.*, ¶¶ 29-30.  Once in the program queue,

13  developers have the option every period to execute a Re-MAT contract at the price offered.

14  *Id.*, ¶ 31.  If the developer elects to take the offered price and is at the front or near the front

15  of the queue, the IOU and the developer will execute a contract.  *Id.*

16      The starting price for the first Re-MAT auction was $89.23/MWh.  To account for

17  changes in generator interest and costs to construct and operate generation facilities – in

18  other words, market supply signals – the Re-MAT price offered each two month program

19  period may be adjusted in $4/MWh to $12/MWh increments up or down based on the

20  outcome and price adjustments of the previous program periods.  *Id.*, ¶ 40.  For the Re-MAT

21  price to increase, two conditions must be met which are a proxy for <u>reduced</u> market supply:

22  (1) there must be at least five unaffiliated projects in the utility's product category queue (to

23  prevent market manipulation); and (2) the total capacity of the price accepting project

24  applicants must be less than 20% of the capacity allocation in that period.  *Id.*, ¶ 41.  In other

25  words, when there is decreased generator interest in accepting the offer price, the price is

26  adjusted upward by $4/MWh to encourage more generators to enter the market.  *Id.*

27      For the Re-MAT price to decrease, similar conditions must be met that are a proxy

28  for <u>increased</u> market supply:  when more generators are willing to sell at the offer price, it is

1    adjusted downwards so that ratepayers can benefit from what appear to be increased supply

2    and falling prices, as reflected by the Re-MAT market signals.  *Id.*, ¶ 42.

3              If the two conditions for either increasing or decreasing the price do not exist, then

4    the price stays the same for the next program period.  *Id.*, ¶ 43.

5              The resulting Re-MAT contract is a long-term contract of 10, 15, or 20 years.  *Id.,* ¶

6    32.  It is considered an "all in" fixed price contract because the price is fixed for the entire

7    length of the contract, with an all-in or combined capacity, energy, and renewable energy

8    credit payment based on the offered price, which is adjusted by time-of-delivery ("TOD")

9    factors that are based on the time of year and time of day the electricity is generated.  *Id.,* ¶

10   32.[4]

11             The Re-MAT program was designed to satisfy state law and policies in the wake of

12   FERC's Clarification Order.  *Re-MAT Decision,* p. 115, Conclusions of Law 2-4, 2012 WL

13   2049420 (May 24, 2012), ECF 61-2; *see also id., mimeo,* pp. 10-13 for an extensive

14   discussion of the FERC Clarification Order).  It created a market for strategically located 3

15   MW and under renewable facilities to facilitate utility compliance with California's RPS

16   goals.  Because of California's RPS requirement, the next increment of power that PG&E

17   must "purchase from another source" is renewable power or that meets California's EPS.

18   Under Re-MAT, renewable QFs compete against each other to provide that increment of

19   power.  The utility's avoided cost is the price it must pay to sign a contract with a generator

20   to provide that power.  If another renewable QF generator in the Re-MAT program is

21   willing to accept less money than WCS, it sets the Re-Mat price for that auction.  This

22   mechanism is efficient, complies with the avoided cost requirements established by FERC

23   and the consumer protection goals of PURPA, and encourages the development of small

24   renewable facilities.  WCS's arguments to the contrary have no merit.

25        **D.    "How Are 'Avoided Costs' Defined And Determined For**
              **Purposes Of 18 C.F.R. § 292.304(d)(2)?"**
26   _____

27   [4] WCS agrees that this contract complies with 18 C.F.R. § 292.304(d)(2)(ii).

28

1    In short, the same definition of avoided cost applies to all FERC regulations.  Those

2  regulations "define avoided costs in terms of costs that the electric utility avoids by virtue of

3  purchasing from the QF."  *CPUC,* 133 FERC ¶ 61,059, at P 26 (ECF 91).  The practical

4  difference between 18 C.F.R. § 292.304(d)(2)(i) and (ii) is that subsection (i) requires that

5  the rate paid to the QF must be "based on … [t]he avoided costs calculated at the time of

6  delivery," such as a real-time spot market price.  Subsection (ii) provides for both an energy

7  and capacity payment calculated at the time of contract execution.  Both provisions

8  guarantee a QF the right to a "legally enforceable obligation" in contrast to 18 C.F.R. §

9  292.304(d)(1) which permits a QF to simply sell as-available energy at avoided costs

10  calculated at the time of delivery.

