UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WINDING CREEK SOLAR LLC,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL PEEVEY, et al.,<br><br>Defendants. | Case No. 13-cv-04934-JD<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND ORDER ON SUMMARY JUDGMENT** |

Plaintiff Winding Creek Solar LLC has sued the Commissioners of the California Public Utilities Commission ("CPUC") for a declaration that three CPUC orders conflict with federal law and consequently violate the Supremacy Clause of the United States Constitution. The CPUC orders set up a procurement program called "Re-MAT" (short for "Renewable Market-Adjusting Tariff"), and regulate the terms on which utility companies like the Pacific Gas and Electric Company ("PG&E") must purchase power from alternative energy power production facilities like small wind farms and solar projects. Winding Creek intends to build such a solar project in Lodi, California, and it seeks a long-term contract to sell the energy from the proposed facility to PG&E. It sued because it believes the CPUC orders in dispute prevented it from getting a contract entitlement under the Public Utility Regulatory Policies Act ("PURPA").

This order brings to a close a case that has been fought hard over a number of years. After three rounds of motions to dismiss, the parties filed cross-requests for summary judgment which were heavily briefed and included submission of an amicus brief from PG&E and other third-party utility companies. Disputes over material facts compelled the Court to hold a one-day bench trial. Both sides presented witnesses and expert testimony, and filed substantial post-trial briefs. The Court makes these findings of fact and conclusions of law, and grants summary judgment in favor of Winding Creek.

**BACKGROUND**

To frame the rather technical dispute between the parties, the Court summarizes the statutory context set out in a prior order. Dkt. No. 60. Under the Federal Power Act ("FPA"), 16 U.S.C. § 791a et seq., the interstate commerce of electric energy at wholesale is subject to regulation by the Federal Energy Regulatory Commission ("FERC"). In 1978, Congress enacted the Public Utility Regulatory Policies Act ("PURPA"), which amended the FPA. PURPA was enacted to encourage the development of renewable sources of energy, and "thus to reduce American dependence on fossil fuels by promoting increased energy efficiency." *Indep. Energy Producers Ass'n, Inc. v. Cal. Pub. Util. Comm'n*, 36 F.3d 848, 850 (9th Cir. 1994). To that end, PURPA directs FERC to prescribe "such rules as it determines necessary to encourage cogeneration and small power production," including rules that require electric utilities to offer to "purchase electric energy from [qualifying cogeneration and small power production facilities]." 16 U.S.C. § 824a-3(a). The Court found in a prior order that plaintiff Winding Creek's proposed Lodi facility is a "qualifying small power production facility" under PURPA. Dkt. No. 75 at 9. PURPA requires State regulatory authorities such as CPUC to implement the rules prescribed by FERC. 16 U.S.C. § 824a-3(f)(1).

The outcome of this case turns on three key requirements under PURPA and its implementing FERC regulations. The first is what the parties have referred to as the "must-take obligation," *see*, *e.g.*, Dkt. No. 152 (Trial Tr.) at 127:8-128:9, which is industry short-hand for the proposition that PURPA requires FERC to encourage small power production with rules that "require electric utilities to offer to . . . purchase electric energy from [qualifying] facilities." 16 U.S.C. § 824a-3(a). FERC's implementing regulations state that "[e]ach electric utility shall purchase . . . any energy and capacity which is made available from a qualifying facility . . . [d]irectly to the electric utility." 18 C.F.R. § 292.303(a)(1). A few exceptions exist for this mandatory purchase obligation, but the parties agree that they do not apply here. Trial Tr. at 130:14-131:7 (CPUC witness Michael Colvin testifying that "the must-take obligation for 20 megawatts and under remains").

2

The second and third legal requirements that are critical to this case have to do with pricing. PURPA and FERC's regulations not only mandate that electric utilities must purchase energy and capacity from qualifying facilities, they also set certain required terms for those purchases. Under 18 C.F.R. § 292.304(b)(2), utilities must purchase energy and capacity from qualifying facilities at a rate that "equals the avoided costs" of the utility. Under the regulations, "avoided costs" means "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6).

The regulations also require that qualifying facilities be given a choice in the pricing of the energy sales to the utilities. Under 18 C.F.R. § 292.304(d):

> Each qualifying facility shall have the option either:
>
> (1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or
>
> (2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the term, be based on either:
>
> (i) The avoided costs calculated at the time of delivery; or
>
> (ii) The avoided costs calculated at the time the obligation is incurred.

The parties agree that section (d)(2) is the pertinent provision in this case because Winding Creek sought a "legally enforceable obligation for the delivery of energy or capacity over a specified term" to secure financing for its planned but unbuilt solar facility.