11    No methodology, rule, formula, or calculation *necessarily* must be used to determine

12  avoided cost rates to comply with 18 C.F.R. § 292.304(d)(2).  FERC regulations require

13  only that states consider, "to the extent practicable," factors such as the availability of

14  electricity during daily and seasonal peak periods and the facility's reliability.  *See* 18 C.F.R.

15  §§ 292.304(b)(2), (e).

16    Avoided cost need not be determined from all generation resources, but can be

17  determined from a narrower set of resources that meet the utility's procurement needs.  *See*

18  *CPUC*, 133 FERC ¶ 61,059, PP 26, 27 (2010).  In California, utilities have only two options

19  for new long-term procurement:  renewable generation facilities and generators meeting

20  California's Emissions Performance Standard.  *See* Colvin Prepared Direct Test., Trial Exh.

21  101, p. 6 ¶ 6.  The CPUC can segment its avoided cost determination between these two

22  options and even more finely, according to state procurement rules.   If a state requires a

23  utility to procure energy from QFs "on the basis of supply characteristics of … different

24  technologies," then only such generators are "able to sell" to the utility for "the specified

25  segment of the utility's energy needs."  *Id.*, PP 23, 27; *see also* 18 C.F.R. §292.304(c)(3)(ii).

26  Thus, if Cal. Pub. Util. Code § 399.20 limits participation in the state-mandated Re-MAT

27  program to those facilities meeting the state requirements, then the CPUC may determine

28  avoided cost rates specific to the Re-MAT "procurement segmentation."  *See id.* at P. 27 and

1    n.53.  As discussed, the "wide degree of latitude" afforded the state to determine avoided-

2    cost rates is intended to "accommodate local conditions and concerns."  *Signal Shasta*, 41

3    FERC ¶ 61,120, P 61,295, 1987 WL 118362 (Oct. 30, 1987), *2.  State law and the CPUC

4    with its ratemaking authority will determine a utility's next increment of procurement.  *See*

5    Colvin Prepared Direct Test., Trial Exh. 101, p. 6 ¶ 6.  Neither FERC nor courts decide the

6    next increment of procurement for electric utilities; this has been a power traditionally left to

7    the states.  *See New York v. FERC*, 535 U.S. 1, 5-6, 23-24 (2002) and *Entergy Nuclear Vt.*

8    *Yankee LLC v. Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013).

9          **E.**      **"What Is The Origin And Purpose Of The 5 MW Bi-**
10                     **Monthly Cap Under Re-MAT For PG&E, And How Does**
                       **That Cap Comply With Or Violate A Utility's Obligation**
11                     **To Purchase All Energy And Capacity Made Available By**
                     **QFs Under PURPA?"**

12         The purpose of the 5 MW bi-monthly cap is to ensure both that the price is set at the

13    utility's avoided cost and that rates "shall be just and reasonable to the electric consumers of

14    the electric utility and in the public interest."  16 U.S.C. § 824a-3(b).  Spreading the IOU's

15    Re-MAT purchases over at least 24 months – rather than requiring the IOUs to buy all of the

16    capacity at one time –  was "designed to *minimize ratepayer exposure* to a large number of

17    non-competitively priced contracts while ensuring that some capacity is available for each

18    product type, for which there is market interest."  *Re-MAT Decision*, D.12-05-035, pp. 49-50

19    (emphases added), 2012 WL 2049420 (ECF 89-3).  The CPUC's decision to implement such

20    a price adjustment mechanism is consistent with FERC precedent that endorses the use of

21    adjustment mechanisms to protect ratepayers from avoided costs that may be set too high.

22    *Admin. Det'n*, P 32,166.

23         The CPUC developed the Re-MAT program rules in its RPS rulemaking proceeding,

24    Rulemaking 11-05-005, pursuant to legislative direction.  Cal. Pub. Util. Code § 399.20.

25    The *Re-MAT Decision* describes the record of the proceeding, including the participation

26    and positions of more than a dozen different parties (*see, e.g.* pp. 19-38).  The *Re-MAT*

27    *Decision* adopted five core policy guidelines "as an important secondary source of

28

guidance" in implementing the state laws requiring Re-MAT.  Three of those guidelines
related to the Re-MAT pricing mechanism:

> (1) Establish a feed-in tariff price based on quantifiable utility avoided
>      costs that results in market demand;
> (2) Contain costs and ensure maximum value to the ratepayer and utility;
>      and
> (3) Ensure administrative ease and lower transaction costs for the buyer,
>      seller, and regulator.