The Court's prior motion to dismiss orders settled the proper parties in the case, the facilities at issue and the plausible legal claims, all of which have mutated to some degree over the life of this case. Dkt. Nos. 39, 60, 75. The operative complaint is plaintiff's second amended complaint for declaratory and injunctive relief. Dkt. No. 61. Plaintiff is Winding Creek Solar LLC, an owner and developer of solar projects, and Allco Finance Limited is its only member. *Id*. ¶ 10. Defendants are the five Commissioners of the California Public Utilities Commission who

3

were sued in their official capacities. *Id*. ¶¶ 11-15. The facility at issue is an unbuilt, 1.0-megawatt solar project that Winding Creek plans to construct in Lodi, California (the "Lodi facility"). *Id*. ¶¶ 10, 75. Winding Creek's only remaining legal claim is for "preemption" based on alleged violations of the Supremacy Clause (and not under 42 U.S.C. § 1983). Dkt. No. 75 at 10-11. The Supremacy Clause theory alleges conflicts between the challenged CPUC orders and PURPA. *Id*.

The three specific CPUC orders that plaintiff challenges are: D.12-05-035 (the "May 2012 Order"), D.13-01-041 (the "January 2013 Order") and D.13-05-034 (the "May 2013 Order"). Dkt. No. 61 ¶ 6. As Winding Creek alleges, these orders set the terms on which California's investor-owned utilities such as PG&E must enter into long-term, fixed-price contracts with qualifying facilities such as Winding Creek's Lodi facility. *Id*. ¶¶ 1, 6. The overall procurement program established by these orders is known as the "Re-MAT Program," *see*, *e.g.*, *id*. ¶ 45 (the "Renewable Market-Adjusting Tariff" or "'Re-MAT' for short"), and Winding Creek focuses its attack on two aspects of the program. It challenges the 750-megawatt statewide cap that the program places on the electric utilities' collective obligation to purchase electricity from qualifying facilities. *Id*. ¶¶ 7, 50-54. It also alleges that "the Orders provide for a purchase price that is different than the utilities' avoided costs." *Id*. ¶ 8. Winding Creek asserts that both of these aspects of the Re-MAT program conflict with PURPA and the regulations enacted by FERC pursuant to PURPA. *See id*. ¶¶ 78-101.

Both sides filed for summary judgment (Dkt. Nos. 89, 90) following the Court's third motion to dismiss order, which granted in part and denied in part defendants' motion to dismiss without further leave to amend. Dkt. No. 75. Tracking its complaint, Winding Creek sought summary judgment on the grounds that the Re-MAT Program violates PURPA because (i) it caps the amount of electricity that utilities must purchase from qualifying facilities, and (ii) the rate offered under the program is not based on the utilities' avoided costs. Dkt. No. 89.

Defendants sought summary judgment in their favor on the same issues, but in doing so, they relied heavily on a different CPUC procurement program: the "mandatory Standard Contract that California utilities must offer smaller QFs of 20 MW or less generation capacity under

1 PURPA." Dkt. No. 90 at 1.  Defendants argued that the Re-MAT program's caps did not violate
2 the utilities' purchase obligation under PURPA because "the Standard Contract is available to
3 Winding Creek." *Id*. at 16.  Defendants also argued that Re-MAT pricing is properly based on
4 utilities' avoided cost rates, and that the Standard Contract satisfies the pricing requirements under
5 18 C.F.R. § 292.304(d)(2).  *Id*. at 17-25.  Defendants argued that because the Standard Contract
6 fully satisfies PURPA, the CPUC was free to have alternative programs like Re-MAT even if
7 those additional programs may not be PURPA-compliant.  Dkt. No. 105 at 15:5-19.  The parties'
8 disagreement has now crystallized around the compliance of the Re-MAT Program and the
9 Standard Contract with PURPA and implementing regulations.

Needless to say, this dispute takes place in a complex regulatory context.  While the dispositive facts turned out to be relatively straightforward, the parties had a marked tendency to resort to industry jargon and inside-baseball arguments in ways that sometimes obscured the basic issues.  Consequently, after the summary judgment motion hearing, the Court invited and received an amicus brief jointly filed by PG&E, Southern California Edison Company and San Diego Gas & Electric Company, to which both plaintiff and defendants filed responses.  Dkt. Nos. 109, 110, 112.  Even then, the Court determined that summary judgment could not be resolved on the papers and held a one-day bench trial on the question of "whether the CPUC's standard contract complies with 18 C.F.R. § 292.304(d)(2)."  Dkt. Nos. 117, 148.  The parties subsequently submitted post-trial materials.  Dkt. Nos. 153-159.  This order sets out the Court's findings of fact and conclusions of law from the bench trial, and resolves the pending summary judgment motions with the benefit of those findings and conclusions.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Rule 42(b) of the Federal Rules of Civil Procedure provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."  Rule 1 directs that the Rules should generally "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  Our circuit has affirmed that "[u]nder Rule 42(b), the district court has broad discretion to bifurcate a

5

trial to permit deferral of costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues." *Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 998 (9th Cir. 2001).[1] The Court held the bench trial under these provisions, with no objection by either side. The parties also agreed to try disputed issues to the Court and not a jury. *See*, *e.g.*, Dkt. No. 82 at 16. The Court consequently states its findings and conclusions below under Rule 52(a)(1).