*Re-MAT Decision,* p. 118, COL 19; *see also id.* p. 37.

The 5 MW bi-monthly cap evolved from a price "adjustment mechanism" proposal
made by SCE on August 5, 2011 in the Re-MAT proceeding.  *Re-MAT Decision,* p. 44 &
n.50.  The *Re-MAT Decision* described the SCE proposal as a market-based alternative to
administratively set avoided costs which remain static over time:

> [U]nlike the administratively-determined prices, such as the MPR, the
> price will not remain static, at a point potentially too high or too low.
> Instead, the price could move higher or lower in response to supply and
> demand of renewable energy in the market.  According to SCE, in contrast
> to a static price, this more flexible proposal offers potential benefits to
> ratepayers because ratepayers will not have to pay excessive costs for
> renewable energy if the market price drops.  Similarly, sellers would
> potentially benefit by being able to accept a contract at a price sufficient to
> develop their projects.

*Re-MAT Decision,* p. 28.

The Re-MAT price adjustment mechanism, including the 5 MW cap, complies with
PURPA because it is consistent with FERC precedent in the *Admin. Det'n* advising
downward price adjustment when too much QF power is offered to the utility: "if QFs offer
capacity in amounts greatly exceeding the utility's capacity needs, then the rate for purchase
of that capacity was probably not set in reference to the cost of the utility's most efficient
alternative.  A rate that does not reflect the cost of the utility's most efficient alternative
source of capacity is excessive, and should be adjusted downward."  *Admin. Det'n,* P
32,166.

1    In sum, there is nothing in the must offer obligation that entitles WCS to secure long-

2   term contracts to sell all of its power to PG&E at the first Re-MAT auction price.

3   Consistent with the administrative rules adopted in the *Re-MAT Decision,* and based on

4   FERC guidance, the Re-MAT program was designed to procure the needed capacity in

5   increments, and to take advantage of market signals to prevent a utility from paying more

6   than necessary for its next increment of power.  *See* Lee Unretained Expert Report, ¶¶ 29,

7   37-48; *see also* Trial Tr. p. 166 (Lee):

8        **Q.**  Okay.  So does [the market adjusting mechanism] suggest to you if
             – if PG&E can enter contracts today for $65 to $57, that the price
9            of $89.43 when Re-MAT opened was perhaps too high of an
             avoided cost?
10

11       **A.**  Yes.

12       In fact, procurement of all power available at the first Re-MAT auction price would

13   violate FERC's regulation providing: "Nothing in this subpart requires any electric utility to

14   pay more than the avoided costs for purchases."  18 C.F.R. § 292.304(a)(2).  The 5 MW

15   bimonthly limit protects ratepayers for paying for too much power at above-avoided-cost

16   rates.

17       The Re-MAT program's 5 MW bimonthly limit is not a hard cap on procurement

18   from QFs, as WCS presents.  Instead, it is a "pause" on utility procurement, to allow the

19   market to operate and adjust prices.  The U.S. Supreme Court held in *FERC v. Mississippi*,

20   that states shall decide how they will implement PURPA.  Similarly the Ninth Circuit in *IEP*

21   recognized states' authority over the contracting relationship between utilities and QFs.  The

22   Ninth Circuit further held in *IEP* that states have "wide latitude" to set avoided cost rates

23   and urged states to pursue "more flexible pricing mechanisms" to avoid burdening

24   ratepayers with above-avoided cost contracts.  Only because of regular "pauses" on and

25   steady pacing of procurement, Re-MAT's dynamic market adjusting mechanism moves up

26   or down to reflect the value of the next increment of power that the utility must procure.

27   Accordingly, the bimonthly "pause" in procurement has ensured that PG&E's ratepayers are

28   not paying $89.23/MWh for the entire "peaking, as-available" allocation.  Ratepayers are

1    instead benefitting from declining production costs and wholesale power prices, the

2    development of new renewable generation projects, the promotion of new non-utility market

3    entrants, and program rules designed to prevent gaming the program, all while paying

4    avoided-cost rates under 18 C.F.R. § 292.304(d)(2)(ii) contracts.

5           In short, Re-MAT complies with all that PURPA, FERC's regulations, the U.S.

6    Supreme Court, the Ninth Circuit, federal district courts, FERC, and state courts require,

7    achieves the policy objectives of PURPA and California's aggressive renewable generation

8    goals, while violating no law or regulation in the process.