## I. THE RE-MAT PROGRAM

1. California has an extensive Renewables Portfolio Standard ("RPS") program that requires investor-owned utilities, electric service providers, and community choice aggregators to significantly increase procurement from eligible renewable energy resources in the coming decades. Dkt. No. 130 ¶ 10.[2] The California legislature established the program in 2002, and expanded it in 2006, 2011 and 2015. *Id*. Many of the legal requirements for the RPS program are codified at California Public Utilities Code Section 399.11 et seq. *Id*. at n.2.

2. The CPUC implements and administers RPS compliance rules for California's retail sellers of electricity, and this includes establishing the terms and conditions of procurement. Dkt. No. 130 ¶ 9.

3. Re-MAT is a market-based RPS program that provides a feed-in tariff for renewable generators sized up to 3 megawatts. Dkt. No. 130 ¶ 11. A feed-in tariff is a policy mechanism designed to accelerate investment in and deployment of renewable energy, and it achieves this by offering long-term contracts to renewable energy producers. *Id*. ¶ 12.

4. The Re-MAT program became operational in October 2013. Dkt. No. 130 ¶ 17.

---

[1] *See also Stewart v. RCA Corp.*, 790 F.2d 624, 629 (7th Cir. 1986) ("Stewart's complaint did not request a jury trial. If the judge was entitled to resolve disputes at trial, he was entitled to try a single issue under Fed. R. Civ. P. 42(b). There is little point in holding a full trial if a surgical approach can cut away needless disputes. A judge on top of a case can identify dispositive issues, and often these issues can be tried quickly and economically. Thoughtfully used, the trial limited to a single issue can assist litigants, witnesses, and courts alike."); *United States v. Berry*, 862 F.2d 567, 568 (6th Cir. 1988) (affirming district court's grant of United States' motion for summary judgment, "which the district court held in abeyance pending an evidentiary hearing").

[2] This document, defendants' unretained expert report of CPUC employee Cheryl Lee, was admitted as Trial Exhibit 113. Dkt. No. 144 at 8-9; Trial Tr. at 223:10-18.

5. The Re-MAT program offers three different prices for each of these different product types: (1) baseload (*i.e.*, providing firm energy deliveries at all hours; *e.g.*, geothermal), (2) peaking as-available (*i.e.*, providing non-firm energy deliveries during peak use hours; *e.g.*, solar), and (3) non-peaking as-available (providing non-firm energy deliveries during non-peak use hours; *e.g.*, wind and hydro). The prices for each product type also vary by the utility making the purchase. Dkt. No. 130 ¶¶ 20-24.

6. Within each of these categories, the price (again, by utility and by method of energy generation) can change based on what is essentially an auction that is held every two months. Dkt. No. 130 ¶¶ 40-43; Trial Tr. at 36:16-37:4.

7. After every two-month program period, the Re-MAT price can be adjusted in $4/MWh increments (up to $12/MWh) up or down based on the outcome and price adjustments of the previous program period. The price is designed to respond to changes in generator interest and costs to construct and operate generation facilities, which are understood to be "market supply signals." If there is decreased generator interest in accepting the offer price, the price is adjusted upward to encourage more generators to enter the market; conversely, when more generators are willing to sell at the offer price, the Re-MAT price is adjusted downwards so that ratepayers can benefit from what appear to be increased supply and falling prices. Dkt. No. 130 ¶¶ 40-42; *see also* Dkt. No. 153 ¶ 18 ("Under the design of the Re-MAT program, after the price for the initial program period is set, the price for subsequent periods will adjust up or down based on QFs' willingness to accept the previous period's offer price.").

8. If at least five unaffiliated projects are in the utility's product category queue and the total capacity of the price-accepting project applicants is < 20% of the capacity allocation in that period, then the price is adjusted upward by $4/MWh. If at least five unaffiliated projects are in the utility's product category queue and the total capacity of the price-accepting project applicants is ≥ 100% of the capacity allocation in that period, then the Re-MAT price is adjusted downward. If the two conditions for either increasing or decreasing the price do not exist, then the price stays the same for the next program period. Dkt. No. 130 ¶¶ 41-43; *see also* Dkt. No. 153 ¶¶ 19-21.

9. The size of the price adjustment (between $4/MWh to $12/MWh) depends on the number of consecutive program periods for which the increase or decrease conditions have been met, and whether or not a contract has been executed in the prior period. Dkt. No. 130 ¶ 45.

10. There was no reasoned basis for CPUC's choice of increments in multiples of $4 for these price adjustments as opposed to any other number; the size of these price adjustments was arbitrary. Trial Tr. at 179:13-180:7.

11. As the CPUC's own expert declared, the "adjustment component of the ReMAT program ensures that IOUs are not entering into contracts on their ratepayers' behalf that are higher than the market price, while also not setting a price that is lower than what the market will bear." Dkt. No. 130 ¶ 46; *see also* Trial Tr. at 182:13-21 (idea behind Re-MAT price adjustments is that ratepayers "should pay no more than the market or . . . opportunities to procure a similar product elsewhere.").