9    **IV.     STANDING, RIPENESS, AND REDRESSABILITY**

10          WCS lacks standing to bring or sustain its claims.  The "irreducible constitutional

11   minimum of standing" requires that WCS demonstrate that it has suffered an "injury in fact"

12   to a "legally-protected interest" that is "fairly traceable" to a challenged action and is likely

13   to be redressed by a favorable decision from the court.   *Lujan v. Defenders of Wildlife*, 504

14   U.S. 555, 560-61 (1992).  Each element must be supported by evidence of specific facts to

15   support the claims.  *Id.* at 561.  Standing can be raised at any time in a case.  *Ctr. for*

16   *Biological Diversity v. Kempthorne*, 588 F.3d 701, 703 (9th Cir. 2009).

17          WCS has the burden of demonstrating an actual, not a speculative, injury, and WCS

18   has not produced evidence that it has been injured.  The evidence shows that Plaintiff

19   declined PG&E's Re-MAT offers of $77.23/MWh as early as March 1, 2014 and

20   $65.23/MWh and lower.  SAC, ¶¶ 68, 69 (ECF 61).  Other project bidders accepted offer

21   prices of $77.23/MWh and $65.23/MWh, and successfully achieved commercial operation;

22   and still other project bidders accepted offer prices of $61.23/MWh and $57.23/MWH that

23   are on schedule for commercial operation.  Lee Decl., ¶¶7-10 (Trial Exh. 112), citing Lee

24   Unretained Expert Report (Trial Exh. 113), Exh. 2 (Trial Exhs. 115 & 116).  Plaintiff only

25   makes bald allegations of injury:  WCS alleged that $65.23/MWH was too low to attract

26   financing, *see* SAC, ¶ 75, but WCS never made such a statement about $77.23/MWh.  *See*

27   SAC, ¶¶ 68 75 (ECF 61); Trial Exh. 102.  In any event, WCS could have accepted an offer

28   of $77.23/MWh on March 1, 2014, and it declined to do so.  Self-inflicted harm is not an

1    injury for constitutional standing purposes.  *See Clapper v. Amnesty Int'l USA*, 568 U.S.

2    398, 133 S. Ct. 1138, 1152 (2013).[5]

3        WCS's basic claim of injury – the inability to secure a long-term contract with a

4    PURPA-compliant avoided-cost rate under 18 C.F.R. § 292.304(d)(2)(ii) – never has been

5    and is not presently ripe for adjudication.  At all relevant times, WCS could have executed

6    the Standard Contract for QFs 20 MW or Less, which has been available to QFs since the

7    CPUC adopted its primary PURPA program in 2010.  WCS has also occupied a position at

8    the head of PG&E's Re-MAT queue since at least March 2014.  *See* Melone Decl., ¶ 9 (ECF

9    89-2).  WCS has admitted that for nearly three years it could have accepted a Re-MAT offer

10   price and contract, and it has elected not to do so.

11       Even if the Court's review of WCS's claim of injury was limited with respect to the

12   Re-MAT program and its 750 MW statewide cap on procurement, WCS's claim of injury is

13   too speculative to be sustained.  An injury in fact must be "actual or imminent, not

14   'conjectural' or 'hypothetical.'"  *Lujan*, 504 U.S. at 560-61.  The California Legislature has

15   expanded the California FiT and Re-MAT program's eligibility and procurement limits no

16   less than three times since its inception in 2006.  *See* Lee Unretained Expert Report, ¶15

17   (ECF 130; Trial Exh. 113).  Assuming the Legislature does not expand Re-MAT further, the

18   soonest that PG&E will cease to offer Re-MAT contracts in the "peaking, as-available"

19   product category in which WCS seeks to participate is 14 months from now.  *See* Lee Decl.,

20   ¶¶ 2-3 (ECF 130; Trial Exh. 112); Trial Tr. 151 (Lee).  That is because certain other Re-

21   MAT projects – which have accepted offer prices, executed Re-MAT contracts, and thereby

22   removed the MWs under contract from further subscription – subsequently had their

23   ─────────────────────────

24   [5] The CPUC questions whether Allco Finance and Thomas Melone knew at the time of
     filing the complaint in this proceeding whether any or all 57 QF projects listed in the
25   Verified Complaint filed at the CPUC in C.13-07-016 could be bidding in PG&E's Re-
     MAT.  The CPUC is unaware if WCS or any of the 56 other projects did not accept offers
26   because they could not obtain financing or whether Allco Finance, Allco Renewable, or
     Thomas Melone  might have hoped that the Re-MAT price would go back up so all 57 QFs
27   could accept higher prices.