12. During PG&E's first Re-MAT program period, the offer price for peaking as-available facilities like Winding Creek was $89.23 per megawatt hour. Dkt. No. 153 ¶ 16; Dkt. No. 156 ¶ 8; Trial Tr. at 36:1-7. The CPUC established $89.23 as the starting price based on the most recent Renewable Auction Mechanism solicitation at the time of the Re-MAT program's adoption. $89.23/MWh was the weighted average of each of the investor-owned utilities' highest-priced executed Renewable Auction Mechanism contracts. Dkt. No. 130 ¶¶ 38-39; *see also* Dkt. No. 153 ¶¶ 16-17. Since then, the price has changed based on the auction mechanism described above, and it has consistently fallen over time.

13. Re-MAT contracts are long-term contracts of 10, 15 or 20 years in duration. The price is fixed for the entire length of the contract, with an all-in (or combined) capacity, energy and renewable energy credit payment based on the offered price, which is adjusted by time-of-delivery factors based on time of year and day that the electricity is generated. Dkt. No. 130 ¶ 32. The contract price and time-of-delivery factors are known at the time of contract execution and they do not change. *Id.* ¶ 49.

14. It is undisputed that the Re-MAT program caps the amount of energy a utility must procure through it. There is a statewide program cap of 750MW for all publicly owned utilities.

8

1  Dkt. No. 130 ¶ 15; *see also* Dkt. No. 153 ¶ 5 ("California has placed a 750 MW overall cap on the quantity of Qualifying Facility generation utilities are obligated to purchase under the Re-MAT program.").

15. Public Utilities Code § 399.20(f) sets the program cap and how the MWs are to be allocated among California's three largest investor-owned utilities. Dkt. No. 130 ¶ 25 & n.7. The 750 MW is allocated among the utilities proportionate to their customers' share of the state-wide peak electricity demand. Dkt. No. 153 ¶ 6.

16. PG&E's share of the total cap is 218.8MW. Dkt. No. 130 ¶ 25; Dkt. No. 153 ¶ 7. This program capacity is then divided equally among the three product categories: as-available peaking, as-available non-peaking, and baseload. Dkt. No. 130 ¶ 26; Dkt. No. 153 ¶ 9. So for peaking as-available QFs like Winding Creek's proposed solar facility, PG&E's total purchase obligation under the Re-MAT is 49.949 MW. Dkt. No. 153 ¶ 10.

17. PG&E offers a limited amount of MWs in every Re-MAT program period. Each Re-MAT program period is two months in duration, and the predetermined maximum amount that PG&E may offer in each period is 5 MWs. Dkt. No. 130 ¶¶ 29-30; Dkt. No. 153 ¶ 12 ("the Re-MAT program also places a cap of 5 MW on PG&E's procurement obligation for each category of QF in each program period").

18. The soonest that PG&E's Re-MAT program can be fully subscribed in the peaking as-available category is approximately July 2018. Dkt. No. 130 ¶ 3.

## II. THE STANDARD CONTRACT

19. The Standard Contract for QFs of 20 MW or less is a product of the QF Settlement, which resolved years of litigation between QFs and their trade associations, utilities, the CPUC and other parties. Dkt. No. 156 ¶¶ 17, 19. The agreement settled disputes over the terms and availability of contracts between QFs and utilities, and took effect in December 2010. Dkt. No. 153 ¶ 32.

20. Winding Creek is not a party to the QF Settlement. Dkt. No. 156 ¶ 18; Dkt. No. 153 ¶ 33. It can, however, enter into a Standard Contract if it so desires. Trial Tr. at 38:17-19.

21. The average term for a Standard Contract is 10 years. Trial Tr. at 41:1-4; *see also id*. at 111:8-12 (term can be up to 7 or 12 years).

22. The pricing for the Standard Contract has two components -- one for capacity, for which the price is fixed, and another for energy. Trial Tr. at 22:4-23; Dkt. No. 156 at ¶¶ 20-21. The capacity payment is essentially a payment for the amount of energy a facility could deliver at any given time, as having that energy available to it increases a utility's ability to meet an increased demand for electricity more quickly. Trial Tr. at 21:4-15. The energy payment on the other hand is for the actual energy that is delivered from the QF to the utility. *Id*. at 21:16-18. For intermittent resources like solar, it is the energy component that counts for probably 80 percent of the revenues. *Id*. at 42:13-15.

23. The energy price for the Standard Contract is a formula rate for which some inputs are known, but at least three of the inputs are not known at the time the contract is signed. Trial Tr. at 22:4-23. The three market-based variable inputs are: a gas index (or burner tip gas price), a market heat rate, and a location adjustment factor. Dkt. No. 156 ¶ 21. (The other three inputs for the formula are: variable operations and maintenance, a time of use factor, and greenhouse gas compliance costs. Dkt. No. 153 ¶ 38.)

24. The burner tip gas price is essentially the price for natural gas, which can vary significantly over time. Trial Tr. at 35:18-20, 27:8-25. The gas input is based on a monthly index updated on the first business day of each month, based on the last week of the previous month. Dkt. No. 156 ¶ 21; Dkt. No. 153 ¶ 42.

25. The market heat rate is a measure of the efficiency of the assumed avoided gas-fired generator. Trial Tr. at 35:7-9. The market heat rate varies monthly and its value for purposes of the formula is updated on the 5th business day of each month. Dkt. No. 153 ¶ 41.