28

1   contracts terminated, and as a result the MWs under the cancelled contracts have been

2   returned to PG&E's program queue for future subscription by other eligible projects.  *See*

3   Lee Unretained Expert Report, ¶¶ 30, 35; *see also* Trial Tr. 151 (Lee); and CPUC Statement

4   As to Why Good Cause Exists to Reopen Summ. J. Proceedings, pp. 2-3 (ECF 131).

5   Because WCS has for newly three years possessed the ability to accept a Re-MAT contract,

6   and because WCS will continue to possess that ability for at least another 14 months, *see*

7   Trial Tr., 151 (Lee), WCS's claim of injury with respect to the Re-MAT program is not ripe.

8           Finally, WCS has not presented this Court with a redressable injury or lawful request

9   for relief.  Standing requires that a plaintiff demonstrate that the requested relief is "likely"

10   to redress the plaintiff's injury, "as opposed to merely speculative."  *Friends of the Earth,*

11   *Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  WCS essentially seeks

12   this Court's order that WCS should have a Re-MAT contract with a higher price than the

13   PURPA-compliant avoided-cost rate set by Re-MAT's market adjusting mechanism,

14   perhaps at a price of $89.23/MWh.  A court, however, cannot decide avoided-cost rates

15   because ratemaking is a legislative, not judicial, function, "a task of striking a balance and

16   reaching a judgment on factors beset with doubts and difficulties, uncertainty and

17   speculation."  *United States v. Morgan*, 313 U.S. 409, 417 (1941).

18           Allco has twice sought in federal court relief on PURPA-related matters within a

19   state's jurisdiction, and in both instances the courts found a lack of redressability.  In a

20   Massachusetts district court decision to which WCS repeatedly cites, the court found that the

21   contracting option made available to Allco Renewable provided spot market prices and was

22   therefore a contract under 18 C.F.R. § 292.304(d)(2)(i).  *Allco Renewable Energy Ltd. v.*

23   *Mass. Elec. Co. et al.*, 208 F.Supp.3d at 400.  The court denied Allco Renewable the relief it

24   sought – that the court engage in fact finding to determine the proper avoided cost rate.  *Id*.[6]

25   _____

26   [6] Allco Renewable sought further relief from the Massachusetts district court, complaining
    that the MDPU had not commenced a rulemaking <u>four months</u> after the district court order.

27   Morris Decl., Exh. 11.  The court denied Allco Renewable's request, and the timing and

28

On appeal from a suit brought against the Connecticut agency implementing PURPA, the Second Circuit declined to grant Allco's preemption claim, finding as speculative Allco's belief that invalidating already-executed contracts would give Allco the relief it sought (a "Section 6" PURPA contract). *Allco Finance Ltd. v. Klee*, 805 F.3d 89, 98 (2d Cir. 2015).

Now, once again, Allco affiliates are seeking redressability that a federal court cannot provide. As the Massachusetts district court properly concluded:

> Nothing in the statutory scheme [of PURPA] provides this Court with rate-making authority, and it lacks the expertise to do so. Rather, the MDPU has the statutory authority to revisit its implementation of FERC's rules, either through a new rulemaking, a case-by-case adjudication, or other reasonable method.

*Allco Renewable*, 208 F.Supp.3d at 400, citing *FERC v. Mississippi*, 456 U.S. at 751. WCS's case must be dismissed for lack of standing.

## V.    CONCLUSION

For the foregoing reasons, the CPUC requests that the Court dismiss WCS's SAC for lack of standing, or else enter judgment in favor of the CPUC, finding that the Re-MAT program and the QF Settlement Standard Contract for QFs 20 MW or Less are contracts under 18 C.F.R. § 292.304(d)(2)(ii), and establish PURPA-compliant avoided cost rates.

Respectfully submitted,

By:    /s/    *HARVEY Y. MORRIS*
May 19, 2017                    HARVEY Y. MORRIS

---

means of PURPA implementation are properly in Massachusetts' hands. *See FERC v. Mississippi, supra*.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2017, I electronically filed the following document with the Clerk of the Court for the United States District Court, Northern District of California by using the CM/ECF system:

- **POST-TRIAL BRIEF OF CPUC DEFENDANTS**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/    *HARVEY Y. MORRIS*
HARVEY Y. MORRIS