26. The third key variable is the locational difference. Trial Tr. at 28:17-19. That factor is based on locational marginal prices, and consequently does not yet exist for an unbuilt facility like the Lodi facility at issue in this case. Trial Tr. at 29:3-23. The location adjustment factor is a site-specific factor that varies to reflect the fact that the cost of energy from a particular

1  location varies due to changes in the local energy markets. It varies monthly and is identified 30

2  days after generation occurs and is then applied to the prior month's payment. Dkt. No. 153 ¶ 43.

3      27.     This formula is the only way that the price of energy is calculated for a QF under

4  the Standard Offer Contract. Trial Tr. at 34:9-15. The output of the formula can exhibit

5  significant volatility over time. Trial Tr. at 30:9-31:21.

6      28.     The CPUC cannot say what the output of the formula, *i.e.*, the energy price, will be

7  for any given time in the future during a utility's contract period with a QF without knowing how

8  the variables will be filled in on a month-by-month basis with actual market data. Trial Tr. at

9  116:13-17.

10      29.     Procurement through the Standard Contract for QFs 20MW or Less is not capped.

11  Dkt. No. 156 ¶ 19.

## III. WINDING CREEK

13      30.     Plaintiff Winding Creek Solar LLC is a developer of solar generating facilities and

14  currently seeks to develop a 1-megawatt solar generating facility in Lodi, California. Dkt. No. 156

15  ¶ 1; Dkt. No. 153 ¶ 1.

16      31.     During PG&E's first Re-MAT program period, when the offer price was $89.23

17  per megawatt hour, Winding Creek could not participate because it was not among the projects at

18  or near enough the head of the queue. Dkt. No. 156 ¶ 8. The order for this first queue was

19  determined randomly for all the generators that had submitted timely applications; subsequently

20  the queue has formed on a first-come, first-served basis. Dkt. No. 153 ¶ 14. For each program

21  period, PG&E proceeds in order of the queue, asking each generator if it will accept a contract at

22  the program price for that period. *Id.* ¶ 15.

23      32.     Winding Creek was offered a contract at $77.23/MWh in March 2014, but it

24  declined. It was offered another contract at $65.23/MWh in May 2014, but Winding Creek

25  declined that also. Dkt. No. 156 ¶ 9; Dkt. No. 153 ¶ 30. Winding Creek has since remained

26  eligible during every Re-MAT period to accept an offer but it has chosen not to do so. Dkt.

27  No. 156 ¶¶ 9, 15. Winding Creek currently occupies the first place in PG&E's Re-MAT queue for

28  peaking as-available facilities. Dkt. No. 153 ¶ 31.

11

1          33.     Winding Creek has the option of entering into a Standard Contract if it so desires. Trial Tr. at 38:17-19.

# SUMMARY JUDGMENT

## I.  LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, a "party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The party moving for summary judgment always bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party also bears the ultimate burden of proof at trial, it can meet this initial burden by "com[ing] forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). When the moving party does not bear the ultimate burden of proof, it can meet its initial burden on summary judgment by "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden of production has been met by the moving party, the burden then shifts to the nonmoving party to "produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also C.A.R.*, 213 F.3d at 480. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103 (citing *Celotex*, 477 U.S. at 322). Conversely, if the nonmoving party "produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id.*

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict" for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id.* at 248-49. To determine

whether there exists a genuine dispute as to any material fact, a court must view the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in that party's favor. *Id*. at 255. A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

In resolving a summary judgment motion, it is not the Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotations omitted). Rather, it is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." *Id*.; *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## II. THE RE-MAT PROGRAM IS NOT COMPLIANT WITH PURPA

Despite the complex regulatory and factual background here, the key legal issues turned out to be straightforward, and the scope of the parties' actual dispute quite narrow. As an initial matter, the Court concludes that the Re-MAT Program is not PURPA-compliant in at least two independent ways. Defendants implicitly recognize this non-compliance in the heavy emphasis they place on the Standard Contract Program.

One area of Re-MAT's non-compliance is the program cap. It is undisputed that the CPUC imposed a 750 MW statewide cap for the program overall, which is further subdivided into a 5 MW cap for PG&E for each category of QF in each Re-MAT program period. *See* Findings of Fact and Conclusions of Law ("FFCL"), *supra*, ¶¶ 14-17. At the same time, it is also undisputed that PURPA and the implementing FERC regulations contain a "must-take obligation" -- a mandatory purchase obligation on the part of utilities to buy "any energy and capacity which is made available from a qualifying facility" -- which remains in place for facilities like the Lodi facility. *See* p. 2, *supra*; *see also* 16 U.S.C. § 824a-3(a), 18 C.F.R. § 292.303(a)(1), and Trial Tr. at 130:14-131:7. The plain meaning of this requirement is that utilities must buy all of the energy and capacity offered by QFs. It does not require significant legal analysis to conclude that CPUC's imposition of caps in the Re-MAT program violates the must-take obligation.

13

1       The other area of non-compliance involves pricing.  Here, too, the Court finds that the
2   issue is straightforward.  Prices generated by the Re-MAT program's reverse auction procedure do
3   not satisfy the definition of "avoided costs" in FERC's regulations.  Under 18 C.F.R.
4   § 292.101(b)(6), "avoided costs" means "the incremental costs to an electric utility of electric
5   energy or capacity or both which, but for the purchase from the qualifying facility or qualifying
6   facilities, such utility would generate itself or purchase from another source."  PURPA itself
7   requires that in prescribing rules for utilities to purchase electric energy from a qualifying facility,
8   the rates may not "exceed[] the incremental cost to the electric utility of alternative electric
9   energy."  16 U.S.C. § 824a-3(b).  The "incremental cost of alternative electric energy" is in turn
10  defined as "the cost to the electric utility of the electric energy which, but for the purchase from [a
11  QF], such utility would generate or purchase from another source."  16 U.S.C. § 824a-3(d).
12      In light of these definitions, it would make sense to look to a spot market price or similar
13  indicator for electricity.  It makes much less sense to use a complex auction procedure burdened
14  with arbitrary rules, such as a randomly selected two-month time period (as opposed to any other)
15  and price adjustments applied in $4 increments -- a method that even the CPUC witness
16  acknowledged was without a reasoned basis.  *See* FFCL ¶¶ 5-10.  The reverse auction procedure
17  strays too far from basing prices on a utility's but-for cost, which the statute and regulations
18  require.

### III. THE STANDARD CONTRACT DOES NOT EXCUSE RE-MAT NON-COMPLIANCE

21      Because Winding Creek has shown the Re-MAT program's non-compliance on these two
22  requirements, the burden shifts to defendants to demonstrate why summary judgment should not
23  be entered for Winding Creek.  They do not meet their burden.
24      As defendants acknowledge, only two programs are at issue in this case:  "The CPUC has
25  developed numerous programs that are compliant with [PURPA], but have identified only two of
26  these programs for which WCS can qualify:  the Renewable Market Adjusting Tariff (Re-MAT)
27  program; and the Standard Contract for QFs 20 MW or Less."  Dkt. No. 156 ¶ 5 (citing Lee
28  Unretained Expert Report, ¶¶ 55-59).  Defendants' primary defense in this case is that the

Standard Contract satisfies PURPA, and so the CPUC is free to have additional programs that are not PURPA-compliant, including a non-compliant Re-MAT Program. Dkt. No. 90. That point makes some analytical sense, and for summary judgment purposes the Court accepts it as true. But it does not save defendants because they have not shown that PURPA and its implementing FERC regulations are fully satisfied through the Standard Contract in and of itself, or even in combination with Re-MAT.

Here is why. The text of 18 C.F.R. § 292.304(d)(2) clearly states that, "at the option of the qualifying facility exercised prior to the beginning of the term," the QF may sell energy or capacity at a rate determined by either "(i) [t]he avoided costs calculated at the time of delivery; or (ii) [t]he avoided costs calculated at the time the obligation is incurred." Winding Creek agrees that the Standard Contract provides a rate based on an "avoided cost." *See* Dkt. No. 153 ¶ 35 ("The rate contained in the Standard Contract is an 'avoided cost' rate, which is defined as a cost that the utility would otherwise incur if it had to buy power from a non-QF source."). But the Standard Contract does not -- and cannot -- offer both of the pricing options that PURPA gives to QFs.

The evidence against the CPUC emerges directly from the defendants' own trial testimony and post-trial submissions. At trial, Michael Colvin, a CPUC employee, expressly testified that the Standard Contract complies with both 18 C.F.R. § 292.304(d)(2)(i) and (d)(2)(ii). Trial Tr. at 119:21-121:15; *see also* Dkt. No. 155 at 6. This testimony effectively acknowledged that the Standard Contract does not offer the legally required price option choice to QFs. *See* Trial Tr. at 121:10-15 (Q: "So in your mind, in your view, there is no meaningful difference between (d)(2)(i) and (d)(2)(ii) in the way that the price paid to the QF would be calculated, is that right?" A: "Correct. For purposes of this contract.").

In post-trial briefing, defendants tried to escape from this testimony by declaring Colvin to be "in error," and stating that "[t]he CPUC here concedes that the Standard Contract for 20 MW or Less is a contract under 18 C.F.R. § 292.304(d)(2)(ii), but is not a contract under 18 C.F.R. § 292.304(d)(2)(i)." Dkt. No. 155 at 6. This effort to bury Colvin's testimony is wholly unpersuasive. As an initial matter, defendants championed Colvin as an expert on contract pricing

for QFs, and relied heavily on his statements before his testimony in court. *See*, *e.g.*, Dkt. No. 134. After taking evidence about Colvin's long experience at the CPUC, and hearing his testimony on the stand, the Court has no doubt that he was a knowledgeable and competent witness who fully understood the questions posed to him and the answers he gave at trial. The Court also finds his testimony was credible. Defendants' about-face on Colvin as a witness and his testimony is not well-taken.

In addition, defendants' post-trial attacks on Colvin are all in the form of statements by lawyers and not based on evidence before the Court. A lawyer's argument does not trump a fact witness's testimony at trial. That is all the more true here because other facts undermine defendants' contentions. Under 18 C.F.R. § 292.304(d)(2), there are two pricing options that must be provided, and defendants have not identified how those two options are on offer through one or more programs that are available to Winding Creek. Defendants acknowledge, as they must, that "a single formula or pricing mechanism does not comply with both 18 C.F.R. § 292.304(d)(2)(i) and (d)(2)(ii) under PURPA." Dkt. No. 159 at 2. And yet they go on to say that both Re-MAT and the Standard Contract "satisfy 18 C.F.R. § 292.304(d)(2)(ii)." *Id*. They do not identify any program that even arguably satisfies 18 C.F.R. § 292.304(d)(2)(i). This violates PURPA and FERC's implementing regulations. *See Allco Renewable Energy Ltd. v. Mass. Elec. Co.*, 208 F. Supp. 3d 390, 398 (D. Mass. 2016) ("The MDPU rule, by providing only the spot market rate, eliminates the QF's ability to choose the latter pricing option [*i.e.*, 'calculated at the time the obligation is incurred']. As such, the MDPU rule fails to properly implement FERC's regulations, as mandated by PURPA section 210(f)(1). 16 U.S.C. § 824a-3(f)(1).").

Defendants make several post-trial arguments about why the programs available to Winding Creek still satisfy PURPA. None of them are persuasive. Defendants suggest that they need not comply with FERC regulations at all because "PURPA itself does not mandate the requirements under 18 C.F.R. § 292.304(d)(2)(i) and (ii)." Dkt. No. 155 at 6. In a similar vein, they repeatedly invoke the "broad authority and wide discretion" that should be afforded to the CPUC. *See*, *e.g.*, *id*. at 1. But as the *Allco* court noted, whatever latitude the state agency is to be given "to implement FERC's PURPA rules does not justify an implementation that plainly

16

conflicts with those rules." 208 F. Supp. 3d at 399. Our circuit has also underscored this uncontroversial principle in a case that defendants repeatedly cite. In *Independent Energy Producers Association v. California Public Utilities Commission*, 36 F.3d 848 (9th Cir. 1994), the court carefully examined FERC's regulations and concluded that a CPUC program is preempted "under federal law" citing to a FERC regulation. *See* 36 F.3d at 859 (concluding that CPUC program is "also preempted under federal law. *See* 18 C.F.R. § 292.303(c)"). Even the snippet defendants quote from a Supreme Court case states that a State commission can comply with PURPA "by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action *reasonably designed to give effect to FERC's rules*." *FERC v. Mississippi*, 456 U.S. 742, 751 (1982) (emphasis added; quoted by defendants at Dkt. No. 155 at 1). FERC's regulations undeniably carry the force of law, and defendants are not free to ignore them just because the regulatory requirements do not appear in the text of PURPA itself.

Defendants also make much of two FERC decisions that addressed Winding Creek's challenges to the Re-MAT program. *See*, *e.g.*, Dkt. No. 155 at 7 (citing *Winding Creek Solar LLC*, 151 FERC ¶ 61,103, 2015 WL 2151303 (May 8, 2015), and *Winding Creek Solar LLC*, 153 FERC ¶ 61,027, 2015 WL 6083932 (Oct. 15, 2015)). These decisions do not speak to the salient issues here. The May 2015 "Notice of Intent Not to Act and Declaratory Order" simply states that the Standard Contract provides a "long-term PURPA contract at an avoided cost rate." 2015 WL 2151303, at *2. And the October 15, 2015 "Order Denying Request for Reconsideration" states that FERC sees no reason to change its prior decision that "the Re-MAT program is consistent with PURPA, because it is an alternative to a primary PURPA program, the Standard Contract for QFs 20 MW or Under, which is consistent with PURPA." 2015 WL 6083932, at *2. Neither order even mentions, let alone meaningfully discusses, the two pricing options that are required under 18 C.F.R. § 292.304(d)(2)(i) and (ii), or how the Standard Contract, the Re-MAT program, or some combination of the two, satisfies those requirements. And because the FERC decisions are consequently not germane, the Court finds that it need not reach questions of the level of deference it must afford to these decisions.

Rather than attempting to show how the Standard Contract (by itself or with the Re-MAT program) might satisfy the price option requirements for QFs, defendants actually put both programs -- the only programs available to Winding Creek -- in the same pricing category, and then insist that the CPUC need not satisfy the regulations at all. This is a misguided approach and the Court rejects it. As a consequence, defendants' argument that it does not matter that the Re-MAT program is not PURPA-complaint because the Standard Contract already does all that is required under PURPA must also be rejected.

Returning to the cap issue, there is no dispute that participation in the Re-MAT program is capped. Participation in the Standard Contract program is not capped. But because the Standard Contract program does not by itself fully satisfy the pricing requirements under PURPA, the absence of caps in the Standard Contract program does not give the CPUC leeway to violate PURPA with a Re-MAT cap. Put differently, even if the Standard Contract program and the Re-MAT program in combination provided the two different pricing options under 18 C.F.R. § 292.304(d)(2)(i) or (d)(2)(ii), that would not be enough because of the Re-MAT program's caps. Winding Creek does not, as the law mandates, have access to an uncapped program offering, at its election, either a rate under 18 C.F.R. § 292.304(d)(2)(i) or (d)(2)(ii). Consequently, defendants have not carried their burden against summary judgment for Winding Creek.[3]

## IV.   STANDING AND ADMINISTRATIVE EXHAUSTION

Defendants have again raised Article III standing and administrative exhaustion arguments, which were previously denied and are denied again here. Defendants say that "WCS could have accepted an offer of $77.23/MWh on March 1, 2014, and it declined to do so," and argue on that basis that "self-inflicted harm is not an injury for constitutional standing purposes." Dkt. No. 155

---

[3] Defendants' motion to reopen the summary judgment proceedings is denied. Dkt. No. 131. The request is based on "newly-understood facts that (1) plaintiff Winding Creek Solar LLC (WCS) will not face a cap on PG&E's Re-MAT program for at least sixteen months, and (2) the Re-MAT program's performance demonstrates that solar developers will accept Re-MAT contracts at lower avoided cost rates as their costs have fallen." *Id.* at 1. These arguments have no bearing on the issues that drive the Court's resolution of Winding Creek's summary judgment motion. Winding Creek has shown that it is being denied an option to sell energy to PG&E on terms required by federal law. That other solar developers have opted not to complain about the same options has no bearing on Winding Creek's correctness in doing so.

at 21-22. This is nothing more than an ill-taken request for reconsideration of the Court's prior standing decision. The Court has already found that Winding Creek has Article III standing for this litigation. *See* Dkt. No. 75 at 11-12 (finding sufficient plaintiff's allegations that its lost "opportunity to enter into a contract with [PG&E] on terms required by federal law" is its injury in fact, as well as the allegation that the "current impermissible price offered . . . 'is the only remaining barrier to plaintiff's ability to obtain the financing needed to construct the Lodi facility"). Defendants make no effort to establish a proper basis for reconsideration of this ruling, *see* Civil L.R. 7-9, and the Court declines to do so.

Defendants also raise an administrative exhaustion argument against Winding Creek's "attack" on the Standard Contract. Dkt. No. 159 at 5. In general, PURPA provides qualifying facilities with the right to file suit in the United States district courts if State agencies like the CPUC fail to properly implement FERC's rules. 16 U.S.C. § 824a-3(h)(2)(B). But this right to file suit arises only after the "electric utility, qualifying cogenerator or qualifying small power producer" has first "petition[ed] the Commission [*i.e.*, FERC] to enforce the requirements of subsection (f)" and FERC has not initiated an enforcement action itself within 60 days of the petition. *Id.* Defendants believe that "WCS's failure to challenge the validity of the CPUC's primary PURPA program pursuant to 18 C.F.R. § 292.301 raises a new failure of WCS to exhaust its administrative remedies." Dkt. No. 159 at 5.

This is unavailing. The Standard Contract is not a program Winding Creek affirmatively challenged in the first instance. Rather, it became an issue in the case -- and plaintiff raised a challenge to it -- only because defendants put the program forward in opposition to Winding Creek's summary judgment motion. There is no administrative exhaustion bar here.

## V. RELIEF

Consequently, on the record before the Court, summary judgment is appropriate for Winding Creek. The question of relief is now ripe. Winding Creek asks the Court to find that it is entitled to a contract with PG&E under the Re-MAT program at the initial offering price of $89.23/MWh. *See* Dkt. No. 154 at 16 (requesting that the Court order "the CPUC to award Winding Creek with a contract for $89.23 per MWh").

That goes too far. There is a difference between an implementation claim and an as-applied challenge. *See Solutions for Utilities, Inc v. Cal. Pub. Util. Comm'n*, No. CV 11-04975 SJO (JCGx), 2016 WL 7613906, at *15 (C.D. Cal. Dec. 28, 2016) ("An implementation claim is a claim that a state agency has failed to implement FERC's PURPA regulations or has implemented them in a way that is inconsistent with FERC's regulations. Such claims are brought in federal court . . . . Meanwhile, an as-applied claim challenges the application of a state agency's rules to an individual petitioner and is reserved to the state courts.") (quotations omitted); *see also Allco*, 208 F. Supp. 3d at 397 ("Allco's remedy for the MDPU's allegedly improper implementation of the FERC regulations is an implementation claim against the MDPU and, once the FERC regulations are properly implemented by the state, an as-applied claim against the utility to enforce the state implementation.").

In this case, while an implementation challenge was properly brought and is now upheld, the request for a specific contract at a specific price is an as-applied challenge that does not belong in this forum. The Court grants only the declaratory and injunctive relief requested by plaintiff (Dkt. No. 61 at 24, Prayer for Relief, subsections (a)-(d)), and goes no further.

## CONCLUSION

Summary judgment is granted for plaintiff and against defendants.

**IT IS SO ORDERED.**

Dated: December 6, 2017

JAMES DONATO
United States District Judge